# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------- x

In re                                   :   Chapter 11

East West Resort Development V, L.P., L.L.L.P.,   :   Case No. 10-_____ (_____)
*et al.*,[1]

                                      :   (Joint Administration Pending)

             Debtors.               :

--------------------------------------------------------------- x

## AFFIDAVIT OF CRAIG FERRARO
## IN SUPPORT OF FIRST DAY MOTIONS

STATE OF COLORADO      )
                              )   ss
COUNTY OF EAGLE        )

1.       I am the Vice President, Treasurer and Secretary of HF Holding Corp. ("HF Holding"). HF Holding is the general partner of East West Resort Development V, L.P., L.L.L.P. ("EWRD V"), a holding company that owns, directly or indirectly, a majority of the membership interests or stock of each of the above-captioned debtors and debtors in possession (the "Debtors" or the "Company") in these chapter 11 cases. Specifically, EWRD V is the manager of Debtors Tahoe Club Company, LLC ("Club Company LLC"), Tahoe Mountain Resorts, LLC ("Mountain Resort LLC"), Gray's Station, LLC ("Gray's LLC"), Old Greenwood,

---

[1] The Debtors are the following 12 entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): East West Resort Development V, L.P., L.L.L.P., a Delaware limited partnership registered as a limited liability limited partnership (9275), NMP Holdings, LLC, a Delaware limited liability company (9716), Northstar Mountain Properties, LLC, a Delaware limited liability company (0823), Northstar Iron Horse, LLC, a Delaware limited liability company (1031), Northstar Big Horn, LLC, a Delaware limited liability company (1132), Northstar Village Townhomes, LLC, a Delaware limited liability company (7166), Northstar Trailside Townhomes, LLC, a Delaware limited liability company (7251), Old Greenwood, LLC, a Delaware limited liability company (3812), Old Greenwood Realty Inc., a California corporation (4355), Gray's Station, LLC, a Delaware limited liability company (8308), Tahoe Mountain Resorts, LLC, a Delaware limited liability company (0093), and Tahoe Club Company, LLC, a Delaware limited liability company (5142). The address of each of the Debtors is 126 Riverfront Lane, 5th Floor, PO Drawer 2770, Avon, Colorado 81620.

LLC ("Greenwood LLC") and NMP Holdings, LLC ("NMPH"). NMPH, in turn, is the manager of Debtor Northstar Mountain Properties, LLC ("NMP"), which in turn is the manager of Debtors Northstar Iron Horse, LLC ("Iron Horse LLC"), Northstar Big Horn, LLC ("Big Horn LLC"), Northstar Trailside Townhomes, LLC ("Trailside Townhomes LLC") and Northstar Village Townhomes, LLC ("Village Townhomes LLC"). Debtor Old Greenwood Realty, Inc. ("Realty Inc.") is 100% owned by Greenwood LLC. As Vice President, Treasurer, and Secretary of HF Holding, I am authorized to sign the chapter 11 petitions for relief on behalf of each of the Debtors. I also serve as the Chief Financial Officer and Vice President of East West Partners, Inc. (which is not itself a debtor in these chapter 11 cases) (together with its affiliates, "East West"), a development company which manages the business, properties and day-to-day operations of the Debtors. I have served in such capacities since August 2000. I began my career in Public Accounting where I worked over a five year period as a CPA at Touche Ross. Immediately prior to joining the Debtors in August 2000, I was the Chief Financial Officer of Aspen Skiing Company. I earned a B.A. in Business Administration from the University of Colorado and an MBA from the University of Pennsylvania Wharton School. After receiving my MBA, I returned to Colorado and worked in a variety of financial and operating positions for public and private companies in Denver and Aspen.

2.      I am generally familiar with the day-to-day operations, business affairs and books and records of each of the Debtors. I submit this affidavit (the "Affidavit") to assist the Court and other parties in interest in understanding (i) the circumstances that led to the filing with this Court of the voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on February 15, 2010 (the "Petition Date") and (ii) the relief that the

LEGAL_US_W # 63383651.20
RLF1 3538040v.1

Debtors have requested of the Court through several motions (the "First Day Motions") that have been filed by the Debtors.

3.      The First Day Motions are intended to enable the Debtors to operate effectively and efficiently during these chapter 11 cases, as well as to avoid certain adverse consequences that might otherwise result from the commencement of such cases. Among other things, the First Day Motions allow the Debtors to (i) stabilize their business operations, (ii) preserve their critical relationships with lenders, joint venture, equity partners, individuals working for the Debtors and other key stakeholders, including, perhaps most critically their club members, (iii) limit disruption through the continued use of the Debtors' pre-petition systems and operations, (iv) continue the Debtors' on-going development efforts so as to eliminate any disruption to Debtors' operations for the benefit of their lenders and other creditors, (v) establish numerous administrative procedures to allow a "smooth landing" into bankruptcy and (vi) perhaps, most critically, allow for a quick and successful emergence from chapter 11. As discussed below, I have reviewed the First Day Motions, and it is my belief that the relief sought in such motions is necessary to: (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operation of, the Debtors' business; (b) maximize and preserve the value of the Debtors' chapter 11 estates and (c) allow for a successful emergence from chapter 11.

4.      Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents and information, my discussions with the Debtors' management team and its professional advisors and my opinion based upon my experience and knowledge. If called upon, I could and would testify competently to the facts set forth herein. I am authorized to submit this Affidavit on behalf of the Debtors.

LEGAL_US_W # 63383651.20
RLF1 3538040v.1

5. Part I of this Affidavit provides an overview of the business operations and a summary of financial results. Part II provides a description of the corporate and debt structures. Part III provides a discussion of the events that compelled the commencement of these chapter 11 cases, as well as the Debtors' plan for these cases. Part IV discusses the facts that support the relief requested in the First Day Motions.

## Part I
## Overview of the Debtors' Business

6. EWRD V is a partnership formed to develop residential and commercial real estate projects on and around Northstar-at-Tahoe Resort (the "Northstar Resort"), a residential development and year-round resort community located in North Lake Tahoe/Truckee area of California.

7. EWRD V has co-developed four unique residential communities on fully-entitled land that provide a year-round resort experience: Northstar Village, Northstar Highlands, Old Greenwood and Gray's Crossing (collectively, the "Development" or the "Projects").

- Northstar Village – a family-oriented ski village located at the base of Northstar Mountain. Completed phases include 12 townhomes and 213 condominium units in six buildings, and associated retail and dining amenities.

- Northstar Highlands – currently consisting of 16 distinguished ski-in/ski-out townhomes, with significant opportunity for future townhomes and condominiums, located mid-mountain on the slopes of Northstar Mountain and adjacent to the recently-completed Ritz-Carlton Hotel and Residences.

- Old Greenwood – a four season resort community located in Truckee, California featuring a Jack Nicklaus signature golf course.

- Gray's Crossing – located adjacent to Old Greenwood, consisting of four neighborhoods featuring a Jacobsen-Hardy golf course.

In addition, as discussed below, EWRD V owns the Tahoe Mountain Club (the "Tahoe Club"), which offers a range of year-round services and amenities to property owners within the four

4

communities.

8. An affiliated (but separately capitalized) partnership, East West Resort Development IX, L.P., L.L.L.P. ("EWRD IX"), through its subsidiaries, owns *The Ritz-Carlton Highlands, Lake Tahoe Hotel and Residences*, Lake Tahoe's first five-star luxury hotel which recently opened on December 9, 2009 (the "Ritz Hotel"). The Ritz Hotel is comprised of 170 hotel rooms, 23 Ritz-Carlton (full-ownership) condominium residences housed on the upper floors of the Ritz Hotel (the "Ritz Residences"). The Ritz Hotel includes, among other things, a world-class spa, several pools, restaurants, lounges and shops, and 11,000 square feet of meeting and event space all connected by a gondola to the Village Plaza. Pursuant to a series of agreements between NMP and The Ritz-Carlton Hotel Company, LLC (the "Ritz Company"), the Ritz Company is the exclusive operator of the Ritz Hotel and earns an operator fee based upon a percentage of the revenue generated from the Ritz Hotel.

9. Land adjacent to the Ritz Hotel is slated for development of additional Ritz-Carlton branded residences, with plans for 61 units in two phases. Approximately $32 million of costs benefiting such future phases has already been invested.

10. An additional separately capitalized partnership, East West Resort Development XII, L.P., L.L.L.P. ("EWRD XII"), has developed a Hyatt-branded fractional and whole ownership property in the Northstar Village. Neither EWRD IX nor EWRD XII are Debtors in these cases.

### A. The Northstar Village

11. The Northstar Village is a year-round premier ski-in/ski out community located at the base of Northstar Mountain. Completed phases include 12 townhomes in the Northstar Village Walk area of the Northstar Village which have all been sold, 100 condominiums in three lodge buildings in the Iron Horse area of the Northstar Village which have all been sold, 113

5

condominiums in three lodge buildings in the Big Horn area of the Northstar Village which have been sold, and 60,000 square feet of commercial space. The commercial space includes a variety of shopping options, galleries, and cafes and restaurants all centered around a plaza complete with a 9,000 square foot skating rink (the "Village Plaza"). Northstar Village also includes 34 condominiums developed as a Hyatt-branded fractional and whole ownership project. To date, 29 fractions have been sold in this project.

### B.     Northstar Highlands

12.     Northstar Highlands is a year-round ski-in/ski-out community located mid-mountain on the slopes of Northstar Mountain. Completed phases include the Ritz Hotel and 16 townhomes in eight (8) duplexes in the Trailside area of the Northstar Village (the "Trailside Townhomes"), of which 12 have been sold and four are currently under contract in the aggregate amount of $14.4 million. The four townhomes under-contract are owned by EWRD V, through its subsidiaries.

13.     EWRD V, through its subsidiary, NMP, also owns approximately 335 acres of undeveloped acres at Northstar Highlands, with rights to develop approximately 1,100 units on such land. NMP currently has the only entitled land in the region available for future ski-in/ski-out development. Significant infrastructure and design work with original cost of approximately $100 million has been completed for future phases.

### C.     Old Greenwood

14.     Old Greenwood is a fully-entitled master planned 923-acre year-round community located in Truckee, California, just ten minutes from Northstar Mountain. Completed phases include the 18-hole Jack Nicklaus Signature Golf Course, recognized by GOLF Magazine as one of the 10 best new public-access courses in America, 100 single-family golf course home sites, 15 golf course villas, and 146 luxury fractional residences (83 of which

6

are built).  Since 2005, all home sites and golf course villas have been sold.  To date, 936 fractions have closed for $109.6 million.

### D.  Gray's Crossing

15.  Gray's Crossing is a 765-acre single-family home community located adjacent to Old Greenwood which is built around a members-only, 18-hole Peter Jacobsen/Jim Hardy Golf Course, and consists of four distinct neighborhoods: The Bluff's, The Ridge, The Woods, and The Meadows.  The Gray's Crossing community includes 376 single family lots, of which 294 have been sold to date and 82 remain in inventory.  Approximately 418 acres of Gray's Crossing's property is permanent open space with six miles of hiking, biking and nature trails.

### E.  The Tahoe Club

16.  Ownership in any of the properties within the Development includes membership in the Tahoe Club, a year round, non-equity club that offers homeowners access to amenities totaling $100 million, including, among other things, state-of-the-art fitness facilities, three signature golf courses and clubhouses (one Jack Nicklaus, one Peter Jacobsen/Jim Hardy and one Brad Bell), a private ski lounge (Alpine Club), and fine members-only dining at the Wild Goose restaurant and the Schaffer's Camp restaurant located at an on-mountain lodge at the top of the Northstar Mountain (the "Northstar Lodge").  The filing of these chapter 11 cases will not affect the rights of Tahoe Club members.

### F.  Key Relationships

17.  The Development is the vision of East West and Harry H. Frampton III, chairman, founder and 100% owner of East West.  For more than 24 years, East West, a veteran developer of award-winning resorts, has pioneered the master planned community concept by providing its customers with unparalleled vacation and homeownership experiences in the most sought-after resort environments, with world class amenities to match.  Since its inception, East West has

7

developed over $2 billion of residential and commercial real estate in Colorado, California, Utah and South Carolina.

18.      East West's investment partner, Crescent Resort Development, Inc. ("CRDI"), has invested over $1 billion since its partnership with East West commenced more than 15 years ago.  CRDI is a wholly owned subsidiary of Crescent Real Estate Equities Company ("CRE"), a real estate investment trust ("REIT") that owns office buildings and resort developments across the country.  In addition to completed residential projects, CRE and East West have also made other substantial investments in the development of associated infrastructure in the Development which include current investment in excess of $150 million in roads and utilities.

19.      Tahoe Mountain Resorts Lodging ("TMRL"), an East West affiliate, provides hospitality and property management services and manages the homeowner associations within the Development.  TMRL does not collect any fee from the Debtors in connection with its operations.

20.      Booth Creek Ski Holdings Inc. ("Booth Creek"), the fourth largest ski resort owner/operator in North America, currently operates the Northstar Resort under a lease with CNL Income Properties, Inc., a REIT that owns 58 properties in North America in the lifestyle and recreation sectors.

21.      Trimont Land Holdings, Inc. ("TLH") holds a 20% ownership interest in the profits and losses of NMP.  The right of TLH to receive distributions from NMP is subject to the return of invested capital to NMPH and the payment of a preferred return on such invested capital.  Due to the critical importance of NMP in the restructuring of the Debtors, it is fully contemplated that TLH will be included in negotiations of the terms of a plan of reorganization.  For these reasons, it is similarly contemplated that the Debtors will make reasonable efforts,

8

consistent with their fiduciary duties, to propose and support a plan of reorganization that will treat the right of TLH to receive certain payments contemplated in Section 5.6 of the NMP Operating Agreement in a manner acceptable to TLH.

### *Management Services and Management Fees*

22.    East West is the entity through which all of the Debtors' affairs are conducted. It provides the day-to-day management and oversight of the Debtors' operations and all decisions in respect to the Projects have been and are made by East West. East West operates throughout all of the relevant business cycles of the Debtors, from acquisition to design to construction to project management to disposition and marketing of the real properties. East West's responsibilities include, among other things, obtaining and maintaining government approvals for each of the Projects, seeking entitlements for the development of land, approving the architectural design and site plan layouts for all properties and overseeing and managing the engineering and constructions of community streets, underground utilities and mass grading at the Projects.

23.    In return for East West's management services, HF Holding or an affiliate of HF Holding, as general partner of EWRD V, is paid an annual management fee of approximately $2.2 million (the "General Management Fee"), which is comprised of a negotiated fixed fee, adjusted according to changes to the consumer price index. The terms of the General Management Fee are set forth in the Amended and Restated Limited Partnership Agreement of EWRD V, dated July 1, 2004 (as amended and supplemented, the "Partnership Agreement"). During each calendar year, the General Management Fee is paid in equal monthly installments, and the General Management Fee is allocated among the Debtors according to each Debtor's attributable portion of management services. The General Management Fee is intended to cover

9

the general and administrative costs and expenses of HF Holding and its affiliates (including East West)[2] (other than general and administrative costs of the East West entities that provide submanagement services to the Debtors as described below) with respect to all Projects undertaken by the Debtors. From the General Management Fee, certain salaries of top ranking officers of HF Holding are paid, as well as salaries of certain of HF Holding's administrative staff in Beaver Creek, Colorado. Pursuant to the Partnership Agreement, the Debtors do not otherwise reimburse HF Holding or its affiliates for their expenses in connection with managing the Development. As of the Petition Date, the Debtors are current with regard to the General Management Fee.

24.     A separate annual management fee (the "Tahoe Management Fee") is payable to East West Resorts, LLC ("Resorts LLC") for managing the Tahoe Club, pursuant to that certain asset management agreement between Club Company LLC and Resorts LLC, entered as of December 31, 2003 (as amended and supplemented, the "Management Agreement"). Club Company LLC is current with regard to the Tahoe Management Fee through the end of 2009. Pursuant to the Management Agreement, during the calendar year 2010, Club Company LLC must pay Resorts LLC $2,250,500 in quarterly installments of $562,500, on each of March 31, June 30, September 30, and December 31, 2010. The Debtors plan to renegotiate the Tahoe Management Fee during their chapter 11 cases.[3]

### Sub-Management Services and Expense Reimbursements

25.     Almost all direct and indirect general and administrative costs incurred as a result of the Debtors' operations are paid by East West and reimbursed by the Debtors in accordance

---

[2]     HF Holding and East West Partners, Inc. are 100% owned by Harry H. Frampton III.

[3]     Resorts LLC has a note payable to Crescent with a balance at December 31, 2009 of $12,463,678 and annual payments of $1,360,000. This note is dated March 30, 2001 and matures on December 31, 2011.

10

with a series of sub-management agreements between East West and the Debtors (the "Sub-Management Agreements"). The costs and expenses of operating the Debtors are directly passed through to the Debtors, i.e., there are no fees on top of the expense reimbursements made by the Debtors.

26.     East West provides personnel and insurance, among other things, to the Debtors pursuant to the Sub-Management Agreements. In fact, as of the Petition Date, no Debtors other than Realty Inc. have executive officers and none of the Debtors have employees. All actions of the Debtors are taken either through the act of an officer of HF Holding or through the act of East West as manager of the Debtors' day-to-day operations and the Projects. All persons dedicated to managing the day-to-day affairs of the Debtors are employed by East West. The salaries and other employment-related expenses associated with each of these employees are paid by East West, and East West is reimbursed by the Debtors, in accordance with the Sub-Management Agreements. These employees and the officers of HF Holding receive no cash or non-cash compensation as a result of these arrangements beyond that which they would otherwise receive from East West for the services performed by them for East West.[4]

### Summary of Recent Financial Results

27.     For the twelve months ending December 31, 2009, the Debtors had total revenues on an unaudited consolidated basis of approximately $38.7 million and total net losses on an unaudited consolidated basis of approximately $31.8 million. As of December 31, 2009, the

---

[4]     Several key employees of East West have been granted ownership interests in certain limited liability companies ("Key Employee Companies") (which are not themselves debtors in these chapter 11 cases). These Key Employee Companies hold ownership interests in certain of the Debtors which provide for distributions of profits to the Key Employee Companies after all capital and preferred return have been distributed to the other owners of the Debtors. In two cases, a Key Employee Company has a contractual right to payment from NMPH based on the amount of certain distributions made by Trailside Townhomes LLC and Village Townhomes LLC to NMP.

11

Debtors had approximately $256 million in total assets and $61 million in total liabilities, excluding approximately $189.4 million in contingent guarantee liabilities and the Debtors' obligations arising from the Bonds (as defined below) and Surety Bonds (as defined below).

## Part II
## Corporate and Debt Structure of the Debtors

### A.  Corporate Structure

28.  The bankruptcy filings include EWRD V, its wholly owned subsidiary NMPH, NMPH's partially owned subsidiary NMP, and each of the direct and indirect subsidiaries of EWRD V and NMP.  EWRD V either directly or indirectly (through its management and intermediate subsidiaries) manages, and either directly or indirectly owns a majority of the membership interests of, the following project level development companies, each of which is a debtor in these chapter 11 cases:  Iron Horse LLC, Big Horn LLC, Trailside Townhomes LLC, Village Townhomes LLC, Greenwood LLC, and Gray's LLC.  A brief description of each of the Debtors' business activities or business functions is set forth below.

(a)  EWRD V holds, directly or indirectly, a majority of the membership interests of or stock in each of the Debtors.

(b)  Gray's LLC was formed for the purpose of developing, owning, constructing, acquiring, operating and selling the properties at Gray's Crossing.

(c)  Greenwood LLC was formed for the purpose of developing, owning, constructing, acquiring, operating and selling the properties at EWRD V's managed projects.

(d)  Realty Inc. is a vehicle for conducting sales and paying sales commissions for sales of residences located at the Projects.

(e)  Club Company LLC owns the Peter Jacobsen/Jim Hardy 18-hole Golf Course, the Jack Nicklaus Signature Golf Course, the Alpine Club, swim, tennis and fitness facilities and the Schaffer's Camp restaurant.  Club Company LLC leases the remaining amenities of the Tahoe Club, including, among other things, the 18-hole Brad Bell golf course and the Wild Goose restaurant.

12

(f)    Mountain Resort LLC accumulates the marketing costs for each of the Debtors and is reimbursed by each Debtor according to each Debtor's allocated portion of marketing expenses.

(g)    NMPH is a holding company that owns 80% of the membership interests of NMP. The other 20% is owned by TLH.

(h)    NMP is the sole member and manager of Iron Horse LLC and Big Horn LLC. NMP is also the manager and a member of Trailside Townhomes LLC and Village Townhomes LLC, with 92% of the membership interests in each of these entities.

(i)    Iron Horse LLC was formed for the purpose of developing, owning, constructing, acquiring, operating and selling the properties located in the Iron Horse area of the Northstar Village.

(j)    Big Horn LLC was formed for the purpose of developing, owning, constructing, acquiring, operating and selling the properties located in the Big Horn area of the Northstar Village.

(k)    Trailside Townhomes LLC was formed for the purpose of developing, owning, constructing, acquiring, operating and selling the Trailside Townhomes in the Northstar Village. Trailside Townhomes LLC owns the four Trailside Townhomes under sales contracts in the aggregate of $14.4 million.

(l)    Village Townhomes LLC was formed for the purpose of developing, owning, constructing, acquiring, operating and selling the townhomes in the Northstar Village Walk area of the Northstar Village.

A comprehensive organization chart that shows the relationship among the Debtors is attached hereto as Exhibit A.

**B.    Debt Structure**

29.    The Debtors' borrowing is generally concentrated at the project level, with such debt often guaranteed by the parent or ultimate parent of the project level entity. The project level entities obtained loans most often secured by real property for acquisition, development and construction activities. In furtherance of such projects and in order to secure development rights, certain Debtors were required to post or guaranty certain bond obligations. As of the Petition Date, the Debtors had approximately $16.5 million of principal indebtedness outstanding,

13

excluding contingent guaranty liabilities of EWRD V and the Debtors' obligations arising from the Bonds (as defined below) and Surety Bonds (as defined below).

### *Gray's Crossing*

30. On July 16, 2007, Gray's LLC entered into a loan agreement (the "Citizens Loan") with Citizens Bank of Northern California in the amount of $2.88 million with a maturity date of July 15, 2010 and an interest rate of 795 bps. The Citizens Loan is secured by real property known as the "Sunset Idea House in Truckee" and is fully guaranteed by EWRD V and HF Holding. The Citizens Loan requires monthly interest payments with the full principal balance and accrued interest due upon maturity. As of the Petition Date, the Debtors had an outstanding principal balance of approximately $2.88 million on the Citizens Loan.

31. On July 29, 2005, Gray's LLC entered into a loan agreement (the "Soc Gen Loan") with Societe Generale to be advanced pursuant to disbursement requests, with the maximum outstanding principal amount not to exceed $26 million at any given time. The Soc Gen Loan is secured by certain real property located at Gray's Crossing and is fully guaranteed by EWRD V. The Soc Gen Loan was originally scheduled to be repaid through monthly interest payments and the sale of units at Gray's Crossing and had a maturity date of July 29, 2008. Pursuant to a series of amendments and side letters to the Soc Gen Loan, however, the maturity date was extended to July 31, 2009, the principal amount outstanding was paid down to $6 million and the interest rate was changed. The Soc Gen Loan was not repaid by the July 31, 2009 maturity date and is currently in default with principal balance of $6 million and a default interest rate of 10.5%.

### *Old Greenwood*

32. On December 26, 2006, Greenwood LLC entered into a loan agreement (the "Citizens Model Loan") with Citizens Bank of Northern California in the amount of $2.35

14

million with interest payments due on a monthly basis, a maturity date of December 26, 2016, and an interest rate of 795 bps. The Citizens Model Loan is partially secured by model units constructed at Old Greenwood for the purpose of promoting sales and is fully guaranteed by EWRD V and HF Holding. As of the Petition Date, Greenwood LLC had an outstanding principal balance of approximately $2.35 million on the Citizens Model Loan.

33. On December 19, 2005, Greenwood LLC entered into a loan agreement (the "Plumas Loan") with Plumas Bank in the amount of approximately $3.94 million with a maturity date of December 20, 2010 and a variable rate of interest of 745 bps. The Plumas Loan is secured by certain real property in Old Greenwood and is fully guaranteed by EWRD V. The Plumas Loan requires monthly principal and interest payments and had a principal balance of approximately $3 million as of the Petition Date.

34. On March 31, 2004, Greenwood LLC entered into a revolving line of credit construction loan agreement (the "JPMorgan Loan") with Bank One, NA, now JPMorgan Chase Bank, N.A., in the aggregate amount of $15.94 million, to be advanced pursuant to disbursement requests for the purpose of constructing certain improvements at Old Greenwood. The JPMorgan Loan is secured by certain real property in Old Greenwood and is fully guaranteed by EWRD V. Pursuant to a series of amendments to the JPMorgan Loan which extended the maturity date to March 31, 2010 and changed the interest rate payable, the original aggregate principal amount was increased to $21 million, and the loan was converted into a term loan. Due to an accelerated pay down schedule, the principal balance as of the Petition Date was approximately $1.77 million.

### *Northstar Highlands*

35. On October 26, 2007, Highlands Hotel Company, LLC ("Hotel LLC"), a wholly-owned indirect subsidiary of EWRD IX, entered into a construction loan agreement (the "BofA

LEGAL_US_W # 63383651.20
RLF1 3538040v.1

Construction Loan") with Bank of America, N.A. ("BofA"), as lender and agent, in the maximum amount of $147 million with an original maturity date of October 26, 2010. The BofA Construction Loan subsequently was amended so that the maximum amount of the Loan is $139.4 million. The BofA Construction Loan is secured by the Ritz Hotel and Ritz Residences and is fully guaranteed by EWRD V and EWRD IX. As of the Petition Date, the balance of the BofA Construction Loan was approximately $123.2 million and Hotel LLC is currently in default of the BofA Construction Loan.

36.     October 27, 2008, Highlands Hotel Residences Company, LLC ("Residences LLC"), another wholly-owned indirect subsidiary of EWRD IX, entered into a term loan agreement (the "BofA Land Loan") with BofA in the amount of $10 million with an original maturity date of October 27, 2009, which bears a variable rate of interest at LIBOR. The BofA Land Loan is secured by certain undeveloped land at Northstar Highlands to be utilized for future development projects related to the Ritz Hotel and is fully guaranteed by EWRD V, EWRD IX and Highlands Hotel Holding Company, LLC, a wholly-owned direct subsidiary of EWRD IX. As of the Petition Date, Residences LLC had an outstanding balance of $10 million on the BofA Land Loan, and Residences LLC is in default of the BofA Land Loan.

### Trailside Townhomes LLC

37.     On September 20, 2006, Trailside Townhomes LLC and U.S. Bank National Association entered into a loan agreement (the "US Bank Loan") in an amount not to exceed $36 million. The US Bank Loan was later amended to, among other things, reduce the maximum loan amount to $4 million. The US Bank Loan matures on March 20, 2010 and accrues interest at a variable rate of interest, currently at 4.32%. Repayment of the US Bank Loan, and completion of the project for which the US Bank Loan was obtained, is guaranteed by EWRD V.

LEGAL_US_W # 63383651.20
RLF1 3538040v.1

As of the Petition Date, Trailside Townhomes LLC had an outstanding principal balance of approximately $450,000 on the US Bank Loan.

### The NCHC Bonds

38.     On June 1, 2006, Northstar Community Housing Corporation (the "NCHC") and U.S. Bank National Association, as trustee (the "Trustee"), entered into that certain Indenture of Trust establishing NCHC's right to issue bonds on behalf of the Town of Truckee (the "Town") to finance the acquisition and construction of real and personal property, buildings and improvements for approximately 96 housing units known as "*Sawmill Heights.*"[5]  In connection therewith, NCHC issued $20.393 million in aggregate principal amount of its Variable Rate Multifamily Housing Project Revenue Bonds, Series 2006A (the "Series A Bonds").

39.     EWRD V guaranteed the payment of principal, interest and other costs incurred by the Trustee in connection with the Series A Bonds and along with NMP, have agreed to indemnify the Trustee against liabilities relating to the Trustee's involvement with the Series A Bonds and the development of Sawmill Heights.

### Manor Vail Construction Loan

40.     On August 28, 2007, MV Penthouses, LLC and LaSalle Bank, National Association ("LaSalle Bank"), as Agent, entered into a $76.5 million construction loan agreement (the "Construction Loan Agreement") for the development of 17 condominiums in Vail, Colorado (the "LaSalle Bank Loan").  LaSalle Bank has subsequently been acquired by Bank of America.

41.     EWRD V and East West Resort Development VIII, L.P., L.L.L.P., a limited partner of MV Penthouses, LLC, guaranteed the completion of the construction and the payment

---

[5]     A majority of Sawmill Heights is restricted to occupancy by tenants of low or moderate income.

LEGAL_US_W # 63383651.20
RLF1 3538040v.1

of principal, interest and other costs incurred by the lenders to the Construction Loan Agreement in connection with the LaSalle Bank Loan. As of the Petition Date, the construction had been completed and a certificate of occupancy has been obtained. As of the Petition Date, the principal outstanding under the LaSalle Bank Loan was $17.7 million.

### *The Mello-Roos Bonds*

42.     In 2003, the Truckee Donner Public Utility District Old Greenwood Community Facilities District No. 03-1 (the "Greenwood District") issued bonds in an aggregate principal amount of approximately $12.4 million (the "Greenwood District Mello-Roos Bonds") to finance the development and construction of land improvements and public utilities at Greenwood LLC (collectively, the "Greenwood Property") pursuant to the terms and provisions of the Mello-Roos Community Facilities Act of 1982, California Government Code Sections 53311 *et seq*. (the "Mello-Roos Act"). The Greenwood District Mello-Roos Bonds are payable solely from special tax revenues earned from the Greenwood Property and from special accounts holding such revenues, proceeds of the Greenwood District Mello-Roos Bonds themselves, and earning on the funds held in the accounts. These special tax revenues and accounts are pledged as security for the Greenwood District Mello-Roos Bonds. The Greenwood District is obligated to use the special tax revenues to pay the Greenwood District Mello-Roos Bonds and is granted a continuing lien against the Greenwood Property to secure the payment of the special taxes, and it has the ability and obligation to foreclose upon the Greenwood Property or portions thereof if there is a default in payment of the special taxes. Greenwood LLC incurs approximately $225,000 per year in special tax obligations arising from the Greenwood District Mello-Roos Bonds.

43.     In 2004 and 2005, the Truckee Donner Public Utility District Gray's Crossing Community Facilities District No. 04-1 (the "Gray's District") issued bonds in an aggregate

LEGAL_US_W # 63383651.20
RLF1 3538040v.1

principal amount of approximately $34.5 million (the "Gray's District Mello-Roos Bonds at Gray's District") to finance the development and construction of land improvements and public utilities at Gray's LLC (collectively, the "Gray's Property") pursuant to the Mello Roos Act. The Gray's District Mello-Roos Bonds are payable solely from special tax revenues earned from the Gray's Property and from special accounts holding such revenues, proceeds of the Gray's District Mello-Roos Bonds themselves, and earning on the funds held in the accounts. These special tax revenues and accounts are pledged as security for the Gray's District Mello-Roos Bonds. The Gray's District is obligated to use the special tax revenues to pay the Gray's District Mello-Roos Bonds and is granted a continuing lien against the Gray's Property to secure the payment of the special taxes, and it has the ability and obligation to foreclose upon the Gray's Property or portions thereof if there is a default in payment of the special taxes. Gray's LLC and Club Company LLC combined incur approximately $1 million per year in special tax obligations arising from the Gray's District Mello-Roos Bonds.

44. In 2005 and 2006, the Northstar Community Services District Community Facilities District No. 1 (the "Northstar District") issued bonds in an aggregate principal amount of approximately $114 million (the "Northstar District Mello-Roos Bonds" and together with the Greenwood District Mello Roos Bonds, Gray's District Mello Roos Bonds and Series A Bonds, the "Bonds"), to finance the development and construction of land improvements and public utilities at Northstar Village and Northstar Highlands (collectively, the "Northstar Property") pursuant to the Mello Roos Act. The Northstar District Mello-Roos Bonds are payable solely from special tax revenues earned from the Northstar Property and from special accounts holding such revenues, proceeds of the Northstar District Mello-Roos Bonds themselves, and earning on the funds held in the accounts. These special tax revenues and accounts are pledged as security

19

for the Northstar District Mello-Roos Bonds. The Northstar District is obligated to use the special tax revenues to pay the Northstar District Mello-Roos Bonds and is granted a continuing lien against the Northstar Property to secure the payment of the special taxes, and it has the ability and obligation to foreclose upon the Northstar Property or portions thereof if there is a default in payment of the special taxes. NMP incurs approximately $4,200,000 per year in special tax obligations arising from the Northstar Mello-Roos Bonds.

### *Surety Bonds*

45.     In the ordinary course of their businesses, certain of the Debtors are required to post bonds as collateral to secure certain of their performance, homeowners association and escrow obligations (the "Surety Bonds"). These Surety Bonds are provided by various companies who specialize in such issuance (the "Sureties"). The Debtors do not have a Surety Bond premium financing program in effect. Rather, premiums under each of the Surety Bonds are paid annually. Because the Debtors have a substantial number of Surety Bonds outstanding with various due dates for the annual premium, the Debtors make payments each month when required which constitute various Surety Bonds' annual premium payments. The debtors have outstanding Surety Bonds of approximately $5.4 million. The aggregate annual premiums for the Debtors' Surety Bonds is approximately $67,500 and as of the Petition Date, no premiums are owing on account of these bonds.

46.     Performance Bonds. Several of the Debtors' Surety Bonds are issued by Sureties to ensure the Debtors' performance obligations under various contracts, principally in connection with infrastructure improvements the Debtors are obligated to complete for various local governmental agencies as a conditions of obtaining permits and other approvals necessary for the development of its projects (collectively, the "Performance Bonds"). Generally, the Performance Bonds are released when the required infrastructure improvements are completed. The Debtors

20

do not believe that these bonds give the Sureties the right to cancel at will.[6] As of the Petition Date, the Debtors have outstanding Performance Bonds of approximately $2.6 million. As of the Petition Date, no premiums are owing on account of these bonds.

47. <u>HOA Bonds</u>. Surety Bonds are also issued by Sureties to ensure the Debtors' compliance with state regulations to properly fund and subsidize various homeowner and condominium associations as required for the sale of real estate necessary for the development of their projects (collectively, the "<u>HOA Bonds</u>"). Generally, the HOA Bonds are released when sales in the communities reach state regulated sales milestones. The Debtors do not believe that these bonds give the Sureties the right to cancel at will. As of the Petition Date, the Debtors have outstanding HOA Bonds of approximately $2.8 million. As of the Petition Date, no premiums are owing on account of these bonds.

48. <u>Escrow Bonds</u>. The Debtors obtain a third type of Surety Bonds as security for their obligation to credit at closing or return escrow deposits of home purchasers that the Debtors had used to fund construction costs as allowable by applicable law (the "<u>Escrow Bonds</u>"). As of the Petition Date, no premiums are owing on account of these bonds.

49. <u>Debtor Guarantees to Affiliated Non-Debtor Entities</u>. The Debtors have also entered into various general indemnity agreements with Sureties to guarantee certain obligations of affiliated non-debtor entities. These guarantees total approximately $4.9 million for Performance Bonds, $600,000 for HOA Bonds and approximately $8.0 million for Escrow Bonds.

---

[6] The Debtors expressly reserve the right to assert that certain Surety Bonds (as defined herein) are non-cancelable and/or, are or are not executory contracts. The Debtors also reserve the right to recover any premiums paid to maintain a Surety Bond in effect if it is later determined that such Surety Bond was non-cancellable.

LEGAL_US_W # 63383651.20
RLF1 3538040v.1

## Part III
## Events Leading to the Commencement of
## These Cases and the Debtors' Chapter 11 Plans and Strategies

50.     In August 2007, Morgan Stanley Real Estate ("Morgan Stanley") acquired Crescent Real Estate Equities Company ("CRE"). The transaction was financed with a loan from Barclays Capital Real Estate, Inc. ("BCRE"). On November 20, 2009, following an unprecedented collapse of the real estate market, ownership in CRE was transferred to a joint venture between an affiliate of BCRE and Goff Capital Units, LP ("Goff Capital"), called Crescent Real Estate Holdings LLC ("Crescent LLC").

51.     Subsequently, EWRD V has been unable to secure additional capital or financing, other than with the protection provided under the Bankruptcy Code, from its current lenders or investors to fund, among other things, (i) land holding costs, (ii) further development, and (iii) operating costs at the Tahoe Club.

52.     Making matters worse, the general decline in the economy has taken its toll on demand for luxury real estate causing property values to fall markedly, particularly in Lake Tahoe, where all of the Debtors' properties are located. Over the course of the past year, the Debtors' properties have lost significant value, in some cases resulting in assets being valued below their loan balances.

53.     In addition, costs stemming from the Tahoe Club, which loses money on an operating basis, and continued contractual infrastructure obligations and tax obligations, have put a severe drain on the Debtors' cash resources. In addition, the Debtors' real estate sales declined to $20.5 million during the last six months of 2009 from $48.7 million during the last six months of 2008.

54.     This lack of liquidity has made it impossible for the Debtors to continue their development efforts, operate the Tahoe Club, fulfill contractual infrastructure obligations or

22

continue to pay their debt service. Currently, EWRD V is in default under the Soc Gen Loan. Additionally, EWRD IX is in default under its $139 million BofA Construction Loan and its $10 million BofA Land Loan, both of which have full recourse guaranties from EWRD V.

55.     To assist in addressing these financial difficulties, the Debtors retained Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings") and Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey") to assist them with restructuring their debt and raising new capital.

56.     In an effort to stabilize their cash flow, the Debtors also implemented cost reductions and increased their efforts with respect to property sales over the last two years. The staff in the Truckee offices of East West has been reduced to 25 from 65. Further reductions in cash flow requirements were achieved by postponing or foregoing new development projects in the Debtors' pipeline. To boost property sales, the Debtors have also been offering steep discounts on certain of their properties. Since April 2009, the Debtors have sold 27 residences for a total price of $20 million and 69 fractions for a total price of $3.7 million and have contracts with buyers for 4 additional residences for a total price of $14.6 million and 6 fractions for a total price of $245,000.

57.     Most critically, during the weeks preceding the commencement of these cases, the Debtors, with the assistance of Paul Hastings and Houlihan Lokey, engaged in a comprehensive process to identify potential financial and strategic sources that could not only provide the requisite debtor-in-possession financing, but be in a position to provide the additional financing that would be needed to restructure the Debtors. Indeed, Houlihan Lokey contacted 19 potential sources of debtor-in-possession financing. In addition, during this period, the Debtors and their advisors engaged in extensive and at times contentious negotiations with their key stakeholders

LEGAL_US_W # 63383651.20
RLF1 3538040v.1

in an effort to work toward a consensual restructuring.  Through the hard work and dedication of

a number of parties, including their principals and advisors, the Debtors were able to obtain

debtor-in-possession financing and reach an agreement with their key stakeholders on the terms

of a restructuring transaction that will enable the Debtors to successfully emerge from chapter

11.

       58.    The terms of the agreement between the Debtors and their key stakeholders is

embodied in a plan support agreement (the "Support Agreement") and plan term sheet (the

"Term Sheet"), a copy of which is attached hereto as Exhibit B.  Some of the critical elements of

the Term Sheet are:

      (a)    A new money investment up to an amount not to exceed $32.5 million.  Of this amount, all administrative, priority and tax claims will be paid in full and $2.5 million will be allocated to pay unsecured claims.

      (b)    A resolution of all project-level secured debt either through reinstatement, consensual restructuring or return of collateral.

      (c)    Amended and restated management agreements to allow for a continuity of operations of the Debtors, including the Tahoe Club for its over 1000 members.

      (d)    An amendment to the operating agreement of NMP that will allow for the right to develop 100 single family lots on the real property owned by TLH.

      (e)    The ability to potentially restructure the obligations under the Mello-Roos Bonds that will greatly enhance the future viability of the Debtors.

      (f)    A debtor-in-possession financing facility with the lenders (the "DIP Lenders") identified in that certain DIP Loan Agreement, with Barclays Bank PLC as agent for the DIP Lenders in the amount of $10 million (the "DIP Loan").

      59.    The Debtors strongly believe that promptly pursuing the restructuring transactions

embodied in the Term Sheet including obtaining approval of the DIP Loan, will provide the

Debtors with the liquidity to maintain their operations, and is in the best interest of all creditors

and stakeholders in these cases, many of whom will not have a viable entity to work with in the

24

years to come. Indeed, this process will enable the Debtors to, among other things, (i) resolve their pressing liquidity problems and guarantee and contingent liabilities, (ii) eliminate non-essential operations, (iii) provide the opportunity to stabilize the Debtors' business and preserve their substantial Northstar investments for their thousands of owners and members, and (iv) obtain additional equity financing to fund ongoing operations and development.

## Part IV
### Facts Relevant to the First Day Pleadings

60.     Concurrently with the filing of these chapter 11 cases, the Debtors filed the First Day Motions, which the Debtors believe are necessary to continue their operations with as little disruption as possible. Certain of the First Day Motions request relief in accordance with the requirements of Bankruptcy Rule 6003 as "necessary to avoid immediate and irreparable harm."

61.     I have reviewed each of the First Day Motions filed contemporaneously herewith (including the exhibits thereto and any supporting memoranda) and incorporate by reference the factual statements set forth in the First Day Motions. It is my belief that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful reorganization.

62.     It is my further belief that, with respect to those First Day Motions requesting the authority to pay discrete prepetition claims and honor pre-petition obligations, including homeowner and condominium association obligations, the relief requested is essential to the Debtors' reorganization and necessary to avoid immediate and irreparable harm to the Debtors, joint venture partners, customers, members and critical service providers. Impairment of the Debtors' business operations, or of their relationships with the individuals who work for them, customers, members or service providers — at the very time when the smooth operation of those operations and the dedication, confidence or cooperation of those constituencies is most critical

LEGAL_US_W # 63383651.20
RLF1 3538040v.1

— would clearly imperil the Debtors' chances of a successful reorganization.  Any diminution in the Debtors' ability to maintain their operations in the ordinary course will have an immediate and irreparable harmful effect on the going concern value of the Debtors' estates to the detriment of all of the Debtors' constituencies.

[remainder of page intentionally left blank]

LEGAL_US_W # 63383651.20
RLF1 3538040v.1

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 16, 2010
    Avon, Colorado

_____
Craig Ferraro

Sworn to and subscribed before me, a notary public for the State of Colorado, County of Eagle,

this 16th day of February, 2010.

_____
Kathryn L Macy
Commission expires 09.12.10