## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------- x
                  :

In re                             :  Chapter 11
                  :

East West Resort Development V, L.P., L.L.L.P.,  :  Case No. 10-_____  (_____)
*et al.*,[1]                         :
                  :  (Joint Administration Pending)
        Debtors.               :
                  :

-------------------------------------------------------------- x

## MOTION OF DEBTORS AND DEBTORS IN POSSESSION
## FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS
## TO OBTAIN POSTPETITION FINANCING, TO GRANT SECURITY
## INTERESTS AND SUPERPRIORITY ADMINISTRATIVE
## EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 364(c) AND 364(d); AND
## (B) SCHEDULING A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001

      The above-captioned debtors and debtors-in-possession (collectively, the "Debtors" and

each a "Debtor"), hereby file this motion (the "Motion") for the entry of an interim order,

substantially in the form attached hereto as <u>Exhibit A</u> (the "Interim Order" and together with a

final order, the "DIP Orders"), respectively, seeking to, *inter alia*:

          (i)      obtain authorization for Debtors East West Resort Development V,
L.P., L.L.L.P., NMP Holdings, LLC, Northstar Trailside Townhomes, LLC, Old
Greenwood, LLC and Tahoe Club Company, LLC (the "Debtor Borrowers" or
"Borrowers") to obtain a senior secured superpriority term loan in the maximum
principal amount of $10,000,000 (the "DIP Financing"), with up to $2,000,000,

---

[1]      The Debtors are the following 12 entities (the last four digits of their respective taxpayer identification
numbers follow in parentheses): East West Resort Development V, L.P., L.L.L.P., a Delaware limited
partnership registered as a limited liability limited partnership (9275), NMP Holdings, LLC, a Delaware
limited liability company (9716), Northstar Mountain Properties, LLC, a Delaware limited liability
company (0823), Northstar Iron Horse, LLC, a Delaware limited liability company (1031), Northstar Big
Horn, LLC, a Delaware limited liability company (1132), Northstar Village Townhomes, LLC, a Delaware
limited liability company (7166), Northstar Trailside Townhomes, LLC, a Delaware limited liability
company (7251), Old Greenwood, LLC, a Delaware limited liability company (3812), Old Greenwood
Realty Inc., a California corporation (4355), Gray's Station, LLC, a Delaware limited liability company
(8308), Tahoe Mountain Resorts, LLC, a Delaware limited liability company (0093), and Tahoe Club
Company, LLC, a Delaware limited liability company (5142). The address of each of the Debtors is 126
Riverfront Lane, 5th Floor, PO Drawer 2770, Avon, Colorado 81620.

plus amounts necessary to cash collateralize letters of credit, available on an interim basis for a period through and including the date of a final hearing on the Motion (the "Final Hearing"), substantially on the terms and conditions set forth in the Debtor in Possession Loan Agreement, a copy of which is attached hereto as Exhibit C (as amended, supplemented, or otherwise modified and in effect from time to time, the "DIP Loan Agreement", and together with any and all other related documents and agreements entered into in connection with or related to the DIP Financing, the "DIP Loan Documents")[2]; from the lenders identified in the DIP Loan Agreement (the "DIP Lenders" or "Lenders") and Barclays Bank PLC ("BBPLC" or the "Agent") as agent for the Lenders.

(ii)    obtain authorization for the Debtor Borrowers to enter into the DIP Loan Agreement and DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection with the DIP Documents;

(iii)    grant the DIP Lenders, subject only to the Carve Out (as described below), superpriority administrative claim status pursuant to section 364(c)(1) of Title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in respect of all DIP Obligations;

(iv)    authorize the guarantors under the DIP Loan Agreement to enter into each applicable Guaranty included in the DIP Loan Documents;

(v)    authorize the Debtors to grant liens to the DIP Lenders subject only to the Permitted Liens, and prime all other liens on the Collateral pursuant to 364(d)(1) of the Bankruptcy Code in the event the holders of such liens do not object to the relief requested herein and in the Final Order;

(vi)    schedule, pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of this Interim Order authorizing the Debtor Borrowers, on an interim basis, to borrow under the DIP Loan Agreement up to $2,000,000 plus amounts necessary to cash collateralize letters of credit to be used for working capital, general expenditures and general corporate purposes of the Debtors pending the Final Hearing; and

(vii)    schedule, pursuant to Bankruptcy Rule 4001, the Final Hearing to consider entry of the Final Order authorizing the Debtors, on a final basis, to borrow the balance of the DIP Financing.

---

[2]    The Loan Parties' obligations under the DIP Loan Documents shall be referred to herein as the "Obligations."

LEGAL_US_W # 63630608. 21
RLF1 3538075v.1

In support of this Motion, the Debtors rely on the Affidavit of Craig Ferraro in Support of First-Day Pleadings (the "Ferarro Affidavit") filed substantially contemporaneously herewith and further respectfully state as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

## Background

2.      On February 16, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      Contemporaneously with the filing of this Motion, the Debtors filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Bankruptcy Rules. To date, no trustee or official committee of unsecured creditors has been appointed by the Office of the United States Trustee.

4.      Debtor East West Resort Development V, L.P., L.L.L.P. ("EWRD V") is a limited partnership between Crescent Resort Development, Inc. ("CRDI," a non-debtor entity) and long-standing developer East West Partners, Inc. (a non-debtor entity and together with its affiliates, "East West") that was formed to develop residential and commercial real estate projects on and around the Northstar at Tahoe Resort in Lake Tahoe, California. Through its various subsidiaries, EWRD V has co-developed four unique residential communities on fully-entitled land that provides a first-class year round resort experience:

3

- Northstar Village – a family-oriented ski village located at the base of Northstar Mountain. Completed phases include 12 townhomes and 213 condominium units in six buildings, and associated retail and dining amenities.

- Northstar Highlands – currently consisting of 16 distinguished ski-in/ski-out townhomes, with significant opportunity for future townhomes and condominiums, located mid-mountain on the slopes of Northstar Mountain and adjacent to the recently-completed Ritz-Carlton Hotel and Residences.

- Old Greenwood – a four season resort community located in Truckee, California featuring a Jack Nicklaus signature golf course.

- Gray's Crossing – located adjacent to Old Greenwood, consisting of four neighborhoods featuring a Jacobsen-Hardy golf course.

5.      EWRD V and its subsidiaries have several additional features that not only allow them to offer a "world class" resort experience, but also set the stage for future economic growth in the expanding Tahoe region. First, EWRD V owns the Tahoe Mountain Club, a year-round non-equity club that offers a range of recreation opportunities and services to the owners of residences at EWRD V's four communities. In addition, EWRD V is the majority owner of Debtor Northstar Mountain Properties, LLC, which owns approximately 335 undeveloped acres with rights to develop over 1000 residential units on Northstar Mountain. When combined with the nearly $100 million of infrastructure improvements already made, EWRD V presents an unparalleled opportunity for a fully-integrated "world class" resort community.

6.      Unfortunately, the chaos in the real estate and finance markets has had a deleterious impact on EWRD V and its subsidiaries. This in conjunction with a dramatic slowdown in consumer spending left EWRD V with a lack of liquidity, which led to defaults on a number of its existing obligations, while others will shortly come due. With no available financing and continued sluggishness in consumer spending, the Debtors were left with no alternative but to commence these chapter 11 cases.

4

7.     East West, an affiliate of EWRD V's general partner, HF Holding Corp., is the entity through which all of the Debtors' affairs are conducted. It provides the day-to-day management and oversight of the Debtors' operations, and provides personnel support to the Debtors, pursuant to a series of sub-management agreements between East West and the Debtors.

8.     For the twelve months ending December 31, 2009, the Debtors had total revenues on an unaudited consolidated basis of approximately $38.7 million and total net losses on an unaudited consolidated basis of approximately $31.8 million. As of December 31, 2009, the Debtors had approximately $256 million in total assets and $61 million in total liabilities, excluding approximately $189.4 million in contingent guarantee liabilities and the Debtors' bond obligations, as described in the Ferraro Affidavit.

9.     During the weeks leading up to these chapter 11 cases, the Debtors and their management team, along with their financial advisors and counsel, engaged in extensive arms-length negotiations and discussions with their key stakeholders and dedicated significant time and resources toward a consensual restructuring. This process has resulted in a successfully negotiated a term sheet ("Term Sheet") for a chapter 11 plan of reorganization that the Debtors' key stakeholders have agreed to support. The Term Sheet will serve as the foundation for reorganizing the Debtors and their prompt emergence from bankruptcy. In connection with the Term Sheet, the Debtors executed a plan support agreement (the "Support Agreement" and together with the Term Sheet, the "Plan Documents"), signed by their key stakeholders, under which these parties have agreed to support and assist in the Debtors' efforts to reorganize. The Plan Documents are discussed in more detail and attached to the Ferraro Affidavit.

LEGAL_US_W # 63630608. 21
RLF1 3538075v.1

## The DIP Financing

### A.    The Debtor's Financing Needs and Efforts to Obtain Postpetition Financing

10.    In August 2007, Morgan Stanley Real Estate ("Morgan Stanley") acquired Crescent Real Estate Equities Company ("CRE"). The transaction was financed with a loan from Barclays Capital Real Estate, Inc. ("BCRE"). On November 20, 2009, following an unprecedented collapse of the real estate market, ownership in CRE was transferred to a joint venture between an affiliate of BCRE and Goff Capital Units, LP ("Goff Capital"), called Crescent Real Estate Holdings LLC ("Crescent LLC").

11.    Subsequently, EWRD V has been unable to secure additional capital or financing, other than with the protection provided under the Bankruptcy Code, from its current lenders or investors to fund, among other things, (i) land holding costs, (ii) further development, and (iii) operating costs at the Tahoe Club.

12.    Making matters worse, the general decline in the economy has taken its toll on demand for luxury real estate causing property values to fall markedly, particularly in Lake Tahoe, where all of the Debtors' properties are located. Over the course of the past year, the Debtors' properties have lost significant value, in some cases resulting in assets being valued below their loan balances.

13.    In addition, costs stemming from the Tahoe Club, which loses money on an operating basis, and continued contractual infrastructure obligations and tax obligations, has put a severe drain on the Debtors' cash resources. In addition, the Debtors' real estate sales declined to $20.5 million during the last six months of 2009 from $48.7 million during the last six months of 2008.

14.    This lack of liquidity has made it impossible for the Debtors to continue their development efforts, operate the Tahoe Club, fulfill contractual infrastructure obligations or

6

continue to pay their debt service. Currently, EWRD V is in default under the Soc Gen Loan. Additionally, EWRD IX is in default under its $139 million BofA Construction Loan and its $10 million BofA Land Loan, both of which have full recourse guaranties from EWRD V.

15.     To assist in addressing these financial difficulties, the Debtors retained Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings") and Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey") to assist them with restructuring their debt and raising new capital.

16.     In an effort to stabilize their cash flow, the Debtors also implemented cost reductions and increased their efforts with respect to property sales over the last two years. The staff in the Truckee offices of East West has been reduced to 25 from 65. Further reductions in cash flow requirements were achieved by postponing or foregoing new development projects in the Debtors' pipeline. To boost property sales, the Debtors have also been offering steep discounts on certain of their properties. Since April 2009, the Debtors have sold 27 residences for a total price of $20 million and 69 fractions for a total price of $3.7 million and have contracts with buyers for 4 additional residences for a total price of $14.6 million and 6 fractions for a total price of $245,000.

17.     Most critically, during the weeks preceding the commencement of these cases, the Debtors, with the assistance of Paul Hastings and Houlihan Lokey engaged in a comprehensive process to identify potential financial and strategic sources that could not only provide the requisite debtor-in-possession financing, but be in a position to provide the additional financing that would be needed to restructure the Debtors. Indeed, Houlihan Lokey contacted 19 potential sources of debtor-in-possession financing. In addition, during this period, the Debtors and their advisors engaged in extensive and at times contentious negotiations with their key stakeholders

LEGAL_US_W # 63630608. 21
RLF1 3538075v.1

in an effort to work toward a consensual restructuring. Through the hard work and dedication of a number of parties, including their principals and advisors, the Debtors were able to obtain debtor-in-possession financing and reach an agreement with their key stakeholders on the terms of a restructuring transaction that will enable the Debtors to successfully emerge from chapter 11.

18.     The terms of the agreement between the Debtors and their key stakeholders is embodied in a plan support agreement (the "Support Agreement") and plan term sheet (the "Term Sheet"), a copy of which is attached to the Ferraro Affidavit. Some of the critical elements of the Term Sheet are:

(a)     A new money investment up to an amount not to exceed $32.5 million. Of this amount, all administrative, priority and tax claims will be paid in full and $2.5 million will be allocated to pay unsecured claims.

(b)     A resolution of all project-level secured debt either through reinstatement, consensual restructuring or return of collateral.

(c)     Amended and restated management agreements to allow for a continuity of operations of the Debtors, including the Tahoe Club for its over 1000 members.

(d)     An amendment to the operating agreement of NMP that will allow for the right to develop 100 single family lots on the real property owned by NMP.

(e)     The ability to potentially restructure the obligations under the Mello-Roos Bonds that will greatly enhance the future viability of the Debtors.

(f)     The DIP Financing.

19.     The Debtors strongly believe that promptly pursuing the restructuring transactions embodied in the Term Sheet including obtaining approval of the DIP Loan, will provide the Debtors with the liquidity to maintain their operations, and is in the best interest of all creditors and stakeholders in these cases, many of whom will not have a viable entity to work with in the years to come. Indeed, this process will enable the Debtors to, among other things, (i) solve their

8

pressing liquidity problems and guarantee and contingent liabilities, (ii) eliminate non-essential operations; (iii) provide the opportunity to stabilize the Debtors' business and preserve their substantial Northstar investments for their thousands of owners and members, and (iv) obtain additional equity financing to fund ongoing operations and development.

20. The DIP Financing is a result of extensive arm's length negotiations between the Debtors and the DIP Lenders. Notably, the DIP Loan Agreement does not seek to give preferential treatment to any pre-existing lender or "roll-up" any prepetition obligations. In light of their liquidity crisis and the state of the credit markets and global economy, and after having considered the best interests of their estates and creditor constituencies, the Debtors, after having consulted with their advisors, have determined that the terms under the DIP Loan are the best that they are able to obtain.

**B.      The DIP Financing**

21. Consistent with Bankruptcy Rule 4001(c)(1) and this Court's requirements under Local Rule 4001-2(a)(i) and (ii) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the pertinent terms of the DIP Loan Agreement and related DIP Orders are as follows:[3]

> (a)    **Use of Loan Proceeds: Section 6.13 of the DIP Loan Agreement provides that the proceeds of the Advances[4] shall be used to fund working capital and general corporate purposes of the Debtor Borrowers and their Subsidiaries as set forth in the Budget.**
>
> (b)    **Termination Date: Section 3.3(a) of the DIP Loan Agreement provides that the DIP Loan Agreement shall continue in full force and effect for a term ending on the earlier of (i) the date on which Agent provides, via electronic or overnight delivery, written notice of**

---

[3]     By necessity the following is a summary of the terms of the DIP Loan Agreement and DIP Orders. To the extent that this summary conflicts with any term or provision of the DIP Loan Agreement or the DIP Orders, the DIP Loan Agreement or the DIP Orders, as the case may be, control.

[4]     Capitalized terms not otherwise defined in this Motion shall have the meaning given to them in the DIP Loan Agreement.

counsel for the Debtors and counsel for any Committee or the occurrence of an Event of Default; (ii) the entry of an order converting any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases; (iii) if the Interim Order is modified at the Final Hearing in a manner unacceptable to Agent, in its sole discretion, the date of the commencement of the Final Hearing; (iv) the effective date of a chapter 11 Plan in any of these Chapter 11 Cases; and (v) October 25, 2010.

(c)    Security: Paragraph 3 of the DIP Orders provides that the Agent, for the benefit of itself and the Lenders, is hereby granted, pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the Postpetition Liens in the Collateral to secure the Postpetition Debt. The Postpetition Liens: (1) are and shall be First Priority Liens in the Collateral (but subject to Permitted Liens, including, without limitation, with respect to the Second Lien Collateral only, subject to the Existing U.S. Bank Liens thereon) without any further action by the Debtors, Agent, or Lenders, and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; (2) shall not be subject to any security interest or lien which is avoided and preserved under Code § 551; and (3) shall remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Cases. The Collateral, as defined in the DIP Loan Agreement, consists of: (a) all assets, rights, and interests listed on Schedule 4.4 to the DIP Loan Agreement, (b) all unencumbered assets and interests in assets and proceeds thereof now owned or hereafter acquired by the Debtors in or upon which a Lien is granted in favor of Agent or the Lenders, (c) the Second Lien Collateral, (d) the collateral described in each Security Instrument, (e) the Designated Account and all funds therein, (f) the Trailside Purchase Deposit Account and all funds therein, (g) all Deposit Accounts and Securities Accounts with respect to the Collateral and all funds therein, (h) the Old Greenwood Option, (i) any property subject to liens or security interest that may be avoided pursuant to the Bankruptcy Code, but only to the extent so avoided, and (j) all of the proceeds (as such term is defined in the Code) and products, whether tangible or intangible, of any of the foregoing, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of

10

loss or damage to, or otherwise with respect to any of the foregoing. Second Lien Collateral consists of all of the assets owned by Northstar Trailside Townhomes, LLC, including, but not limited to, the Highlands Trailside Townhomes, as described more fully in the DIP Loan Documents. Paragraphs 5(b) and 5(c) of the DIP Orders describe certain of the Agent's rights upon termination. In Paragraph 5(c), among other things, the Debtors expressly waive their rights under any "single action," collateral first, anti-deficiency, or other similar state law rules and restrictions, including, without limitation, California Code Of Civil Procedure § 726, and the Court finds and concludes that all such state law rules and restrictions with respect to the Collateral are superseded by the Order. The Agent also covenants and agrees that, subject to the terms set forth in Paragraph 5(c), in exercising its rights and remedies pursuant to the Order and the other Postpetition Documents, it shall ask the Court to conduct a Code § 363 Sale, or shall accept a deed in lieu of foreclosure, or attempt to foreclose (either judicially or nonjudicially) on the Trailside Townhomes Collateral prior to doing so on, or otherwise exercising any remedy in respect of, any of the other Collateral.

(d)  **Superpriority Claim:** Paragraph 3 of the DIP Orders provides that the Postpetition Debt is granted superpriority administrative expense status under section 364(c)(1) of the Bankruptcy Code, with priority over all costs and expenses of administration of the Cases that are incurred under any provision of the Code, other than the Carveout.

(e)  **Fees:** Paragraph 1(b) of the DIP Orders provides that the Debtors are authorized to incur Postpetition Debt to pay Postpetition Charges, which includes, among other things, all fees, costs, expenses and other charges due or coming due under the Postpetition Documents or in connection with the Postpetition Debt (including, without limitation, all attorneys' fees and paralegals' fees and expenses, financial advisor fees and expenses, appraiser fees and expenses, valuation related fees and expenses, consultant fees and expenses, out-of-pocket filing and recording fees, external and internal audit fees and expenses, closing fees, letter of credit fees, unused line fees, facility fees, administrative fees, agency fees, arrangement fees, deferred fees, consultant fees and expenses, and all other costs and expenses).

(f)  **Interest Rate:** Section 2.6(a) of the DIP Loan Agreement provides that all Obligations that have been charged to the Loan Account pursuant to the terms of the DIP Loan Agreement shall bear interest on the Daily Balance at an interest rate of: (i) if the relevant Obligation is a LIBOR Rate Loan, at a per annum rate equal to the LIBOR Rate plus the LIBOR Rate Margin or (ii) otherwise, at a per annum rate equal to the Base Rate plus the Base Rate Margin. Section 2.6(b) provides that upon the occurrence and during the

LEGAL_US_W # 63630608. 21
RLF1 3538075v.1

continuation of an Event of Default, at the election of the Required Lenders, all obligations that have been charged to the Loan Account shall bear interest on the Daily Balance at a per annum rate equal to 2 percentage points above the per annum rate otherwise applicable.

(g) <u>Events of Default</u>: Section 8.1 of the DIP Loan Agreement enumerates the Events of Default under the Agreement.

(h) <u>Remedies/Automatic Stay</u>: Paragraph 7(c) of the DIP Orders provides that the automatic stay of section 362 of the Bankruptcy Code is hereby modified with respect to Agent to the extent necessary to effectuate the provisions of the Interim Order, including, after the Termination Date, to permit the Agent to exercise its rights contemplated by Paragraph 5(b) of the DIP Orders.

(i) <u>506(c) Waiver</u>: Paragraph 6(d) of the DIP Orders provides that, upon entry of the Final Order, at no time during these bankruptcy cases shall the surcharge provisions of section 506(c), the enhancement of collateral provisions of section 552, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) be imposed upon Lenders or the Agent or any of the Collateral for the benefit of any party in interest, including the Debtors, the Committee, any of the Carveout Professionals, or any Trustee.

(j) <u>Budget</u>: Amounts available under the DIP Loan shall be subject to the Budget attached to this Motion as Exhibit D, which sets forth in reasonable detail all receipts and disbursements of the Borrowers on a two-week and calendar month basis, separated into line items for each category of receipt or disbursement, and is otherwise in form and substance acceptable to the Agent, in its sole discretion.

(k) <u>Carveout</u>: Paragraph 3 of the DIP Orders provides that the Postpetition Debt is granted superpriority administrative expense status under section 364(c)(1) of the Bankruptcy Code, with priority over all costs and expenses of administration of the Cases that are incurred under any provision of the Code, other than the Carveout. "Carveout" is defined in paragraph 4 of the DIP Orders as the following expenses: (i) statutory fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (ii) subject to the terms and conditions of the Order, all fees and disbursements incurred by the Debtors and/or the Committee for Carveout Professionals, retained by final order of the Bankruptcy Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) pursuant to sections 327 or 1103(a) to the extent allowed by order of the Bankruptcy Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) under sections 328, 330 and/or 331 and any interim compensation

LEGAL_US_W # 63630608. 21
RLF1 3538075v.1

procedures order, but solely to the extent such fees and disbursements are within the corresponding amounts set forth in the Budget and were reflected as estimated fees and expenses of such professionals in the most recent Budget delivered by the Borrowers to the Agent prior to the date that such fees and disbursements were incurred; provided, that: (a) following a notice to the Debtors from the Agent of the occurrence of an Event of Default, the amount of the Carveout shall not exceed $1,000,000 plus the amount of any compensation or reimbursement of budgeted expenses and fees incurred, awarded or paid prior to the occurrence of an Event of Default in respect of which the Carveout is invoked; (b) the Carveout shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Carveout Professionals, (c) all prepetition retainers and any other property of the estate (other than property subject to an unavoidable lien in favor of Agent) shall be used to pay any allowed fees and expenses of the Carveout Professionals before any payments of such fees or expenses are made from the Postpetition Debt or the Collateral, (d) upon the Termination Date, and with the exception of the $1,000,000 portion of the Carveout which Lender has agreed to fund on or after the Termination Date, Lender shall have no obligation to fund any fees or expenses of the Carveout Professionals.

(l) **Milestones:** Section 5.15 of the DIP Loan Agreement provides that the Loan Parties shall (a) within 90 days of the Petition Date, file either (i) a Plan of Reorganization and accompanying Disclosure Statement, or (ii) a motion to approve Bid Procedures; (b) within 120 days of the Petition Date, either (i) obtain approval of the disclosure statement with respect to the Plan of Reorganization, or (ii) commence an auction for the Debtors' assets pursuant to the Bid Procedures; (c) within 165 days of the Petition Date, either (i) obtain confirmation of a Plan of Reorganization, or (ii) close a Sale of the Debtors' assets pursuant to the Bid Procedures; and (d) achieve the effective date of a Plan of Reorganization within 176 days of the Petition Date.

(m) **Indemnification:** Section 10.3 of the DIP Loan Agreement sets forth certain obligations of the Debtors to indemnify the Agent-Related Persons, the Lender-Related Persons and each Participant.

22.     To the extent there is any conflict between the summary set forth herein and the DIP Loan Documents, the terms of the DIP Loan Documents shall govern. To the extent there is any conflict between the terms of the DIP Loan Documents and the proposed DIP Orders being submitted herewith, the terms of the DIP Orders shall govern.

13

## LOCAL RULE 4001-2 DISCLOSURES

23.     Pursuant to Local Rule 4001-2, a debtor in possession seeking authority to use

cash collateral or obtain financing must disclose the presence and location of certain

provisions contained in the documentation evidencing the cash collateral usage or financing.

The debtor in possession must also justify the inclusion of such provisions.  Set forth below

are the disclosures required in accordance with Local Rule 4001-2:

(a)     **Local Rule 4001-2(a)(i)(A) requires a debtor to disclose whether it has granted cross-collateralization to prepetition secured creditors in connection with the debtor's cash collateral usage or additional financing.**  The DIP Loan Documents do not provide for the granting of cross-collateralization protection to any Prepetition Secured Lenders.

(b)     **Local Rule 4001-2(a)(i)(B) requires disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the Committee at least sixty (60) days from the date of its formation to investigate such matters.**  The DIP Loan Documents do not contain any such provisions.

(c)     **Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that seek to waive a debtor's rights without notice under section 506(c) of the Bankruptcy Code.**  Paragraph 6(d) of the DIP Orders provides that, upon entry of the Final Order, at no time during these bankruptcy cases shall the surcharge provisions of  section 506(c), the enhancement of collateral provisions of section 552, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) be imposed upon Lenders or the Agent or any of the Collateral for the benefit of any party in interest, including the Debtors, the Committee, any of the Carveout Professionals, or any Trustee.

(d)     **Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code.**  Paragraph 3 of the DIP Orders provides that the Agent, for the benefit of itself and the Lenders, is granted, pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the Postpetition Liens in the Collateral

14

to secure the Postpetition Debt. The Collateral, as defined in the DIP Loan Agreement includes any property subject to liens or security interest that may be avoided pursuant to the Bankruptcy Code, but only to the extent so avoided.

(e) **Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem prepetition secured debt be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor' prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code).** BBPLC is not a prepetition lender, and so the prepetition credit facilities will not be rolled into the DIP Facility, nor will the proceeds of the DIP Facility be used to pay all or part of any prepetition credit facility.

(f) **Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out.** The DIP Loan Documents do not provide for disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the Debtors.

(g) **Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for the priming of any secured lien without the consent of that lienor.** The liens granted to the DIP Lenders will prime certain liens, as set forth in the definition of "Permitted Liens" in the DIP Loan Agreement,[5] to the extent the holders of such liens do not file an objection to this Motion and entry of the Final Order with respect thereto.

## BASIS FOR RELIEF

24. Section 364(c) of the Bankruptcy Code provides that:

> If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative

---

[5] The liens that will be primed in the absence of objection include:

(i) judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under Section 8.1(c) of the DIP Loan Agreement,

(ii) Liens set forth on Schedule P-2;

(iii) Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of business and not in connection with the borrowing of money.

LEGAL_US_W # 63630608. 21
RLF1 3538075v.1

expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1) with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

25.     Section 364(d)(1) of the Bankruptcy Code provides that:

The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

(A) the [debtor in possession] is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

26.     Bankruptcy Rule 4001(c)(2) provides, in relevant part, that:

The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

27.     Bankruptcy Rule 4001(d) provides, in relevant part, that (i) a motion for approval to modify or terminate the automatic stay shall be served on any committee appointed pursuant to section 1102 of the Bankruptcy Code, on the creditors included on the list filed under Bankruptcy Rule 1007(d), and on such other entities as the court may direct, and (ii) objections

LEGAL_US_W # 63630608. 21
RLF1 3538075v.1

may be filed within 15 days of the mailing of the notice of the motion and the time for filing objections thereto. See Fed. R. Bankr. P. 4001(d)(1) - (2).

## A.    The DIP Financing

28.     As set forth above, based on discussions with potential lenders other than the DIP Lenders, the Debtors were unable to obtain alternative postpetition financing on an unsecured basis in an amount, and within the timeframe, that the Debtors' current liquidity situation mandated.

29.     The Debtors with the assistance of their advisors, negotiated the DIP Loan Agreement at arm's-length and have determined, in the exercise of their business judgment, that it is the best proposal under the circumstances.  Provided that this judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its business judgment. See, e.g., In re Ames Dept. Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (courts have discretion under section 364 of the Bankruptcy Code to permit debtors to exercise reasonable business judgment so long as (i) the terms of the financing agreement do not "leverage the bankruptcy process and powers" and (ii) the financing agreement's purpose is primarily to benefit the estate, and not a party in interest).

30.     The financing under the DIP Loan Documents provides additional liquidity to the Debtors sufficient to enable them, among other things, to (a) minimize disruption and avoid immediate and irreparable harm to their business and operations, (b) preserve and maximize the value of the estate, and (c) enable the Debtors to fund expenses incurred in connection with the Chapter 11 Case.  Without the financing provided for in the DIP Loan Agreement, the Debtors will not be able to meet their direct operating expenses, thereby preventing the Debtors from

17

being able to preserve the value of their assets and jeopardizing their ability to successfully reorganize.

31.     The Debtors believe that the terms and conditions of the DIP Loan Agreement are fair and reasonable under the circumstances.  Accordingly, the Debtors request that the DIP Lenders be afforded the benefits of section 364(e) of the Bankruptcy Code in respect of the DIP Documents.

32.     Based upon the foregoing, the Debtors respectfully request that the Court approve the DIP Financing in accordance with the terms set forth in the DIP Orders and the DIP Loan Documents.

**B.     Priming**

33.     In addition to authorizing financing under section 364(c), courts also may authorize postpetition credit secured by a senior or equal lien on encumbered property without consent from affected secured parties if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.  *See* 11 U.S C. § 364(d)(1).

34.     Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if
>
> (A) the [debtor] is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

35.     The Debtors are seeking only limited relief in that regard.  The DIP Loan Agreement provides that certain liens shall be permitted as enumerated therein, but the holders of

18

certain types of these liens must file a notice or object to the DIP Loan in order to avoid being primed.[6] The DIP Loan Agreement was negotiated on an expedited basis, and the DIP Lenders were unable to conduct full scale diligence to analyze liens that may be asserted against the assets securing their financing. Many of the Subject Liens that appear on various title reports may have been abandoned, satisfied or are duplicative of other liens. Thus, the DIP Loan Agreement requires the Subject Liens to proactively assert their lien to avoid being primed by the liens granted to the DIP Lenders. To the extent the Subject Liens, except for one category of liens,[7] exceed $250,000 in the aggregate, the DIP Lenders will not be obligated to fund additional advances under the agreement.

36.     Accordingly, the Debtors propose to serve notice of this Motion and entry of Interim Order to all holders of the Subject Liens for whom the Debtors have address information, to give them an opportunity to object to the relief requested herein. To the extent a holder of a Subject Lien does not file an objection to the entry of a Final Order, then their lien or security interest will be primed by and rendered subordinate to the liens and security interests to be granted to secure the Debtors' obligations under the Dip Loan Agreement. To the extent such lienholder does file an objection, then their lien will constitute a "Permitted Lien" to the extent otherwise valid.

37.     The focus of a bankruptcy court's approval of a financing agreement pursuant to section 364(d)(1) should be whether the transaction would enhance the value of the Debtors' assets. Courts advocate using a "holistic approach" to evaluate superpriority postpetition

---

[6] These liens are (i) judgment liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under Section 8.1(c) of the DIP Loan Agreement, (ii) Liens set forth on Schedule P-2 to the Postpetition Loan Agreement; and (iii)Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of business and not in connection with the borrowing of money (collectively, the "Subject Liens").

[7] Excepted from this calculation are the Permitted Liens in respect of the 335 undeveloped acres owned by Northstar Mountain Properties, LLC and listed on Schedule 4.4 to the DIP Loan Agreement as Item 1.

LEGAL_US_W # 63630608. 21
RLF1 3538075v.1

financing agreements that focuses on the transaction as a whole, not just on the priming of liens. *See In re Aqua Ass.*, 123 B.R. 192, 196 (Bankr. E.D. Pa 1991) ("Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere."). Given that the holders of Subject Liens will be adequately noticed and presented with an opportunity to assert their rights, the priming of such liens in the absence of such response is fair, equitable and necessary to obtain the required financing. Moreover, courts in this district have previously granted similar relief. *See In re Landsource Communities Dev. LLC, et al*, Case No. 08-11111 (KJC) (Bankr. D. Del. July 21, 2008 as amended May 22, 2009).

## C.    Modification of the Automatic Stay

38.    Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed DIP Financing contemplates the modification of the automatic stay, to the extent applicable and necessary to permit the DIP Lenders to perform any act authorized or permitted under, or by virtue of, the DIP Orders or the DIP Loan Documents.

39.    Stay modification provisions of this type are standard features of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the DIP Orders and DIP Loan Documents.

LEGAL_US_W # 63630608. 21
RLF1 3538075v.1

**D.**    **Interim Approval of the DIP Financing**

40.    As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

41.    The Debtor respectfully requests that the Court schedule and conduct a preliminary hearing on the Motion and authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the DIP Documents.

**E.**    **Establishing Notice Procedures and Scheduling Final Hearing**

42.    Notice of this Motion shall be provided by first class U.S. mail and/or fax to the following parties (the "Initial Notice Parties"): (a) the Office of the United States Trustee for the District of Delaware, (b) the Debtors' largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions, (c) counsel to the Debtors' senior prepetition secured lenders and (d) counsel to the Debtors' postpetition lenders. As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by and in accordance with Rule 9013-1(m) of the Local Rules. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required. The Debtors submit that, under the circumstances, no further notice of the hearing on the interim financing is necessary and request that any further notice be dispensed with and waived.

43.    The Debtors further respectfully request that the Court schedule the Final Hearing and authorize them to mail and/or fax copies, in accordance with Local Rule 9013-1(m), of the

21

signed Interim Order, which fixes the time, date and manner for the filing of objections, and a notice thereof (the "DIP Notice"), annexed as Exhibit B hereto, which provides further detail regarding the Final Order and the Final Hearing, to (i) the Initial Notice Parties; (ii) any party that has filed prior to such date a request for notices with this Court; (iii) counsel for any official committee(s); (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; and (vi) holders of Subject Liens. The Debtors request that the Court consider such notice of the Final Hearing, including without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under section 506(c) of the Bankruptcy Code, and notice that the Debtors will grant to the Lenders priming liens over certain non-objecting holders of liens, to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.[8]

44.     No previous request for the relief sought herein has been made to this Court or any other court.

**Notice**

45.     Pursuant to Rule 4001(c), notice of this Motion and the Interim Hearing shall be provided to: (a) the Office of the United States Trustee for the District of Delaware, (b) the Debtors' largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions, (c) counsel to the Debtors' senior prepetition secured lenders, (d) counsel to the Debtors' postpetition secured lenders and (e) counsel to the parties to the Support Agreement. As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by and in accordance with Local Rule 9013-1(m). As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be

---

[8]     Local Rule 2002-1(b) provides that "[i]n chapter 11 cases, all motions . . . shall be served only upon counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices under Fed. R. Bankr. P. 2002(i) and all parties whose rights are affected by the motion. If an official unsecured creditors' committee has not been appointed, service shall be made on the twenty (20) largest unsecured creditors in the case in lieu of the creditors' committee."

LEGAL_US_W # 63630608. 21
RLF1 3538075v.1

served on all parties required by and in accordance with Local Rule 9013-1(m). Due to the

urgency of the circumstances surrounding this Motion and the nature of the relief requested

herein, the Debtors respectfully submit that no further notice of this Motion is required.

WHEREFORE, the Debtors respectfully request that this Court enter the proposed DIP

Orders, in substantially the form attached hereto as Exhibit A, and grant the Debtors the relief

requested herein along with such other relief as this Court deems just and appropriate.

Dated: February 16, 2010
      Wilmington, Delaware

Respectfully submitted,

Daniel J. DeFranceschi (DE 2732)
Paul N. Heath (DE 3704)
Dana L. Reynolds (DE 4930)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: defranceschi@rlf.com
       heath@rlf.com
       reynolds@rlf.com

-and-

Richard A. Chesley (IL 6240877)
Gregory S. Otsuka (IL 6270388)
Hilla Uribe Jimenez (IL 6293064)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
191 North Wacker Drive, 30th Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Email: richardchesley@paulhastings.com
       gregoryotsuka@paulhastings.com
       hillauribe@paulhastings.com

PROPOSED COUNSEL FOR DEBTORS AND
DEBTORS IN POSSESSION

LEGAL_US_W # 63630608. 21
RLF1 3538075v.1