# EXHIBIT A

# PROPOSED INTERIM ORDER

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------- x
                                            :
In re                                       :   Chapter 11
                                            :
East West Resort Development V, L.P., L.L.L.P.,  :   Case No. 10-_____ (_____)
et al.,¹                                    :
                                            :   (Joint Administration Pending)
            Debtors.                        :
                                            :
------------------------------------------------------------- x
```

## ORDER (A) AUTHORIZING DEBTORS TO OBTAIN
## INTERIM POSTPETITION FINANCING TO GRANT SECURITY
## INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
## STATUS PURSUANT TO BANKRUPTCY CODE §§ 364(c) AND 364(d);
## AND (B) SCHEDULING A FINAL HEARING PURSUANT TO FED R. BANK. P. 4001

This matter came before this Court on the motion (the "Motion") of the above-captioned

debtors and debtors-in-possession (the "Debtors") requesting that this Court enter an order

authorizing the Debtors to: (a) incur Postpetition Debt on an interim basis; and (b) grant certain

liens and other relief to Barclays Bank PLC, (the "Agent"), for the benefit of itself and the

lenders under the Postpetition Loan Agreement (the "Lenders").²

This Order shall constitute findings of fact and conclusions of law pursuant to Fed. R.

Bankr. P. 7052 and shall take effect and be fully enforceable as of the Filing Date.

---

1       The Debtors are the following 12 entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): East West Resort Development V, L.P., L.L.L.P., a Delaware limited partnership registered as a limited liability limited partnership (9275), NMP Holdings, LLC, a Delaware limited liability company (9716), Northstar Mountain Properties, LLC, a Delaware limited liability company (0823), Northstar Iron Horse, LLC, a Delaware limited liability company (1031), Northstar Big Horn, LLC, a Delaware limited liability company (1132), Northstar Village Townhomes, LLC, a Delaware limited liability company (7166), Northstar Trailside Townhomes, LLC, a Delaware limited liability company (7251), Old Greenwood, LLC, a Delaware limited liability company (3812), Old Greenwood Realty Inc., a California corporation (4355), Gray's Station, LLC, a Delaware limited liability company (8308), Tahoe Mountain Resorts, LLC, a Delaware limited liability company (0093), and Tahoe Club Company, LLC, a Delaware limited liability company (5142). The address of each of the Debtors is 126 Riverfront Lane, 5th Floor, PO Drawer 2770, Avon, Colorado 81620.

² Unless otherwise indicated, all capitalized terms used as defined terms herein have the meanings ascribed thereto in Exhibit A hereto .

Having examined the Motion, being fully advised of the relevant facts and circumstances surrounding the Motion and having completed a hearing pursuant to Code § 364[3] and Fed. R. Bankr. P. 4001(c), and objections, if any, having been withdrawn or resolved or overruled by the Court,

THE MOTION IS GRANTED, AND THE COURT HEREBY FINDS THAT:

A.      On the Filing Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Code.  The Court has authorized the joint administration of these Cases for procedural purposes.  The Debtors have retained possession of their property and continue to operate their businesses as debtors in possession pursuant to Code §§ 1107 and 1108.

B.      The Court has jurisdiction over the Cases and this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Determination of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).  Venue over this Motion is proper under 28 U.S.C. § 1409(a).

C.      [Intentionally Omitted.]

D.      No Committee has been appointed in these Cases.

E.      Even if the Debtors were authorized to use all available Cash Proceeds upon a showing of adequate protection of the interests therein of the Prepetition Lenders, such Cash Proceeds would be insufficient to provide the Debtors with the working capital necessary to prevent immediate and irreparable harm to the Debtors.

F.      The Debtors are unable to obtain unsecured credit as an administrative claim allowable under Code § 503(b)(1) sufficient to finance the operations of the Debtors' business.  Except as provided below, the Debtors are unable to obtain credit allowable under Code §§ 364(c)(1), (c)(2) or (c)(3) on terms more favorable than those offered by the Lenders.

---

[3] Unless otherwise indicated, all section references used herein are to the Bankruptcy Code, 11 U.S.C. §§ 101 et seq (2010).

G.    Consequently, an immediate need exists for the Debtors to obtain the Postpetition Debt in order to minimize disruption to and avoid the termination of their business operations, and to enhance the possibility of a successful reorganization.

H.    In order to prevent immediate and irreparable harm to the estates pending the Final Hearing, the Debtors need to incur Postpetition Debt on an interim basis as provided herein through the conclusion of such Final Hearing.

I.    The Lenders have indicated a willingness to extend the Postpetition Debt, but only on the terms and conditions set forth in this Order and the Postpetition Documents. Under the circumstances of the Cases, the terms and conditions of this Order are a fair and reasonable response to the Debtors' request to incur Postpetition Debt, and the entry of this Order is in the best interests of the Debtors' estates and their creditors. Such terms and conditions have been negotiated in good faith and at arms' length, and the Postpetition Debt is being extended in good faith, as that term is used in Code § 364(e).

J.    The notice provided by the Debtors of the Motion, the hearing on the Motion, and the entry of this Order satisfy the requirements of Fed. R. Bankr. P. 2002, 4001(c) and 9014, Local Rule 9014-1(m) and Code §§ 102 and 364 and were otherwise sufficient and appropriate under the circumstances.

WHEREFORE, IT IS HEREBY ORDERED THAT:

1.    Authorization to Incur Postpetition Debt.

(a)    Approval of Postpetition Documents. As consideration for the extension of the Postpetition Debt, the Postpetition Documents and all of the terms and conditions thereof (including, without limitation, the fees set forth therein) are hereby approved in their entirety.

The Debtors are hereby authorized and directed to: (1) execute the Postpetition Documents, including all documents that the Agent deems are necessary to implement the transactions contemplated by the Postpetition Documents; and (2) perform each of their obligations under and comply with all of the terms and provisions of the Postpetition Documents and this Order. Upon execution and delivery thereof, the Postpetition Documents shall constitute valid and binding obligations of the Debtors, enforceable in accordance with their terms.

(b) <u>Permitted Uses of Postpetition Debt</u>. The Debtors are hereby authorized to incur Postpetition Debt: (1) solely in accordance with and pursuant to the terms and provisions of this Order and the Postpetition Documents; and (2) solely to the extent required to pay those expenses enumerated in the Budget as and when such expenses become due and payable for the purposes allowed under Section 6.13 of the Postpetition Loan Agreement. Notwithstanding anything to the contrary in this Paragraph 1(b), however: (1) the Debtors are hereby authorized to incur Postpetition Debt to pay the Postpetition Charges and the Carveout when due and payable; and (2) if the Agent or Lenders advance monies to the Debtors and the Debtors use such monies other than in accordance with the terms and provisions of this Order or the Postpetition Documents, such advances shall be considered Postpetition Debt for purposes of this Order.

2. <u>Procedure for Delivery of Cash Proceeds</u>.

(a) <u>Delivery of Cash Proceeds to Agent</u>. The Debtors are authorized and directed to deliver all Cash Proceeds, regardless of the source of such Cash Proceeds, now or hereafter in their possession or under their control to the Agent, into the Designated Account. The Agent shall thereafter apply such Cash Proceeds in accordance with Paragraph 6(a) of this Order.

(b)     Account Debtors. Without further order of court, the Agent may direct the Debtors to, or the Agent may directly, instruct all account Debtors to make payments directly into the Designated Account or such other accounts satisfactory to the Agent, in which event all such Cash Proceeds shall applied to the Postpetition Debt in accordance with Paragraph 6(a) of this Order.

(c)     Cash Proceeds in Agent's Possession. The Agent is authorized to collect upon, convert to Cash Proceeds and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into its possession or under its control which constitute Collateral or proceeds of Collateral.

3.      Superpriority Administrative Expense Status: Postpetition Liens. The Postpetition Debt is hereby granted superpriority administrative expense status under Code § 364(c)(1), with priority over all costs and expenses of administration of the Cases that are incurred under any provision of the Code, other than the Carveout. In addition, the Agent, for the benefit of itself and the Lenders, is hereby granted, pursuant to Code §§ 364(c)(2), and 364(c)(3), and 364(d), the Postpetition Liens in the Postpetition Collateral to secure the Postpetition Debt. The Postpetition Liens: (1) are and shall be First Priority Liens in the Postpetition Collateral (but subject to Permitted Liens, including, without limitation, with respect to the Second Lien Collateral only, subject to the Existing U.S. Bank Liens thereon) without any further action by the Debtors, Agent, or Lenders, and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; (2) shall not be subject to any security interest or lien which is avoided and preserved under Code § 551; and (3) shall remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Cases. Notwithstanding the foregoing, the Debtors are authorized and directed to execute and deliver to

Agent such financing statements, mortgages, instruments and other documents as Agent may deem necessary or desirable from time to time. Any such financing statements, mortgages, instruments, or other documents filed by Agent shall be deemed to have been filed as of the Filing Date.

4.    Carveout Terms.    (a) The Carveout shall include the following expenses: (i) statutory fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (ii) subject to the terms and conditions of the Order, all fees and disbursements incurred by the Borrowers and/or the Committee for Carveout Professionals, retained by final order of the Bankruptcy Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) pursuant to Code §§ 327 or 1103(a) to the extent allowed by order of the Bankruptcy Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) under Code §§ 328, 330 and/or 331 and any interim compensation procedures order, but solely to the extent such fees and disbursements are within the corresponding amounts set forth in the Budget and were reflected as estimated fees and expenses of such professionals in the most recent Budget delivered by the Borrowers to the Agent prior to the date that such fees and disbursements were incurred; provided, that: (a) following a notice to the Borrowers from the Agent of the occurrence of an Event of Default, the amount of the Carveout shall not exceed $1,000,000 plus the amount of any compensation or reimbursement of budgeted expenses and fees incurred, awarded or paid prior to the occurrence of an Event of Default in respect of which the Carveout is invoked; (b) the Carveout shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Carveout Professionals, (c) all prepetition retainers and any other property of the estates (other than property subject to an unavoidable lien in favor of Agent) shall be used to pay any allowed fees and expenses of the Carveout Professionals before

any payments of such fees or expenses are made from the Postpetition Debt or the Collateral, (d) upon the Termination Date, and with the exception of the $1,000,000 portion of the Carveout which Lender has agreed to fund on or after the Termination Date, Lender shall have no obligation to fund any fees or expenses of the Carveout Professionals. Notwithstanding anything to the contrary in the foregoing sentence, the Carveout shall not include, and no Postpetition Debt or Collateral may be used to pay, any fees or expenses incurred by any entity, including the Debtors, the Committee, or the Carveout Professionals in connection with claims, actions or services adverse to Agent or Lenders, or any of Agent's or Lenders' interests in any of the Collateral, including (i) preventing, hindering or delaying Agent's or Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred, (ii) using or seeking to use Cash Proceeds or selling any other Collateral without Agent's consent, (iii) incurring indebtedness without Agent's consent, except as expressly permitted by the Postpetition Documents, or (iv) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of the Postpetition Debt or the Postpetition Liens or any other rights or interests of Agent or Lenders, or in asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Code, against Agent or Lenders. Nothing herein shall be construed as consent to the allowance of any fees or expenses of the Carveout Professionals or shall affect the right of Agent to object to the allowance and payment of such fees, costs or expenses.

     5.     <u>Termination of Right To Incur Postpetition Debt</u>.

     (a)     <u>Termination Date</u>. Unless extended by the Court upon the written agreement of the Agent, this Order and the Debtors' authorization to incur Postpetition Debt

pursuant to this Order will automatically terminate on the Termination Date without further notice or order of Court.

(b) <u>Rights Upon Termination</u>. Upon the Termination Date, without further notice or order of the Court, at the Agent's election: (1) the Postpetition Debt shall be immediately due and payable; (2) the Agent shall be entitled to apply or set off any Cash Proceeds in the Agent's possession or control to the Postpetition Debt in accordance with Paragraph 6(a) of this Order, until such Postpetition Debt is indefeasibly and finally paid in full; and (3) the Debtors shall be prohibited from using any Cash Proceeds for any purpose other than application to the Postpetition Debt in accordance with Paragraph 6(a) of this Order, until such Postpetition Debt is indefeasibly and finally paid in full. On the third Business Day after the Termination Date, but subject in each instance to Paragraph 5(c) of this Order: (x) at Agent's election, this Court will conduct a Code § 363 sale on not less than 10 days notice of all or such part of the Collateral designated by Agent, in its sole discretion, and on terms acceptable to Agent, in its sole discretion, with all proceeds to be used to pay the Postpetition Debt in the manner set forth in the Postpetition Loan Agreement (and with Agent preserving the right to credit bid in such sale); (y) at the Agent's election, without further order of the Court, the Agent shall have automatic and immediate relief from the automatic stay with respect to the Collateral (without regard to the passage of time provided for in Fed. R. Bankr. P. 4001(a)(3)), and shall be entitled to exercise all rights and remedies available to it under the Postpetition Documents (including, without limitation, this Order) and applicable nonbankruptcy law with respect to the Collateral; and (z) at Agent's election, the Debtors shall be authorized and directed to execute a deed in lieu of foreclosure of all or part of the Collateral, in form and substance satisfactory to the Agent, in its sole discretion, and otherwise surrender the Collateral and to cooperate to assist

the Agent in the exercise of the rights and remedies available to the Agent under the Postpetition Documents (including this Order) and applicable nonbankruptcy law with respect to the Collateral; provided, however, that (a) during the three Business Day period following the Termination Date, the Debtors shall have the right to obtain an order of this Court determining that the Termination Date has not occurred, but during such three Business Day period, the Debtors may not use Cash Proceeds (other than to pay the Carveout) unless such use is agreed to in writing by the Agent, and the Agent shall have no obligation to advance Postpetition Debt to the Debtors; and (b) solely for purposes of determining if the Postpetition Debt has been paid in full, the value of any deed in lieu accepted by the Agent shall be determined on the date of acceptance by a certified financial appraiser selected by Agent, and reasonably acceptable to the Debtors and TLH.

(c)     State Law Restrictions. In connection with any exercise of rights and remedies by Agent with respect to the Collateral, including, without limitation, any credit bid at any sale of the Collateral under Code § 363, Debtors hereby expressly waive their rights under any "single action," collateral first, anti-deficiency, or other similar state law rules and restrictions, including, without limitation, California Code Of Civil Procedure § 726, and this Court hereby finds and concludes that all such state law rules and restrictions with respect to the Collateral are superseded by this Order. In reliance on the Debtors' waivers and this Court's findings and conclusions, Agent hereby covenants and agrees that, in exercising its rights and remedies pursuant to this Order and the other Postpetition Documents, it shall ask this Court to conduct a Code § 363 Sale, or shall accept a deed in lieu of foreclosure, or attempt to foreclose (either judicially or nonjudicially) on the Trailside Townhomes Collateral prior to doing so on, or otherwise exercising any remedy in respect of, any of the other Collateral. If the Postpetition

Debt has not been paid in full from the proceeds of a sale or foreclosure on the Trailside Townhomes Collateral by (i) the 180th day following the date that the Agent begins to exercise its remedies in respect of the Trailside Townhomes Collateral (the "180th Day"), or (ii) the completion of the sale or foreclosure on the Trailside Townhomes Collateral (the "Sale Completion Date"), the Agent shall be released from the covenant and agreement contained in the preceding sentence on the earlier to occur of the 180th Day and the Sale Completion Date, and shall be entitled to exercise its rights and remedies with respect to the remaining Collateral under the Postpetition Documents (including this Order) and applicable nonbankruptcy law immediately; provided that, solely for purposes of determining if the Postpetition Debt has been paid in full from the proceeds of a foreclosure on the Trailside Townhomes Collateral, the value of any deed in lieu accepted by the Agent shall be determined on the date of acceptance by a certified financial appraiser elected by the Agent, and reasonably acceptable to the Debtors and TLH. The Agent further covenants that it shall use commercially reasonable efforts to realize upon the Trailside Townhomes Collateral by the 180th Day. If for any reason the waivers, findings and conclusions in this Section 5(c) are invalidated by any court of competent jurisdiction after the entry of this Order, Agent's covenants and agreements under this Paragraph 5(c) shall immediately cease, and Agent shall be entitled to exercise its rights and remedies with respect to the Collateral in the same manner it would have as if Agent had never exercised any of its right and remedies under the Postpetition Documents (including this Order) or applicable nonbankruptcy law.

6.    Additional Consideration For Postpetition Debt. As additional consideration for the extension of the Postpetition Debt:

(a)     _Application of Cash Proceeds_.  The Agent, at its election, is authorized to apply all Cash Proceeds (and all monies received by the Agent under Paragraph 1(b) of this Order) now or hereafter coming into the Agent's possession or control in accordance with the terms of the Postpetition Loan Agreement.  All such applications shall be final and not subject to challenge by any person, including any Trustee, subject only to the right of parties in interest to object solely to applications to Postpetition Charges consisting of attorneys' fees and expenses under and in accordance with Paragraph 7(a) of this Order.  Any amounts disgorged in connection with any such objection or determination shall be first applied to repay other Postpetition Debt in accordance with this Paragraph 6(a).

(b)     _Prohibition Against Use of Cash Proceeds_.  The Debtors will not use or seek to use Cash Proceeds (including, without limitation, Cash Collateral), unless, in addition to the satisfaction of all requirements of Code § 363 for the use of such Cash Proceeds: (i) the Agent has consented to such order; (ii) at the time of the entry of such an order, there is no Postpetition Debt outstanding, and no obligation of the Agent to extend additional Postpetition Debt; or (iii) such Cash Proceeds are first used to immediately and indefeasibly pay the Postpetition Debt in cash in full.  Notwithstanding anything else in this Order, as set forth in Section 2.4(e)(i) of the Postpetition Loan Agreement, in connection with the sale or disposition of any Collateral owned by Debtor Northstar Trailside Townhomes, LLC, 72.4% of the Net Cash Proceeds (as that term is defined in the Postpetition Loan Agreement) shall be utilized to prepay Obligations in accordance with the first sentence of Section 2.4(e)(1) of the Postpetition Loan Agreement, and 27.6% of the net proceeds shall be held as collateral for the Postpetition Debt in the Trailside Purchase Deposit Account for the benefit of the Agent and Lenders until it is

disbursed to the agent on the Termination Date and applied on such date pursuant to Section 2.4(f)(i) of the Postpetition Loan Agreement.

(c)      Prohibition Against Additional Debt.  The Debtors will not incur or seek to incur debt secured by a lien which is equal to or superior to the Postpetition Liens, or which is given superpriority administrative expense status under Code § 364(c)(1), unless, in addition to the satisfaction of all requirements of Code § 364 for the incurrence of such debt: (a) the Agent has consented to such order; (b) at the time of the entry of such an order, there is no Postpetition Debt outstanding, and no obligation of the Agent to extend additional Postpetition Debt; or (c) such credit or debt is first used to immediately and indefeasibly pay the Postpetition Debt in cash in full.

(d)      No Surcharge.  Effective upon entry of the Final Order, at no time during the Cases shall the surcharge provisions of Code § 506(c), the enhancement of collateral provisions of Code § 552, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) be imposed upon Lenders or the Agent or any of the Collateral for the benefit of any party in interest, including the Debtors, the Committee, any of the Carveout Professionals, or any Trustee.

(e)      Right to Credit Bid.  In all events, pursuant to Code § 363(k), the Agent shall have the right to use the Postpetition Debt or any part thereof to credit bid with respect to any bulk or piecemeal sale of all or any portion of the Collateral.

(f)      Plan.  Unless the Agent consents thereto, no order shall be entered confirming a plan in any of these Cases unless such order provides for payment in full in cash of all Postpetition Debt on the effective date thereof, together with releases, exculpations, waivers and indemnification, acceptable to the Agent and Required Lenders, in their sole discretion.

7.     <u>Miscellaneous Provisions</u>.

(a)     <u>Notice of and Objections to Postpetition Charges</u>.  The Agent shall provide summaries of all invoices with respect to the Agent's attorneys' fees and related costs and expenses asserted as Postpetition Charges that are incurred after the entry of this Order to: (i) Paul, Hastings, Janofsky & Walker, LLP, Attn:  Richard A. Chesley; 191 North Wacker Drive, Chicago, Illinois, 60640; (ii) Richards, Layton & Finger, P.A., Attn:  Daniel J. DeFranceschi; One Rodney Square, 920 North King Street, Wilmington, Delaware, 19801; (iii) the Office of the United States Trustee, Attn: Joseph J. McMahon, Esq., J. Caleb Boggs Federal Building, 844 King Street, Suite 2313, Lockbox 35, Wilmington, Delaware, 19801 and (iv) counsel for any Committee.  Any such party may object to the reasonableness of any such fees, costs and expenses.  However, any such objection shall be forever waived and barred unless, within 30 days of receipt of the summary of the invoice to which the objection relates: (1) the objection is filed with the Court and served upon the Agent and its counsel; and (2) the objection describes with particularity the items or categories of fees, costs and expenses that are the subject of the objection and provides the specific basis of the objection to each such item or category of fees, costs and expenses.  Any hearing on an objection to the fees, costs and expenses set forth on any invoice summary shall be limited to the reasonableness or necessity of the particular items or categories of the fees, costs and expenses which are the subject of such objection.  The disallowance of any such fees and expenses shall not affect the Agent's right to collect such amounts from any person or entity other than the Debtors.

(b)     <u>Force and Effect of Postpetition Documents</u>. To the extent there exists any conflict among the Motion, the Postpetition Documents and the terms of this Order, this Order shall govern and control.

(c)     <u>Modification of Stay</u>. The automatic stay of Code § 362 is hereby modified with respect to the Agent to the extent necessary to effectuate the provisions of this Order, including, after the Termination Date, to permit the Agent to exercise its rights contemplated by Paragraph 5(b) above.

(d)     <u>Financial Information</u>. The Debtors are hereby directed to deliver to the Agent such financial and other information concerning the business and affairs of the Debtors and any of the Collateral as may be required pursuant to the Postpetition Documents and/or as the Agent shall reasonably request from time to time. The Debtors are also directed to allow the Agent access to the premises in accordance with the terms of the Postpetition Loan Agreement for the purpose of enabling the Agent to inspect and audit the Collateral and the Debtors' books and records.

(e)     <u>No Waiver</u>. The Agent's or the Lenders' failure, at any time or times hereafter, to require strict performance by the Debtors (or by any Trustee) of any provision of this Order or the Postpetition Documents shall not waive, affect or diminish any right of the Agent or the Lenders, as the case may be, thereafter to demand strict compliance and performance therewith. No delay on the part of the Agent or the Lenders in the exercise of any right or remedy under this Order, the Postpetition Documents, the Code, or applicable nonbankruptcy law shall preclude any other or further exercise of any right or remedy. Neither the Agent nor the Lenders shall be deemed to have suspended or waived any of their rights or remedies under this Order, the Postpetition Documents, the Code, or applicable nonbankruptcy law unless such suspension or waiver is in writing, signed by a duly authorized officer of such party, and directed to the Debtors.

(f) "Responsible Person." By executing the Postpetition Documents or taking any actions pursuant to this Order, the Agent shall not: (1) be deemed to be in control of the operations or liquidation of the Debtors; or (2) be deemed to be acting as a "responsible person" with respect to the operation, management or liquidation of the Debtors.

8. Binding Effect.

(a) Order. This Order shall be binding on all parties in interest in the Cases and their respective successors and assigns, including any Trustee, except that any Trustee shall have the right to terminate this Order after notice and hearing. If, in accordance with Code § 364(e), this Order does not become a final nonappealable order, if a Trustee terminates this Order, or if any of the provisions of the Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent order shall not affect (a) the stipulations, representations and findings contained in this Order; and (b) the priority, validity, enforceability or effectiveness of any lien, security interests or any other benefit or claim authorized hereby with respect to any Postpetition Debt incurred prior to the effective date of such termination or subsequent order. All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Order, and the Agent shall be entitled to all the rights, remedies, privileges and benefits granted herein, including the liens and priorities granted herein, with respect to the Postpetition Debt. Except as otherwise explicitly set forth in this Order, no third party is intended to be, or shall be deemed to be, a third party beneficiary of this Order.

(b) Survival. The provisions of this Order, and any actions taken pursuant to or in reliance upon the terms hereof, shall survive entry of, and govern in the event of any conflict with, any order which may be entered in the Cases: (1) confirming any chapter 11 plan;

(2) converting the Cases to cases under chapter 7; or (3) dismissing the Cases. The terms and provisions of this Order, including the rights granted to the Agent and the Lenders under Code §§ 364(c) and (d), shall continue in full force and effect until all of the Postpetition Debt is indefeasibly and finally paid in cash in full and discharged.

9.     <u>Notice of Final Hearing.</u>. The Final Hearing is scheduled for February [_____], 2010. The Debtors are directed to immediately serve a copy of this Order by first class mail, postage prepaid, on the Agent, the Lenders, the Existing Lenders, the Debtors' other secured creditors, the Debtors' twenty largest unsecured creditors, and the United States Trustee, which service shall constitute adequate and proper notice of the Final Hearing. Any objection to the Order must be, no later than seventy-two hours prior to the commencement of such Final Hearing, filed with the Court and received by counsel for the Debtors, Agent, the Lenders, and the United States Trustee. Any timely and properly filed and served objection will be heard at the Final Hearing.

Dated: _____, 2010
        Wilmington, Delaware

        _____
        UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

## DEFINED TERMS

1.      <u>Budget</u>. The budget attached to this Order as Exhibit B; <u>provided, however,</u> that such budget may be amended with Agent's consent, in its sole discretion, without the necessity for further Court approval.

2.      <u>Business Day</u>. Any Business Day (as that term is defined in the Postpetition Loan Agreement).

3.      <u>Carveout</u>. For the purposes of enabling the Debtors' estates to pay allowed fees and disbursements of the Carveout Professionals as may be awarded from time to time pursuant to Code § 330, the aggregate amount set forth in Paragraph 4 of this Order; provided, however, that the Carveout may be used only subject to the terms and provisions of Paragraph 4 of this Order.

4.      <u>Carveout Professionals.</u> Collectively: (a) Paul, Hastings, Janofsky & Walker, LLP, as counsel for the Debtors; (b) Richards Layton & Finger, PA, as counsel for the Debtors; (c) Houlihan Lokey Howard & Zukin Capital, Inc., as financial advisor and investment banker for the Debtors; (d) counsel for any Committee; and (e) a single financial advisor for any Committee.

5.      <u>Cases</u>. These chapter 11 cases or any superseding chapter 7 cases of the Debtors.

6.      <u>Cash Collateral</u>. All "cash collateral," as that term is defined in Code § 363.

7.      <u>Cash Proceeds</u>. All cash, including, without limitation, all Cash Collateral and other cash, arising from the collection or other conversion to cash of the Collateral (including, without limitation, tax refunds, deposits subject to setoff, insurance proceeds, and Net Cash Proceeds (as that term is defined in the Postpetition Loan Agreement).

8.      <u>Code</u>. Title 11 of the United States Code, as in effect from time to time. Unless otherwise indicated, all statutory section references in this Order are to the Code.

9.      <u>Committee</u>. Any official creditors' committee appointed to represent unsecured creditors in the Cases pursuant to Code § 1102.

10.      <u>Designated Account.</u> The "Designated Account," as that term is defined in the Postpetition Loan Agreement.

11.      <u>Effective Date</u>. The effective date of any chapter 11 plan confirmed in any of these Cases.

12.      <u>Event of Default.</u> Any one or more of the following: (a) the Debtors commit any Event of Default under Section 8.1 of the Postpetition Loan Agreement; or (b) the Debtors fail to

perform any of their obligations in strict accordance with the terms of, or otherwise fail to comply with any of the provisions of, this Order.

13. <u>Existing Lenders.</u>  The holders of Existing Loans.

14. <u>Existing Loans</u>.  The loans identified on Schedule 4.19 of the Postpetition Loan Agreement.

15. <u>Existing U.S. Bank Liens</u>.  The Liens of U.S. Bank on the Second Lien Collateral which secure the Existing Loans made by U.S. Bank to Northstar Trailside Townhomes, LLC.

16. <u>Filing Date</u>.  February 16, 2010.

17. <u>Final Hearing</u>.  The final hearing on the Motion conducted in accordance with Fed. R. Bankr. P. 4001.

18. <u>Final Order</u>.  A final order authorizing the Debtors to incur Postpetition Debt entered at or in connection with the Final Hearing.

19. <u>First Priority Liens</u>.  Liens which are first priority, properly perfected, valid and enforceable security interests, which are not subject to any claims, counterclaims, defenses, setoff, recoupment or deduction, and which are otherwise unavoidable and not subject to avoidance or subordination pursuant to any provisions of the Code, applicable nonbankruptcy law, or any agreement.

20. <u>Guarantied Obligations</u>.  The "Guarantied Obligations," as that term is defined in the Guaranty.

21. <u>Guarantors</u>.  The "Guarantors," as that term is defined in the Postpetition Loan Agreement.

22. <u>Guaranty</u>.  The "Guaranty," as that term is defined in the Postpetition Loan Agreement.

23. <u>Liens</u>.  The "Liens," as that term is defined in the Postpeition Loan Agreement.

24. <u>Obligations</u>.  The "Obligations," as that term is defined in the Postpetition Loan Agreement.

25. <u>Permitted Liens</u>.  Collectively:

    (i)     Liens held by Agent to secure the Obligations,

    (ii)    Liens to secure the Existing Loans, but excluding Liens on all or any portion of the Collateral (other than the Liens under that certain Loan Agreement dated as of September 20, 2006 between Northstar Trailside Townhomes, LLC and U.S. Bank National Association),

(iii)    Solely to the extent any such Lien exists and is a valid, enforceable, perfected and non-avoidable Lien as of the Petition Date and the holder of such Lien files an objection or other responsive pleading prior to the entry of the Final Order asserting such Lien:

>    (A)    judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under Section 8.1(c) of the Postpetition Loan Agreement,
>
>    (B)    Liens set forth on Schedule P-2 to the Postpetition Loan Agreement; provided, however, any such Lien described on Schedule P-2 shall only secure the Indebtedness that it secures on the Petition Date;
>
>    (C)    Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of business and not in connection with the borrowing of money,

(iv)    Liens for unpaid taxes set forth on Schedule 4.20,

(v)    Liens on amounts deposited to secure Borrowers' and their Subsidiaries obligations in connection with worker's compensation or other unemployment insurance,

(vi)    with respect to any Real Property, easements, rights of way, and zoning restrictions that do not materially interfere with or impair the use or operation thereof, and

(vii)    rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business.

26.    <u>Postpetition Charges.</u>    Interest at the rate set forth in Section 2.6 of the Postpetition Loan Agreement, and all fees, costs, expenses and other charges due or coming due under the Postpetition Documents or in connection with the Postpetition Debt (including, without limitation, all attorneys' fees and paralegals' fees and expenses, financial advisor fees and expenses, appraiser fees and expenses, valuation related fees and expenses, consultant fees and expenses, out-of-pocket filing and recording fees, external and internal audit fees and expenses, closing fees, letter of credit fees, unused line fees, facility fees, administrative fees, agency fees, arrangement fees, deferred fees, consultant fees and expenses, and all other costs and expenses) that are incurred before, on, or after the Filing Date by Agent with respect the preparation, negotiation or documentation of the Postpetition Documents, the Postpetition Debt, or the administration of the Postpetition Debt.

27.    <u>Postpetition Collateral.</u>    The "Collateral," as that term is defined in the Postpetition Loan Agreement.

28.     Postpetition Debt. (a) All indebtedness, Obligations, or Guarantied Obligations of any or all of the Debtors to Agent or Lenders incurred on or after the Filing Date pursuant to this Order, the Postpetition Documents, or otherwise, including any advances made by Agent or Lenders to pay any Prepetition Debt, plus (b) the Postpetition Charges.

29.     Postpetition Documents. The Postpetition Loan Agreement and the "Loan Documents," as that term is defined in the Postpetition Loan Agreement.

30.     Postpetition Loan Agreement.  That certain Senior Secured, Super-Priority Debtor-In-Possession Loan And Security Agreement by and among the Debtors, the Lenders, the Guarantors, and the Agent dated as of the date hereof and attached hereto as Exhibit C, as amended, modified or supplemented from time to time with the Agent's consent (in its sole discretion) and without the need for further Court approval.

31.     Postpetition Lenders. Barclays Bank PLC, and any other lender that may, from time to time, become a party to the Postpetition Loan Agreement.

32.     Postpetition Liens. First Priority Liens in the Collateral, subject only to Permitted Liens.

33.     Required Lenders. "Required Lenders," as that term is defined in the Postpetition Loan Agreement.

34.     Second Lien Collateral.  The "Second Lien Collateral," as that term is defined in the Postpetition Loan Agreement.

35.     Security Instruments. The "Security Instruments," as that term is defined in the Postpetition Loan Agreement.

36.     Termination Date.  At Agent's election, the earliest to occur of: (a) the date on which Agent provides, via electronic or overnight delivery, written notice to counsel for the Debtors and counsel for any Committee of the occurrence of an Event of Default; (b) the entry of an order converting any of these Cases to a case under chapter 7 of the Code or dismissing any of these Cases; (c) if this Order is modified at the Final Hearing in a manner unacceptable to Agent, in its sole discretion, the date of the commencement of the Final Hearing; (d) the effective date of plan of reorganization; and (e) October 25, 2010.

37.     Trailside Purchase Deposit Account. The "Trailside Purchase Deposit Account," as that term is defined in the Postpetition Loan Agreement.

38.     Trailside Townhomes Collateral. The Collateral consisting of four townhomes of Trailside Townhomes LLC that are under sales contracts as of the Petition Date in the amount of $14,400,000.

38.     Trustee. Any trustee appointed or elected in the Cases.

# EXHIBIT B

## BUDGET

# East West Resort Development V
*Weekly Projected Cash Flows*

*($ in thousands)*

| | Beginning Cash 2/2/2010 | Week 1 2/5/2010 | Week 2 2/12/2010 | Week 3 2/19/2010 | Week 4 2/26/2010 | Week 5 3/5/2010 | Week 6 3/12/2010 | Week 7 3/19/2010 | Week 8 3/26/2010 | Week 9 4/2/2010 | Week 10 4/9/2010 | Week 11 4/16/2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Cash Receipts** | | | | | | | | | | | | |
| Budgeted Revenue | | 70.7 | 70.7 | 70.7 | 70.7 | 92.8 | 92.8 | 92.8 | 92.8 | 40.6 | 40.6 | 40.6 |
| Other [1] | | | | | 58.3 | | | | 58.3 | | | |
| **Total Operating Cash Receipts** | | 70.7 | 70.7 | 70.7 | 129.1 | 92.8 | 92.8 | 92.8 | 151.1 | 40.6 | 40.6 | 40.6 |
| **Operating Cash Disbursements** | | | | | | | | | | | | |
| **Development Costs** | | | | | | | | | | | | |
| Mello Roos | | | 936.9 | | | | | | | | | |
| Contractors | | (277.0) | | (55.0) | (80.0) | | | (60.0) | (75.0) | | (20.0) | (65.0) |
| Environmental | | (39.5) | | (5.0) | | | | | | | | |
| **Soft Costs** | | | | | | | | | | | | |
| Utilities | | (33.7) | (25.8) | | (25.8) | (225.6) | (24.0) | (329.6) | (24.0) | (151.1) | (20.5) | (256.1) |
| Payroll | | (15.0) | | (321.2) | | | (110.0) | (185.0) | (13.0) | | (3.8) | (185.0) |
| Management Fees | | | | | | | (13.0) | (10.0) | (10.0) | | | (5.0) |
| Legal/Financial | | (60.4) | | (10.0) | (10.0) | | (5.0) | (22.5) | (38.6) | | (11.4) | (12.5) |
| Marketing/TMR Allocation | | (135.0) | | (12.5) | (50.0) | (237.0) | (8.6) | | | | | |
| HOA dues | | (441.4) | | | | | | | | | | |
| G&A/office OH | | (61.3) | (108.3) | (20.0) | (23.0) | (45.5) | (23.7) | (20.0) | (23.7) | (52.9) | (26.8) | (20.0) |
| Operating Expenses | | (103.5) | | | (108.3) | | (45.5) | (45.5) | (45.5) | (52.9) | (52.9) | (52.9) |
| Contingency | | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (20.0) | (20.0) | (20.0) |
| **Total Operating Cash Disbursements** | | (1,195.9) | 777.9 | (448.7) | (324.0) | (533.1) | (154.7) | (697.6) | (254.7) | (224.0) | (155.3) | (616.5) |
| **Debt Service + Restructuring Costs** | | | | | | | | | | | | |
| DIP Service | | (1.7) | (3.4) | (3.4) | (3.4) | (3.4) | (3.4) | (3.9) | (4.3) | (4.7) | (5.6) | (6.4) |
| Debt Service - Project Level | | (140.0) | | (54.0) | (101.3) | | | (54.0) | (101.3) | | | |
| Legal Fees (GT / Crozier) | | (700.0) | | | | | | | | | | |
| Restructuring Costs | | (693.8) | (193.8) | (193.8) | (193.8) | (181.3) | (181.3) | (181.3) | (181.3) | (145.0) | (145.0) | (145.0) |
| **Total Debt Service + Restructuring Costs** | | (1,535.4) | (197.2) | (251.2) | (298.5) | (184.7) | (184.7) | (239.1) | (286.9) | (149.7) | (150.6) | (151.4) |
| **Total Disbursements** | | (2,731.3) | 580.8 | (699.9) | (622.5) | (717.8) | (339.4) | (936.7) | (541.6) | (373.7) | (305.9) | (767.9) |
| **Consolidated Net Cash Flow** | | (2,660.5) | 651.5 | (629.2) | (493.4) | (625.0) | (246.6) | (843.9) | (390.5) | (333.1) | (265.3) | (727.3) |
| DIP Draws | 2,000 | | | | | | | 500 | | 500 | 500 | 500 |
| **Cash Balance** | 2,767.8 | 3,107.1 | 2,758.6 | 2,129.4 | 1,636.0 | 1,011.0 | 764.4 | 420.5 | 30.0 | 196.9 | 431.6 | 204.2 |
| | | | | | | | | | | | | |
| **$10.0 million DIP Financing** | | | | | | | | | | | | |
| Beginning Balance | | | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,500.0 | 2,500.0 | 3,000.0 | 3,500.0 |
| EWRD V DIP Draw | 2,000 | 2,000 | | | | | | 500 | | 500 | 500 | 500 |
| DIP Balance | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,500.0 | 2,500.0 | 3,000.0 | 3,500.0 | 4,000.0 |
| Ending DIP Availability | 8,000.0 | 8,000.0 | 8,000.0 | 8,000.0 | 8,000.0 | 8,000.0 | 8,000.0 | 7,500.0 | 7,500.0 | 7,000.0 | 6,590.0 | 6,000.0 |
| | | | | | | | | | | | | |
| **Financial Covenants:** | | | | | | | | | | | | |
| **Cumulative Consolidated Net Cash Flow:** | | | | | | | | | | | | |
| Projected Consolidated Net Cash Flow | | (2,660.5) | (2,009.0) | (2,638.2) | (3,131.6) | (3,756.6) | (4,003.2) | (4,847.2) | (5,237.6) | (5,570.8) | (5,836.1) | (6,563.4) |
| Less: Permitted Variance (12.5%) | | (332.6) | (251.1) | (329.8) | (391.5) | (469.6) | (500.4) | (605.9) | (654.7) | (696.3) | (729.5) | (820.4) |
| **Minimum Projected Consolidated Net Cash Flow** | | (2,993.1) | (2,260.2) | (2,968.0) | (3,523.1) | (4,226.2) | (4,503.6) | (5,453.1) | (5,892.3) | (6,267.1) | (6,565.6) | (7,383.8) |

(1) Per term sheet, 27.6% of Trailside closings proceeds placed in escrow.

(1) Exclusive Resorts currently leases Trailside townhomes; should pending sale of townhome close, lease payments to decline.

East West Resort Development V  
*Weekly Projected Cash Flows*

($ in thousands)

| | Week 12 4/23/2010 | Week 13 4/30/2010 | Week 14 5/7/2010 | Week 15 5/14/2010 | Week 16 5/21/2010 | Week 17 5/28/2010 | Week 18 6/4/2010 | Week 19 6/11/2010 | Week 20 6/18/2010 | Week 21 6/25/2010 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Week Ended | | | | | | |
| **Operating Cash Receipts** | | | | | | | | | | | |
| Budgeted Revenue | 40.6 | 40.6 | 113.6 | 113.6 | 113.6 | 113.6 | 150.9 | 150.9 | 150.9 | 150.9 | 1,915.1 |
| Other (1) | - | 58.3 | - | - | - | 58.3 | - | - | - | 58.3 | 291.7 |
| **Total Operating Cash Receipts** | 40.6 | 98.9 | 113.6 | 113.6 | 113.6 | 171.9 | 150.9 | 150.9 | 150.9 | 209.3 | 2,206.7 |
| **Operating Cash Disbursements** | | | | | | | | | | | |
| *Development Costs* | | | | | | | | | | | |
| Mello Roos | - | - | - | - | - | - | - | - | - | - | 936.9 |
| Contractors | (25.0) | (11.0) | (15.0) | (60.0) | - | (36.0) | (10.0) | (50.0) | (5.0) | (36.0) | (880.0) |
| Environmental | - | - | - | - | - | - | - | - | - | - | (44.5) |
| *Soft Costs* | | | | | | | | | | | |
| Utilities | (20.5) | - | (17.3) | - | (17.3) | - | (16.4) | - | (16.4) | - | (241.5) |
| Payroll | (9.0) | (151.1) | - | (332.6) | (19.0) | (237.6) | - | (387.3) | (19.0) | (292.3) | (2,760.5) |
| Management Fees | (3.8) | - | (3.8) | (185.0) | (3.8) | - | (13.0) | (185.0) | (13.0) | - | (806.8) |
| Legal/Financial | (10.0) | (5.0) | - | (5.0) | - | (15.0) | (10.0) | - | - | (15.0) | (170.4) |
| Marketing/TMR Allocation | (51.4) | - | (16.8) | (12.5) | (46.8) | (10.0) | (12.0) | (12.5) | (42.0) | (10.0) | (504.9) |
| HOA dues | - | - | - | - | - | - | (215.0) | (17.0) | - | - | (910.4) |
| G&A/office OH | (26.8) | - | (12.6) | (20.0) | (12.6) | - | (23.4) | (20.0) | (23.4) | - | (359.2) |
| Operating Expenses | (52.9) | (52.9) | (84.6) | (84.6) | (84.6) | (84.6) | (72.9) | (72.9) | (72.9) | (72.9) | (1,396.5) |
| Contingency | (20.0) | (20.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (25.0) | (500.0) |
| **Total Operating Cash Disbursements** | (219.3) | (240.0) | (175.1) | (724.7) | (209.1) | (408.2) | (397.5) | (769.7) | (216.5) | (451.2) | (7,637.8) |
| **Debt Service + Restructuring Costs** | | | | | | | | | | | |
| DIP Service | (7.3) | (8.1) | (8.6) | (9.4) | (10.3) | (10.7) | (11.6) | (12.8) | (14.1) | (15.0) | (151.5) |
| Debt Service - Project Level | (54.0) | (101.3) | - | - | - | (155.3) | - | - | - | (155.3) | (916.6) |
| Legal Fees (GTT / Chrstr) | - | - | - | - | - | - | - | - | - | - | (700.0) |
| Restructuring Costs | (145.0) | (145.0) | (181.3) | (181.3) | (181.3) | (181.3) | (181.3) | (181.3) | (181.3) | (181.3) | (4,175.0) |
| **Total Debt Service + Restructuring Costs** | (206.3) | (254.5) | (189.8) | (190.7) | (191.5) | (347.3) | (192.8) | (194.1) | (195.4) | (351.6) | (5,943.1) |
| **Total Disbursements** | (425.6) | (494.5) | (364.9) | (915.4) | (400.6) | (755.5) | (590.3) | (963.8) | (411.9) | (802.7) | (13,580.9) |
| **Consolidated Net Cash Flow** | (385.0) | (395.6) | (251.3) | (801.8) | (287.0) | (583.6) | (439.4) | (812.8) | (261.0) | (593.5) | (11,374.1) |
| DIP Draws | 500.0 | 500 | 1,000.0 | 1,000.0 | - | 500.0 | 500.0 | 1,000.0 | 500 | 500.0 | 9,000.0 |
| **Cash Balance** | 319.2 | 423.7 | 172.4 | 370.6 | 83.7 | 0.1 | 60.7 | 247.9 | 486.9 | 393.5 | 393.5 |

**$10.0 million DIP Financing**

| | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | Week 19 | Week 20 | Week 21 |
|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | 4,000.0 | 4,500.0 | 5,000.0 | 5,000.0 | 6,000.0 | 6,000.0 | 6,500.0 | 7,000.0 | 8,000.0 | 8,500.0 |
| EWRD V DIP Draw | 500 | 500 | 1,000.0 | 1,000.0 | - | 500.0 | 500.0 | 1,000.0 | 500 | 500.0 |
| DIP Balance | 4,500.0 | 5,000.0 | 6,000.0 | 6,000.0 | 6,000.0 | 6,500.0 | 7,000.0 | 8,000.0 | 8,500.0 | 9,000.0 |
| Ending DIP Availability | 5,500.0 | 5,000.0 | 5,000.0 | 4,000.0 | 4,000.0 | 3,500.0 | 3,000.0 | 2,000.0 | 1,500.0 | 1,000.0 |

**Financial Covenants:**

Cumulative Consolidated Net Cash Flow:

| | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | Week 19 | Week 20 | Week 21 |
|---|---|---|---|---|---|---|---|---|---|---|
| Projected Consolidated Net Cash Flow | (6,948.4) | (7,344.0) | (7,595.2) | (8,397.0) | (8,684.0) | (9,267.5) | (9,706.9) | (10,519.7) | (10,780.7) | (11,374.1) |
| Less: Permitted Variance (12.5%) | (868.6) | (918.0) | (949.4) | (1,049.6) | (1,085.5) | (1,158.4) | (1,213.4) | (1,315.0) | (1,347.6) | (1,421.8) |
| Minimum Projected Consolidated Net Cash | (7,817.0) | (8,262.0) | (8,544.6) | (9,446.6) | (9,769.5) | (10,426.0) | (10,920.3) | (11,834.7) | (12,128.3) | (12,795.9) |

(1) Exclusive Resorts currently leases Trailside townhomes, should pending sale of townhomes close, lease payments to decline.

(1) Per term sheet, 27.6% of Trailside closings pr[...]

# EXHIBIT C

## POSTPETITION LOAN AGREEMENT

$10,000,000

## SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
## LOAN AND SECURITY AGREEMENT

by and among

**EAST WEST RESORT DEVELOPMENT V, L.P., L.L.L.P.,
NMP HOLDINGS, LLC,
NORTHSTAR TRAILSIDE TOWNHOMES, LLC,
OLD GREENWOOD, LLC, and
TAHOE CLUB COMPANY, LLC,**

as Borrowers,

**THE LENDERS THAT ARE SIGNATORIES HERETO**

as the Lenders,

**BARCLAYS BANK PLC,**

as the Agent

and

**THE GUARANTORS THAT ARE LISTED ON SCHEDULE B-1**

as the Guarantors

**Dated as of February [__], 2010**

# SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
## LOAN AND SECURITY AGREEMENT

THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT (this "Agreement"), is entered into as of February [____], 2010, by and among the lenders identified on the signature pages hereof (such lenders, together with their respective successors, and permitted assigns, are referred to hereinafter each individually as a "Lender" and collectively as the "Lenders"), Barclays Bank PLC, a United Kingdom company, as agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "Agent"), and East West Resort Development V, L.P., L.L.L.P., NMP Holdings, LLC, Northstar Trailside Townhomes, LLC, Old Greenwood, LLC, and Tahoe Club Company, LLC (each, individually, a "Borrower", and collectively, the "Borrowers").

WHEREAS, on February [__], 2010 (the "Petition Date"), the Borrowers and certain of their Subsidiaries commenced voluntary Chapter 11 Case Nos. [____] through [____] as administratively consolidated at Chapter 11 Case No. [____] under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, the Borrowers intend to continue to operate their business and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Borrowers have requested that the Lenders provide financing to the Borrowers consisting of a senior secured super priority term loan facility in a principal amount of up to $10,000,000 (the "Facility") pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code;

WHEREAS, the Lenders have indicated their willingness to agree to extend the Facility to the Borrowers, all on terms and conditions set forth herein and in the other Loan Documents and in accordance with Sections 364(c) and 364(d) of the Bankruptcy Code, so long as:

(a)     the Obligations are (i) secured by Liens on the Collateral granted by the Borrowers, subject in priority only to certain Permitted Liens and the Carve-Out, as hereinafter provided, and (ii) given superpriority status as provided in the Interim Order and, on and after the entry thereof, the Final Order; and

(b)     each Guarantor has jointly and severally guaranteed the Obligations; and

WHEREAS, the Borrowers have agreed to provide such collateral security, superpriority claims and adequate protection, subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

1.      **DEFINITIONS AND CONSTRUCTION.**

1.1     **Definitions.**  Capitalized terms used in this Agreement shall have the meanings specified therefor on Schedule 1.1.

1.2     **Accounting Terms.**  All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, however, that if Borrowers notify Agent that Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if Agent notifies Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then Agent and

Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of the Lenders and Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrowers" is used in respect of a financial covenant or a related definition, it shall be understood to mean Borrowers and their Subsidiaries on a consolidated basis, unless the context clearly requires otherwise.

1.3     **Code.** Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; provided, however, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

1.4     **Construction.** Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in full of all Obligations other than unasserted contingent indemnification Obligations (with all such Obligations consisting of monetary or payment Obligations having been paid in full in cash). Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.

1.5     **Schedules and Exhibits.** All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

2.     **LOAN AND TERMS OF PAYMENT.**

2.1     **[Intentionally Omitted].**

2.2     **Agreement to Lend; Term Loan Advances; Security Instruments and Loan Documents**.

(a)     Subject to the terms and conditions of this Agreement, each Lender with a Term Loan Commitment agrees (severally, not jointly or jointly and severally), during the term of this Agreement, to make advances to the Borrowers in a principal amount not to exceed the Term Loan Amount (the "Advances") and Borrowers hereby agree to accept the Advances.

(b)     The outstanding unpaid principal balance and all accrued and unpaid interest on the Advances shall be due and payable on the earlier of the (i) Maturity Date, and (ii) date of the acceleration of

- 2 -

the Obligations in accordance with the terms hereof. All principal of, interest on, and other amounts payable in respect of the Advances shall constitute Obligations.

(c)      The Advances shall be evidenced by the Loan Documents and the Interim Order and Final Order, and secured by the Interim Order, the Final Order, the Security Instruments and the other Loan Documents.

2.3      **Borrowing Procedures and Settlements.**

(a)      **Procedure for Borrowing.** Each Borrowing shall be made by a written request by an Authorized Person delivered to Agent. Such notice must be received by Agent no later than 12:00 p.m. (New York time) on the Business Day that is the requested Funding Date specifying (i) the amount of such Borrowing, and (ii) the requested Funding Date, which shall be a Business Day. At Agent's election, in lieu of delivering the above-described written request, any Authorized Person may give Agent telephonic notice of such request by the required time. In such circumstances, Borrowers agree that any such telephonic notice will be confirmed in writing within 24 hours of the giving of such telephonic notice, but the failure to provide such written confirmation shall not affect the validity of the request.

(b)      **Settlement.** It is agreed that each Lender's funded portion of the Advances is intended by the Lenders to equal, at all times, such Lender's Pro Rata Share of the outstanding Advances. Such agreement notwithstanding, Agent and the other Lenders agree (which agreement shall not be for the benefit of Borrowers) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the Lenders as to the Advances shall take place on a periodic basis in accordance with the following provisions:

(i)      Agent shall request settlement ("Settlement") with the Lenders on a weekly basis, or on a more frequent basis if so determined by Agent by notifying the Lenders by telecopy, telephone, or other similar form of transmission, of such requested Settlement, no later than 2:00 p.m. (New York time) on the Business Day immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "Settlement Date"). Such notice of a Settlement Date shall include a summary statement of the amount of outstanding Advances for the period since the prior Settlement Date. Subject to the terms and conditions contained herein: (y) if a Lender's balance of the Advances exceeds such Lender's Pro Rata Share of the Advances as of a Settlement Date, then Agent shall, by no later than 12:00 p.m. (New York time) on the Settlement Date, transfer in immediately available funds to a Deposit Account of such Lender (as such Lender may designate), an amount such that each such Lender shall, upon receipt of such amount, have as of the Settlement Date, its Pro Rata Share of the Advances, and (z) if a Lender's balance of the Advances as of a Settlement Date, such Lender shall no later than 12:00 p.m. (New York time) on the Settlement Date transfer in immediately available funds to Agent's Account, an amount such that each such Lender shall, upon transfer of such amount, have as of the Settlement Date, its Pro Rata Share of the Advances. If any such amount is not made available to Agent by any Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Agent shall be entitled to recover for its account such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate.

(ii)      In determining whether a Lender's balance of the Advances is less than, equal to, or greater than such Lender's Pro Rata Share of the Advances of a Settlement Date, Agent shall, as part of the relevant Settlement, apply to such balance the portion of payments actually received in good funds by Agent with respect to principal, interest, fees payable by Borrowers and allocable to the Lenders hereunder, and proceeds of Collateral.

(c)     **Notation**.  Agent, as a non-fiduciary agent for Borrowers, shall maintain a register showing the principal amount of the Advances owing to each Lender and the interests therein of each Lender, from time to time and such register shall, absent manifest error, conclusively be presumed to be correct and accurate.

(d)     **Lenders' Failure to Perform**.  All Advances shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares.  It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any Advance (or other extension of credit) hereunder, nor shall any Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

2.4     **Payments; Reductions of Commitments; Prepayments.**

(a)     **Payments by Borrowers**.

(i)     Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Agent's Account for the account of the Lender Group and shall be made in immediately available funds, no later than 2:00 p.m. (New York time) on the date specified herein.  Any payment received by Agent later than 2:00 p.m. (New York time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)     Unless Agent receives notice from Borrowers prior to the date on which any payment is due to the Lenders that Borrowers will not make such payment in full as and when required, Agent may assume that Borrowers have made (or will make) such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent Borrowers do not make such payment in full to Agent on the date when due, each Lender severally shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

(b)     **Apportionment and Application**.

(i)     So long as no Application Event has occurred and is continuing and except as otherwise provided with respect to Defaulting Lenders, all principal and interest payments shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and all payments of fees and expenses (other than fees or expenses that are for Agent's separate account) shall be apportioned ratably among the Lenders having a Pro Rata Share of the type of Commitment or Obligation to which a particular fee or expense relates.  All payments to be made hereunder by Borrowers shall be remitted to Agent and all (subject to Section 2.4(b)(iv), and Section 2.4(e)) such payments, and all proceeds of Collateral received by Agent, shall be applied, so long as no Application Event has occurred and is continuing, to reduce the balance of the Advances outstanding and, thereafter, to Borrowers (to be wired to the Designated Account) or as otherwise required by applicable law.

(ii)     At any time that an Application Event has occurred and is continuing and except as otherwise provided with respect to Defaulting Lenders, all payments remitted to Agent and all proceeds of Collateral received by Agent shall be applied as follows:

- 4 -

(A)    first, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Agent under the Loan Documents, until paid in full,

(B)    second, to pay any fees or premiums then due to Agent under the Loan Documents until paid in full,

(C)    third, ratably to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Lenders under the Loan Documents, until paid in full,

(D)    fourth, ratably to pay any fees or premiums then due to any of the Lenders under the Loan Documents until paid in full,

(E)    fifth, ratably to pay interest due in respect of the Advances until paid in full,

(F)    sixth, ratably to pay the principal of all Advances until paid in full,

(G)    seventh, to pay any other Obligations until paid in full, and

(H)    eighth, to Borrowers (to be wired to the Designated Account) or as otherwise required by applicable law.

(iii)    Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive, subject to a Settlement delay as provided in Section 2.3(b).

(iv)    In each instance, so long as no Application Event has occurred and is continuing, Section 2.4(b)(i) shall not apply to any payment made by Borrowers to Agent and specified by Borrowers to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement or any other Loan Document.

(v)    [Intentionally Omitted].

(vi)    In the event of a direct conflict between the priority provisions of this Section 2.4 and any other provision contained in any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.4 shall control and govern.

(c)    **Reduction of Commitments.** Borrowers may not prepay the Advances, except pursuant to Sections 2.4(d) and (e) or 2.5 hereof. Any payment under Sections 2.4(d) or (e) shall permanently reduce the Term Loan Commitment by the amount of such payment.

(d)    **Optional Prepayments.**

Borrowers may prepay the outstanding principal amount of any Advance at any time in whole or in part, without premium or penalty.

(e)    **Mandatory Prepayments.**

(i)     **Dispositions**.  Except as set forth in the penultimate sentence of this Section 2.4(e)(i), within 1 Business Day of the date of receipt by Borrowers or Guarantors of the Net Cash Proceeds of any voluntary or involuntary sale or disposition by Borrowers or Guarantors of (x) any Loan Party's assets (other than assets securing any Existing Loans), or (y) with respect to assets securing any Existing Loans, any net proceeds available after any repayment required from the proceeds of such sale or disposition pursuant to the Existing Loan Agreements underlying such Existing Loans, Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(f)(i) in an amount equal to 100% of such Net Cash Proceeds (including condemnation awards and payments in lieu thereof) received by such Person in connection with such sales or dispositions.  Nothing contained in this Section 2.4(e)(i) shall permit Borrowers or Guarantors to sell or otherwise dispose of any assets other than in accordance with Section 6.4.  Notwithstanding the foregoing, in connection with the sale or disposition of (A) Old Greenwood Villa #12, the Borrowers and Guarantors shall only be required to prepay the Obligations in an amount equal to 50% of the Net Cash Proceeds received by such Person in connection with such sale, with such remaining 50% to be used in accordance with the Budget and (B) any Collateral owned by Northstar Trailside Townhomes, LLC, 72.4% of the Net Cash Proceeds shall be utilized to prepay Obligations in accordance with the first sentence of this subsection, and 27.6% of the net proceeds shall be held as collateral security in the Trailside Purchase Deposit Account for the benefit of the Agent and Lenders until it is disbursed to the Agent on the Maturity Date and applied on such date pursuant to Section 2.4(f)(i).  Interest earned on deposits in the escrow account shall be for the account of Borrowers.

(ii)     **Extraordinary Receipts**.  Within 1 Business Day of the date of receipt by Borrowers or any Guarantors of any Extraordinary Receipts that are not otherwise included in the Budget, Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(f)(i) in an amount equal to 100% of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts.

(iii)     **Indebtedness**.  Within 1 Business Day of the date of incurrence by Borrowers or any Guarantors of any Indebtedness (other than Permitted Indebtedness), Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(f)(i) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such incurrence.  The provisions of this Section 2.4(e)(iii) shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms and conditions of this Agreement.

(f)     **Application of Payments.**

(i)     Each prepayment pursuant to Section 2.4(e) shall, (A) so long as no Application Event shall have occurred and be continuing, be applied, *first*, to pay accrued and unpaid interest on, and expenses in respect of, the Advances; *second*, to repay in full the outstanding principal balance of the Advances with a corresponding reduction of the Commitment, and *third*, to the Borrowers, and (B) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.4(b)(ii).

2.5     **Overadvances**.  If, at any time or for any reason, the amount of Obligations owed by Borrowers to the Lender Group pursuant to Section 2.2 is greater than the Term Loan Amount (any such excess, an "Overadvance"), Borrowers shall immediately pay to Agent, in cash, the amount of such excess, which amount shall be used by Agent to reduce the Obligations in accordance with the priorities set forth in Section 2.4(b); provided, however, that in the case of an Overadvance that is caused solely as a result of the charging by Agent of Lender Group Expenses to the Loan Account, Borrowers shall have 3 Business Days from the date of the initial occurrence of such Overadvance to pay to Agent, in cash, the amount of such excess

- 6 -

(which period of 3 Business Days shall in no event be duplicative of the 3 Business Days period referenced in Section 8.1(a) of this Agreement). Borrowers promise to pay the Obligations (including principal, interest, fees, costs, and expenses) in Dollars in full on the Maturity Date or, if earlier, on the date on which the Obligations are declared due and payable pursuant to the terms of this Agreement. The Borrowers may, upon notice to the Agent, without premium or penalty, terminate in whole or permanently reduce in part ratably any unused portion of the Commitments.

2.6     **Interest Rates and Rates, Payments, and Calculations.**

(a)     **Interest Rates.** Except as provided in Section 2.6(c), all Obligations that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof as follows:

(i)     if the relevant Obligation is a LIBOR Rate Loan, at a per annum rate equal to the LIBOR Rate plus the LIBOR Rate Margin,

(ii)     otherwise, at a per annum rate equal to the Base Rate plus the Base Rate Margin.

(b)     **Default Rate.** Upon the occurrence and during the continuation of an Event of Default, at the election of the Required Lenders (confirmed by written notice from Agent to Borrowers), all Obligations that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof at a per annum rate equal to two percentage points (2%) above the per annum rate otherwise applicable hereunder.

(c)     **Payment.** Except to the extent provided to the contrary in Section 2.10, interest, all other fees payable hereunder or under any of the other Loan Documents, and all costs, expenses, and Lender Group Expenses payable hereunder or under any of the other Loan Documents shall be due and payable, in arrears, on the first day of each month at any time that Obligations or Commitments are outstanding. Borrowers hereby authorize Agent, from time to time without prior notice to Borrowers, to charge all interest and all other fees payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), all costs, expenses, and Lender Group Expenses payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), all fees and costs provided for in Section 2.10 (in each case, as and when due and payable), and all other payments as and when due and payable under any Loan Document to the Loan Account, which amounts thereafter shall constitute Advances hereunder and shall accrue interest at the rate then applicable to Advances that are Base Rate Loans. Any interest, fees, costs, expenses, Lender Group Expenses, or other amounts payable hereunder or under any other Loan Document not paid when due shall be compounded by being charged to the Loan Account and shall thereafter constitute Advances hereunder and shall accrue interest at the rate then applicable to Advances that are Base Rate Loans (unless and until converted into LIBOR Rate Loans in accordance with the terms of this Agreement).

(d)     **Computation.** All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue. In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

(e)     **Intent to Limit Charges to Maximum Lawful Rate.** In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Borrowers and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment

- 7 -

exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.7 **Crediting Payments; Clearance Charge**. The receipt of any payment item by Agent shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to Agent's Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into Agent's Account on a Business Day on or before 2:00 p.m. (New York time). If any payment item is received into Agent's Account on a non-Business Day or after 2:00 p.m. (New York time) on a Business Day, it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.

2.8 **Designated Account.** Agent is authorized to make the Advances under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person or, without instructions, if pursuant to Section 2.6(d). Borrowers agree to establish and maintain the Designated Account with the Designated Account Bank and to (i) receive the proceeds of the Advances requested by Borrowers and made by Agent or the Lenders hereunder in such Designated Account; and (ii) deposit all proceeds of the Collateral and all mandatory prepayments hereunder into such Designated Account, after which such sums shall be applied in accordance with Sections 2.4(f)(i) and 2.4(b) and, upon such application, permanently reduce the Commitments in a like amount in accordance with Section 2.4(e).

2.9 **Maintenance of Loan Account; Statements of Obligations.** Agent shall maintain an account on its books in the name of Borrowers (the "Loan Account") on which Borrowers will be charged with all Advances made by Agent or the Lenders to Borrowers or for Borrowers' account, and with all other payment Obligations hereunder or under the other Loan Documents including, accrued interest, fees and expenses, and Lender Group Expenses. In accordance with Section 2.7, the Loan Account will be credited with all payments received by Agent from Borrowers or for Borrowers' account. Agent shall render monthly statements regarding the Loan Account to Borrowers, including principal, interest, fees, and including an itemization of all charges and expenses constituting Lender Group Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Lender Group unless, within 60 days after receipt thereof by Borrowers, Borrowers shall deliver to Agent written objection thereto describing the error or errors contained in any such statements.

2.10 **Fees.**

Borrower shall pay to Agent, for the ratable account of the Lenders, on the first day of each month from and after the Closing Date up to the first day of the month prior to the Maturity Date and on the Maturity Date, an unused line fee in an amount equal to 0.5% per annum times the result of (i) the Term Loan Amount, less (ii) the average Daily Balance of the Advances during the immediately preceding month (or portion thereof).

2.11 **[Intentionally Omitted.]**

2.12 **LIBOR Option.**

(a) **Interest and Interest Payment Dates.** In lieu of having interest charged at the rate based upon the Base Rate, Borrowers shall have the option, subject to Section 2.12(b) below (the "LIBOR Option") to have interest on all or a portion of the Advances be charged (whether at the time when made

- 8 -

(unless otherwise provided herein), upon conversion from a Base Rate Loan to a LIBOR Rate Loan, or upon continuation of a LIBOR Rate Loan as a LIBOR Rate Loan) at a rate of interest based upon the LIBOR Rate. Interest on LIBOR Rate Loans shall be payable on the earliest of (i) the last day of the Interest Period applicable thereto; (ii) the date on which all or any portion of the Obligations are accelerated pursuant to the terms hereof, or (iii) the date on which this Agreement is terminated pursuant to the terms hereof. On the last day of each applicable Interest Period, unless Borrowers properly have exercised the LIBOR Option with respect thereto, the interest rate applicable to such LIBOR Rate Loan automatically shall convert to the rate of interest then applicable to Base Rate Loans of the same type hereunder. At any time that an Event of Default has occurred and is continuing, at the written election of the Required Lenders, Borrowers no longer shall have the option to request that Advances bear interest at a rate based upon the LIBOR Rate.

(b)     **LIBOR Election.**

(i)     Borrower may, at any time and from time to time, so long as Borrower has not received a notice from Agent, after the occurrence and during the continuance of an Event of Default, of the election of the Required Lenders to terminate the right of Borrower to exercise the LIBOR Option during the continuance of such Event of Default, elect to exercise the LIBOR Option by notifying Agent prior to 2:00 p.m. (New York time) at least 3 Business Days prior to the commencement of the proposed Interest Period (the "LIBOR Deadline"). Notice of Borrower's election of the LIBOR Option for a permitted portion of the Advances and an Interest Period pursuant to this Section shall be made by delivery to Agent of a LIBOR Notice received by Agent before the LIBOR Deadline, or by telephonic notice received by Agent before the LIBOR Deadline (to be confirmed by delivery to Agent of a LIBOR Notice received by Agent prior to 5:00 p.m. (New York time) on the same day). Promptly upon its receipt of each such LIBOR Notice, Agent shall provide a copy thereof to each of the affected Lenders.

(ii)    Each LIBOR Notice shall be irrevocable and binding on Borrowers. In connection with each LIBOR Rate Loan, Borrowers shall indemnify, defend, and hold Agent and the Lenders harmless against any loss, cost, or expense actually incurred by Agent or any Lender as a result of (A) the payment of any principal of any LIBOR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (B) the conversion of any LIBOR Rate Loan other than on the last day of the Interest Period applicable thereto, or (C) the failure to borrow, convert, continue or prepay any LIBOR Rate Loan on the date specified in any LIBOR Notice delivered pursuant hereto (such losses, costs, or expenses, "Funding Losses"). A certificate of Agent or a Lender delivered to Borrower setting forth in reasonable detail any amount or amounts that Agent or such Lender is entitled to receive pursuant to this Section 2.12 shall be conclusive absent manifest error. Borrowers shall pay such amount to Agent or the Lender, as applicable, within 30 days of the date of their receipt of such certificate. If a payment of a LIBOR Rate Loan on a day other than the last day of the applicable Interest Period would result in a Funding Loss, Agent may, in its sole discretion at the request of Borrowers, hold the amount of such payment as cash collateral in support of the Obligations until the last day of such Interest Period and apply such amounts to the payment of the applicable LIBOR Rate Loan on such last day, it being agreed that Agent has no obligation to so defer the application of payments to any LIBOR Rate Loan and that, in the event that Agent does not defer such

- 9 -

application, Borrowers shall be obligated to pay any resulting Funding Losses.

(iii)    Borrowers shall have not more than 5 LIBOR Rate Loans in effect at any given time. Borrowers only may exercise the LIBOR Option for proposed LIBOR Rate Loans of at <u>least</u> $1,000,000.

(c)    **Conversion.** Borrowers may convert LIBOR Rate Loans to Base Rate Loans at any time; <u>provided, however</u>, that in the event that LIBOR Rate Loans are converted or prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any automatic prepayment through the required application by Agent of proceeds of any Loan Party's Collections in accordance with <u>Section 2.4(b)</u> or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, Borrowers shall indemnify, defend, and hold Agent and the Lenders and their Participants harmless against any and all Funding Losses in accordance with <u>Section 2.12(b)(ii)</u>.

(d)    **Special Provisions Applicable to LIBOR Rate.**

(i)    The LIBOR Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender (other than additional or increased costs of a *de minimis* amount) of maintaining or obtaining any eurodollar deposits or increased costs (other than additional or increased costs of a *de minimis* amount), in each case, due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), excluding the Reserve Percentage, which additional or increased costs would increase the cost of funding or maintaining loans bearing interest at the LIBOR Rate. In any such event, the affected Lender shall give Borrowers and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrowers may, by notice to such affected Lender (y) require such Lender to furnish to Borrowers a statement setting forth in reasonable detail the calculations and the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (z) repay the LIBOR Rate Loans with respect to which such adjustment is made (together with any amounts due under <u>Section 2.12(b)(ii)</u>). Notwithstanding the foregoing, Borrowers shall not be required to compensate any Lender pursuant to this <u>Section 2.12</u> for such additional or increased costs incurred more than 90 days prior to the date that such Lender delivers such certificate.

(ii)    In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation or application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain LIBOR Rate Loans or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Agent and Borrowers and Agent promptly shall transmit the notice to each other Lender and (y) in the case of any LIBOR Rate Loans of such Lender that are

- 10 -

outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such LIBOR Rate Loans, and interest upon the LIBOR Rate Loans of such Lender thereafter shall accrue interest at the rate then applicable to Base Rate Loans, and (z) Borrowers shall not be entitled to elect the LIBOR Option until such Lender determines that it would no longer be unlawful or impractical to do so.

(e)     **No Requirement of Matched Funding.** Anything to the contrary contained herein notwithstanding, neither Agent, nor any Lender, nor any of their Participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate.

2.13     **Capital Requirements**.

(a)     If, after the date hereof, any Lender determines that (i) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any Governmental Authority charged with the administration thereof, or (ii) compliance by such Lender or its parent bank holding company with any guideline, request or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on such Lender's or such holding company's capital as a consequence of such Lender's Commitments hereunder to a level below that which such Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration such Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount deemed by such Lender to be material, then such Lender may notify Borrowers and Agent thereof. Following receipt of such notice, Borrowers agree to pay such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within 60 days after presentation by such Lender of a statement in the amount and setting forth in reasonable detail such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error). In determining such amount, such Lender may use any reasonable averaging and attribution methods. Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand compensation; provided that Borrowers shall not be required to compensate a Lender pursuant to this Section for any reductions in return incurred more than 90 days prior to the date that such Lender notifies Borrowers of such law, rule, regulation or guideline giving rise to such reductions and of such Lender's intention to claim compensation therefor; provided further that if such claim arises by reason of the adoption of or change in any law, rule, regulation or guideline that is retroactive, then the 90-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b)     If any Lender requests additional or increased costs or amounts under Section 2.13(a) (any such Lender, an "Affected Lender"), then such Affected Lender shall use reasonable efforts to promptly designate a different one of its lending offices or to assign its rights and obligations hereunder to another of its offices or branches, if (i) in the reasonable judgment of such Affected Lender, such designation or assignment would eliminate or reduce amounts payable pursuant to Section 2.13(a), as applicable, and (ii) in the reasonable judgment of such Affected Lender, such designation or assignment would not subject it to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to it. Borrowers agree to pay all reasonable out-of-pocket costs and expenses incurred by such Affected Lender in connection with any such designation or assignment. If, after such reasonable efforts, such Affected Lender does not so designate a different one of its lending offices or assign its rights to another of its offices or branches so as to eliminate Borrowers' obligation to pay any future amounts to such Affected Lender pursuant to Section 2.13(a), as applicable, then Borrowers (without prejudice to any amounts then due to such Affected Lender under Section 2.13(a), as applicable) may, unless prior to the effective date of any such assignment the Affected Lender withdraws its request for such additional amounts under Section 2.13(a), as applicable, may seek a substitute Lender reasonably acceptable to Agent to purchase the Obligations owed to such Affected

- 11 -

Lender and such Affected Lender's Commitments hereunder (a "Replacement Lender"), and if such Replacement Lender agrees to such purchase, such Affected Lender shall assign to the Replacement Lender its Obligations and Commitments, pursuant to an Assignment and Acceptance Agreement, and upon such purchase by the Replacement Lender, such Replacement Lender shall be deemed to be a "Lender" for purposes of this Agreement and such Affected Lender shall cease to be a "Lender" for purposes of this Agreement.

3. **CONDITIONS; TERM OF AGREEMENT.**

   3.1 **Conditions Precedent to Advances of Interim Order Amount.**

   No Lender shall be required to make any Advances unless and until all of the conditions specified below shall have been satisfied (the making of any Advance by a Lender being conclusively deemed to be its satisfaction or waiver of the conditions precedent contained in this Section 3.1.).

   (a) Agent shall have received the Budget (as that is defined in Section 5.16 of this Agreement), in form and substance satisfactory to Agent and Required Lenders, in their sole discretion.

   (b) Borrowers shall represent to the Agent that there are no defaults under any of their Collateral Material Contracts, except as set forth in Schedule 3.1(b).

   (c) The Bankruptcy Court shall have entered the Interim Order, in form and substance satisfactory to the Agent and the Required Lenders, in their sole discretion, within three (3) Business Days of the Petition Date, and such order shall be in full force and effect and shall not have been modified or amended (unless otherwise approved by the Required Lenders), reversed, stayed or subject to a motion for reargument or reconsideration, or appealed. The Loan Parties, the Agent and the Lenders shall be entitled to rely in good faith upon the Interim Order, and shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections thereto, unless the relevant order has been stayed by a court of competent jurisdiction.

   (d) The Agent shall have received a Guaranty from each Guarantor, the Security Instruments, and any other Loan Documents, all of which shall be in form and substance reasonably satisfactory to the Agent.

   (e) The Agent shall have received evidence, in form and substance reasonably satisfactory to Agent that the Borrowers and Guarantors shall have obtained all requisite consents and approvals in connection with the filing of the Chapter 11 Cases, the execution, delivery and performance of this Agreement and the other Loan Documents.

   (f) The Borrowers and Guarantors shall have filed their respective Chapter 11 Cases in the Bankruptcy Court on or before February 17, 2010, and each of the Borrowers and Guarantors shall be a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code.

   (g) All first day motions and applications shall have been filed, and all orders with respect thereto and any other orders entered in the Chapter 11 Cases prior to the Closing Date shall be in form and substance reasonably satisfactory to the Agent and Required Lenders.

   (h) All fees required to be paid on the Closing Date under this Agreement shall have been paid.

   (i) All other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered, executed, or recorded and shall be in form and substance reasonably satisfactory to Agent.

3.2     **Conditions Precedent to all Extensions of Credit.**

The obligation of the Lender Group (or any member thereof) to make any Advances hereunder (or to extend any other credit hereunder), other than the Interim Order Amount, at any time shall be subject to the satisfaction (or waiver by Agent in its sole discretion) of the following conditions precedent (the making of any Advance or other extension of credit by a Lender being conclusively deemed to be its satisfaction or waiver of the conditions precedent with respect to such Advance):

(a)     The representations and warranties of Borrowers or their Subsidiaries contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(b)     No Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof.

(c)     Other than with respect to the Interim Order Amount, the Bankruptcy Court shall have entered the Final Order, in form and substance satisfactory to the Agent and the Required Lenders, in their sole discretion, within thirty (30) Business Days of the Petition Date, and such order shall be in full force and effect and shall not have been modified or amended (unless otherwise approved by the Agent and Required Lenders), reversed, stayed or subject to a motion for reargument or reconsideration, or appealed.

(d)     Subject to Section 4.1(b) hereof, the Loan Parties shall have delivered Schedule 3.2(d), which shall be, as of the date of each Advance, a complete and accurate list of the Loan Parties and their direct and indirect Subsidiaries, showing: (i) a complete and accurate description of the authorized capital Stock of each Loan Party and its Subsidiaries, by class, (ii) the number and the percentage of the outstanding shares of each such class owned directly or indirectly by each Loan Party and its Subsidiaries, (iii) a description of the number of shares of each such class that are issued and outstanding, and (iv) a complete and accurate description of all subscriptions, options, warrants, or calls relating to any shares of each Loan Party's and its Subsidiaries' capital Stock, including any right of conversion or exchange under any outstanding security or other instrument.

(e)     The Agent shall have received all existing title reports with respect to the Collateral, updated as necessary.

(f)     The Agent shall have received such other approvals, opinions or documents as the Required Lenders through the Agent may reasonably request.

(g)     Each Loan Party shall have obtained any registrations, consents, approvals, notices, or other actions required by any Governmental Authority in connection with the execution, delivery, and performance by such Loan Party of the Loan Documents to which such Loan Party is a party, and the consummation of the transactions contemplated by the Loan Documents;

(h)     Borrowers shall (i) have represented that each Loan Party owns, or hold licenses in, all trademarks, trade names, copyrights, patents, and licenses that are necessary to the conduct of its business as currently conducted, and shall have delivered Schedule 3.2(h), a true, correct, and complete listing of all material trademarks, trade names, copyrights, patents, and licenses as to which any Loan Party is the owner or is an exclusive licensee, in each case, as of the Closing Date, provided, however, that each Loan Party may amend Schedule 3.2(h) to add additional intellectual property so long as such amendment occurs by written notice to Agent not less than 30 days after the date on which the applicable Loan Party acquires any such property after the Closing Date, and (ii) have delivered mortgages, financing statements and such other

- 13 -

documents requested by the Agent, in its sole discretion, necessary to obtain and perfect security interests in the assets listed on Schedule 3.2(h), as it exists as of the Closing Date and/or as amended or modified from time to time;

(i)     Each Guarantor shall represent that, except as provided in Schedule 4.14, or defaults solely as a result of the filing of the Chapter 11 Cases, each Guarantor enjoys peaceful and undisturbed possession under all Guarantor Material Leases, and, subject to Permitted Protests, all of such Guarantor Material Leases are valid and subsisting and no material default by the applicable Guarantor exists under any of them;

(j)     No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against Borrowers, Agent, or any Lender;

(k)     The aggregate of all Permitted Liens under clause (c) of the definition of Permitted Liens does not exceed $250,000, except with respect to the Permitted Liens in respect of the 335 undeveloped acres owned by Northstar Mountain Properties, LLC and listed on Schedule 4.4 as Item 1;

(l)     The Agent shall have received the Control Agreements, in form and substance reasonably satisfactory to the Agent; and

(m)     The Loan Parties shall have delivered Schedule 3.2(m) (as such Schedule may be updated from time to time in accordance herewith), a list of the Material Contracts of each Loan Party as of the most recent date on which Borrowers provided their Compliance Certificate pursuant to Section 5.1; provided, however, that Borrowers shall amend Schedule 3.2(m) from time to time to add additional Material Contracts that have been approved by Agent pursuant to Section 5.14 hereof (in the case of Collateral Material Contracts, in its sole discretion, and in the case of Guarantor Material Contracts, such approval not to be unreasonably withheld).

3.3     **Maturity.**

(a)     This Agreement shall continue in full force and effect for a term ending on the earlier of (i) the date on which Agent provides, via electronic or overnight delivery, written notice to counsel for the Debtors and counsel for any Committee of the occurrence of an Event of Default; (ii) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases; (iii) if the Interim Order is modified at the Final Hearing in a manner unacceptable to Agent, in its sole discretion, the date of the commencement of the Final Hearing; (iv) the effective date of a chapter 11 plan in any of these Chapter 11 Cases; and (v) October 25, 2010 (the "Maturity Date"). All Obligations, including without limitation the outstanding unpaid principal balance and all accrued and unpaid interest on the Advances shall be due and payable on the Maturity Date. All principal of, interest on, and other amounts payable in respect of the Advances shall constitute Obligations.

(b)     The foregoing notwithstanding, the Agent may, and, upon the direction of the Required Lenders, shall, terminate its obligations under this Agreement immediately and without notice upon the occurrence and during the continuation of an Event of Default.

3.4     **Effect of Maturity.** On the Maturity Date, all commitments of the Lender Group to provide additional credit hereunder shall automatically be terminated and all Obligations immediately shall become due and payable without notice or demand. No termination of the obligations of the Lender Group (other than payment in full of the Obligations and termination of the Commitments) shall relieve or discharge any Loan Party of its duties, Obligations, or covenants hereunder or under any other Loan Document and Agent's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full and the Commitments have been terminated. When all of the Obligations have been paid in

- 14 -

full and the Lender Group's obligations to provide additional credit under the Loan Documents have been terminated Agent will, at Borrowers' sole expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Agent's Liens and all notices of security interests and liens previously filed by Agent with respect to the Obligations.

      3.5    **Early Termination By Borrowers.**  Borrowers have the option, at any time upon 10 Business Days prior written notice to Agent, to terminate this Agreement and terminate the Commitments hereunder by repayment in full of the Obligations to Agent, subject to the provisions of <u>Section 5.15</u> and <u>Section 10</u>, which shall survive such termination.

## 4.     REPRESENTATIONS AND WARRANTIES.

      In order to induce the Lender Group to enter into this Agreement, each Loan Party makes the following representations and warranties to the Lender Group which shall be true, correct, and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Closing Date (except as set forth in Sections 4.13 and 4.17), and shall be true, correct, and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the date of the making of each Advance (or other extension of credit) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

      4.1    **Due Organization and Qualification; Subsidiaries.**

      (a)    Subject to the Bankruptcy Court's entry of the Orders, each Loan Party (i) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, (ii) is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, and (iii) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

      (b)    Schedule 3.2(d) (as such Schedule may be updated from time to time pursuant to <u>Section 3.2(d)</u> or otherwise to reflect changes resulting from transactions permitted under this Agreement) sets forth the complete and accurate ownership and capitalization of each Loan Party; provided, however, that prior to the making of the first Advance after the Interim Order Amount, Schedule 3.2(d) shall only reflect such matters with respect to each of the Borrowers.  Other than as described on <u>Schedule 3.2(d)</u>, there are no subscriptions, options, warrants, or calls relating to any shares of Borrowers' capital Stock, including any right of conversion or exchange under any outstanding security or other instrument.  Borrowers are not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital Stock or any security convertible into or exchangeable for any of its capital Stock.

      4.2    **Due Authorization; No Conflict.**

      Subject to the Bankruptcy Court's entry of the Orders:

      (a)    As to each Loan Party, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Loan Party.

      (b)    Other than as set forth on <u>Schedule 4.2</u>, as to each Loan Party, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party do not and will not

- 15 -

(i) violate any material provision of federal, state, or local law or regulation applicable to any Loan Party, the Governing Documents of any Loan Party, or any order, judgment, or decree of any court or other Governmental Authority binding on any Loan Party, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract of any Loan Party except to the extent that any such conflict, breach or default could not individually or in the aggregate reasonably be expected to result in a Material Adverse Change, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any Collateral of any Loan Party, other than Permitted Liens, or (iv) require any approval of any Loan Party's interest holders or any approval or consent of any Person under any Material Contract or Material Leases of any Loan Party, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of Material Contracts or Material Leases, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to result in a Material Adverse Change.

4.3 **[Intentionally Omitted]**.

4.4 **Binding Obligations; Perfected Liens.**

Subject to the Bankruptcy Court's entry of the Orders:

(a)    Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).

(b)    Agent's Liens are validly created, perfected and first priority Liens, subject only to the Carve-Out and the Permitted Liens. The Borrowers own the Collateral described on Schedule 4.4 as of the Closing Date.

4.5 **Title to Assets; No Encumbrances.** Each Loan Party has (i) good, sufficient and legal title to (in the case of fee interests in Real Property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good and marketable title to (in the case of all other personal property), all of such Loan Party's assets that constitute Collateral hereunder. The Collateral is free and clear of Liens except for Permitted Liens.

4.6 **Jurisdiction of Formation; Location of Chief Executive Office; Organizational Identification Number; Commercial Tort Claims.**

(a)    The name of (within the meaning of Section 9-503 of the Code) and jurisdiction of formation of each Loan Party is set forth on Schedule 4.6(a) (as such Schedule may be updated from time to time by notice from Borrowers to Agent to reflect changes resulting from transactions permitted under this Agreement).

(b)    The chief executive office of each Loan Party is located at the address indicated on Schedule 4.6(b) (as such Schedule may be updated from time to time by notice from Borrowers to Agent to reflect changes resulting from transactions permitted under this Agreement).

(c)    Each Loan Party's tax identification numbers and organizational identification numbers, if any, are identified on Schedule 4.6(c) (as such Schedule may be updated from time to time by notice from Borrowers to Agent to reflect changes resulting from transactions permitted under this Agreement).

- 16 -

4.7    **Litigation.**

Except with respect to the Chapter 11 Cases:

(a)    There are no actions, suits, or proceedings pending or, to the knowledge of Borrowers, threatened in writing against a Loan Party that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Change, except as disclosed on <u>Schedules 4.19</u> and <u>4.7(b)</u>.

(b)    <u>Schedule 4.7(b)</u> sets forth a complete and accurate description, with respect to each of the actions, suits, or proceedings with asserted liabilities in excess of, or that could reasonably be expected to result in liabilities in excess of, $500,000 that, as of the Closing Date, is pending or, to the knowledge of Borrowers, threatened against a Loan Party, of (i) the parties to such actions, suits, or proceedings, (ii) the nature of the dispute that is the subject of such actions, suits, or proceedings, (iii) the status, as of the Closing Date, with respect to such actions, suits, or proceedings, and (iv) whether any liability of the Loan Parties in connection with such actions, suits, or proceedings is covered by insurance.

4.8    **Compliance with Laws.** Except as disclosed in Schedule 4.8, no Loan Party (a) is in violation of any applicable laws, rules, regulations, executive orders, or codes (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change.

4.9    **No Material Adverse Change.** All historical financial statements relating to the Loan Parties that have been delivered by Borrowers to Agent have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments) and present fairly in all material respects, the Loan Parties' consolidated financial condition as of the date thereof and results of operations for the period then ended. Other than arising as the result of the commencement of the Chapter 11 Cases, since January 24, 2010, no event, circumstance, or change has occurred that has or could reasonably be expected to result in a Material Adverse Change with respect to the Loan Parties:

4.10    **Fraudulent Transfer.** No transfer of property is being made by any Loan Party and no obligation is being incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Loan Party.

4.11    **Employee Benefits.** No Loan Party, or any of its ERISA Affiliates, maintains or contributes to any Benefit Plan.

4.12    **Environmental Condition.** Except to the extent that any of the matters referred to in clauses (a), (b), and (d) below could not reasonably be expected to result in a Material Adverse Change, (a) to Borrowers' knowledge, no Loan Party's properties or assets has ever been used by a Loan Party or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (b) to Borrowers' knowledge, no Loan Party's properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) no Loan Party has received notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or operated by a Loan Party, except to the extent that such Liens are the subject of a Permitted Protest, and (d) other than with respect to Administrative Civil Liability Order issued in March 2009 by the California Regional Water

- 17 -

Quality Control Board, Lahontan Region with respect to the Lahontan Water Project, no Loan Party nor any of their respective facilities or operations is subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law or Environmental Liability that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change.

4.13 **Intellectual Property.** Each Loan Party owns, or hold licenses in, all trademarks, trade names, copyrights, patents, and licenses that are necessary to the conduct of its business as currently conducted, provided, *however*, that the representations and warranties set forth in this Section 4.13 shall not apply until such time as Borrowers shall have delivered the first Schedule 3.2(h).

4.14 **Leases.** Except as provided in Schedule 4.14, or defaults solely as a result of the filing of the Chapter 11 Cases, each Borrower enjoys peaceful and undisturbed possession under all Collateral Material Leases, and, subject to Permitted Protests, all of such Collateral Material Leases are valid and subsisting and no material default by the applicable Borrower exists under any of them.

4.15 **Deposit Accounts and Securities Accounts.** Set forth on Schedule 4.15 (as updated pursuant to the provisions of the Security Agreement from time to time) is a listing of all of the Loan Parties' Deposit Accounts and Securities Accounts, including, with respect to each bank or securities intermediary (a) the name and address of such Person, and (b) the account numbers of the Deposit Accounts or Securities Accounts maintained with such Person.

4.16 **Complete Disclosure.** All financial statements and other factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) furnished on or before the date hereof by or on behalf of a Loan Party in writing to Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents, and all other such factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) hereafter furnished by or on behalf of a Loan Party in writing to Agent or any Lender will be, true and accurate, in all material respects, on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided. The Projections delivered to Agent on January 4, 2010 represent, and as of the date on which any other Projections are delivered to Agent, such additional Projections represent, Borrowers' good faith estimate, on the date such Projections are delivered, of the Loan Parties' future performance for the periods covered thereby based upon assumptions believed by Borrowers to be reasonable at the time of the delivery thereof to Agent (it being understood that such Projections are subject to uncertainties and contingencies, many of which are beyond the control of the Loan Parties, that no assurances can be given that such Projections will be realized, and that actual results may differ in a material manner from such Projections).

4.17 **Material Contracts.** Other than arising as a result of the commencement of the Chapter 11 Cases, and except for matters which, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change, each Material Contract (other than those that have expired at the end of their normal terms) (a) is in full force and effect and is binding upon and enforceable against the applicable Loan Party and, to Borrowers' knowledge, each other Person that is a party thereto in accordance with its terms, (b) has not been otherwise amended or modified (other than amendments or modifications permitted under Section 6.7(c)(i)), and (c) is not in default in any material respect due to the action or inaction of any Loan Party thereto; provided, however, that the representations and warranties set forth in this Section 4.17 shall not apply until such time as Borrowers shall have delivered the first Schedule 3.2(m).

4.18 **Patriot Act.** To the extent applicable, each Loan Party is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any

- 18 -

other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act"). No part of the proceeds of the loans made hereunder will be used by any Loan Party or any of their Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

4.19    **Indebtedness.** Set forth on Schedule 4.19 is a true and complete list of all Indebtedness (other than the Obligations) of each Loan Party outstanding immediately prior to the Closing Date in excess of $75,000 that is to remain outstanding immediately after giving effect to the closing hereunder on the Closing Date and such Schedule accurately sets forth the aggregate principal amount of such Indebtedness as of the Closing Date. None of the Indebtedness set forth on Schedule 4.19 is secured by any of the Collateral, other than the Indebtedness owed to U.S. Bank, which is secured by the Second Lien Collateral.

4.20    **Payment of Taxes.** Except as provided on Schedule 4.20 and except as otherwise permitted under Section 5.5 (a) all United States federal, state and other material tax returns and reports of each Loan Party required to be filed by any of them with respect to the Collateral have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees and other governmental charges upon any Loan Party's Collateral that are due and payable, other than taxes that are the subject of a Permitted Protest, have been paid when due and payable, (b) with respect to the Collateral, each Loan Party has made adequate provision in accordance with GAAP for all material taxes not yet due and payable, and (c) with respect to the Collateral, Borrowers know of no proposed tax assessment against a Loan Party with respect to United States federal or state taxes that is not being actively contested by such Loan Party diligently, in good faith, and by appropriate proceedings; provided such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

4.21    **Governmental Regulation.** No Loan Party is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. No Loan Party is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

5.    **AFFIRMATIVE COVENANTS.**

Each Loan Party covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations, the Loan Parties shall comply with each of the following:

5.1    **Financial Statements, Reports, Certificates.** Deliver to Agent, with copies to each Lender, (a) no later than the Closing Date, audited annual 2008 financial statements and unaudited and certified 2009 financial statements; (b) when issued or received, reports to shareholders, performance test results, notices of defaults, litigation and other material events; and (c) at the time of a request for any Borrowing, a Compliance Certificate. In addition, Borrowers agree that no Loan Party will have a fiscal year different from that of Borrowers. In addition, Borrowers agree to maintain a system of accounting that enables Borrowers to produce financial statements in accordance with GAAP.

5.2    **Collateral Reporting.** Provide Agent, on a monthly basis, an updated Schedule 4.20 reflecting any additional United States federal, state, and other material taxes on the Collateral accrued and delinquent as of the date that such updated Schedule 4.20 is required to be provided to the Agent.

5.3    **Existence.** Except as otherwise permitted under Section 6.3 or Section 6.4, at all times (a) maintain and preserve in full force and effect its existence (including being in good standing in its jurisdiction

of formation) and (b) maintain all its rights and franchises, licenses and permits, except where the failure to maintain any such rights and franchises, or licenses and permits, could not reasonably be expected to result in a Material Adverse Change.

5.4 **Maintenance of Properties.** Except where the failure to do so could not reasonably be expected to result in a Material Adverse Change, (a) maintain and preserve all of its assets that are necessary to the proper conduct of its business in good working order and condition, ordinary wear, tear, and casualty excepted and Permitted Dispositions excepted, and (b) comply with the material provisions of all material leases to which it is a party as lessee, so as to prevent the loss or forfeiture thereof, unless such provisions are the subject of a Permitted Protest.

5.5 **Taxes.** Cause all assessments and taxes imposed, levied, or assessed against any Collateral to be paid in full, before delinquency or before the expiration of any extension period, other than taxes that are scheduled in Schedule 4.20 to be accrued, in an amount not to exceed the lesser of (a) the amount of accrued taxes set forth in Schedule 4.20 through the relevant testing date, and (b) $7,000,000.

5.6 **Insurance.** At Borrowers' expense, maintain insurance respecting each of the Loan Parties' assets wherever located, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses. Borrowers also shall maintain (with respect to each of the Loan Parties) business interruption, general liability, product liability insurance, director's and officer's liability insurance, fiduciary liability insurance, and employment practices liability insurance, as well as insurance against larceny, embezzlement, and criminal misappropriation. All such policies of insurance shall be with responsible and reputable insurance companies and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope reasonably satisfactory to Agent. All property insurance policies covering the Collateral are to be made payable to Agent for the benefit of Agent and the Lenders, as their interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard non contributory "lender" or "secured party" clause and are to contain such other provisions as Agent may reasonably require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies. All certificates of property and general liability insurance are to be delivered to Agent, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of Agent and shall provide for not less than 30 days (10 days in the case of non-payment) prior written notice to Agent of the exercise of any right of cancellation. Borrowers should promptly provide evidence of such insurance to Agent, including evidence that Agent has been included as an additional beneficiary of such insurance, within 30 days of the Closing Date and must diligently work to comply with, and cooperate with Agent's agents, with respect to implementing any insurance modifications reasonably requested by Agent in order for Borrowers to comply with the provisions of Section 5.6. If Borrowers fail to maintain such insurance, Agent may arrange for such insurance, but at Borrowers' expense and without any responsibility on Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Borrowers shall give Agent prompt notice of any loss exceeding $50,000 covered by its casualty or business interruption insurance. Upon the occurrence and during the continuance of an Event of Default, Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

5.7 **Inspection.** Permit Agent and each of its duly authorized representatives or agents to visit any of its properties and inspect any of its assets or books and records, to conduct appraisals and valuations, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as Agent may reasonably require and, so long as no Default or Event of Default exists, with reasonable prior notice to Borrowers.

- 20 -

5.8 **Compliance with Laws.** Comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

5.9 **Environmental**.

(a) Keep any property either owned or operated by any Loan Party free of any Environmental Liens or post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens,

(b) Comply with Environmental Laws and provide to Agent documentation of such compliance which Agent reasonably requests, except to the extent that any such failure to comply could not reasonably be expected to result in a Material Adverse Change,

(c) Promptly notify Agent of any release of which Borrowers have knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Loan Party that could reasonably be expected to result in a Material Adverse Change, and take any Remedial Actions required to abate said release or otherwise to come into compliance, in all material respects, with applicable Environmental Law (except to the extent that any such noncompliance could not reasonably be expected to result in a Material Adverse Change), and

(d) Promptly, but in any event within 5 Business Days of its receipt thereof, provide Agent with written notice of any of the following: (i) notice that an Environmental Lien has been filed against any of the real or personal property of any Loan Party, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against any Loan Party, and (iii) written notice of a violation, citation, or other administrative order from a Governmental Authority.

5.10 **Disclosure Updates.** Promptly and in no event later than 5 Business Days after obtaining knowledge thereof, notify Agent if any written information, exhibit, or report (other than materials marked as drafts and forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) furnished to the Lender Group contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein (taken as a whole) not misleading in light of the circumstances in which made. The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

5.11 **Formation of Subsidiaries.** No Loan Party may form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Closing Date without the consent of the Agent, in its sole discretion. Any Subsidiary that is formed after the Closing Date shall be a Guarantor and execute the form of Guaranty attached hereto as Schedule 5.11 and any other documentation reasonably requested by Agent.

5.12 **Further Assurances**. At any time upon the reasonable request of Agent, execute or deliver to Agent any and all financing statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, mortgages, deeds of trust, opinions of counsel, and all other documents (collectively, the "Additional Documents") that Agent may reasonably request in form and substance reasonably satisfactory to Agent, to create, perfect, and continue perfected or to better perfect Agent's Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of Agent in any Collateral acquired by any Borrower after the Closing Date with a fair market value in excess of $500,000, and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents. To the maximum extent permitted by applicable

- 21 -

law, Borrowers authorize Agent to execute any such Additional Documents in the applicable Borrower's name, as applicable, and authorize Agent to file such executed Additional Documents in any appropriate filing office. In furtherance and not in limitation of the foregoing, each Loan Party shall take such actions as Agent may reasonably request from time to time to ensure that the Obligations are guarantied by the Guarantors and are secured by substantially all of the assets of any Borrower and all of the outstanding capital Stock of any Borrower, or any direct, wholly-owned Subsidiary of any Borrower.

5.13    **[Intentionally Omitted].**

5.14    **Material Contracts.**  No Loan Party may enter, amend or modify (i) a Collateral Material Contract or Collateral Material Lease after the Petition Date without the consent of Agent, in its sole discretion; and (ii) a Guarantor Material Contract or Guarantor Material Lease, without the consent of Agent, such consent not to be unreasonably withheld.

5.15    **Chapter 11 Milestones**.  The Loan Parties shall:

(a)    Within 90 days of the Petition Date, file either (i) a Plan of Reorganization and accompanying Disclosure Statement, or (ii) a motion to approve Bid Procedures.

(b)    Within 120 days of the Petition Date, either (i) obtain approval of the disclosure statement with respect to the Plan of Reorganization, or (ii) commence an auction for the Debtors' assets pursuant to the Bid Procedures.

(c)    Within 165 days of the Petition Date, either (i) obtain confirmation of a Plan of Reorganization, or (ii) close  a Sale of the Debtors' assets pursuant to the Bid Procedures.

(d)    Achieve the effective date of a Plan of Reorganization within 176 days of the Petition Date.

5.16    **Budget**.  No later than January 30, 2010, Borrowers shall provide Agent with a budget that sets forth in reasonable detail all receipts and disbursements of the Borrowers on a two-week and calendar month basis, separated into line items for each category of receipt or disbursement, and is otherwise in form and substance acceptable to the Agent, in its sole discretion (as amended with the consent of Agent in its sole discretion, the "Budget").

6.    **NEGATIVE COVENANTS.**

Each Loan Party covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations, the Loan Parties will not do any of the following:

6.1    **Indebtedness.**  Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

6.2    **Liens.**  Create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

6.3    **Restrictions on Fundamental Changes.**

Except in connection with a Plan of Reorganization or a Sale approved by the Bankruptcy Court:

- 22 -