(a)     Enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Stock, except for any merger between Loan Parties, provided that Borrowers must be the surviving entity of any such merger to which it is a party,

(b)     Liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), except for (i) the liquidation or dissolution of non-operating Subsidiaries of Borrowers with nominal assets and nominal liabilities, (ii) the liquidation or dissolution of a Loan Party (other than Borrowers) so long as all of the assets (including any interest in any Stock) of such liquidating or dissolving Loan Party are transferred to a Loan Party that is not liquidating or dissolving, or

(c)     Suspend or go out of a substantial portion of its or their business, except as permitted pursuant to clauses (a) or (b) above or in connection with the transactions permitted pursuant to Section 6.4.

6.4     **Disposal of Assets.**     Other than Permitted Dispositions, Permitted Investments, or transactions expressly permitted by Sections 6.3 and 6.12, convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any Collateral held by any Loan Party.

6.5     **Change Name.**     Change any Loan Party's name, organizational identification number, state of organization or organizational identity; provided, however, that any Loan Party may change their names upon at least 10 days prior written notice (or such shorter period approved by Agent in its sole discretion) to Agent of such change.

6.6     **Nature of Business.**     Make any change in the nature of its or their business as described in Schedule 6.6 or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, however, that the foregoing shall not prevent any Loan Party from (i) engaging in any business that is reasonably related or ancillary to its or their business, or (ii) complying with any requirement of the Bankruptcy Code.

6.7     **Prepayments and Amendments.**

(a)     prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Loan Party, other than (i) the Obligations in accordance with this Agreement, (ii) Permitted Intercompany Advances and (iii) the Existing Loans, but (A) solely out of the proceeds of any sales of assets securing such Existing Loans, and (B) subject to the provisions of Section 2.4(e)(i).

(b)     make any payment on account of Indebtedness that has been contractually subordinated in right of payment if such payment is not permitted at such time under the subordination terms and conditions, or

(c)     Directly or indirectly, amend, modify, or change any of the terms or provisions of

(i)     any agreement, instrument, document, indenture, or other writing evidencing or concerning Permitted Indebtedness other than (A) the Obligations in accordance with this Agreement, (B) Permitted Intercompany Advances, (C) Indebtedness permitted under clause (d) of the definition of Permitted Indebtedness, and (D) the Existing Loans, to the extent such amendments, modifications, or changes, individually or in the aggregate, could not reasonably be expected to be materially adverse to the interests of Agent or Lenders.

(ii)     any Material Contract or Material Lease, with the consent of Agent, in its sole discretion, such consent not to be unreasonably withheld, or

- 23 -

(iii)    the Governing Documents of any Loan Party, except to the extent that such amendment, modification, or change does not, individually or in the aggregate, result in a Material Adverse Change.

6.8    **Change of Control.**  Cause, permit, or suffer, directly or indirectly, any Change of Control.

6.9    **Restricted Junior Payments.**  Make any Restricted Junior Payment.

6.10    **Accounting Methods.**  Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

6.11    **Investments; Controlled Investments.**

(a)    Except for Permitted Investments, directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment.

(b)    Other than (i) an aggregate amount of not more than $100,000 at any one time, in the case of each Loan Party (ii) amounts deposited into Deposit Accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for any Loan Party's employees, and (iii) each Deposit Account used, in the ordinary course of business, solely for daily accounts payable that has an ending daily balance every day of zero, make, acquire, or permit to exist Permitted Investments consisting of cash, Cash Equivalents, or amounts credited to Deposit Accounts or Securities Accounts unless any Loan Party, as applicable, and the applicable bank or securities intermediary have entered into Control Agreements with Agent governing such Permitted Investments in order to perfect (and further establish) Agent's Liens in such Permitted Investments that constitute Collateral hereunder.

6.12    **Transactions with Affiliates.**  Directly or indirectly enter into or permit to exist any transaction with any Affiliate of any Loan Party except for:

(a)    transactions (other than the payment of management, consulting, monitoring, or advisory fees) between any Loan Party, on the one hand, and any Affiliate of any Loan Party, on the other hand, so long as such transactions (i) are fully disclosed to Agent prior to the consummation thereof, and (ii) are no less favorable, taken as a whole, to any Loan Party, as applicable, than would be obtained in an arm's length transaction with a non-Affiliate,

(b)    so long as it has been approved by any Loan Party's board of directors (or comparable governing body) in accordance with applicable law, any indemnity provided for the benefit of directors (or comparable managers) or officers of any Loan Party or is provided for in any operating agreement, limited partnership agreement, articles of incorporation, bylaws, that has been fully disclosed to Agent prior to the date hereof,

(c)    so long as it has been approved by any Loan Party's board of directors (or comparable governing body) in accordance with applicable law, the payment of reasonable compensation, severance, or employee benefit arrangements to employees, officers, and outside directors of any Loan Party in the ordinary course of business and consistent with past practice,

(d)    transactions permitted by Section 6.3, or any Permitted Intercompany Advance,

(e)    the payment, pursuant to the EWRD V Operating Agreement, of management, consulting, monitoring, and advisory fees to East West Partners, Inc. or its Affiliates set forth in the Budget in an aggregate amount not to exceed $550,000 in any fiscal quarter of Borrowers, so long as no Event of Default has occurred and is continuing or would result therefrom; provided, that if at any time any such management, consulting, monitoring or advisory fees to East West Partners, Inc. or its Affiliates are not permitted to be paid

- 24 -

as a result of the failure to satisfy the preceding conditions set forth in this Section 6.12(e), then (1) such amounts shall continue to accrue, and (2) any such amounts that have accrued but which were not permitted to be paid may be paid in any subsequent quarter so long as the preceding conditions set forth in this Section 6.12(e) are satisfied at the time of the making of such payments,

(f)     payments, pursuant to any sub-management agreements or other arrangements among the Loan Parties and any of their Affiliates (i) of any management, consulting, monitoring, and advisory fees, or (ii) in respect of any expense reimbursement obligations, in each case, to any of the Loan Parties' Affiliates; provided that any such payments are not inconsistent with the Budget, and

(g)     the payment of sales commissions, payable in the ordinary course, in connection with the sale of Northstar Trailside Townhomes, LLC units.

6.13     **Use of Proceeds**  The proceeds of the Advances shall be used to fund working capital and general corporate purposes of the Borrowers and their Subsidiaries solely to pay transaction costs, fees and expenses set forth in the Budget as and when due and payable thereunder.

6.14     **Prepetition Indebtedness**.  Subject to Section 6.7, pay or discharge, or permit any Loan Party to pay or discharge, or cause to be paid or discharged, the Existing Loans or any other Indebtedness of any Loan Party incurred before the Petition Date without the consent of the Agent, in its sole discretion, other than the Existing Loans (a) solely out of the proceeds of any sales of assets securing such Existing Loans, and (b) subject to the provisions of Section 2.4(e)(i).

6.15     **Limitation on Capital Expenditures.**  Except as set forth in the Budget, make or incur any Capital Expenditure without the prior written consent of the Agent.

6.16     **Bankruptcy Chapter 11 Cases**.  Seek, consent or suffer to exist or permit any of their Subsidiaries to seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to the Orders; (ii) a priority claim for any administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in Section 503(b) or 507(b) of the Bankruptcy Code or, from and after the entry of the Final Order, Section 506(c) of the Bankruptcy Code) equal to or superior to the priority claim of the Agent and the Lenders in respect to the Obligations, other than the Carve Out; and (iii) any Lien on any Collateral having a priority equal or superior to the Liens in favor of the Agent and the Lenders in respect of the Obligations other than Permitted Liens.

7.     **FINANCIAL COVENANTS**

7.1     **Financial Covenants**.

(a)     **Budget Variance Analysis**.  Borrowers will prepare and deliver to Agent and Lenders no later than the fifth day following the end of every weekly period following the Petition Date (i) a budget variance analysis sufficient to permit testing under Section 7.1(b) hereof; and (ii) a bi-weekly conference call regarding the Budget and management issues.

(b)     **Maximum Allowed Budget Variances**.  Borrowers covenant and agree that, until termination of all of the Commitments and payment in full of the Obligations, Borrowers shall operate solely in accordance with the Budget; provided, however, that, beginning with the week ended January 22, 2010, and at the end of each week thereafter on a cumulative basis (the "Testing Period"), the Borrowers' net cash flow for the Testing Period then ended may exceed those set forth in the Budget by no more than the greater of (i) $500,000, and (ii) 12.5%.

8.     **EVENTS OF DEFAULT.**

8.1     **Event of Default.** Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

(a)     If Borrowers fail to pay when due and payable, or when declared due and payable, (a) all or any portion of the Obligations consisting of interest, fees, or charges due the Lender Group, reimbursement of Lender Group Expenses, or other amounts (other than any portion thereof constituting principal) constituting Obligations (including any portion thereof that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), and such failure continues for a period of 3 Business Days, or (b) all or any portion of the principal of the Obligations;

(b)     If any Loan Party:

(i)     fails to comply with any of the chapter 11 milestones contained in Section 5.15 of this Agreement;

(ii)     fails to perform or observe any covenant or other agreement contained in any of (i) Sections 5.1, 5.3 (solely if Borrowers are not in good standing in its jurisdiction of organization), 5.6, 5.7 (solely if Borrowers refuse to allow Agent or its representatives or agents to visit Borrowers' properties, inspect its assets or books or records, examine and make copies of its books and records, or discuss Borrowers' affairs, finances, and accounts with officers and employees of Borrowers), or 5.14 of this Agreement, (ii) Sections 6.1 through 6.16 of this Agreement, (iii) Section 7 of this Agreement, or (iv) Section 6 of the Security Agreement;

(iii)     fails to perform or observe any covenant or other agreement contained in any of Sections 5.3 (other than if Borrowers are not in good standing in its jurisdiction of organization), 5.4, 5.5, 5.8, 5.10, and 5.12 of this Agreement and such failure continues for a period of 10 days after the date on which written notice thereof is given to Borrowers by Agent; or

(iv)     fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents, in each case, other than any such covenant or agreement that is the subject of another provision of this Section 8 (in which event such other provision of this Section 8 shall govern), and such failure continues for a period of 30 days after the date on which written notice thereof is given to Borrowers by Agent;

(c)     Except as authorized by the Bankruptcy Court, if one or more judgments, orders, or awards for the payment of money involving an aggregate amount of $50,000, or more (in excess of insurance coverage with respect to which the insurer has not denied coverage) is entered or filed against a Loan Party or any of its Subsidiaries, or with respect to any of their respective assets, and either (i) there is a period of 30 consecutive days at any time after the entry of any such judgment, order, or award during which (A) the same is not discharged, satisfied, vacated, or bonded pending appeal, or (B) a stay of enforcement thereof is not in effect, or (ii) enforcement proceedings are commenced upon such judgment, order, or award;

(d)     If a Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of Borrowers and their Subsidiaries, taken as a whole;

(e)     If there is a default in one or more agreements to which a Loan Party is a party with one or more third Persons relative to a Loan Party's Indebtedness (not disclosed on Schedule 4.19) involving an aggregate amount of $50,000 or more, and such default (i) occurs at the final maturity of the obligations

- 26 -

thereunder, or (ii) results in a right by such third Person, irrespective of whether exercised, to accelerate the maturity of such Loan Party's or its Subsidiary's obligations thereunder, to the extent not otherwise stayed by the Chapter 11 Cases;

(f)     If any warranty, representation, certificate, or Record made herein or in any other Loan Document or delivered in writing to Agent or any Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

(g)     If the obligation of any Guarantor under the Guaranty is limited or terminated by operation of law or by such Guarantor (other than in accordance with the terms of this Agreement);

(h)     If the Security Agreement or any other Loan Document that purports to create a Lien, shall, for any reason, fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien on the Collateral covered thereby, provided, however, that any such failure or cessation shall not constitute an Event of Default if such failure is (a) a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement, or (b) as the result of an action or failure to act on the part of Agent; or

(i)     The validity or enforceability of any Loan Document shall at any time for any reason (other than solely as the result of an action or failure to act on the part of Agent) be declared to be null and void, or a proceeding shall be commenced by a Loan Party or its Subsidiaries, or by any Governmental Authority having jurisdiction over a Loan Party or its Subsidiaries, seeking to establish the invalidity or unenforceability thereof, or a Loan Party or its Subsidiaries shall deny that such Loan Party or their Subsidiaries has any liability or obligation purported to be created under any Loan Document;

(j)     The Bankruptcy Court shall enter any order (i) amending, reversing, revoking, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order, the Final Order or any other order with respect to the Chapter 11 Cases affecting in any material respect this Agreement or the Loan Documents, without the Required Lenders' consent, (ii) appointing a Chapter 11 trustee or an examiner, with enlarged powers relating to the operation of the business pursuant to Section 1104 of the Bankruptcy Code (powers beyond those set forth in Section 1106(a)(3) and (4) and 1106(b) of the Bankruptcy Code) in the Chapter 11 Cases, (iii) dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, or (iv) granting relief from the automatic stay to any creditor holding or asserting a Lien or reclamation claim on the assets of Borrowers or Guarantors to permit such creditor to foreclose upon or to reclaim Collateral with a value in excess of $100,000;

(k)     A motion shall be filed seeking approval of any other Superpriority Claim in the Chapter 11 Cases (other than the Carve Out) which is pari passu with or senior to the claims of any of the Agents or the Lenders against any of the Loan Parties unless after giving effect to the transactions contemplated by such motion, all Obligations of any Loan Party under the Loan Documents (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) shall be paid in full in cash;

(l)     The failure of the Bankruptcy Court to enter the Interim Order, in form and substance reasonably satisfactory to the Agent, within three (3) days after the filing of the motion to approve the Interim Order;

(m)     A motion shall be filed (i) seeking to obtain additional financing under Section 364 of the Bankruptcy Code and to use cash collateral of the Lenders under Section 363(c) of the Bankruptcy Code without the consent of the Agent and Required Lenders, (ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code,

- 27 -

or (iii) to take any other action or actions adverse to the Lenders or their rights and remedies hereunder or under any of the other Loan Documents or any of the documents evidencing or creating the Secured Parties' interest in any of the Collateral;

(n)     The filing of any plan other than a Plan of Reorganization, a motion to approve bid procedures other than the Bid Procedures, or a motion to approve a sale of any assets other than the Sale.

(o)     The use by the Borrowers of cash collateral other than in accordance with the terms of an order approving its use entered by the Bankruptcy Court;

(p)     Any Material Adverse Change shall occur;

(q)     The occurrence of any material damage to or loss of assets of the Loan Parties taken as a whole (after application of any insurance as to which the applicable insurance company has accepted responsibility to cover such damage or loss, but inclusive of any deductible amount);

(r)     An order terminating exclusivity has been entered by the Bankruptcy Court or requested of the Bankruptcy Court unless actively contested by the Borrowers;

(s)     If, subsequent to the entry of the Final Order, the aggregate of all Permitted Liens under clause (c) of the definition of Permitted Liens, except with respect to the Permitted Liens in respect of the 335 undeveloped acres owned by Northstar Mountain Properties, LLC and listed on Schedule 4.4 as Item 1, exceeds $250,000;

then, and in any such event, the Agent may, or upon the request of the Required Lenders, shall, by notice to the Borrowers, declare (A) the Commitments of each Lender and the obligation of each Lender to make Advances to be terminated, whereupon the same shall forthwith terminate, and (B) the Advances, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Obligations, all such interest and all such amounts shall be forthwith due and payable.

8.2     **Rights and Remedies.**  Upon the occurrence and during the continuation of an Event of Default, and notwithstanding the provisions of Section 362 of the Bankruptcy Code, Agent may, and, at the instruction of the Required Lenders, shall, in each case by written notice to Borrowers and in addition to any other rights or remedies provided for hereunder or under any other Loan Document or by applicable law, do any one or more of the following on behalf of the Lender Group:

(a)     declare the Obligations, whether evidenced by this Agreement or by any of the other Loan Documents immediately due and payable, whereupon the same shall become and be immediately due and payable, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by Borrowers; and

(b)     obtain and liquidate the Collateral without the necessity for any further order from the Bankruptcy Court or any other court, or the initiation of any further proceeding pursuant to a deed in lieu agreement with Borrowers, to be negotiated by Borrowers and Agent in good faith.

8.3     **Remedies Cumulative.**  The rights and remedies of the Lender Group under this Agreement, the other Loan Documents, and all other agreements shall be cumulative.  The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity.  No exercise by the Lender Group of one right or remedy shall be deemed an election, and no waiver by the Lender Group of any Event of Default shall be deemed a continuing waiver.  No delay by the Lender Group shall constitute a waiver, election, or acquiescence by it.

9.      **PRIORITY AND COLLATERAL SECURITY**

*Error! Unknown document property name.*
RLF1 3538067v.1

9.1    **Superpriority Claims and Collateral Security.**

(a)    The Borrowers and any Loan Party, as applicable, jointly and severally warrant and covenant that, except as otherwise expressly provided in this paragraph, upon the entry of the applicable Order, the Obligations of any Loan Party under the Loan Documents

(i)    shall at all times constitute a Superpriority Claim in the Chapter 11 Cases having priority, pursuant to Section 364(c)(1) and 507(b) of the Bankruptcy Code (subject only to the Carve Out), over the other administrative claims of any entity, including, without limitation any claims under Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code (including, subject to entry of the Final Order, Section 506(c)), and shall at all times be senior to the rights of the Loan Parties, the Loan Parties' estates, any successor trustee to the extent permitted by law, or any other creditor in the Chapter 11 Cases;

(ii)    pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code and the Security Instruments, shall at all times be secured by, and each Borrower hereby grants to the Agent, for the benefit of the Lenders, a continuing, valid, binding, enforceable, non-avoidable and automatically properly perfected post-petition security interest and first priority (subject to the Carve Out and Permitted Liens) Lien on all of the Borrowers' existing and after acquired real and personal property and other assets that constitute Collateral hereunder, tangible and intangible, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Borrowers, whether owned or consigned by or to, or leased from or to the Borrowers and regardless of where located, including without limitation, (A) the Collateral (as defined in the Security Instruments), (B) all avoidance power claims and actions arising under Section 549 of the Bankruptcy Code relating to postpetition transfers of Collateral and any proceeds thereof, (C) subject to entry of the Final Order, all avoidance power claims and actions under Chapter 5 of the Bankruptcy Code and any proceeds thereof, (D) subject to entry of the Final Order, the security interest will not be subject to Section 551 of the Bankruptcy Code nor shall Collateral be surcharged pursuant to Section 506(c) of the Bankruptcy Code, and (E) any unencumbered assets of the Borrowers.

(b)    Such Superpriority Claim and Liens referred to in Section 9.1 shall be subject to the Carve Out, but shall otherwise be senior in priority to (i) all claims against any Loan Party in the Chapter 11 Cases; and (ii) all other Liens on the assets and properties of the Borrowers other than Permitted Liens.

9.2    **Guarantees**. The Obligations shall be guaranteed by the Guarantors pursuant to the terms of each Guarantor's respective Guaranty.

9.3    **No Discharge; Survival of Claims**. Pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Borrowers hereby waive any discharge of the Obligations with respect to any plan of reorganization that shall not provide for the payment in full in cash of the Obligations (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) under this Facility.

9.4    **Adequate Protection**. To the extent necessary, the holders of the Existing Loans may receive administrative claims junior to the Superpriority Claim to the extent of any diminution in the value of their collateral, pursuant to the Orders.

10.    **WAIVERS; INDEMNIFICATION.**

10.1 **Demand; Protest; etc.** Borrowers waive demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Lender Group on which Borrowers may in any way be liable.

10.2 **The Lender Group's Liability for Collateral.** Borrowers hereby agree that: (a) so long as Agent complies with its obligations, if any, under the Code, the Lender Group shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by Borrowers, except any thereof resulting from the gross negligence, bad faith or willful misconduct of the Lenders as finally determined by a court of competent jurisdiction.

10.3 **Indemnification.** Borrowers shall pay, indemnify, defend, and hold the Agent-Related Persons, the Lender-Related Persons, and each Participant (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable and documented out-of-pocket fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery (provided that Borrowers shall not be liable for costs and expenses (including attorneys fees) of any Lender (other than Agent) incurred in advising, structuring, drafting, reviewing, administering or syndicating the Loan Documents), enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of Borrowers' and their Subsidiaries' compliance with the terms of the Loan Documents (provided, however, that the indemnification in this clause (a) shall not extend to (i) disputes solely between or among the Lenders or (ii) disputes solely between or among the Lenders and their respective Affiliates; it being understood and agreed that the indemnification in this clause (a) shall extend to disputes between or among Agent on the one hand, and one or more Lenders, or one or more of their Affiliates, on the other hand), (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any assets or properties owned, leased or operated by any Loan Party or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any such assets or properties of any Loan Party (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, Borrowers shall have no obligation to any Indemnified Person under this Section 10.3 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Person or its officers, directors, employees, attorneys, or agents. This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrowers were required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrowers with respect thereto. **WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.**

11. **NOTICES.**

*Error! Unknown document property name.*
RLF1 3538067v.1

All notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or telefacsimile.  In the case of notices or demands to any Loan Party hereunder or any service of process to any Loan Party or Agent, as the case may be, they shall be sent to the respective address set forth below:

|  | |
|---|---|
| If to any Loan Party: | **c/o East West Partners, Inc.**<br>126 Riverfront Lane, 5th Floor<br>P.O. Drawer 2770<br>Avon, Colorado 81620<br>Attn: Craig Ferraro<br>Fax No. 970-845-7205 |
| with copies to: | **Paul, Hastings, Janofsky & Walker LLP**<br>191 N. Wacker Drive<br>30th Floor<br>Chicago, Illinois 60606<br>Attn: Richard A. Chesley, Esq.<br>Fax No.: 312-499-6150 |
| with copies to: | **Crescent Real Estate Equities Limited Partnership**<br>777 Main Street, Suite 2000<br>Fort Worth, Texas 76102<br>Attention: Tom Nezworski .<br>Tnezworski@Goffgp.Com<br>Fax: (817) 321-2002<br>Attn: Cris Baird, Esq<br>CBaird@crescent.com<br>Fax: (817) 882-8900 |
| If to Agent: | **Barclays Bank PLC**<br>200 Park Avenue<br>New York, New York 10166<br>Attn: David Sawyer, Esq.<br>David.Sawyer@barclayscapital.com<br>Fax No.: 212-520-0315 |
|  | **Barclays Bank PLC**<br>745 Seventh Avenue<br>New York, New York 10019<br>Attn: Elisabeth Summers, Esq.<br>Elisabeth.Summers@barclayscapital.com<br>Fax No.: 212-520-0306 |
| with copies to: | **Greenberg Traurig, LLP**<br>200 Park Avenue<br>New York, New York 10166<br>Attn: Bruce R. Zirinsky, Esq.<br>zirinskyb@gtlaw.com |

*Error! Unknown document property name.*
*RLF1 3538067v.1*

Fax No.: (212) 805-5517
Attn: Nathan A. Haynes, Esq.
haynesn@gtlaw.com
Fax No.: (212) 801-6400

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this Section 11, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days after the deposit thereof in the mail; provided, that (a) notices sent by overnight courier service shall be deemed to have been given when received, (b) notices by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient) and (c) notices by electronic mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment). If any notice, disclosure, or report is required to be delivered pursuant to the terms of this Agreement on a day that is not a Business Day, such notice, disclosure, or report shall be deemed to have been required to be delivered on the immediately following Business Day.

12.     **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

        (a)     THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

        (b)     THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. BORROWER AND EACH MEMBER OF THE LENDER GROUP WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 12(b); PROVIDED, FURTHER, HOWEVER, THAT ALL PARTIES HEREBY AGREE THAT THEY HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT.

        (c)     TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWER AND EACH MEMBER OF THE LENDER GROUP REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING

- 32 -

CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

13. **ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS.**

13.1 **Assignments and Participations.**

(a) (i) With the prior written consent of Borrowers, which consent of Borrowers shall not be unreasonably withheld, delayed or conditioned, and shall not be required (A) if an Event of Default has occurred and is continuing, and (B) in connection with an assignment to a Person that is a Lender or an Affiliate (other than individuals) of a Lender and (ii) with the prior written consent of Agent, any Lender may assign and delegate to one or more assignees (each, an "Assignee") all or any portion of the Obligations, the Commitments and the other rights and obligations of such Lender hereunder and under the other Loan Documents, in a minimum amount (unless waived by Agent) of $1,000,000 (except such minimum amount shall not apply to (x) an assignment or delegation by any Lender to any other Lender or an Affiliate of any Lender or (y) a group of new Lenders, each of which is an Affiliate of each other or a Related Fund of such new Lender to the extent that the aggregate amount to be assigned to all such new Lenders is at least $1,000,000); provided, however, that Borrowers and Agent may continue to deal solely and directly with such Lender in connection with the interest so assigned to an Assignee until (i) written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to Borrowers and Agent by such Lender and the Assignee, (ii) such Lender and its Assignee have delivered to Borrowers and Agent an Assignment and Acceptance and Agent has notified the assigning Lender of its receipt thereof in accordance with Section 13.1(b), and (iii) unless waived by Agent, the assigning Lender or Assignee has paid to Agent for Agent's separate account a processing fee in the amount of $3,500.

(b) From and after the date that Agent notifies the assigning Lender (with a copy to Borrowers) that it has received an executed Assignment and Acceptance and, if applicable, payment of the required processing fee, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, shall have the rights and obligations of a Lender under the Loan Documents, and (ii) the assigning Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (except with respect to Section 10.3) and be released from any future obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto and thereto); provided, however, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Section 15.

(c) By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto, (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrowers or the performance or observance by Borrowers of any of their respective obligations under this Agreement or any other Loan Document furnished pursuant hereto, (iii) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance, (iv) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (v) such Assignee appoints and authorizes Agent to take such actions and to exercise such powers

- 33 -

under this Agreement and the other Loan Documents as are delegated to Agent, by the terms hereof and thereof, together with such powers as are reasonably incidental thereto, and (vi) such Assignee agrees that it will perform all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     Immediately upon Agent's receipt of the required processing fee, if applicable, and delivery of notice to the assigning Lender pursuant to Section 13.1(b), this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Commitments arising therefrom. The Commitment allocated to each Assignee shall reduce such Commitments of the assigning Lender *pro tanto*.

(e)     Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons (a "Participant") participating interests in all or any portion of its Obligations, its Commitment, and the other rights and interests of that Lender (the "Originating Lender") hereunder and under the other Loan Documents; provided, however, that (i) the Originating Lender shall remain a "Lender" for all purposes of this Agreement and the other Loan Documents and the Participant receiving the participating interest in the Obligations, the Commitments, and the other rights and interests of the Originating Lender hereunder shall not constitute a "Lender" hereunder or under the other Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Borrowers, Agent, and the Lenders shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents, (iv) no Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other Loan Document would (A) extend the final maturity date of the Obligations hereunder in which such Participant is participating, (B) reduce the interest rate applicable to the Obligations hereunder in which such Participant is participating, (C) release all or substantially all of the Collateral or guaranties (except to the extent expressly provided herein or in any of the Loan Documents) supporting the Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through such Lender (other than a waiver of default interest), or (E) change the amount or due dates of scheduled principal repayments or prepayments or premiums, and (v) all amounts payable by Borrowers hereunder shall be determined as if such Lender had not sold such participation, except that, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set off to the extent a Lender is entitled to do so pursuant to Section 15.12 in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement. The rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to the other Lenders, Agent, Borrowers, the Collections of Borrowers or their Subsidiaries, the Collateral, or otherwise in respect of the Obligations. No Participant shall have the right to participate directly in the making of decisions by the Lenders among themselves.

(f)     In connection with any such assignment or participation or proposed assignment or participation or any grant of a security interest in, or pledge of, its rights under and interest in this Agreement, a Lender may, subject to the provisions of Section 17.8, disclose all documents and information which it now or hereafter may have relating to any Loan Party and their respective businesses.

13.2    **Successors**. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that Borrowers may not assign this Agreement or any rights or duties hereunder without the Lenders' prior written consent and any prohibited assignment shall be absolutely void *ab initio*. No consent to assignment by the Lenders shall, unless otherwise provided in such

- 34 -

consent, release Borrowers from their Obligations. A Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to <u>Section 13.1</u> and, except as expressly required pursuant to <u>Section 13.1</u>, no consent or approval by Borrowers is required in connection with any such assignment.

14.    **AMENDMENTS; WAIVERS.**

    14.1    <u>**Amendments and Waivers.**</u>

        (a)    No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by Borrowers therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent at the written request of the Required Lenders) and the Loan Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given; <u>provided, however</u>, that no such waiver, amendment, or consent shall, unless in writing and signed by all of the Lenders directly affected thereby and the Loan Parties that are party thereto, do any of the following:

        (i)    increase the amount of or extend the expiration date of any Commitment of any Lender,

        (ii)    postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal (other than a mandatory prepayment that is payable pursuant to <u>Section 2.4(e)(i)</u> or <u>Section 2.4(e)(ii)</u>), interest, fees, or other amounts due hereunder or under any other Loan Document,

        (iii)    reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document (except that neither (y) any amendment or modification of defined terms used in the financial covenants in this Agreement nor (z) any waiver of applicability of <u>Section 2.6(b)</u> shall constitute a reduction in the rate of interest or a reduction of fees for purposes of this clause (iii)),

        (iv)    amend or modify this Section or any provision of this Agreement providing for consent or other action by all Lenders,

        (v)    other than as permitted by <u>Section 15.11</u>, release Agent's Lien in and to any of the Collateral,

        (vi)    change the definition of "Required Lenders" or "Pro Rata Share",

        (vii)    contractually subordinate any of Agent's Liens (provided, Agent shall have the ability to subordinate any of the Agent's Liens that it could release in accordance with the provisions of the Loan Documents),

        (viii)    other than in connection with a merger, liquidation, dissolution or sale of such Person expressly permitted by the terms hereof or the other Loan Documents, release Borrowers or any Guarantor from any obligation for the payment of money or consent to the assignment or transfer by Borrowers or any Guarantor of any of their rights or duties under this Agreement or the other Loan Documents,

        (ix)    amend any of the provisions of <u>Section 2.4(b)(i)</u> or <u>2.4(b)(ii).</u>

(x)      amend Section 13.1(a) to permit a Loan Party, an Affiliate of a Loan Party, to be permitted to become an Assignee.

(b)      No amendment, waiver, modification, or consent shall amend, modify, or waive any provision of Section 15 pertaining to Agent, or any other rights or duties of Agent under this Agreement or the other Loan Documents, without the written consent of Agent, Borrowers, and the Required Lenders, and

(c)      Anything in this Section 14.1 to the contrary notwithstanding, any amendment, modification, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of Borrowers, shall not require consent by or the agreement of Borrowers.

14.2      **Replacement of Certain Lenders.**

(a)      If (i) any action to be taken by the Lender Group or Agent hereunder requires the consent, authorization, or agreement of all Lenders or all Lenders directly adversely affected thereby and if such action has received the consent, authorization, or agreement of the Required Lenders but not of all Lenders or all Lenders affected thereby or (ii) any Lender makes a claim for compensation under this Agreement, then Borrowers or Agent, upon at least 5 Business Days prior irrevocable notice, may permanently replace any Lender (a "Holdout Lender") that failed to give its consent, authorization, or agreement or made a claim for compensation (a "Tax Lender") with one or more Replacement Lenders, and the Holdout Lender or Tax Lender, as applicable, shall have no right to refuse to be replaced hereunder. Such notice to replace the Holdout Lender or Tax Lender, as applicable, shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

(b)      Prior to the effective date of such replacement, the Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender being repaid its share of the outstanding Obligations (including an assumption of its Pro Rata Share of the Letters of Credit) without any premium or penalty of any kind whatsoever. If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Holdout Lender shall be made in accordance with the terms of Section 13.1(a). Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Holdout Lender hereunder and under the other Loan Documents, the Holdout Lender shall remain obligated to make the Holdout Lender's Pro Rata Share of Advances and to purchase a participation in each Letter of Credit, in an amount equal to its Pro Rata Share of such Letters of Credit.

14.3      **No Waivers; Cumulative Remedies.**  No failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or any Lender in exercising the same, will operate as a waiver thereof. No waiver by Agent or any Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Agent or any Lender on any occasion shall affect or diminish Agent's and each Lender's rights thereafter to require strict performance by Borrowers of any provision of this Agreement. Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

15.      **AGENT; THE LENDER GROUP.**

15.1      **Appointment and Authorization of Agent.**  Each Lender hereby designates and appoints BBPLC as its agent under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other

- 36 -

action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Agent agrees to act as agent for and on behalf of the Lenders on the conditions contained in this <u>Section 15</u>. Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Agent shall not have any duties or responsibilities, except those expressly set forth herein or in the other Loan Documents, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Loan Documents with reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties. Each Lender hereby further authorizes Agent to act as the secured party under each of the Loan Documents that create a Lien on any item of Collateral. Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Agent, Lenders agree that Agent shall have the right to exercise the following powers as long as this Agreement remains in effect: (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, the Collections of Borrowers and their Subsidiaries, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (c) make Advances, for itself or on behalf of Lenders, as provided in the Loan Documents, (d) exclusively receive, apply, and distribute the Collections of Borrowers and their Subsidiaries as provided in the Loan Documents, (e) open and maintain such bank accounts and cash management arrangements as Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes with respect to the Collateral and the Collections of Borrowers and their Subsidiaries, (f) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to Borrowers or their Subsidiaries, the Obligations, the Collateral, the Collections of Borrowers and their Subsidiaries, or otherwise related to any of same as provided in the Loan Documents, and (g) incur and pay such Lender Group Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

15.2 **Delegation of Duties.** Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

15.3 **Liability of Agent.** None of the Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders for any recital, statement, representation or warranty made by Borrowers or any of their Subsidiaries or Affiliates, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of Borrowers or their Subsidiaries or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lenders to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of Borrowers or their Subsidiaries.

- 37 -

15.4    **Reliance by Agent.** Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrowers or counsel to any Lender), independent accountants and other experts selected by Agent.  Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Agent shall first receive such advice and concurrence of the Lenders as it deems appropriate and until such instructions are received, Agent shall act, or refrain from acting, as it deems advisable.  If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the requisite Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders.

15.5    **Notice of Default or Event of Default.** Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the Lenders and, except with respect to Events of Default of which Agent has actual knowledge, unless Agent shall have received written notice from a Lender or Borrowers referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default."  Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Agent has actual knowledge.  If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and Agent of such Event of Default.  Each Lender shall be solely responsible for giving any notices to its Participants, if any.  Subject to <u>Section 15.4</u>, Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with <u>Section 9</u>; provided, however, that unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

15.6    **Credit Decision.** Each Lender acknowledges that none of the Agent-Related Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of Borrowers and their Subsidiaries or Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender.  Each Lender represents to Agent that it has, independently and without reliance upon any Agent-Related Person and based on such due diligence, documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of Borrowers or any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrowers.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Borrowers or any other Person party to a Loan Document.  Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Agent, Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of Borrowers or any other Person party to a Loan Document that may come into the possession of any of the Agent-Related Persons.  Each Lender acknowledges that Agent does not have any duty or responsibility, either initially or on a continuing basis (except to the extent, if any, that is expressly specified herein) to provide such Lender with any credit or other information with respect to Borrowers, their Affiliates or any of their respective business, legal, financial or other affairs, and

- 38 -

irrespective of whether such information came into Agent's or its Affiliates' or representatives' possession before or after the date on which such Lender became a party to this Agreement.

15.7 **Waiver of Certain Claims and Counterclaims.** In no event shall any Lender have any liability to the Borrowers for lost profits or other special, consequential, incidental, exemplary or punitive damages in connection with this Agreement or any of the other Loan Documents or the transactions contemplated hereby or thereby (other than any such damages resulting solely from the gross negligence, bad faith or willful misconduct of such Lender, as determined by a final non-appealable judgment of a court of competent jurisdiction), and the Borrowers expressly waive any and all right to assert any such claims. The Borrowers further waive all rights to interpose any claims, deductions, setoffs, recoupment, or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Obligations, the Collateral or any matter arising therefrom or relating hereto or thereto. No officer of any Lender has any authority to waive, condition, or modify the provisions of this section.

15.8 **Costs and Expenses; Indemnification.** Agent may incur and pay Lender Group Expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorneys fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not Borrowers are obligated to reimburse Agent or Lenders for such expenses pursuant to this Agreement or otherwise. Agent is authorized and directed to deduct and retain sufficient amounts from the Collections of Borrowers and their Subsidiaries received by Agent to reimburse Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders. In the event Agent is not reimbursed for such costs and expenses by Borrowers or their Subsidiaries, each Lender hereby agrees that it is and shall be obligated to pay to Agent such Lender's Pro Rata Share thereof. Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Agent-Related Persons (to the extent not reimbursed by or on behalf of Borrowers and without limiting the obligation of Borrowers to do so), according to their Pro Rata Shares, from and against any and all Indemnified Liabilities; provided, however, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make an Advance or other extension of credit hereunder. Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for such Lender's Pro Rata Share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that Agent is not reimbursed for such expenses by or on behalf of Borrowers. The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

15.9 **Successor Agent.** Agent may resign as Agent upon 30 days prior written notice to the Lenders (unless such notice is waived by the Required Lenders) and Borrowers (unless such notice is waived by Borrowers). If Agent resigns under this Agreement, the Required Lenders shall be entitled, with (so long as no Event of Default has occurred and is continuing) the consent of Borrowers (such consent not to be unreasonably withheld, delayed, or conditioned), to appoint a successor Agent for the Lenders. If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders and Borrowers, a successor Agent. If Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Agent with a successor Agent from among the Lenders with (so long as no Event of Default has occurred and is continuing) the consent of Borrowers (such consent not to be unreasonably withheld, delayed, or conditioned). In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent

- 39 -

and the term "Agent" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 15 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor Agent has accepted appointment as Agent by the date which is 30 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor Agent as provided for above.

15.10 **Lender in Individual Capacity.** Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with Borrowers and their Subsidiaries and Affiliates and any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group. The other members of the Lender Group acknowledge that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding Borrowers or their Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of Borrowers or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them.

15.11 **Collateral Matters.**

(a)     The Lenders hereby irrevocably authorize Agent to release any Lien on any Collateral (i) upon the termination of the Commitments and payment and satisfaction in full by Borrowers of all Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if Borrowers certify to Agent that the sale or disposition is permitted under Section 6.4 (and Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which Borrowers or their Subsidiaries owned no interest at the time Agent's Lien was granted nor at any time thereafter, or (iv) constituting property leased to Borrowers or their Subsidiaries under a lease that has expired or is terminated in a transaction permitted under this Agreement. The Lenders hereby irrevocably authorize Agent, based upon the instruction of the Required Lenders, to credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted by Agent under the provisions of the Code, including pursuant to Sections 9-610 or 9-620 of the Code, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or at any sale or foreclosure conducted by Agent (whether by judicial action or otherwise) in accordance with applicable law. Except as provided above, Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders, or (z) otherwise, the Required Lenders. Upon request by Agent or Borrowers at any time, the Lenders will confirm in writing Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 15.11; provided, however, that (1) Agent shall not be required to execute any document necessary to evidence such release on terms that, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of Borrowers in respect of) all interests retained by Borrowers, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral. The Lenders further hereby irrevocably authorize Agent, at its option and in its sole discretion, to subordinate any Lien granted to or held by Agent under any Loan Document to the holder of any Permitted Lien on such property if such Permitted Lien secures Permitted Purchase Money Indebtedness.

(b)     Agent shall have no obligation whatsoever to any of the Lenders to assure that the Collateral exists or is owned by Borrowers or their Subsidiaries or is cared for, protected, or insured or has

- 40 -

been encumbered, or that Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the Collateral in its capacity as one of the Lenders and that Agent shall have no other duty or liability whatsoever to any Lender as to any of the foregoing, except as otherwise provided herein.

(c)     In connection with any Permitted Disposition or other disposition consented to by Agent and Lenders, Agent shall promptly execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence the termination or release of Liens on the assets the subject of such disposition.

(d)     Rental payments by the buyer under the Exclusive Resorts Agreement in advance of the closing of the sale contemplated by such agreement shall not be deducted from the purchase price set forth in the Exclusive Resorts Agreement.

### 15.12   **Restrictions on Actions by Lenders; Sharing of Payments.**

(a)     Each of the Lenders agrees that it shall not, without the express written consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Agent, set off against the Obligations, any amounts owing by such Lender to Borrowers or their Subsidiaries or any deposit accounts of Borrowers or their Subsidiaries now or hereafter maintained with such Lender. Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against Borrowers or any Guarantor or to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)     If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Agent pursuant to the terms of this Agreement, or (ii) payments from Agent in excess of such Lender's Pro Rata Share of all such distributions by Agent, such Lender promptly shall (A) turn the same over to Agent, in kind, and with such endorsements as may be required to negotiate the same to Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; provided, however, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

15.13   **Agency for Perfection.**   Agent hereby appoints each other Lender as its agent (and each Lender hereby accepts such appointment) for the purpose of perfecting Agent's Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the Code can be perfected by possession or control. Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

15.14   **Payments by Agent to the Lenders.**   All payments to be made by Agent to the Lenders shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as

- 41 -

each party may designate for itself by written notice to Agent. Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

15.15    **Concerning the Collateral and Related Loan Documents.**  Each member of the Lender Group authorizes and directs Agent to enter into this Agreement and the other Loan Documents.  Each member of the Lender Group agrees that any action taken by Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

15.16    **Audits and Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information.**  By becoming a party to this Agreement, each Lender:

(a)    is deemed to have requested that Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report respecting Borrowers or their Subsidiaries (each a "Report" and collectively, "Reports") prepared by or at the request of Agent, and Agent shall so furnish each Lender with such Reports,

(b)    expressly agrees and acknowledges that Agent does not (i) make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Agent or other party performing any audit or examination will inspect only specific information regarding Borrowers and their Subsidiaries and will rely significantly upon Borrowers' and their Subsidiaries' books and records, as well as on representations of Borrowers' personnel,

(d)    agrees to keep all Reports and other material, non-public information regarding Borrowers and their Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 17.8, and

(e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrowers, and (ii) to pay and protect, and indemnify, defend and hold Agent, and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys fees and costs) incurred by Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

In addition to the foregoing:  (x) any Lender may from time to time request of Agent in writing that Agent provide to such Lender a copy of any report or document provided by Borrowers or their Subsidiaries to Agent that has not been contemporaneously provided by Borrowers or such Subsidiary to such Lender, and, upon receipt of such request, Agent promptly shall provide a copy of same to such Lender, (y) to the extent that Agent is entitled, under any provision of the Loan Documents, to request additional reports or information from Borrowers or their Subsidiaries, any Lender may, from time to time, reasonably request Agent to exercise such right as specified in such Lender's notice to Agent, whereupon Agent promptly shall request of Borrowers the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from Borrowers or such Subsidiary, Agent promptly shall provide a copy of same to such Lender, and (z) any

- 42 -

time that Agent renders to Borrowers a statement regarding the Loan Account, Agent shall send a copy of such statement to each Lender.

15.17 **Several Obligations; No Liability.** Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Commitments. Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender. Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender. Except as provided in Section 15.7, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group. No Lender shall be responsible to Borrowers or any other Person for any failure by any other Lender to fulfill its obligations to make credit available hereunder, nor to advance for such Lender or on its behalf, nor to take any other action on behalf of such Lender hereunder or in connection with the financing contemplated herein.

16. **[INTENTIONALLY OMITTED]**

17. **GENERAL PROVISIONS.**

17.1 **Effectiveness.** This Agreement shall be binding and deemed effective when executed by Borrowers, Agent, and each Lender whose signature is provided for on the signature pages hereof.

17.2 **Section Headings.** Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

17.3 **Interpretation.** Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Lender Group or Borrowers, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

17.4 **Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

17.5 **Debtor-Creditor Relationship.** The relationship between the Lenders and Agent, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor. No member of the Lender Group has (or shall be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between the members of the Lender Group, on the one hand, and the Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

17.6 **Counterparts; Electronic Execution.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of

- 43 -

transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

17.7    **Revival and Reinstatement of Obligations.**  If the incurrence or payment of the Obligations by Borrowers or Guarantor or the transfer to the Lender Group of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if the Lender Group is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that the Lender Group is required or elects to repay or restore, and as to all reasonable out-of-pocket costs, expenses, and attorneys fees of the Lender Group related thereto, the liability of Borrowers or Guarantor automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

17.8    **Confidentiality.**   Agent and Lenders each individually (and not jointly or jointly and severally) agree that material, non-public information regarding Borrowers and their Subsidiaries, their operations, assets, and existing and contemplated business plans ("Confidential Information") shall be treated by Agent and the Lenders in a confidential manner, and shall not be disclosed by Agent and the Lenders to Persons who are not parties to this Agreement, except:  (i) to attorneys for and other advisors, accountants, auditors, and consultants to any member of the Lender Group ("Lender Group Representatives") (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential), (ii) to Subsidiaries and Affiliates of any member of the Lender Group, provided that any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this Section 17.8, (iii) as may be required by regulatory authorities so long as such authorities are informed of the confidential nature of such information, (iv) as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided that (x) prior to any disclosure under this clause (iv), the disclosing party agrees to provide Borrowers with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Borrowers pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation and (y) any disclosure under this clause (iv) shall be limited to the portion of the Confidential Information as may be required by such statute, decision, or judicial or administrative order, rule, or regulation, (v) as may be agreed to in advance by Borrowers or as requested or required by any Governmental Authority pursuant to any subpoena or other legal process, provided, that, (x) prior to any disclosure under this clause (v) the disclosing party agrees to provide Borrowers with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Borrowers pursuant to the terms of the subpoena or other legal process and (y) any disclosure under this clause (v) shall be limited to the portion of the Confidential Information as may be required by such Governmental Authority pursuant to such subpoena or other legal process, (vi) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Agent or the Lenders or the Lender Group Representatives), (vii) in connection with any assignment, participation  or pledge of any Lender's interest under this Agreement, provided that any such assignee, participant, or pledgee shall have agreed in writing to receive such information hereunder subject to the terms of this Section, (viii) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents; provided, that, prior to any disclosure to any Person (other than any Loan Party, Agent, any Lender, any of their respective Affiliates, or their respective counsel) under this clause (viii) with respect to litigation involving any Person (other than Borrowers, Agent, any Lender, any of their respective Affiliates, or their respective counsel), the disclosing party agrees to provide Borrowers with prior notice thereof, and (ix) in connection with, and to the extent reasonably necessary for, the exercise of any secured creditor remedy under this Agreement or under any other Loan Document.

- 44 -

17.9     **Lender Group Expenses.**  Borrowers agree to pay any and all Lender Group Expenses promptly after demand therefor by Agent and agree that their respective obligations contained in this Section 17.9 shall survive payment or satisfaction in full of all other Obligations.

17.10     **USA PATRIOT Act.**  Each Lender that is subject to the requirements of the Patriot Act hereby notifies Borrowers that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies Borrowers, which information includes the name and address of Borrowers and other information that will allow such Lender to identify Borrowers in accordance with the Patriot Act.

17.11     **Integration.**  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

18.     **Joint and Several Liability**

Each Loan Party acknowledges, represents and warrants the following:

18.1     **Inducement..**  The Lenders have been induced to make the Advances to Borrowers in part based upon the assurances by each Loan Party that each Loan Party desires that the Advances be honored and enforced as separate obligations of each Loan Party, should the Agent and the Lenders desire to do so.

18.2     **Combined Liability.**  Notwithstanding the foregoing, the Advances and the other obligations of Loan Parties constitute the joint and several obligations of each and every Loan Party, and Agent and the Lenders may at their option enforce the entire amount of the Advances and the other obligations of the Loan Parties against any one or more Loan Parties.

18.3     **Separate Exercise of Remedies..**  Agent (on behalf of the Lenders) may exercise remedies against each Loan Party and its property separately, whether or not Agent exercises remedies against any other Loan Party or its property.  The Agent may enforce one or more Loan Parties' Obligations without enforcing any other Loan Party's Obligations.  Any failure or inability of Agent to enforce one or more Loan Parties' Obligations shall not in any way limit the Agent's right to enforce the Obligations of any other Loan Party.  If Agent forecloses or exercises similar remedies on any Collateral, then such foreclosure or similar remedy shall be deemed to reduce the balance of the Advances only to the extent of the cash proceeds actually realized by the Lenders from such foreclosure or similar remedy or, if applicable, the Agent's credit bid at such sale, regardless of the effect of such foreclosure or similar remedy on the Advances secured by such Collateral under the applicable state law.

[Signature pages to follow.]

*Error! Unknown document property name.*
RLF1 3538067v.1

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

East West Resort Development V, L.P., L.L.L.P., a Delaware limited partnership registered as a limited liability partnership, as a Borrower

By HF Holding Corp., a Colorado corporation

By: _____

Craig Ferraro

Title: Vice President, Secretary and Treasurer

NMP Holdings, LLC, a Delaware limited liability company, as a Borrower

By HF Holding Corp., a Colorado corporation

By: _____

Craig Ferraro

Title: Vice President, Secretary and Treasurer

Northstar Trailside Townhomes, LLC a Delaware limited liability company, as a Borrower

By HF Holding Corp., a Colorado corporation

By: _____

Craig Ferraro

Title: Vice President, Secretary and Treasurer

Tahoe Club Company, LLC, a Delaware limited liability company, as a Borrower

By HF Holding Corp., a Colorado corporation

By: _____

Craig Ferraro

Title: Vice President, Secretary and Treasurer

Old Greenwood, LLC, a Delaware limited liability company, as a Borrower

By HF Holding Corp., a Colorado corporation

By: _____

Craig Ferraro

Title: Vice President, Secretary and Treasurer

Barclays Bank PLC,
a United Kingdom corporation, as Agent and as a Lender

By: _____
Title:

## Schedule 1.1

As used in the Agreement, the following terms shall have the following definitions:

"Account" means an account (as that term is defined in the Code).

"Account Debtor" means any Person who is obligated on an Account, chattel paper, or a general intangible.

"Additional Control Agreements" means the control agreements, in form and substance reasonably satisfactory to Agent and which shall perfect Lenders' security interest in all of the Borrowers' bank accounts and Deposit Accounts in accordance with the Uniform Commercial Code (as enacted in the state in which the bank holding the applicable Accounts has jurisdiction pursuant to Section 9-304 of the applicable Uniform Commercial Code), executed and delivered by Borrowers, the Agent, and such bank. Each Additional Control Agreement shall provide, among other things, that the bank party thereto agrees, from and after the receipt of a notice (an "Activation Notice") from Agent (which Activation Notice may only be given by Agent at any time at which an Event of Default has occurred and is continuing), to follow instructions only from Agent with respect to such bank account or Deposit Account and the funds on deposit therein

"Additional Documents" has the meaning specified therefor in Section 5.12 of the Agreement.

"Advances" has the meaning specified therefor in Section 2.2(a) of the Agreement.

"Affected Lender" has the meaning specified therefor in Section 2.13(b) of the Agreement.

"Affiliate" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Stock, by contract, or otherwise; provided, however, that, for purposes of Section 6.12 of the Agreement: (a) any Person which owns directly or indirectly 10% or more of the Stock having ordinary voting power for the election of directors or other members of the governing body of a Person or 10% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership in which a Person is a general partner shall be deemed an Affiliate of such Person.

"Agent" has the meaning specified therefor in the preamble to the Agreement.

"Agent-Related Persons" means Agent, together with its Affiliates, officers, directors, employees, attorneys, and agents.

"Agent's Account" means the Deposit Account of Agent identified on Schedule A-1.

"Agent's Liens" means the Liens granted by Borrowers or their Subsidiaries to Agent under the Loan Documents.

"Agreement" means the Credit Agreement to which this Schedule 1.1 is attached.

"Application Event" means the occurrence (a) of a failure by Borrowers to repay all of the Obligations on the Maturity Date, or (b) and continuation of an Event of Default and the election by Agent or

the Required Lenders to require that payments and proceeds of Collateral be applied pursuant to <u>Section 2.4(b)(ii))</u> of the Agreement.

"<u>Assignee</u>" has the meaning specified therefor in <u>Section 13.1(a)</u> of the Agreement.

"<u>Assignment and Acceptance</u>" means an Assignment and Acceptance Agreement substantially in the form of <u>Exhibit A-1</u>.

"<u>Authorized Person</u>" means any one of the individuals identified on <u>Schedule A-2</u>, as such schedule is updated from time to time by written notice from Borrowers to Agent.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, as in effect from time to time.

"<u>Bankruptcy Court</u>" has the meaning specified in the recitals to this Agreement.

"<u>Base LIBOR Rate</u>" means the rate per annum, determined by Agent in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate, to be the rate at which Dollar deposits (for delivery on the first day of the requested Interest Period) are offered to major banks in the London interbank market 2 Business Days prior to the commencement of the requested Interest Period, for a term and in an amount comparable to the Interest Period and the amount of the LIBOR Rate Loan requested (whether as an initial LIBOR Rate Loan or as a continuation of a LIBOR Rate Loan or as a conversion of a Base Rate Loan to a LIBOR Rate Loan) by Borrowers in accordance with the Agreement, which determination shall be conclusive in the absence of manifest error.

"<u>Base Rate</u>" means the greater of (a) the Federal Funds Rate plus ½%, and (b) the rate of interest announced, from time to time, within BBPLC at its principal office in New York as its "prime rate", with the understanding that the "prime rate" is one of BBPLC's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as BBPLC may designate.

"<u>Base Rate Loan</u>" means each portion of the Advances that bears interest at a rate determined by reference to the Base Rate.

"<u>Base Rate Margin</u>" means 9.5%.

"<u>Benefit Plan</u>" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) for which Borrowers or any of their Subsidiaries or ERISA Affiliates has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

"<u>Bid Procedures</u>" means bidding procedures for a sale of all or substantially all of the Borrowers' assets, which shall provide for the payment in full in cash of the Obligations at the closing of such sale.

"<u>Board of Directors</u>" means the board of directors (or comparable managers) of Borrowers or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers).

"<u>Borrowers</u>" has the meaning specified therefor in the preamble to the Agreement.

"<u>Borrowing</u>" means a borrowing hereunder consisting of Advances made on the same day by the Lenders (or Agent on behalf thereof).

"<u>BBPLC</u>" means Barclays Bank PLC.

"Budget" has the meaning specified in Section 5.16 of this Agreement.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the state of New York.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person and their Subsidiaries during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"Capitalized Lease Obligation" means that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve Out" means, the following expenses: (a) statutory fees payable to the United States Trustee pursuant to 28 U.S.C. Section 1930(a)(6); and (b) subject to the terms and conditions of the Order, all fees and disbursements incurred by the Borrowers and/or the Creditors' Committee for any attorneys and a single financial advisor for the Borrowers and Creditors' Committee respectively, retained by final order of the Bankruptcy Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) pursuant to Sections 327 or 1103(a) of the Bankruptcy Code to the extent allowed by order of the Bankruptcy Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) under Sections 328, 330 and/or 331 of the Bankruptcy Code and any interim compensation procedures order, but solely to the extent such fees and disbursements are within the corresponding amounts set forth in the Budget and were reflected as estimated fees and expenses of such professionals in the most recent Budget delivered by the Borrowers to the Agent prior to the date that such fees and disbursements were incurred; provided, that, following a notice to the Borrowers from the Agent of the occurrence of an Event of Default, the amount of the Carve Out shall not exceed $1,000,000 plus the amount of any compensation or reimbursement of budgeted expenses and fees incurred, awarded or paid prior to the occurrence of an Event of Default in respect of which the Carve Out is invoked.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances or time deposits maturing within 1 year from the date of acquisition thereof issued or guaranteed by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $250,000,000, having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

- 3 -

"<u>Change of Control</u>" means that (a) Permitted Holder fails to own and control, directly or indirectly, 51%, or more, of the Stock of Borrowers, (b) if any Loan Party is a corporation, any merger, consolidation, sale, transfer or pledge of such Loan Party's Stock or the creation or issuance of new stock, (c) if a Loan Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner, or the sale, transfer or pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest of any general partner or any profits or proceeds relating to such general partnership interest, or the sale or pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interests or the creation or issuance of new limited partnership interests, (d) if any Loan Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the sale, transfer or pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the sale, transfer or pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests, (e) Borrowers fail to own and control, directly or indirectly, 100% of the Stock of each other Loan Party, other than as set forth in Schedule 3.2(d), (f) a Loan Party voluntarily removes or replaces an independent director, if any, of any Loan Party or subsidiary thereof without Agent's prior approval, in its sole discretion, or (g) except in the case of the death or permanent disability of Harry Frampton, Harry Frampton shall cease to own 100% of the outstanding common stock of the general partner of East West Resort Development V, L.P., L.L.L.P. and (together with his spouse) of HF Management LLC.

"<u>Chapter 11 Cases</u>" has the meaning specified in the recitals to this Agreement.

"<u>Closing Date</u>" means the date of the making of the initial Advance (or other extension of credit) hereunder or the date on which Agent sends Borrowers a written notice that each of the conditions precedent set forth in Section 3.1 of this Agreement either have been satisfied or have been waived.

"<u>Code</u>" means the New York Uniform Commercial Code, as in effect from time to time.

"<u>Collateral</u>" means, collectively, (a) all assets, rights, and interests listed on Schedule 4.4 hereof, (b) all unencumbered assets and interests in assets and proceeds thereof now owned or hereafter acquired by Borrowers in or upon which a Lien is granted in favor of Agent or the Lenders, (c) the Second Lien Collateral, (d) the collateral described in each Security Instrument, (e) the Designated Account and all funds therein, (f) the Trailside Purchase Deposit Account and all funds therein, (g) all Deposit Accounts and Securities Accounts with respect to the Collateral and all funds therein, (h) the Old Greenwood Option, (i) any property subject to liens or security interest that may be avoided pursuant to the Bankruptcy Code, but only to the extent so avoided, and (j) all of the proceeds (as such term is defined in the Code) and products, whether tangible or intangible, of any of the foregoing, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing.

"<u>Collateral Material Contract</u>" means, (a) the Existing Loan Agreements, (b) the Exclusive Resorts Agreement, and (c) with respect to any Person, (i) each contract or agreement related to the Collateral to which such Person or any of their Subsidiaries is a party involving aggregate consideration payable to or by such Person or such Subsidiary of $50,000 or more (other than purchase orders in the ordinary course of the business of such Person or such Subsidiary and other than contracts that by their terms may be terminated by such Person or Subsidiary in the ordinary course of its business upon less than 60 days notice without penalty or premium), and (ii) all other contracts or agreements related to the Collateral, the loss of which could reasonably be expected to result in a Material Adverse Change.

- 4 -

"Collateral Material Lease" means, with respect to any Borrower, (i) each lease related to the Collateral to which such Borrower is a party involving aggregate consideration payable to or by such Person or such Subsidiary of $50,000 or more, and (ii) all other leases related to the Collateral, the loss of which could reasonably be expected to result in a Material Adverse Change.

"Collections" means *all* cash, checks, notes, instruments, and other items of payment (including insurance proceeds, cash proceeds of asset sales, rental proceeds, and tax refunds), other than any rental proceeds that Loan Parties are not (or would not be) entitled to deduct from the purchase price in connection with any sale of the Collateral to which they relate.

"Commitment" means, with respect to each Lender, its Term Loan Commitment, or its Total Commitment, as the context requires, and, with respect to all Lenders, their Term Loan Commitments, or their Total Commitments, as the context requires, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1 of the Agreement.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C-1 delivered by the chief financial officer of Borrowers to Agent.

"Confidential Information" has the meaning specified therefor in Section 17.8 of the Agreement.

"Continuing Director" means (a) any member of the Board of Directors who was a director (or comparable manager) of Borrowers on the Closing Date, and (b) any individual who becomes a member of the Board of Directors after the Closing Date if such individual was approved, appointed or nominated for election to the Board of Directors by either the Permitted Holders or a majority of the Continuing Directors, but excluding any such individual originally proposed for election in opposition to the Board of Directors in office at the Closing Date in an actual or threatened election contest relating to the election of the directors (or comparable managers) of Borrowers and whose initial assumption of office resulted from such contest or the settlement thereof.

"Control Agreements" means, collectively, the Designated Account Control Agreement and the Additional Control Agreements.

"Creditors' Committee" means the Official Unsecured Creditors' Committee to be appointed by the United States Trustee in relation to the Chapter 11 Cases, as applicable.

"Daily Balance" means, as of any date of determination and with respect to any Obligation, the amount of such Obligation owed at the end of such day.

"Debtors" means East West Resort Development V, L.P., L.L.L.P., a Delaware limited partnership registered as a limited liability limited partnership, NMP Holdings, LLC, a Delaware limited liability company, Northstar Mountain Properties, LLC, a Delaware limited liability company, Northstar Iron Horse, LLC, a Delaware limited liability company, Northstar Big Horn, LLC, a Delaware limited liability company, Northstar Village Townhomes, LLC, a Delaware limited liability company, Northstar Trailside Townhomes, LLC, a Delaware limited liability company, Old Greenwood, LLC, a Delaware limited liability company, Old Greenwood Realty Inc., a California corporation, Gray's Station, LLC, a Delaware limited liability company, Tahoe Mountain Resorts, LLC, a Delaware limited liability company and Tahoe Club Company, LLC, a Delaware limited liability company.

"Deed of Trust" means, individually and collectively, each Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing to secure the Obligations, whether now or hereafter

- 5 -

executed and delivered by Borrowers and/or any applicable Guarantor in favor of Agent, in form and substance reasonably satisfactory to Agent, that encumbers the Real Property Collateral.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Defaulting Lender" means any Lender that fails to make any Advance (or other extension of credit, including the failure to make available to Agent amounts required pursuant to a Settlement) that it is required to make hereunder on the date that it is required to do so hereunder.

"Defaulting Lender Rate" means  (a) for the first 3 days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Advances that are Base Rate Loans (inclusive of the Base Rate Margin applicable thereto).

"Deposit Account" means any deposit account (as that term is defined in the Code) and also the Designated Account and the Trailside Purchase Deposit Account.

"Designated Account" means the Deposit Account of Borrowers identified on Schedule D-1.

"Designated Account Bank" has the meaning specified therefor in Schedule D-1.

"Designated Account Control Agreement" means a control agreement, in form and substance reasonably satisfactory to Agent and which shall perfect Lenders' security interest in the Designated Account in accordance with the Uniform Commercial Code (as enacted in the state in which the Designated Account Bank has jurisdiction pursuant to Section 9-304 of the applicable Uniform Commercial Code), executed and delivered by Borrowers, the Agent, and the Designated Account Bank.

"Dollars" or "$" means United States dollars.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials (a) from any assets, properties, or businesses of any Borrowers, any Subsidiary of Borrowers, or any of their predecessors in interest, (b) from adjoining properties or businesses, or (c) from or onto any facilities which received Hazardous Materials generated by any Borrowers, any Subsidiary of Borrowers, or any of their predecessors in interest.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on Borrowers or their Subsidiaries, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Equipment" means equipment (as that term is defined in the Code).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of Borrowers or their Subsidiaries under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of Borrowers or their Subsidiaries under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which Borrowers or any of their Subsidiaries is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with Borrowers or any of their Subsidiaries and whose employees are aggregated with the employees of Borrowers or their Subsidiaries under IRC Section 414(o).

"Event of Default" has the meaning specified therefor in Section 8 of the Agreement.

"EWRD V Operating Agreement" means that certain Amended and Restated Operating Agreement of East West Resort Development V, L.P., L.L.L.P.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Exclusive Resorts Agreement" means that certain First Amended to Amended and Restated Purchase and Sale Agreement and First Amendment to Lease Agreement dated January 15, 2010, by and between Northside Trailside Townhomes, LLC and Exclusive Resorts Real Estate Holdings II, LLC, with respect to the Amended and Restated Purchase and Sale Agreement and by and between Northside Trailside Townhomes, LLC and Exclusive Resorts Club Management, LLC with respect to the Lease Agreement.

"Existing Lenders" means the holders of the Existing Loans.

"Existing Loans" means all the loans identified on Schedule 4.19.

"Existing Loan Agreements" means the agreements underlying the Existing Loans.

"Extraordinary Receipts" means any cash received by Borrowers or any Guarantor not in the ordinary course of business ((i) net of all out-of-pocket fees, costs, legal fees, court costs, taxes and other expenses incurred by any Borrower or Guarantor in connection with the collection, litigation, adjudication, arbitration, receipt or recovery of any such Extraordinary Receipt; and (ii) and not consisting of proceeds described in Section 2.4(e)(ii) of the Agreement) consisting of, without limitation, (a) proceeds of judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (b) indemnity payments (other than to the extent such indemnity payments are (i) immediately payable to a Person that is not an Affiliate of Borrowers or any Guarantor, or (ii) received by Borrowers or any Guarantor as reimbursement for any payment previously made to such Person), (c) any purchase price adjustment (other than a working capital adjustment received in connection with any purchase agreement), and (d) any insurance proceeds or tax refunds.

"Facility" has the meaning specified in the recitals to this Agreement.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for

- 7 -

any day which is a Business Day, the average of the quotations for such day on such transactions received by Agent from three Federal funds brokers of recognized standing selected by it.

"Final Hearing" means a hearing held by the Bankruptcy Court regarding the approval of the Final Order.

"Final Order" means a final order of the Bankruptcy Court authorizing and approving this Agreement and the other Loan Documents on a final basis and entered following a final hearing in form and substance satisfactory to the Agent, in its sole discretion, the Borrowers, and their respective counsel.

"Foreign Lender" means any Lender or Participant that is not a United States person within the meaning of IRC section 7701(a)(30).

"Funding Date" means the date on which a Borrowing occurs.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation, by-laws, or other organizational documents of such Person.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Guarantor Material Contract" means, with respect to any Guarantor, (i) each contract or agreement to which such Guarantor is a party involving aggregate consideration payable to or by such Guarantor of $250,000 or more (other than purchase orders in the ordinary course of the business of such Guarantor and other than contracts that by their terms may be terminated by such Guarantor in the ordinary course of its business upon less than 60 days notice without penalty or premium), and (ii) all other contracts or agreements, the loss of which could reasonably be expected to result in a Material Adverse Change.

"Guarantor Material Lease" means, with respect to any Guarantor, (i) each lease to which such Guarantor is a party involving aggregate consideration payable to or by such Guarantor of $250,000 or more, and (ii) all other leases, the loss of which could reasonably be expected to result in a Material Adverse Change.

"Guarantors" means (a) each Person identified as a Guarantor in an applicable Guaranty from time to time, (b) each Subsidiary of Borrowers, and (c) each other Person that becomes a guarantor after the Closing Date pursuant to Section 5.11 of the Agreement, and "Guarantor" means any one of them.

"Guaranty" means, collectively, each General Continuing Guaranty, dated as of even date with the Agreement, executed and delivered by each extant Guarantor in favor of Agent, for the benefit of the Lender Group, and each General Continuing Guaranty entered into by any Guarantor after the date hereof pursuant to Section 5.11 of this Agreement, each in form and substance reasonably satisfactory to Agent.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or

- 8 -

any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Holdout Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"Indebtedness" means (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (f) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning specified therefor in Section 10.3 of the Agreement.

"Indemnified Person" has the meaning specified therefor in Section 10.3 of the Agreement.

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan (or the continuation of a LIBOR Rate Loan or the conversion of a Base Rate Loan to a LIBOR Rate Loan) and ending one month thereafter; provided, however, that (a) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (b) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (c) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is one month after the date on which the Interest Period began, as applicable, and (d) Borrower may not elect an Interest Period which will end after the Maturity Date.

"Interim Order" means the Interim Order pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (a) approving postpetition financing pursuant to the Facility and the making of Advances in an aggregate amount not to exceed the Interim Order Amount, (b) authorizing use of cash collateral, (c) granting Liens and providing superpriority administrative expense status, (d) granting adequate protection, (e) modifying the automatic stay, and (f) scheduling a final hearing with respect to the Chapter 11 Cases (including the Budget), to be entered on the docket of the Chapter 11 Cases within three (3) Business Days of the Petition Date.

"Interim Order Amount" means, for the period between the Interim Order and the Final Order, up to $2,000,000 plus amounts necessary to cash collateralize letters of credit.

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) *bona fide* Accounts arising in the ordinary course of business), or acquisitions of

- 9 -

Indebtedness, Stock, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"Lender" and "Lenders" have the respective meanings set forth in the preamble to the Agreement, and shall include any other Person made a party to the Agreement pursuant to the provisions of Section 13.1 of the Agreement.

"Lender Group" means each of the Lenders (including the Issuing Lender) and Agent, or any one or more of them.

"Lender Group Expenses" means all (a) costs or expenses (including taxes, and insurance premiums) required to be paid by Borrowers or Guarantors under any of the Loan Documents that are paid, advanced, or incurred by the Lender Group, (b) out-of-pocket fees or charges paid or incurred by Agent in connection with the Lender Group's transactions with Borrowers or Guarantors under any of the Loan Documents, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations to the extent of the fees and charges (and up to the amount of any limitation) contained in the Agreement), real estate surveys, real estate title policies and endorsements, and environmental audits, (c) reasonable out-of-pocket costs and expenses incurred by Agent in the disbursement of funds to Borrowers or other members of the Lender Group (by wire transfer or otherwise), (d) out-of-pocket charges paid or incurred by Agent resulting from the dishonor of checks payable by or to any Loan Party, (e) reasonable out-of-pocket costs and expenses paid or incurred by the Lender Group to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) reasonable out-of-pocket audit fees and expenses (including travel, meals, and lodging) of Agent related to any inspections or audits to the extent of the fees and charges (and up to the amount of any limitation) contained in the Agreement, (g) reasonable out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by the Lender Group in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or the Lender Group's relationship with Borrowers or any Guarantors, (h) Agent's reasonable costs and expenses (including reasonable attorneys fees) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), syndicating (including rating the Facility), or amending the Loan Documents, and (i) Agent's and each Lender's reasonable costs and expenses (including reasonable attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning Borrowers or any Guarantors or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral.

"Lender Group Representatives" has the meaning specified therefor in Section 17.8 of the Agreement.

"Lender-Related Person" means, with respect to any Lender, such Lender, together with such Lender's Affiliates, officers, directors, employees, attorneys, and agents.

"LIBOR Deadline" has the meaning specified therefor in Section 2.12(b)(i) of the Agreement.

"LIBOR Notice" means a written notice in the form of Exhibit L-1.

- 10 -

"LIBOR Option" has the meaning specified therefor in <u>Section 2.12(a)</u> of the Agreement.

"LIBOR Rate" means, for each Interest Period for each LIBOR Rate Loan, the rate per annum determined by Agent by *dividing* (a) the Base LIBOR Rate for such Interest Period, by (b) 100% *minus* the Reserve Percentage. The LIBOR Rate shall be adjusted on and as of the effective day of any change in the Reserve Percentage (if any).

"LIBOR Rate Loan" means each portion of an Advance that bears interest at a rate determined by reference to the LIBOR Rate.

"LIBOR Rate Margin" means 8.5%.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Loan Account" has the meaning specified therefor in <u>Section 2.9</u> of the Agreement.

"Loan Documents" means the Agreement, the Control Agreements, the Guaranty, the Deeds of Trust, the other Security Instruments, the Interim Order, the Final Order, and any other note or notes executed by Borrowers in connection with the Agreement and payable to any member of the Lender Group, any other agreement entered into, now or in the future, by Borrowers or any of their Subsidiaries and any member of the Lender Group in connection with the Agreement, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing.

"Loan Party" means Borrowers or any Guarantor.

"Material Adverse Change" means (a) a material adverse change in the business, operations, results of operations, assets, liabilities or financial condition of Borrowers and their Subsidiaries, taken as a whole, (b) a material impairment of Borrowers' and their Subsidiaries ability to perform their obligations under the Loan Documents to which they are parties or of the Lender Group's ability to enforce the Obligations or realize upon the Collateral or (c) a material impairment of the enforceability or priority of Agent's Liens with respect to a material portion the Collateral as a result of an action or failure to act on the part of Borrowers or their Subsidiaries.

"Material Contract" means Guarantor Material Contracts and Collateral Material Contracts.

"Material Lease" means Guarantor Material Leases and Collateral Material Leases.

"Maturity Date" has the meaning specified therefor in <u>Section 3.3</u> of the Agreement.

"Moody's" has the meaning specified therefor in the definition of Cash Equivalents.

"Net Cash Proceeds" means:

(a)    with respect to any sale or disposition by Borrowers or any Guarantors of assets, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of Borrowers or any Guarantors, in connection therewith after deducting therefrom only (i) reasonable fees, commissions, and expenses related thereto and required to be paid by Borrowers or such Guarantor in connection with such sale or disposition and (ii) taxes

- 11 -

paid or payable to any taxing authorities by Borrowers or such Guarantor in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of Borrowers or any Guarantors, and are properly attributable to such transaction; and

(b)      with respect to the issuance or incurrence of any Indebtedness by Borrowers or any Guarantors, or the issuance by any Borrower or any Guarantors of any shares of its Stock, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of Borrowers or such Guarantor in connection with such issuance or incurrence, after deducting therefrom only (i) reasonable fees, commissions, and expenses related thereto and required to be paid by Borrowers or such Guarantor in connection with such issuance or incurrence, (ii) taxes paid or payable to any taxing authorities by Borrowers or such Guarantor in connection with such issuance or incurrence, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of Borrowers or any Guarantors, and are properly attributable to such transaction.

"Obligations" means all loans, Advances, debts, principal, interest, contingent reimbursement or indemnification obligations, premiums, liabilities (including all amounts charged to the Loan Account pursuant to the Agreement), obligations (including indemnification obligations), fees, Lender Group Expenses, guaranties, covenants, and duties of any kind and description owing by Borrowers to the Lender Group pursuant to or evidenced by the Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that Borrowers are required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents.

"Old Greenwood Option" means the option held by Old Greenwood, LLC pursuant to that certain Option Agreement, dated December 31,2004, between Tahoe Club Company, LLC, as optionor and Old Greenwood LLC, as optionee, to re-purchase the Old Greenwood golf course at any time for any reason until December 31, 2024 for Ten Dollars.

"Orders" means the Interim Order and the Final Order; and "Order" means whichever of the Interim Order or the Final Order is then in effect.

"Participant" has the meaning specified therefor in Section 13.1(e) of the Agreement.

"Patriot Act" has the meaning specified therefor in Section 4.18 of the Agreement.

"Permitted Dispositions" means:

(a)      sales, abandonment, or other dispositions of Equipment that is substantially worn, damaged, or obsolete in the ordinary course of business,

(b)      any involuntary loss, damage or destruction of property,

(c)      any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property,

(d)      the making of a Permitted Investment,

(e)      dispositions expressly set forth in the Budget,

(f)      dispositions of assets (other than intellectual property, licenses, Stock of Subsidiaries of Borrowers, or Material Contracts) not otherwise permitted in clauses (a) through (e) above so long as made

- 12 -

at fair market value and the aggregate fair market value of all assets disposed of in all such dispositions since the Closing Date (including the proposed disposition) would not exceed $25,000, and

        (g)      the sale or other disposition of the assets of Northstar Trailside Townhomes, LLC, in accordance with the Exclusive Resorts Agreement.

"Permitted Holder" means Crescent Real Estate Equities Limited Partnership, a Delaware limited partnership.

"Permitted Indebtedness" means:

        (a)      Indebtedness evidenced by the Agreement and the other Loan Documents,

        (b)      Existing Loans,

        (c)      Indebtedness consisting of unsecured guarantees incurred in the ordinary course of business with respect to surety and appeal bonds, performance bonds, bid bonds, appeal bonds, completion guarantee and similar obligations,

        (d)      Indebtedness incurred in the ordinary course of business during the Chapter 11 Cases under performance, surety, statutory, and appeal bonds,

        (e)      Indebtedness owed to any Person providing property, casualty, liability, or other insurance to Borrowers or any of their Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year, and

        (f)      Indebtedness composing Permitted Investments.

"Permitted Intercompany Advances" means loans made by (a) a Loan Party to another Loan Party, (b) a non-Loan Party to another non-Loan Party, and (c) a non-Loan Party to a Loan Party.

"Permitted Investments" means:

        (a)      Investments in cash and Cash Equivalents,

        (b)      Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business,

        (c)      advances made in connection with purchases of goods or services in the ordinary course of business,

        (d)      Investments received in settlement of amounts due to any Loan Party or any of their Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of their Subsidiaries as a result of insolvency proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party,

        (e)      Investments owned by any Loan Party or any of their Subsidiaries on the Closing Date and set forth on Schedule P-1,

        (f)      guarantees permitted under the definition of Permitted Indebtedness,

- 13 -

(g)     Permitted Intercompany Advances,

(h)     Stock or other securities acquired in connection with the satisfaction or enforcement of Indebtedness or claims due or owing to a Loan Party (in bankruptcy of customers or suppliers or otherwise outside the ordinary course of business) or as security for any such Indebtedness or claims,

(i)     deposits of cash made in the ordinary course of business to secure performance of operating leases, and

(j)     so long as no Event of Default has occurred and is continuing or would result therefrom, any other Investments in an aggregate amount not to exceed $50,000 during the term of the Agreement.

"Permitted Liens" means

(a)     Liens held by Agent to secure the Obligations,

(b)     All Liens to secure the Existing Loans, but excluding Liens on all or any portion of the Collateral (other than the Liens under that certain Loan Agreement dated as of September 20, 2006 between Northstar Trailside Townhomes, LLC and U.S. Bank National Association),

(c)     Solely to the extent any such Lien exists and is a valid, enforceable, perfected and non-avoidable Lien as of the Petition Date and the holder of such Lien files an objection or other responsive pleading prior to the entry of the Final Order asserting such Lien:

(i)     judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under Section 8.1(c) of the Agreement,

(ii)     Liens set forth on Schedule P-2; provided, however, any such Lien described on Schedule P-2 shall only secure the Indebtedness that it secures on the Petition Date;

(iii)     Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of business and not in connection with the borrowing of money,

(d)     Liens for unpaid taxes set forth on Schedule 4.20,

(e)     Liens on amounts deposited to secure Borrowers' and their Subsidiaries obligations in connection with worker's compensation or other unemployment insurance,

(f)     with respect to any Real Property, easements, rights of way, and zoning restrictions that do not materially interfere with or impair the use or operation thereof, and

(g)     rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business.

"Permitted Protest" means the right of Borrowers or any of their Subsidiaries to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on Borrowers' or their Subsidiaries' books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by Borrowers or their

- 14 -

Subsidiary, as applicable, in good faith, and (c) Agent is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Agent's Liens.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Petition Date" has the meaning specified in the recitals hereto.

"Plan" means a Single Employer Plan, or a Multiple Employer Plan.

"Plan of Reorganization" means a chapter 11 plan for the Debtors, that provides for, inter alia, payment in full in cash of all Obligations on the effective date thereof, together with releases, exculpations, waivers and indemnification, acceptable to the Agent and Required Lenders, in their sole discretion.

"Projections" means Borrowers' cash flow projections, prepared on a basis consistent with Borrowers' historical financial statements, together with appropriate supporting details and a statement of underlying assumptions.

"Pro Rata Share" means, as of any date of determination:

(a)     with respect to a Lender's obligation to make Advances and right to receive payments of principal, interest, fees, costs, and expenses with respect thereto, (i) prior to the Commitments being terminated or reduced to zero, the percentage obtained by dividing (y) such Lender's Commitment, by (z) the aggregate Commitments of all Lenders, and (ii) from and after the time that the Commitments have been terminated or reduced to zero, the percentage obtained by dividing (y) the outstanding principal amount of such Lender's Advances by (z) the outstanding principal amount of all Advances, and

(b)     with respect to a Lender's obligation to make the Advances and right to receive payments of interest, fees, and principal with respect thereto, (i) prior to the making of the Advances, the percentage obtained by dividing (y) such Lender's Term Loan Commitment, by (z) the aggregate amount of all Lenders' Term Loan Commitments, and (ii) from and after the making of the Advances, the percentage obtained by dividing (y) the principal amount of such Lender's portion of the Advances by (z) the principal amount of the Advances.

"Purchase Money Indebtedness" means Indebtedness (other than the Obligations, but including Capitalized Lease Obligations), incurred at the time of, or within 20 days after, the acquisition of any fixed assets for the purpose of financing all or any part of the acquisition cost thereof.

"Qualified Cash" means, as of any date of determination, the amount of unrestricted cash and Cash Equivalents of Borrowers and their Subsidiaries that is in Deposit Accounts or in Securities Accounts, or any combination thereof, and which such Deposit Account or Securities Account is the subject of one of the Control Agreements and is maintained by a branch office of the bank or securities intermediary located within the United States.

"Real Property" means any estates or interests in real property now owned or hereafter acquired by Borrowers or their Subsidiaries and the improvements thereto.

"Real Property Collateral" means the Real Property identified on Schedule 4.4 and any unencumbered Real Property hereafter acquired by Borrowers.

*Error! Unknown document property name.*
*RLF1 3538067v.1*

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Related Fund" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Replacement Lender" has the meaning specified therefor in Section 2.13(b) of the Agreement.

"Report" has the meaning specified therefor in Section 15.16(a)of the Agreement.

"Required Lenders" means, at any time, Lenders whose aggregate Pro Rata Shares (calculated under clause (d) of the definition of Pro Rata Shares) exceed 50%.

"Reserve Percentage" means, on any day, for any Lender, the maximum percentage prescribed by the Board of Governors of the Federal Reserve System (or any successor Governmental Authority) for determining the reserve requirements (including any basic, supplemental, marginal, or emergency reserves) that are in effect on such date with respect to eurocurrency funding (currently referred to as "eurocurrency liabilities") of that Lender, but so long as such Lender is not required or directed under applicable regulations to maintain such reserves, the Reserve Percentage shall be zero.

"Restricted Junior Payment" means to (a) declare or pay any dividend or make any other payment or distribution on account of Stock issued by Borrowers (including any payment in connection with any merger or consolidation involving Borrowers or to the direct or indirect holders of Stock issued by Borrowers in their capacity as such (other than dividends or distributions payable in Stock issued by Borrowers, or (b) purchase, redeem, or otherwise acquire or retire for value (including in connection with any merger or consolidation involving Borrowers) any Stock issued by Borrowers.

"Sale" shall mean a sale of substantially all of the Debtors' assets which shall provide for the payment in full of the Obligations on the closing of such sale.

"S&P" has the meaning specified therefor in the definition of Cash Equivalents.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Second Lien Collateral" means all of the assets owned by Northstar Trailside Townhomes, LLC, including but not limited to the Highlands Trailside Townhomes, as more fully described in the Security Instruments.

"Securities Account" means a securities account (as that term is defined in the Code).

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

- 16 -

"Security Agreement" means a security agreement, dated as of even date with the Agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by Borrowers and Guarantors to Agent.

"Security Instruments" means, collectively, the Security Agreement, each Deed of Trust, each Control Agreement, and all Uniform Commercial Code financing statements filed in connection with the Facility and the Advances.

"Settlement" has the meaning specified therefor in Section 2.3(b)(i) of the Agreement.

"Settlement Date" has the meaning specified therefor in Section 2.3(b)(i) of the Agreement.

"Solvent" means, with respect to any Person on a particular date, that, at fair valuations, the sum of such Person's assets is greater than all of such Person's debts.

"Stock" means all shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the shares of Stock having ordinary voting power to elect a majority of the board of directors (or appoint other comparable managers) of such corporation, partnership, limited liability company, or other entity.

"Superpriority Claim" means a claim against a Borrowers or their estate in the Chapter 11 Cases which is an administrative expense claim having priority over (a) any and all allowed administrative expenses, and (b) unsecured claims now existing or hereafter arising, including, without limitation, administrative expenses of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code (including, subject to entry of the Final Order, Section 506(c)).

"Tax Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"Term Loan Amount" means $10,000,000.

"Term Loan Commitment" means, with respect to each Lender, its Term Loan Commitment, and, with respect to all Lenders, their Term Loan Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1 of the Agreement.

"Total Commitment" means, with respect to each Lender, its Total Commitment, and, with respect to all Lenders, their Total Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 attached hereto or on the signature page of the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1 of the Agreement.

"Trailside Purchase Deposit Account" means a Deposit Account with Barclays Bank, PLC, established by Borrowers prior to the entry of the Interim Order.

*Error! Unknown document property name.*
RLF1 3538067v.1

"United States" means the United States of America.

"Voidable Transfer" has the meaning specified therefor in Section 17.7 of the Agreement.

*Error! Unknown document property name.*
*RLF1 3538067v.1*

# TABLE OF CONTENTS

Page

1. DEFINITIONS AND CONSTRUCTION. ...................................................................................1

    1.1    Definitions...........................................................................................................1
    1.2    Accounting Terms ...............................................................................................1
    1.3    Code ....................................................................................................................2
    1.4    Construction ........................................................................................................2
    1.5    Schedules and Exhibits.......................................................................................2

2. LOAN AND TERMS OF PAYMENT. .......................................................................................2

    2.1    [Intentionally Omitted].......................................................................................2
    2.2    Agreement to Lend; Term Loan Advances; Security Instruments and Loan
           Documents...........................................................................................................2
    2.3    Borrowing Procedures and Settlements...............................................................3
    2.4    Payments; Reductions of Commitments; Prepayments........................................4
    2.5    Overadvances .....................................................................................................6
    2.6    Interest Rates and Rates, Payments, and Calculations. .......................................7
    2.7    Crediting Payments; Clearance Charge................................................................8
    2.8    Designated Account. ...........................................................................................8
    2.9    Maintenance of Loan Account; Statements of Obligations ..................................8
    2.10   Fees....................................................................................................................8
    2.11   [Intentionally Omitted.]......................................................................................8
    2.12   LIBOR Option.....................................................................................................8
    2.13   Capital Requirements .......................................................................................11

3. CONDITIONS; TERM OF AGREEMENT. ............................................................................12

    3.1    Conditions Precedent to Advances of Interim Order Amount..............................12
    3.2    Conditions Precedent to all Extensions of Credit................................................13
    3.3    Maturity ............................................................................................................14
    3.4    Effect of Maturity .............................................................................................14
    3.5    Early Termination By Borrowers. ......................................................................15

4. REPRESENTATIONS AND WARRANTIES. .........................................................................15

    4.1    Due Organization and Qualification; Subsidiaries. .............................................15
    4.2    Due Authorization; No Conflict. ........................................................................15
    4.3    [Intentionally Omitted]......................................................................................16
    4.4    Binding Obligations; Perfected Liens. ................................................................16
    4.5    Title to Assets; No Encumbrances .....................................................................16
    4.6    Jurisdiction of Formation; Location of Chief Executive Office; Organizational
           Identification Number; Commercial Tort Claims. ...............................................16
    4.7    Litigation. .........................................................................................................17
    4.8    Compliance with Laws......................................................................................17
    4.9    No Material Adverse Change .............................................................................17
    4.10   Fraudulent Transfer ..........................................................................................17
    4.11   Employee Benefits ............................................................................................17
    4.12   Environmental Condition ...................................................................................17

*Error! Unknown document property name.*
RLF1 3538067v.1

| | 4.13 | Intellectual Property | 18 |
| | 4.14 | Leases | 18 |
| | 4.15 | Deposit Accounts and Securities Accounts | 18 |
| | 4.16 | Complete Disclosure | 18 |
| | 4.17 | Material Contracts. | 18 |
| | 4.18 | Patriot Act | 18 |
| | 4.19 | Indebtedness | 19 |
| | 4.20 | Payment of Taxes | 19 |
| | 4.21 | Governmental Regulation | 19 |
| 5. | | AFFIRMATIVE COVENANTS | 19 |
| | 5.1 | Financial Statements, Reports, Certificates | 19 |
| | 5.2 | Collateral Reporting | 19 |
| | 5.3 | Existence | 19 |
| | 5.4 | Maintenance of Properties | 20 |
| | 5.5 | Taxes | 20 |
| | 5.6 | Insurance | 20 |
| | 5.7 | Inspection | 20 |
| | 5.8 | Compliance with Laws | 21 |
| | 5.9 | Environmental | 21 |
| | 5.10 | Disclosure Updates | 21 |
| | 5.11 | Formation of Subsidiaries. | 21 |
| | 5.12 | Further Assurances | 21 |
| | 5.13 | [Intentionally Omitted]. | 22 |
| | 5.14 | Material Contracts | 22 |
| | 5.15 | Chapter 11 Milestones | 22 |
| | 5.16 | Budget | 22 |
| 6. | | NEGATIVE COVENANTS. | 22 |
| | 6.1 | Indebtedness | 22 |
| | 6.2 | Liens | 22 |
| | 6.3 | Restrictions on Fundamental Changes. | 22 |
| | 6.4 | Disposal of Assets | 23 |
| | 6.5 | Change Name | 23 |
| | 6.6 | Nature of Business | 23 |
| | 6.7 | Prepayments and Amendments. | 23 |
| | 6.8 | Change of Control | 24 |
| | 6.9 | Restricted Junior Payments. | 24 |
| | 6.10 | Accounting Methods | 24 |
| | 6.11 | Investments; Controlled Investments. | 24 |
| | 6.12 | Transactions with Affiliates | 24 |
| | 6.13 | Use of Proceeds | 25 |
| | 6.14 | Prepetition Indebtedness | 25 |
| | 6.15 | Limitation on Capital Expenditures | 25 |
| | 6.16 | Bankruptcy Chapter 11 Cases | 25 |
| 7. | | FINANCIAL COVENANTS | 25 |
| | 7.1 | Financial Covenants | 25 |
| 8. | | EVENTS OF DEFAULT. | 25 |

| | 8.1 | Event of Default | 26 |
| | 8.2 | Rights and Remedies | 28 |
| | 8.3 | Remedies Cumulative | 28 |
| 9. | | PRIORITY AND COLLATERAL SECURITY | 28 |
| | 9.1 | Superpriority Claims and Collateral Security | 29 |
| | 9.2 | Guarantees | 29 |
| | 9.3 | No Discharge; Survival of Claims | 29 |
| | 9.4 | Adequate Protection | 29 |
| 10. | | WAIVERS; INDEMNIFICATION. | 29 |
| | 10.1 | Demand; Protest; etc | 30 |
| | 10.2 | The Lender Group's Liability for Collateral | 30 |
| | 10.3 | Indemnification | 30 |
| 11. | | NOTICES | 30 |
| 12. | | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER | 32 |
| 13. | | ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS | 33 |
| | 13.1 | Assignments and Participations | 33 |
| | 13.2 | Successors | 34 |
| 14. | | AMENDMENTS; WAIVERS. | 35 |
| | 14.1 | Amendments and Waivers | 35 |
| | 14.2 | Replacement of Certain Lenders | 36 |
| | 14.3 | No Waivers; Cumulative Remedies | 36 |
| 15. | | AGENT; THE LENDER GROUP. | 36 |
| | 15.1 | Appointment and Authorization of Agent | 36 |
| | 15.2 | Delegation of Duties | 37 |
| | 15.3 | Liability of Agent | 37 |
| | 15.4 | Reliance by Agent | 38 |
| | 15.5 | Notice of Default or Event of Default | 38 |
| | 15.6 | Credit Decision | 38 |
| | 15.7 | Waiver of Certain Claims and Counterclaims | 39 |
| | 15.8 | Costs and Expenses; Indemnification | 39 |
| | 15.9 | Successor Agent | 39 |
| | 15.10 | Lender in Individual Capacity | 40 |
| | 15.11 | Collateral Matters | 40 |
| | 15.12 | Restrictions on Actions by Lenders; Sharing of Payments. | 41 |
| | 15.13 | Agency for Perfection | 41 |
| | 15.14 | Payments by Agent to the Lenders | 41 |
| | 15.15 | Concerning the Collateral and Related Loan Documents | 42 |
| | 15.16 | Audits and Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information | 42 |

|  | 15.17 | Several Obligations; No Liability | 43 |
| 16. | | [INTENTIONALLY OMITTED] | 43 |
| 17. | | GENERAL PROVISIONS. | 43 |
|  | 17.1 | Effectiveness | 43 |
|  | 17.2 | Section Headings | 43 |
|  | 17.3 | Interpretation | 43 |
|  | 17.4 | Severability of Provisions | 43 |
|  | 17.5 | Debtor-Creditor Relationship | 43 |
|  | 17.6 | Counterparts; Electronic Execution | 43 |
|  | 17.7 | Revival and Reinstatement of Obligations | 44 |
|  | 17.8 | Confidentiality | 44 |
|  | 17.9 | Lender Group Expenses | 45 |
|  | 17.10 | USA PATRIOT Act | 45 |
|  | 17.11 | Integration | 45 |
| 18. | | JOINT AND SEVERAL LIABILITY | 45 |
|  | 18.1 | Inducement. | 45 |
|  | 18.2 | Combined Liability. | 45 |
|  | 18.3 | Separate Exercise of Remedies. | 45 |

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A-1 | Form of Assignment and Acceptance |
| Exhibit C-1 | Form of Compliance Certificate |
| Exhibit L-1 | LIBOR Notice |
| | |
| Schedule A-1 | Agent's Account |
| Schedule A-2 | Authorized Persons |
| Schedule B-1 | Guarantors |
| Schedule C-1 | Commitments |
| Schedule D-1 | Designated Account |
| Schedule P-1 | Permitted Investments |
| Schedule P-2 | Permitted Liens |
| Schedule 1.1 | Definitions |
| Schedule 3.1(b) | Defaults in Connection with Collateral Material Contracts |
| Schedule 3.2(d) | Capitalization of Loan Parties and Their Subsidiaries |
| Schedule 3.2(h) | Intellectual Property |
| Schedule 3.2(m) | Material Contracts |
| Schedule 4.2 | Due Authorization |
| Schedule 4.4 | Collateral |
| Schedule 4.6(a) | States of Organization |
| Schedule 4.6(b) | Chief Executive Offices |
| Schedule 4.6(c) | Organizational Identification Numbers |
| Schedule 4.7(b) | Litigation |
| Schedule 4.8 | Exception to Compliance with Laws |
| Schedule 4.14 | Defaulted Leases |
| Schedule 4.15 | Deposit Accounts and Securities Accounts |
| Schedule 4.19 | Existing Indebtedness |
| Schedule 4.20 | Taxes |
| Schedule 5.11 | Guaranty |
| Schedule 6.6 | Nature of Business |

*Error! Unknown document property name.*
RLF1 3538067v.1