# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | |
| EAST WEST RESORT DEVELOPMENT V, L.P., L.L.L.P., ET AL., | **JOINTLY ADMINISTERED CASE NO. 10-10452** |
| Debtors. | |

| (includes: | |
|---|---|
| NMP Holdings, LLC; | **10-10455** |
| Northstar Mountain Properties, LLC; | **10-10463** |
| Northstar Iron Horse, LLC; | **10-10462** |
| Northstar Big Horn, LLC; | **10-10460** |
| Northstar Village Townhomes, LLC; | **10-10459** |
| Northstar Trailside Townhomes, LLC; | **10-10461** |
| Old Greenwood, LLC; | **10-10457** |
| Old Greenwood Realty Inc; | **10-10458** |
| Gray's Station, LLC; | **10-10456** |
| Tahoe Mountain Resorts, LLC; | **10-10454** |
| Tahoe Club Company, LLC) | **10-10453** |

Chapter 11 Cases
Judge Brendan Linehan Shannon

## AMENDED DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED

**RICHARDS, LAYTON & FINGER, P.A.**

Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
L. Katherine Good (No. 5101)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**

Richard A. Chesley (IL 6240877)
Gregory S. Otsuka (IL 6270388)
Hilla Uribe Jimenez (IL 6293064)
191 North Wacker Drive, 30th Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100

**Counsel for the Debtors and Debtors in Possession**

**TABLE OF CONTENTS**

                                                                                                **Page**

SUMMARY ........................................................................................................... 1

ARTICLE I.        INTRODUCTION ....................................................................... 3

    A.        Holders of Claims Entitled to Vote.................................................. 3

    B.        Voting Procedures............................................................................ 5

    C.        Confirmation Hearing ...................................................................... 6

ARTICLE II.       OVERVIEW OF THE PLAN ....................................................... 8

ARTICLE III.      GENERAL INFORMATION ....................................................... 21

    A.        Overview of Chapter 11 .................................................................. 21

    B.        Overview of the Debtors and their Principal Assets.......................... 22

    C.        Capital Structure and Significant Prepetition Indebtedness............... 29

    D.        Recent Financial Information .......................................................... 34

ARTICLE IV.      KEY EVENTS LEADING TO THE COMMENCEMENT OF THE
                  CHAPTER 11 CASES................................................................... 34

    A.        The Collapse of Real Estate Finance Markets Left the Debtors Unable to
                  Refinance Existing Obligations ....................................................... 35

    B.        Cost Reductions and Discounted Property Sales ............................... 36

    C.        The Debtors' Restructuring Efforts .................................................. 36

ARTICLE V.       SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES ............... 37

    A.        Retention of Professionals by the Debtors......................................... 37

    B.        Formation of the Official Committee of Unsecured Creditors ............ 37

    C.        "First Day" Relief ........................................................................... 37

    D.        Other Significant Motions................................................................ 39

    E.        Postpetition Negotiations with Key Parties ...................................... 41

ARTICLE VI.      THE PLAN ................................................................................. 42

    A.        Introduction..................................................................................... 42

    B.        Classification and Treatment of Claims and Interests Under the Plan ....... 42

    C.        Unclassified Claims: Administrative Claims, Priority Tax Claims, Secured
                  Tax Claims and DIP Lender Secured Claims ..................................... 46

    D.        Classes of Claims and Interests: Classification, Treatment and Voting
                  Rights ............................................................................................. 48

ARTICLE VII.     ACCEPTANCE AND REJECTION OF THE PLAN ................................ 57

    A.        Impaired Classes of Claims Entitled to Vote..................................... 57

B.    Classes Deemed to Accept the Plan.................................................................... 57

C.    Classes Deemed to Reject the Plan..................................................................... 57

D.    Nonconsensual Confirmation............................................................................... 57

ARTICLE VIII.    MEANS FOR IMPLEMENTATION OF THE PLAN................................ 58

A.    Continued Corporate Existence ........................................................................... 58

B.    New EWRD V ...................................................................................................... 58

C.    Dissolution of Gray's............................................................................................ 58

D.    EWRD V............................................................................................................... 58

E.    The Dissolving Subsidiaries ................................................................................ 59

F.    Transfer of Assets ................................................................................................ 59

G.    Asset Sales ........................................................................................................... 59

H.    Tahoe Club Member Rights.................................................................................. 59

I.    Consummation of the Transactions Contemplated by the PSA........................... 60

J.    Terms of New Money Investment ....................................................................... 60

K.    Execution of Documents and Limited Liability Action...................................... 60

L.    NMP Consents ..................................................................................................... 62

M.    Effectuating Documents; Further Transactions .................................................. 63

ARTICLE IX.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES............................................................................................................... 64

A.    Rejection of Remaining Executory Contracts and Unexpired Leases................. 64

B.    Assumption and Cure of Executory Contracts.................................................... 64

C.    Cure of Defaults of Assumed Executory Contracts............................................ 64

D.    Effect of Assumption Assignment ...................................................................... 65

E.    Rejection Damages Bar Date ............................................................................... 65

F.    Insurance Policies ................................................................................................ 65

G.    Trailside Closings ................................................................................................ 66

ARTICLE X.    DISTRIBUTIONS ................................................................................................ 66

A.    Distributions on Allowed Unsecured Claims ...................................................... 66

B.    Date of Distributions............................................................................................ 66

C.    Disbursing Agent ................................................................................................. 67

D.    Delivery of Distributions ..................................................................................... 67

E.    Unclaimed Distributions ........................................................................ 67

F.    Manner of Payment ............................................................................... 67

G.    Limitation on Cash Distributions .......................................................... 67

H.    Allocation of Plan Distributions Between Principal and Interest .......... 67

ARTICLE XI.    PROCEDURES FOR TREATING DISPUTED CLAIMS ........................... 68

A.    Claims Administration Responsibility .................................................. 68

B.    Procedures for Treating and Resolving Disputed and Contingent Claims .......... 69

C.    Setoffs and Recoupment ....................................................................... 69

D.    Allowance and Disallowance of Claims Subject to Section 502 of the Bankruptcy Code .......... 69

E.    Adjustment to Certain Claims Without a Filed Objection ..................... 70

F.    Resolution of Administrative Claims and Claims ................................. 70

G.    Offer of Judgment ................................................................................ 70

H.    Amendments to Claims ......................................................................... 70

I.    Cancellation of Instruments and Agreements ....................................... 70

J.    No Interest on Claims ........................................................................... 71

K.    Withholding Taxes ................................................................................ 71

ARTICLE XII.    EFFECT OF CONFIRMATION ........................................................ 71

A.    Vesting of Assets .................................................................................. 71

B.    Binding Effect ....................................................................................... 71

C.    Discharge of Claims and Termination of Interests .............................. 71

D.    Injunction .............................................................................................. 72

E.    Term of Injunctions or Stays ................................................................ 72

F.    Exculpation and Releases ..................................................................... 73

G.    Reservation of Causes of Action/Reservation of Rights ...................... 73

H.    Avoidance Actions/Objections ............................................................. 73

I.    Discharge of the Debtors' Professionals ............................................... 73

ARTICLE XIII.    CONDITIONS PRECEDENT ........................................................... 74

A.    Conditions Precedent to Effectiveness .................................................. 74

B.    Waiver of Conditions ............................................................................ 74

C.    Satisfaction of Conditions .................................................................... 74

ARTICLE XIV.    ADMINISTRATIVE PROVISIONS .............................................................. 75

    A.    Retention of Jurisdiction by the Bankruptcy Court ............................ 75

    B.    Payment of Statutory Fees ................................................................... 76

    C.    Headings ............................................................................................... 76

    D.    Binding Effect of Plan ......................................................................... 76

    E.    Final Order ........................................................................................... 77

    F.    Withholding and Reporting Requirements ........................................... 77

    G.    Tax Exemption and Expedited Tax Determination ............................. 77

    H.    Governing Law ..................................................................................... 77

    I.    Plan Supplement ................................................................................... 78

    J.    Severability ........................................................................................... 78

    K.    Revocation ............................................................................................ 78

    L.    Substantial Consummation ................................................................... 78

    M.    Construction .......................................................................................... 78

    N.    Conflict ................................................................................................. 79

    O.    Amendments and Modifications ........................................................... 79

    P.    Notices .................................................................................................. 79

    Q.    Filing of Additional Documents .......................................................... 80

    R.    Direction to a Party .............................................................................. 80

    S.    Successors and Assigns ........................................................................ 80

ARTICLE XV.    CERTAIN FACTORS AFFECTING THE DEBTORS ............................. 80

    A.    Certain Bankruptcy Law Considerations ............................................. 80

    B.    Additional Factors to be Considered .................................................... 81

ARTICLE XVI.    CONFIRMATION OF THE PLAN .............................................................. 84

    A.    Confirmation Hearing ........................................................................... 84

    B.    Requirements for Confirmation of the Plan ......................................... 84

ARTICLE XVII.    EXEMPTION FROM SECURITIES LAWS ............................................... 93

    A.    Exemption From Securities Laws ......................................................... 93

    B.    New Money Investment and Management Investment ......................... 96

ARTICLE XVIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
                  OF THE PLAN .......................................................................................... 96

**Page**

| | | |
|---|---|---|
| A. | Liquidation Under Chapter 7 | 96 |
| B. | Alternative Plan of Reorganization | 97 |
| ARTICLE XIX. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 97 |
| A. | Federal Income Tax Consequences to Holders of Claims | 97 |
| B. | Federal Income Tax Consequences to Holders of Interests | 100 |
| C. | Information Reporting and Withholding | 100 |
| ARTICLE XX. | DEFINITIONS AND INTERPRETATION | 101 |
| A. | Defined Terms | 101 |
| B. | Other Terms | 114 |
| C. | Exhibits | 114 |
| ARTICLE XXI. | CONCLUSION | 115 |

## TABLE OF EXHIBITS

| Exhibit A | Debtors' Chapter 11 Plan |
| Exhibit B | Disclosure Statement Order |
| Exhibit C | Organizational Chart |
| Exhibit D | Chapter 7 Liquidation Analysis |
| Exhibit E | Financial Projections |

LEGAL_US_E # 86966965.18

# SUMMARY

The following is a summary of the Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated as of April 15, 2010. This Disclosure Statement describes the Plan and the distributions contemplated thereunder for each of the Debtors and their creditors. Unless otherwise defined herein, all capitalized terms contained in this Disclosure Statement have the meanings ascribed to them in the Plan. Unless the context requires otherwise, reference to "we," "our," and "us" are to the Debtors (collectively, the "Company").

EWRD V is a limited liability partnership formed to develop residential and commercial real estate projects on and around the Northstar-at-Tahoe Resort in Lake Tahoe, California. Having invested over $925 million in infrastructure, development, club amenities and on-mountain improvements to date, EWRD V has developed a year-round experience in Lake Tahoe that includes four unique residential communities on fully-entitled land: Northstar Village, Northstar Highlands, Old Greenwood and Gray's Crossing (collectively, the "Development"). To date, over 700 units have been developed and sold at the Development. Such units include (i) single family lots, (ii) townhomes, (iii) condominiums and (iv) fractional ownership residences.

NMP owns approximately 335 acres of undeveloped land at Northstar Highlands, with rights to develop approximately 1,100 additional units on such land. NMP currently has the only entitled land in the region available for future ski-in/ski-out development. Significant infrastructure and design work with an original cost of nearly $100 million has been completed for future phases.

EWRD V's current and future properties are tied together through the Tahoe Club, a year round, non-equity club that offers homeowners access to amenities, including, among other things, state-of-the-art fitness facilities, signature golf courses (including one Jack Nicklaus and one Peter Jacobsen/Jim Hardy), a private ski lounge, and fine members-only dining options located at an on-mountain lodge at the top of the Northstar Mountain.

The Development is the vision of East West and Harry H. Frampton III, chairman, founder and 100% owner of East West. For more than 24 years, East West, a veteran developer of award-winning resorts, has pioneered the master planned community concept by providing its customers with unparalleled vacation and homeownership experiences in the most sought-after resort environments, with world class amenities to match. Since its inception, East West has developed over $2 billion of residential and commercial real estate in Colorado, California, Utah and South Carolina.

East West's investment partner, CRDI, has invested over $1 billion since its partnership with East West commenced more than 15 years ago. CRDI is a wholly owned subsidiary of Crescent Real Estate Equities Company ("CRE"), a real estate development and land management company that owns and manages office buildings and resort developments across the country. In addition to completed residential projects, CRE and East West have also made other substantial investments in the development of associated infrastructure in the Development which includes current investment in excess of $150 million in roads and utilities.

Throughout calendar year 2009 and into 2010, EWRD V has been negatively impacted by a variety of factors, most importantly:

- An ongoing slowdown in the residential and commercial real estate markets negatively impacted demand for luxury real estate and led to significant declines in property values.

- Debt defaults and an ownership transition of EWRD V's ultimate parent, CRE, resulted in an elimination of further equity funding.

- Insufficient sources of cash left the Debtors unable to fund ongoing cash needs, including, but not limited to: (i) significant land holding costs, (ii) operating losses at the Tahoe Club, (iii) ongoing development, marketing and administrative expenditures and (iv) construction loans which swept 100% of asset sale proceeds.

During this time, EWRD V developed a revised business plan and attempted to negotiate an out-of-court recapitalization transaction, including raising adequate capital to fund its operations. The Debtors' out-of-court recapitalization efforts, however, were complicated by, among other things, (i) the amount of financing required, (ii) EWRD V's complex organizational and capital structure, (iii) a variety of ongoing payment defaults and (iv) the threat of impending creditor actions.

Faced with dwindling liquidity and the threat of imminent piecemeal liquidation of its assets, EWRD V and its advisors successfully negotiated a recapitalization transaction with new money providers, CRDI and certain other key stakeholders. Pursuant to a support agreement and accompanying term sheet, EWRD V successfully obtained: (i) $10,000,000 of debtor-in-possession financing from Barclays, (ii) up to $32.5 million of long term post-emergence financing from the New Money Investors and (iii) the necessary consents to file the Chapter 11 Cases. The support agreement contemplates implementation of a recapitalization of the Debtors through a pre-arranged Plan and expedited emergence from Chapter 11.

With the support agreement in place, the Debtors commenced the Chapter 11 Cases on February 16, 2010. The Plan, which is attached hereto as Exhibit A, reflects the framework of the consensual agreement with the Support Parties. The Plan constitutes a separate chapter 11 plan for each of the Debtors except for EWRD V, which is not subject to the Plan and will be resolved through a separate plan of liquidation or alternative process. Any and all claims against EWRD V shall be completely unaffected by the Plan and any rights and interests of EWRD V claimants are expressly reserved.

**THE DEBTORS AND SUPPORT PARTIES STRONGLY BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO (I) FUND ONGOING OPERATIONS AND DEVELOPMENT, (II) AVOID IMMEDIATE PIECEMEAL LIQUIDATION OF THEIR ASSETS, (III) MAXIMIZE VALUE OF THEIR ESTATES FOR THE BENEFIT OF ALL CONSTITUENTS, (IV) ACCOMPLISH A REORGANIZATION SUCCESSFULLY AND (V) ACCOMPLISH THE OBJECTIVES OF CHAPTER 11. ACCORDINGLY, THE DEBTORS AND THE SUPPORT PARTIES BELIEVE THAT ACCEPTANCE OF THE**

2

**PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS AND, THEREFORE, URGE ALL CREDITORS ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN.**

## ARTICLE I.

## INTRODUCTION

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Interests in and Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan filed by the Debtors with Bankruptcy Court and (ii) the Confirmation Hearing.

Annexed as Exhibit A to this Disclosure Statement is a copy of the Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code.

A ballot ("Ballot") for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement mailed to the holders of Claims that the Debtors believe may be entitled to vote to accept or reject the Plan.

On April __, 2010, after notice and a hearing, the Bankruptcy Court signed the Disclosure Statement Order, approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order, a copy of which is annexed hereto as Exhibit B, sets forth in detail, among other things, the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

### A.     Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected the proposed plan are entitled to vote to accept or reject a proposed plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. For a detailed description of the treatment of Claims and Interests under the Plan, see Article VI.B of this Disclosure Statement.

3

Claims in Classes 2, 3, 4, 5, 6, 7.A, 7.B, 7.C, 7.D, 7.E, 7.F, 7.G, 7.H, 7.J, 7.K(a) and 7.K(b) of the Plan are impaired and, to the extent Claims in such Classes are Allowed, the holders of such Claims will receive distributions under the Plan. As a result, Holders of Claims in those Classes are entitled to vote to accept or reject the Plan. If and to the extent any other Class identified as being unimpaired is impaired (whether as a result of the terms of the Plan or any modification or amendment thereto), upon such determination, such Class shall then be entitled to vote to accept or reject the Plan.

Classes 1.A, 1.B, 1.C, 1.D, 1.E, 1.F, 1.G. 1.H, 1.J, 1.K, 8.B, 8.G., 8.J and 8.K(a) are unimpaired by the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, Holders of such Classes are therefore conclusively presumed to have accepted the Plan, and the votes of Holders of such Classes will therefore not be solicited.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Article XVI of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the rejection of a plan by one or more impaired classes of claims or equity interests. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Article XVI.B.1.d of this Disclosure Statement.

Holders of Claims in Class 1.I (Gray's Priority Claims), Class 7.I (Gray's General Unsecured Claims), Classes 9.A through 9.K (Intercompany Claims) and Classes 10.A through 10.K (Interests and Interest Related Claims) will not receive any distribution under the Plan and are therefore deemed to have rejected the Plan. With respect to these Classes of Claims that are deemed to have rejected the Plan, *i.e.*, Classes 9.A through 9.K (Intercompany Claims) and Classes 10.A through 10.K (Interests and Interest Related Claims), the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

**THE DEBTORS AND THE SUPPORT PARTIES RECOMMEND THAT HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT THE PLAN.**

The Debtors' legal advisors are Paul, Hastings, Janofsky & Walker LLP and Richards, Layton & Finger, P.A. Their financial advisor and investment banker is Houlihan Lokey Howard & Zukin Capital, Inc. They can be contacted at:

LEGAL_US_E # 86966965.18

HOULIHAN LOKEY HOWARD & ZUKIN
CAPITAL, INC.
1930 Century Park West
Los Angeles, CA 90067
Telephone: (310) 553-8871
Facsimile: (310) 553-2173
Attn:   Amit Patel
          Andrew Morrow

PAUL, HASTINGS, JANOFSKY & WALKER
LLP
191 North Wacker Drive, 30th Floor
Chicago, IL 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Attn:   Richard A. Chesley
          Gregory S. Otsuka
          Hilla Uribe Jimenez

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Attn:   Daniel J. DeFranceschi
          Paul N. Heath
          L. Katherine Good

**B.**     **Voting Procedures**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims. The Debtors, with the approval of the Bankruptcy Court, have engaged Epiq Bankruptcy Solutions, LLC, to serve as the Voting and Claims Agent with respect to Claims in Classes that are entitled to vote on the Plan. The Voting and Claims Agent will assist in the solicitation process by, among other things, answering questions, providing additional copies of all solicitation materials, and generally overseeing the solicitation process for Claims. The Voting and Claims Agent will also process and tabulate ballots for each of the respective Classes that are entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable before the Confirmation Hearing.

Ballots should be returned to:

East West Resort Development V, L.P., L.L.L.P. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Tel. [Toll-free] (866) 212-0222
Fax. (646) 282-2501

**Do not return your notes, securities, or any other documents with your Ballot.**

MORE DETAILED INSTRUCTIONS REGARDING HOW TO VOTE ON THE PLAN ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO HOLDERS OF CLAIMS THAT

LEGAL_US_E # 86966965.18

ARE ENTITLED TO VOTE ON THE PLAN. TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY NO LATER THAN 4:00 P.M. (PREVAILING EASTERN TIME) ON MAY 21, 2010. ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN SHALL NOT BE COUNTED.

Any Claim in an impaired Class as to which an objection or request for estimation is pending is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan. Additionally, any Claim in an impaired Class that is listed on the Schedules as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has timely filed a proof of claim and no objection has been filed to such proof of claim or if an objection is filed with respect to such proof of claim (a) an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (b) an order of the Bankruptcy Court is entered temporarily allowing such claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (c) a stipulation or other agreement is executed between the holder of such Claim and the Debtors resolving the objection and allowing such claim in an agreed upon amount; (d) a stipulation or other agreement is executed between the holder of such claim and the Debtors temporarily allowing the holder of such claim to vote its claim in an agreed upon amount; or (e) the pending objection to such claim is voluntarily withdrawn by the Debtors (each, a "Resolution Event") provided, however, that if the Debtors object to a claim on a reduced and allowed basis the claimant may, absent a Resolution Event, vote such claim at the amount asserted by the Debtors.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set April 14, 2010 as the record date for holders of Claims entitled to vote on the Plan. Accordingly, only holders of record as of the applicable record date that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Epiq at (866) 212-0222.

## C. Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on May 27, 2010 at 1:30 p.m. (prevailing Eastern Time) before the Honorable Brendan L. Shannon, Room #1, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before May 21, 2010 at 4:00 p.m. (prevailing Eastern Time) in the manner described below in Article XVI of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

LEGAL_US_E # 86966965.18

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.  HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE PLAN, PRIOR TO VOTING ON THE PLAN.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.  THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN ARTICLE XV OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY, REFERENCE TO THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THE DEBTORS AND SUPPORT PARTIES STRONGLY BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO (I) FUND ONGOING OPERATIONS AND DEVELOPMENT, (II) AVOID IMMEDIATE PIECEMEAL LIQUIDATION OF THEIR ASSETS, (III) MAXIMIZE VALUE OF THEIR ESTATES FOR THE BENEFIT OF ALL CONSTITUENTS, (IV) ACCOMPLISH A REORGANIZATION SUCCESSFULLY AND (V) ACCOMPLISH THE OBJECTIVES OF CHAPTER 11.  ACCORDINGLY, THE DEBTORS AND THE SUPPORT PARTIES BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS AND, THEREFORE, URGE ALL CREDITORS ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN.

**IRS CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND

7

CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## ARTICLE II.

## <u>OVERVIEW OF THE PLAN</u>

The following table briefly summarizes the classification and treatment of Administrative Expense Claims, Claims and Interests under the Plan:[1]

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| -- | Administrative Claims: Non-Professional Fee Claims | Paid in full, in Cash, without interest, as soon as practicable after the later of (a) the Effective Date, but no later than twenty (20) days after the Effective Date, (b) within thirty (30) days after such Administrative Claim becomes an Allowed Claim and (c) when due in the ordinary course. | $3,325,000, plus any amounts incurred and payable in the ordinary course of business | 100% |
| -- | Administrative Claims: Professional Fee Claims | Paid in full, in Cash, as soon as practicable after the later of (a) the Effective Date and (b) the date upon which any order awarding fees and expenses becomes a Final Order, and in accordance with the terms of any order of the Bankruptcy Court governing the | $3,000,000 | 100% |

---

[1] To the extent that there is any inconsistency between the terms in this table and the terms of the Plan, the terms of the Plan control.

[2] The amounts set forth herein are the Debtors' estimates based on the Debtors' books and records. Actual amounts will depend upon the amounts of Claims timely filed before the Bar Date, final reconciliation and resolution of all Administrative Claims and Claims and the negotiation of cure amounts. Accordingly, the actual amounts may vary significantly from the amounts set forth herein.

[3] The approximate percentage recoveries set forth herein are the Debtors' estimates based on the Debtors' books and records. Actual recovery percentages will depend upon the amounts of Claims timely filed before the Bar Date, final reconciliation and resolution of all Administrative Claims and Claims and the negotiation of cure amounts. Accordingly, the actual recovery percentages may vary significantly from the amounts set forth herein.

8

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | payment of fees and expenses. | | |
| -- | Priority Tax Claims and Secured Tax Claims | The Disbursing Agent shall pay, at the Debtors' discretion, each Holder of an Allowed Priority Tax Claim and Allowed Secured Tax Claim against any Debtor in full in Cash at the later of (a) as soon as practicable after the Effective Date but not more than 10 Business Days after the Effective Date, or (b) within thirty (30) days after such Claim becomes an Allowed Claim.  Notwithstanding the immediately preceding sentence, the Disbursing Agent, may at the direction of the Debtors, make payment on such Claims over a term of 5 years from the Petition Date, provided, however, that if the Debtors elect to make payments in this manner, such claimants shall receive interest from the Effective Date through and including the date of the last payment at the interest rate required by section 511 of the Bankruptcy Code. | Undetermined | 100% |
| -- | DIP Lenders Secured Claim | Paid in full, in Cash, on the Effective Date. | Undetermined | 100% |
| 1.A | NMPH Priority Claims | Unimpaired or Impaired by Agreement.  Paid in full, in Cash, without interest, as soon as practicable but no later than thirty (30) days after the Effective Date. | Undetermined | 100% |
| 1.B | NMP Priority Claims | Unimpaired or Impaired by Agreement.  Paid in full, in Cash, without interest, as soon as practicable but no later than thirty (30) days after the Effective Date. | Undetermined | 100% |
| 1.C | Iron Horse Priority Claims | Unimpaired or Impaired by Agreement.  Paid in full, in Cash, without interest, as soon as practicable but no later than thirty (30) days after the Effective Date. | Undetermined | 100% |

LEGAL_US_E # 86966965.18

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| 1.D | Big Horn Priority Claims | Unimpaired or Impaired by Agreement. Paid in full, in Cash, without interest, as soon as practicable but no later than thirty (30) days after the Effective Date. | Undetermined | 100% |
| 1.E | Village Townhomes Priority Claims | Unimpaired or Impaired by Agreement. Paid in full, in Cash, without interest, as soon as practicable but no later than thirty (30) days after the Effective Date. | Undetermined | 100% |
| 1.F | Trailside Townhomes Priority Claims | Unimpaired or Impaired by Agreement. Paid in full, in Cash, without interest, as soon as practicable but no later than thirty (30) days after the Effective Date. | Undetermined | 100% |
| 1.G | Greenwood Priority Claims | Unimpaired or Impaired by Agreement. Paid in full, in Cash, without interest, as soon as practicable but no later than thirty (30) days after the Effective Date. | Undetermined | 100% |
| 1.H | Realty Priority Claims | Unimpaired or Impaired by Agreement. Paid in full, in Cash, without interest, as soon as practicable but no later than thirty (30) days after the Effective Date. | Undetermined | 100% |
| 1.I | Gray's Priority Claims | Impaired. Gray's Priority Claims in Class 1.I shall receive no Distributions under the Plan. | $0 | 0% |
| 1.J | Resorts Priority Claims | Unimpaired or Impaired by Agreement. Paid in full, in Cash, without interest, as soon as practicable but no later than thirty (30) days after the Effective Date. | Undetermined | 100% |
| 1.K | Club Priority Claims | Unimpaired or Impaired by Agreement. Paid in full, in Cash, without interest, as soon as practicable but no later than thirty (30) days after the Effective Date. | Undetermined | 100% |
| 2 | Citizens Secured Claim | Impaired. In full and final satisfaction of the Allowed Citizens Secured Claim, Holders of | $2,881,000 plus accrued and | Undetermined |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | Allowed Class 2 Claims shall be entitled to a recovery of their Allowed Claim through, at Citizen's option, either (i) the sale of the Citizens Collateral by the Debtors to a third party with the proceeds from such sale (less broker fees not to exceed 4%) in an amount sufficient to satisfy the Allowed Citizens Secured Claim returned to Citizens, and the repair of the Citizens Collateral to be completed using insurance proceeds previously received and without cost to Citizens or (ii) the transfer of the Citizens Collateral to Citizens. | unpaid interest | |
| 3 | Citizens Model Secured Claim | Impaired. On the Effective Date, the legal, equitable and contractual rights of Holders of Allowed Class 3 Claims shall be unaffected by the Plan; however, the Citizens Model Facility shall be modified as follows: (i) the interest rate on the Citizens Model Facility shall be reduced from 7.95% to 5.0%, (ii) following the repayment of the JPMorgan Facility, the Debtors will contribute $5,000 from the sale of each future fraction at Greenwood to pay down the Citizens Model Facility; (iii) on or before December 31, 2011, Greenwood will begin to market fractions at Greenwood that comprise the Citizens Model Collateral with 100% of the proceeds from any sales of such fractions to be used pay down the Citizens Model Facility and (iv) certain other terms of the Citizens Model Facility shall be modified as agreed to by the Debtors and Citizens. | $2,350,000 plus accrued and unpaid interest | Undetermined |
| 4 | JPMorgan Secured Claim | Impaired. On the Effective Date, the legal, equitable and contractual rights of Holders of Allowed Class 4 Claims shall be unaffected by the Plan; however, the JPMorgan | $1,254,104 plus accrued and unpaid interest | Undetermined |

11

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | Facility shall be modified as follows: (i) the maturity date on the JPMorgan Facility shall be extended to March 31, 2011 and (ii) certain other terms of the JPMorgan Facility shall be modified as agreed to by the Debtors and JPMorgan. | | |
| 5 | Plumas Secured Claim | Impaired. In full and final satisfaction of the Allowed Plumas Secured Claim, Holders of Allowed Class 5 Claims shall be entitled to (A) a recovery of their Allowed Claim through the transfer of the Plumas Collateral to Plumas (as further described below); and (B) an Allowed General Unsecured Claim in Class 7.G in the amount of $1,500,000. In the event the Debtors have not consummated a consensual transfer of the Plumas Collateral on or before the Effective Date and the stay has not otherwise been lifted with respect to the Plumas Collateral on or before the Effective Date, (i) the Plumas Collateral shall be deemed abandoned, (ii) any and all stays and injunctions under the Bankruptcy Code, the Plan or otherwise with respect to the Plumas Collateral shall be immediately lifted, and (iii) there shall be no impairment, injunction against or discharge of Plumas's liens, security interests, rights, loan documents or claims, and Plumas shall be permitted to exercise any and all of its rights and remedies under applicable bankruptcy and non-bankruptcy law against the Plumas Collateral and Greenwood, to the extent incidental thereto. The consensual transfer or conveyance of the Plumas Collateral by the Debtors by any method (a consensual sale shall not include foreclosure), shall be subject to any valid, enforceable and perfected | $2,971,129 plus accrued and unpaid interest | Undetermined |

LEGAL_US_E # 86966965.18

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | lien, right of subrogation, or right under statute held by International Fidelity Insurance Company, if any, or the Town of Truckee, if any, or Truckee Donner Public Utility District Community Facilities District No. 04-1 or the Truckee Donner Public Utility District Community Facilities District No. 03-1, if any, against such Plumas Collateral that is determined to be senior in priority in such Plumas Collateral under otherwise applicable non-bankruptcy law to the liens and security interests under the Plumas Facility in or against such Plumas Collateral, if any. It is expressly understood that Plumas does not admit the existence, extent, amount or validity of any such alleged liens or rights, and affirmatively disputes the same. | | |
| 6 | SocGen Secured Claim | Impaired.  In full and final satisfaction of the Allowed SocGen Secured Claim, Holders of Allowed Class 6 Claims shall be entitled to a recovery of their Allowed Claim through, at the Debtors' option, either (i) proceeds from the sale of the SocGen Collateral to a third party, provided, however, that the Debtors shall not proceed with any sale of the SocGen Collateral unless the entire indebtedness and sums owed to SocGen under the SocGen Loan Documents are paid in cash in full upon closing of such a sale or SocGen provides further written consent to such a sale or (ii) the consensual transfer of the SocGen Collateral to SocGen.  In the event the Debtors have not consummated such a consensual transfer or permitted sale on or before the Effective Date and the stay has not otherwise been lifted with respect to the SocGen Collateral on or before the | $6,000,000 plus accrued and unpaid interest | Undetermined |

LEGAL_US_E # 86966965.18

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | Effective Date, (i) the SocGen Collateral shall be deemed abandoned, (ii) any and all stays and injunctions under the Bankruptcy Code, the Plan or otherwise with respect to the SocGen Collateral shall be immediately lifted, and (iii) there shall be no impairment, injunction against or discharge of SocGen's liens, security interests, rights, loan documents or claims, and SocGen shall be permitted to exercise any and all of its rights and remedies under applicable bankruptcy and non-bankruptcy law against the SocGen Collateral and Gray's Crossing, to the extent incidental thereto. The consensual transfer, conveyance or sale of the SocGen Collateral by the Debtors by any method (a consensual sale shall not include foreclosure), shall be subject to any valid, enforceable and perfected lien, right of subrogation, or right under statute held by International Fidelity Insurance Company, if any, or the Town of Truckee, if any, or Truckee Donner Public Utility District Community Facilities District No. 04-1 or the Truckee Donner Public Utility District Community Facilities District No. 03-1, if any, against such SocGen Collateral that is determined to be senior in priority in such SocGen Collateral under otherwise applicable non-bankruptcy law to the liens and security interests under the SocGen Loan Documents in or against such SocGen Collateral, if any. It is expressly understood that SocGen does not admit the existence, extent, amount or validity of any such alleged liens or rights, and affirmatively disputes the same. The Debtors do not believe SocGen will accept a consensual transfer of the SocGen Collateral in the absence of prior | | |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | resolution of such disputed liens and rights. | | |
| 7.A | NMPH General Unsecured Claims | Impaired. In full and final satisfaction of Allowed NMPH General Unsecured Claims in Class 7.A, Holders of Allowed Class 7.A Claims shall receive the lesser of (i) Cash in an amount equal to their Claim without interest or (ii) a Pro Rata Distribution in Cash of $1,000. | $1,000 | 100% |
| 7.B | NMP General Unsecured Claims | Impaired. In full and final satisfaction of Allowed Class 7.B Claims, Holders of Allowed Class 7.B Claims (except for those who elect to receive payment under a Convenience Class) shall receive a Pro Rata Distribution in Cash of $1,000,000. | $2,637,000 – $3,380,000 | 30%-38%[4] |
| 7.C | Iron Horse General Unsecured Claims | Impaired. In full and final satisfaction of Allowed Iron Horse General Unsecured Claims in Class 7.C, Holders of Allowed Class 7.C Claims shall receive the lesser of (i) Cash in an amount equal to their Claim without interest or (ii) a Pro Rata Distribution in Cash of $1,000. | $1,000 | 100% |
| 7.D | Big Horn General Unsecured Claims | Impaired. In full and final satisfaction of Allowed Big Horn General Unsecured Claims in Class 7.D Claims shall receive the lesser of | $20,000 | 100% |

---

[4] As described in Article VIII.D of the Disclosure Statement, EWRD V will file proofs of claim against each of the Debtors to preserve any Claims that EWRD V may have against the Debtors. The Debtors estimate that EWRD V has Intercompany Claims totaling approximately $72,000 (which consists of Intercompany Claims in the approximate amounts of $10,000 against Club, $8,000 against Greenwood, $8,000 against Gray's, $20,000 against Resorts and $26,000 against NMP). The estimated Intercompany Claims of EWRD V were not factored into the calculation of estimated recovery percentages provided herein because all Intercompany Claims are currently contemplated to be cancelled under the Plan. In connection with confirmation of the Plan, the Debtors may be required or otherwise determine to allow Intercompany Claims of EWRD V. In the event that the Intercompany Claims of EWRD V are ultimately deemed Allowed, the actual recovery percentages may vary from the estimated recovery percentages set forth herein. If any amounts for Intercompany Claims of EWRD V are Allowed, such amounts would be subject to setoff as described in Article VII.C of the Plan.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | (i) Cash in an amount equal to their Claim without interest or (ii) a Pro Rata Distribution in Cash of $20,000. | | |
| 7.E | Village Townhomes General Unsecured Claims | Impaired. In full and final satisfaction of Allowed Village Townhomes General Unsecured Claims in Class 7.E, Holders of Allowed Class 7.E Claims shall receive the lesser of (i) Cash in an amount equal to their Claim without interest or (ii) a Pro Rata Distribution in Cash of $15,000. | $15,000 | 100% |
| 7.F | Trailside Townhomes General Unsecured Claims | Impaired. In full and final satisfaction of Allowed Trailside Townhomes General Unsecured Claims in Class 7.F, Holders of Allowed Class 7.F Claims shall receive the lesser of (i) Cash in an amount equal to their Claim without interest or (ii) a Pro Rata Distribution in Cash of $2,000. | $2,000 | 100% |
| 7.G | Greenwood General Unsecured Claims | Impaired. In full and final satisfaction of Allowed Class 7.G Claims, Holders of Allowed Class 7.G Claims (except for those who elect to receive payment under a Convenience Class) shall receive a Pro Rata Distribution in Cash of $500,000. | $1,830,000 | 27%[4] |
| 7.H | Realty General Unsecured Claims | Impaired. In full and final satisfaction of Allowed Class 7.H Claims, Holders of Allowed Class 7.H Claims shall receive a Pro Rata Distribution in Cash of $10,000. | $10,000 | 100% |
| 7.I | Gray's General Unsecured Claims | Impaired. Holders of Allowed Class 7.I Claims shall receive no Distributions with respect to Gray's General Unsecured Claims. | $0 | 0% |
| 7.J | Resorts General Unsecured Claims | Impaired. In full and final satisfaction of Allowed Class 7.J Claims, Holders of Allowed Class 7.J Claims (except for those who | $31,000 | 65%[4] |

LEGAL_US_E # 86966965.18

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | elect to receive payment under a Convenience Class) shall receive a Pro Rata Distribution in Cash of $20,000. | | |
| 7.K(a) | Club General Unsecured Claims | Impaired. In full and final satisfaction of Allowed Class 7.K(a) Claims, Holders of Allowed Class 7.K(a) Claims (except for those who elect to receive payment under a Convenience Class) shall receive a Pro Rata Distribution in Cash of $1,000,000. | $2,883,000 – $6,335,000 | 16%-35%[4] |
| 7.K(b) | Golf Member Club General Unsecured Claims | Impaired. In full and final satisfaction of Allowed Golf Member Club General Unsecured Claims in Class 7.K(b), each Holder of an Allowed Golf Member Club General Unsecured Claim shall be entitled to receive, at their sole election, either (1) non-monetary compensation in the form of a (i) Sports Membership with all the privileges of Sports Membership afforded by the Club for Sports Members, (ii) a credit toward the full initiation deposit for the Sports Membership, and (iii) a waiver of the required monthly dues for the Sports Membership and annual green fees until the earlier of such Holder's resignation from the Club or other termination or a date between two to ten years following the Effective Date of the Plan, with such date calculated based on the amount of initiation deposit previously paid by such Holder to the Club or (2) a Club General Unsecured Claim in Class 7.K(a). In the event that the Holder of a Golf Member Claim does not elect treatment under either Class 7.K(b)(1) or 7.K(b)(2), upon confirmation of the Plan of Club, the Golf Member shall be deemed to have elected to receive the treatment provided for in Class 7.K(b)(1). | $0 – $3,453,000 | 24%-29% plus non-economic benefits of Sports Membership |

LEGAL_US_E # 86966965.18

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| 8.B | NMP Convenience Class Claims | Unimpaired or Impaired by Agreement. The Disbursing Agent will distribute to each Holder of an Allowed Class 8.B Claim an amount, in Cash, equal to 100% of the Face Amount thereof up to a maximum of $1,000 total payout in full and final satisfaction of such Claim. | N/A | 100% |
| 8.G | Greenwood Convenience Class Claims | Unimpaired or Impaired by Agreement. The Disbursing Agent will distribute to each Holder of an Allowed Class 8.G Claim an amount, in Cash, equal to 100% of the Face Amount thereof up to a maximum of $1,000 total payout in full and final satisfaction of such Claim. | N/A | 100% |
| 8.J | Resorts Convenience Class Claims | Unimpaired or Impaired by Agreement. The Disbursing Agent will distribute to each Holder of an Allowed Class 8.J Claim an amount, in Cash, equal to 100% of the Face Amount thereof up to a maximum of $1,000 total payout in full and final satisfaction of such Claim. | N/A | 100% |
| 8.K(a) | Club Convenience Class Claims | Unimpaired or Impaired by Agreement. The Disbursing Agent will distribute to each Holder of an Allowed Class 8.K(a) Claim an amount, in Cash, equal to 100% of the Face Amount thereof up to a maximum of $1,000 total payout in full and final satisfaction of such Claim. | N/A | 100% |
| 9.A | NMPH Intercompany Claims | Impaired. Intercompany Claims in Class 9.A shall be cancelled and forever discharged. | N/A | 0% |
| 9.B | NMP Intercompany Claims | Impaired. Intercompany Claims in Class 9.B shall be cancelled and forever discharged. | N/A | 0% |

18

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| 9.C | Iron Horse Intercompany Claims | Impaired. Intercompany Claims in Class 9.C shall be cancelled and forever discharged. | N/A | 0% |
| 9.D | Big Horn Intercompany Claims | Impaired. Intercompany Claims in Class 9.D shall be cancelled and forever discharged. | N/A | 0% |
| 9.E | Village Townhomes Intercompany Claims | Impaired. Intercompany Claims in Class 9.E shall be cancelled and forever discharged. | N/A | 0% |
| 9.F | Trailside Townhomes Intercompany Claims | Impaired. Intercompany Claims in Class 9.F shall be cancelled and forever discharged. | N/A | 0% |
| 9.G | Greenwood Intercompany Claims | Impaired. Intercompany Claims in Class 9.G shall be cancelled and forever discharged. | N/A | 0% |
| 9.H | Realty Intercompany Claims | Impaired. Intercompany Claims in Class 9.H shall be cancelled and forever discharged. | N/A | 0% |
| 9.I | Gray's Intercompany Claims | Impaired. Intercompany Claims in Class 9.I shall be cancelled and forever discharged. | N/A | 0% |
| 9.J | Resorts Intercompany Claims | Impaired. Intercompany Claims in Class 9.J shall be cancelled and forever discharged. | N/A | 0% |
| 9.K | Club Intercompany Claims | Impaired. Intercompany Claims in Class 9.K shall be cancelled and forever discharged. | N/A | 0% |
| 10.A | NMPH Interests | Impaired. Interests and Interest Related Claims in Class 10.A shall be deemed cancelled, null and void, and of no force and effect, and Holders of Allowed Class 10.A Interests shall receive no distribution on account of such Claims. | N/A | 0% |
| 10.B | NMP Interests | Impaired. Interests and Interest Related Claims in Class 10.B shall be deemed cancelled, null and | N/A | 0% |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | void, and of no force and effect, and Holders of Allowed Class 10.B Interests shall receive no distribution on account of such Claims. | | |
| 10.C | Iron Horse Interests | Impaired. Interests and Interest Related Claims in Class 10.C shall be deemed cancelled, null and void, and of no force and effect, and Holders of Allowed Class 10.C Interests shall receive no distribution on account of such Claims. | N/A | 0% |
| 10.D | Big Horn Interests | Impaired. Interests and Interest Related Claims in Class 10.D shall be deemed cancelled, null and void, and of no force and effect, and Holders of Allowed Class 10.D Interests shall receive no distribution on account of such Claims. | N/A | 0% |
| 10.E | Village Townhomes Interests | Impaired. Interests and Interest Related Claims in Class 10.E shall be deemed cancelled, null and void, and of no force and effect, and Holders of Allowed Class 10.E Interests shall receive no distribution on account of such Claims. | N/A | 0% |
| 10.F | Trailside Townhomes Interests | Impaired. Interests and Interest Related Claims in Class 10.F shall be deemed cancelled, null and void, and of no force and effect, and Holders of Allowed Class 10.F Interests shall receive no distribution on account of such Claims. | N/A | 0% |
| 10.G | Greenwood Interests | Impaired. Interests and Interest Related Claims in Class 10.G shall be deemed cancelled, null and void, and of no force and effect, and Holders of Allowed Class 10.G Interests shall receive no distribution on account of such | N/A | 0% |

LEGAL_US_E # 86966965.18

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | Claims. | | |
| 10.H | Realty Interests | Impaired. Interests and Interest Related Claims in Class 10.H shall be deemed cancelled, null and void, and of no force and effect, and Holders of Allowed Class 10.H Interests shall receive no distribution on account of such Claims. | N/A | 0% |
| 10.I | Gray's Interests | Impaired. Interests and Interest Related Claims in Class 10.I shall be deemed cancelled, null and void, and of no force and effect, and Holders of Allowed Class 10.I Interests shall receive no distribution on account of such Claims. | N/A | 0% |
| 10.J | Resorts Interests | Impaired. Interests and Interest Related Claims in Class 10.J shall be deemed cancelled, null and void, and of no force and effect, and Holders of Allowed Class 10.J Interests shall receive no distribution on account of such Claims. | N/A | 0% |
| 10.K | Club Interests | Impaired. Interests and Interest Related Claims in Class 10.K shall be deemed cancelled, null and void, and of no force and effect, and Holders of Allowed Class 10.K Interests shall receive no distribution on account of such Claims. | N/A | 0% |

# ARTICLE III.
# GENERAL INFORMATION

## A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the

LEGAL_US_E # 86966965.18

distribution of a debtor's assets. The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the Petition Date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare, and obtain bankruptcy court approval of, a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor of the relevant classes to make an informed judgment regarding the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against and Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

**B.    Overview of the Debtors and their Principal Assets**

**1.    The Debtors**

EWRD V is a limited partnership formed to develop residential and commercial real estate projects on and around Northstar at Tahoe Resort located in Lake Tahoe, California.

EWRD V has co-developed and co-owns four unique residential communities on fully-entitled land that provide a year-round resort experience: Northstar Village, Northstar Highlands, Old Greenwood and Gray's Crossing.

NMP owns approximately 335 acres of undeveloped land with rights to develop approximately 1,100 additional units on such land. NMP currently has the only entitled land in the region available for future ski-in/ski-out development, creating an unrivalled opportunity for a fully-integrated, world-class resort community. Significant infrastructure and design work, with original cost of approximately $100 million, has been completed for future phases.

Non-debtor EWRD IX, a separately capitalized partnership, owns the recently completed five-star (*Ritz-Carlton Highlands, Lake Tahoe Hotel and Residences*) Lake Tahoe's first five-star luxury hotel which recently opened on December 9, 2009 (the "Ritz Hotel"). The Ritz Hotel consists of 170 hotel rooms and 23 whole-ownership condominium residences (the "Residences") housed on the upper floors of the Ritz Hotel. The Ritz Hotel and Residences both provide ski-in/ski-out access. Land adjacent to the Ritz Hotel is slated for development of additional Ritz-Carlton branded residences, with plans for 61 units in two phases. Approximately $32 million of costs benefiting such future phases has already been invested.

22

## 2. The Debtors' Businesses and Their Principal Assets

### a. The Development

To date, over 700 units have been developed and sold at the Development. Such units include (i) single family lots, (ii) townhomes, (iii) condominiums and (iv) fractional ownership residences.

Below is a summary of each of the Debtors' projects:

- **Northstar Village**: Northstar Village is a family-oriented ski village located at the base of Northstar Mountain. Completed phases include 12 townhomes and 213 condominium units in five buildings, and 135,000 square feet of associated retail and dining amenities. This project was 100% sold out as of the Petition Date.

- **Northstar Highlands**: Northstar Highlands is a year-round ski-in/ski-out community located mid-mountain on the slopes of Northstar Mountain. Completed phases include 16 townhomes (the "Trailside Townhomes") in eight (8) duplexes. Thirteen of the sixteen Trailside Townhomes have been sold and the remaining three Trailside Townhomes are under contract.

- **Old Greenwood**: Old Greenwood is a master-planned 923-acre year-round community built around the Old Greenwood Golf Course. Completed phases include 100 single-family golf course home sites, 15 golf course villas and 83 luxury fractional residences. Since 2005, all home sites and golf course villas but one has been sold. In addition to the one golf course villa, 448 shares remain in inventory.

- **Gray's Crossing**: Gray's Crossing is a 765-acre single-family home community located adjacent to Old Greenwood which is built around the Gray's Crossing Golf Course. The Gray's Crossing community includes 376 single family lots, of which 294 have been sold to date and 82 remain in inventory.

### b. The Tahoe Club

The Tahoe Club owns the following facilities:

- the 18-hole *"Old Greenwood Golf Course"* designed by Jack Nicklaus;

- the 18-hole *"Gray's Crossing Golf Course"* designed by Peter Jacobsen;

- the *"Alpine Club,"* a private facility in The Village at Northstar which includes a lounge, ski storage, ski valet and a kids room; and

- the *"Old Greenwood Fitness Pavilion,"* a state-of-the-art 17,000 square foot swim, tennis, fitness and spa facility at Old Greenwood.

23

The remaining facilities of the Tahoe Club such as the private "*Wild Goose Restaurant*" in Tahoe Vista, California, are leased by the Club.

Membership Classifications. As of the Petition Date, membership in the Tahoe Club consisted of the following categories:

| | |
|---|---|
| Sports Membership | Included in the purchase of any whole ownership residence within the Development is an entry-level Sports Membership in the Tahoe Club. |
| | To date, over 600 Sports Memberships have sold for $25,000 to $35,000 per membership. |
| Vacation Sports Membership | Included in the purchase of any fractional ownership residence within the Development is an entry-level Vacation Sports Membership in the Tahoe Club. |
| Signature Golf Membership | Signature Golf Membership offers members special golf benefits. To date, 2 Signature Gold Memberships have been sold. |
| Vacation Signature Golf Membership | Members who have a Vacation Sports Membership may upgrade their membership to the Vacation Signature Golf Membership. Vacation Signature Golf Membership offers members access to special golf benefits. |
| Full Golf Membership | In addition to having access to all of the facilities that a Sports Member has, a Full Golf Membership offers access to the Gray's Crossing Golf Course. |
| | To date, 43 Full Golf Memberships have sold for $20,000 to $100,000 per membership. |
| Founder Membership | Founder memberships were sold at the commencement of real estate offerings at the Development to purchasers of whole-ownership residences. Members who have Founder Memberships have special benefits and privileges that are not available to members in the other membership classifications. |
| | Over 100 Founder Memberships have sold for |

24

$100,000 per membership

3.    **Corporate Structure**

EWRD V is a limited partnership between CRDI and HF Holding where HF Holding is the developer and general partner. CRDI owns 93.4% of EWRD V. CRDI is a wholly owned subsidiary of CRE. The bankruptcy filings include EWRD V, its wholly owned subsidiary NMPH, NMPH's majority owned subsidiary NMP, and each of the direct and indirect subsidiaries of EWRD V and NMP. EWRD V either directly or indirectly owns a majority of the membership interests of, the following project level Debtors: Iron Horse, Big Horn, Trailside Townhomes, Village Townhomes, Greenwood, and Gray's. Attached hereto as <u>Exhibit C</u> is an organization chart which illustrates the relationship among the various Debtors.

A brief description of each of the Debtors' business activities or business functions is set forth below.

- EWRD V holds, directly or indirectly, a majority of the membership interests of or stock in each of the Debtors.

- Gray's was formed for the purpose of developing, owning, constructing, acquiring, operating and selling the properties at Gray's Crossing.

- Greenwood was formed for the purpose of developing, owning, constructing, acquiring, operating and selling the properties at Old Greenwood.

- Realty is a vehicle for conducting sales and paying sales commissions for sales of residences located at the Projects.

- Club owns some of the facilities at the Tahoe Club.

- Resorts coordinates the marketing for each of the Debtors and is reimbursed by each Debtor according to each Debtor's allocated portion of marketing expenses.

- NMPH is a holding company that owns 80% of the membership interests of NMP. The other 20% is owned by TLH.

- NMP is the sole member and manager of Iron Horse, Big Horn, Trailside Townhomes and Village Townhomes.

- Iron Horse was formed for the purpose of developing, owning, constructing, acquiring, operating and selling the properties located in the Iron Horse area of the Northstar Village.

- Big Horn was formed for the purpose of developing, owning, constructing, acquiring, operating and selling the properties located in the Big Horn area of the Northstar Village.

- Trailside Townhomes was formed for the purpose of developing, owning, constructing, acquiring, operating and selling the Trailside Townhomes in the Northstar Village. On March 2, 2010, Trailside Townhomes closed on the first of its four remaining townhomes currently under contract with Exclusive Resorts Real Estate Holdings II, LLC, for a total of $14.6 million.

- Village Townhomes was formed for the purpose of developing, owning, constructing, acquiring, operating and selling the townhomes in the Northstar Village Walk area of the Northstar Village.

## 4.     Interests in NMP

NMP is managed by NMPH and the membership interests of NMP are split 80/20 between NMPH and TLH, respectively, but TLH's 20% interest is subject to the prior distribution to NMPH of all of its invested capital and a preferred return. Under the NMP Operating Agreement, the manager has responsibility for the day-to-day operations of NMP. Certain actions of the manager require the reasonable consent of TLH and others require the discretionary consent of TLH (to be exercised in good faith). Among the rights of TLH under the NMP Operating Agreement are the rights to approve changes in the density of construction and development within Northstar. In addition, pursuant to the NMP Operating Agreement, the discretionary consent of TLH is required for the manager to commence "any proceeding with respect to [NMP] or any [subsidiary entity] for relief under bankruptcy or insolvency laws or laws relating to the relief of debtors, reorganizations, arrangements, compositions, or extensions."

Booth Creek Ski Holdings, Inc. (aka, "Booth Creek" and hereinafter "Booth Creek") currently operates the Northstar Resort under a lease with CNL Income Properties, Inc. (including its affiliates, "CNL"), a REIT that owns 58 properties in North America in the lifestyle and recreation sectors.

## 5.     Interests in Trailside Townhomes and Village Townhomes

NMP operates each of Village Townhomes and Trailside Townhomes separately, and accounts for the revenues and expenses of each entity separately, while also taking into account any common liabilities of NMP that are not attributable solely to Village Townhomes, Trailside Townhomes, or another entity owned by NMP.

This separate accounting by NMP includes separately accounting for the distributions that would be made by NMP to NMPH in respect of Village Townhomes if Village Townhomes were the sole investment of NMP, subject to adjustment for common liabilities (such assumed distribution being referred to as the "Series B Cash"), and the distributions that would be made by NMP to NMPH in respect of Trailside if Trailside were the sole investment of NMP, subject

26

to adjustment for common liabilities (such assumed distribution being referred to as the "Series C Cash").

## 6. Executive Management

The names, titles and biographical information for East West's executive management are set forth below.

*Harry H. Frampton, III.* Mr. Frampton is managing partner of East West. East West specializes in real estate development and is currently developing resort properties in Vail, Beaver Creek, and Summit County in Colorado, Lake Tahoe, California and Deer Valley, Utah. Mr. Frampton is also a principal of Slifer Smith & Frampton Real Estate. Prior to founding East West, Mr. Frampton served in various capacities with the Sea Pines Company, ultimately reaching the position of Executive Vice President and member of the Board of Directors. In 1976, Mr. Frampton became President and a majority stockholder of the Brandermill Group in Richmond, Virginia. From 1982 to 1986, Mr. Frampton was President of Vail Associates, Inc., the creators of Vail and Beaver Creek Mountain resorts in Colorado. Mr. Frampton holds a graduate degree in economics from Clemson University. Mr. Frampton is active in various community-focused organizations.

*Craig Ferraro.* Mr. Ferraro is the senior financial officer for East West. Prior to joining East West, Mr. Ferraro served as Chief Financial Officer of Aspen Skiing Company. While there, Mr. Ferraro also helped to establish the Aspen Skiing Company Environmental Foundation, which has contributed over $500,000 to environmental projects in the Roaring Fork Valley. Mr. Ferraro has also served in a variety of financial and operating positions for public and private companies in Denver and Aspen. Mr. Ferraro graduated from the University of Colorado and received his MBA from the University of Pennsylvania. Mr. Ferraro received his CPA from the State of California.

*Blake Riva.* Mr. Riva is a senior partner in East West's Lake Tahoe projects, where he is responsible for overseeing the Tahoe Development projects and managing financial matters. Mr. Riva has been involved with East West for over 20 years and was previously its Chief Financial Officer. Mr. Riva has extensive experience in real estate development, accounting, finance and project management. Prior to joining East West, Mr. Riva served as controller for Lorig Associates, Inc. Mr. Riva began his career in the audit division of Arthur Anderson & Company. Mr. Riva graduated from the University of Washington and was a Certified Public Accountant. Mr. Riva served as the President of the Board of Directors of the Boys and Girls Club of North Lake Tahoe.

## 7. Management Services and Management Fees

East West is the entity through which all of the Debtors' affairs are conducted. It provides the day-to-day management and oversight of the Debtors' operations and all decisions in respect to the Development have been and are made by East West. East West operates throughout all of the relevant business cycles of the Debtors, from acquisition to design to construction to project management to disposition and marketing of the real properties. East West's responsibilities include, among other things, obtaining and maintaining government

approvals for each of the Projects, seeking entitlements for the development of land, approving the architectural design and site plan layouts for all properties and overseeing and managing the engineering and constructions of community streets, underground utilities and mass grading at the Projects.

Prior to the Petition Date, East West was paid an annual management fee of approximately $2.2 million for managing the Development and pursuant to a separate asset management agreement ("Club Management Agreement") with East West Resorts, LLC ("East West Resorts"), East West Resorts was paid an annual management fee of approximately $2.2 million for managing the Tahoe Club.

For a number of reasons, including, among others, East West's superior experience in developing, selling and managing high end resort residential and fractional projects, as well as established relationships with resort owner and operator, CNL and Booth Creek, and critical relationships with various local agencies in the Lake Tahoe region, the Debtors strongly believe that East West is best positioned to maximize the value of the Debtors' assets, including the undeveloped land at NMP. Therefore, the Plan contemplates that East West will continue to manage the New EWRD V Entities following their emergence from chapter 11. The Debtors, however, intend to reject the Club Management Agreement on or prior to the Effective Date.

### 8. Sub-Management Services and Expense Reimbursements

Almost all direct and indirect general and administrative costs incurred as a result of the Debtors' operations are paid by East West and reimbursed by the Debtors in accordance with the Submanagement Agreements. The costs and expenses of operating the Debtors are directly passed through to the Debtors, i.e., there are no fees on top of the expense reimbursements made by the Debtors.

East West provides all of the Debtors' personnel support pursuant to the Submanagement Agreements. In fact, none of the Debtors have any employees, and the general and administrative costs incurred as a result of the Debtors' operations are paid by East West and reimbursed by the Debtors in accordance with the Submanagement Agreements.

Tahoe Club Employee Company, LLC ("Employee Company"), an East West non-debtor affiliate, maintains a workforce of approximately 150 individuals who work at the Tahoe Club (the "Tahoe Club Employees"). East West Partners – Tahoe, Inc. ("Tahoe Inc."), an East West non-debtor affiliate, employs all of the Debtors' remaining personnel and maintains a staff of 25 individuals in East West's Truckee offices (the "Tahoe Employees" and together with the Tahoe Club Employees, the "Employees").

Employee Company pays the salary, bonuses, incentive compensation, benefit costs and all other employment-related claims and expenses of the Tahoe Club Employees (collectively, the "Tahoe Club Employee Expenses") and Tahoe Inc. pays the salary, bonuses, incentive compensation, benefit costs and all other employment-related claims and expenses of the Tahoe Employees (collectively, the "Tahoe Employee Expenses"). Club then directly reimburses Employee Company for all Tahoe Club Employee Expenses that are reasonably allocable to

28

Club and each of the remaining Debtors reimburse Tahoe Inc. for their allocable share of Tahoe Employee Expenses.

Realty lists and sells all of the Debtors' properties and maintains sales centers in Northstar Village and the main lobby of the Ritz Hotel. Realty Inc. also lists and sells a variety of non-Debtor properties. Realty Inc. retains approximately 15 sales representatives as independent contractors (the "Independent Contractors"), who are paid on a commission-only basis. When a property is sold, the balance of the purchase price, including any applicable commission, is remitted to Realty. Disbursement of all commission payments is the responsibility of Realty. These commission payments are structured identically, regardless of whether the property is owned by a Debtor or an unrelated third-party. In exchange for its brokerage services, Realty is paid 40% of the total commission earned on a sale, while the remaining 60% is paid to the applicable Independent Contractor.

The Independent Contractors list and sell real estate for the Debtors for a sales commission charge ranging from .5% to 7% of the sales price, with the average sales commission being 2.5%. During calendar year 2009, the Independent Contractors generated annual gross revenue for the Debtors of approximately $29.2 million and are projected to generate annual gross revenue of approximately $20 million during calendar year 2010.

## C.  Capital Structure and Significant Prepetition Indebtedness

The Debtors' borrowing is generally concentrated at the Projects, with such debt often guaranteed by EWRD V. The Projects obtained loans most often secured by real property for acquisition, development and construction activities. In furtherance of such Projects and in order to secure development rights, the Debtors were required to post or guaranty a variety of bond obligations. As of the Petition Date, the Debtors had approximately $16,500,000 of principal indebtedness outstanding, excluding contingent guaranty liabilities of EWRD V and the Debtors' obligations arising from Bonds and Surety Bonds (as discussed below).

### 1.  Gray's

On July 16, 2007, Gray's entered into the Citizens Facility with Citizens in the amount of $2,880,000 with a maturity date of July 15, 2010 and an interest rate of 795 bps. The Citizens Facility is secured by real property known as the "Sunset Idea House in Truckee" and is fully guaranteed by EWRD V and HF Holding. The Citizens Facility requires monthly interest payments with the full principal balance and accrued interest due upon maturity. As of the Petition Date, the outstanding principal balance on the Citizens Facility was approximately $2,881,000.

On July 29, 2005, Gray's entered into the SocGen Facility with SocGen in the amount of $6,000,000 and maturity date of July 31, 2009. The SocGen Facility is secured by certain real property located at Gray's Crossing and is fully guaranteed by EWRD V. The SocGen Facility was not repaid by the July 31, 2009 maturity date and is currently in default with a principal balance of $6,000,000 and a default interest rate of 10.5%.

LEGAL_US_E # 86966965.18

## 2.    Greenwood

On December 26, 2006, Greenwood entered into the Citizens Model Facility with Citizens in the amount of $2,350,000 with interest payments due on a monthly basis, a maturity date of December 26, 2016, and an interest rate of 795 bps. The Citizens Model Facility is partially secured by model units constructed at Old Greenwood for the purpose of promoting sales and is fully guaranteed by EWRD V and HF Holding. As of the Petition Date, outstanding principal balance on the Citizens Model Facility was approximately $2,350,000.

On December 19, 2005, Greenwood entered into the Plumas Facility with Plumas in the amount of approximately $3,940,000 with a maturity date of December 20, 2010 and a variable rate of interest of 745 bps. The Plumas Facility is secured by certain real property in Old Greenwood and is fully guaranteed by EWRD V. As of the Petition Date, the outstanding principal balance on the Plumas Facility was approximately $3,000,000.

On March 31, 2004, Greenwood entered into the JPMorgan Facility with JPMorgan in the amount of $15,940,000, for the purpose of constructing certain improvements at Old Greenwood. The JPMorgan Facility is secured by certain real property in Old Greenwood and is fully guaranteed by EWRD V. Due to an accelerated pay down schedule, the principal balance on the JPMorgan Facility as of the Petition Date was approximately $1,513,000.

## 3.    Northstar Highlands

On October 26, 2007, non-debtor Hotel LLC entered into the BofA Construction Loan with BofA, as lender and agent, in the maximum amount of $147,000,000 with an original maturity date of October 26, 2010. The BofA Construction Loan is secured by the Ritz Hotel and Ritz Residences and is fully guaranteed by EWRD V and non-debtor EWRD IX. The BofA Construction Loan is currently in default as of the Petition Date, and the principal balance outstanding on the BofA Construction Loan was approximately $123,200,000.

October 27, 2008, non-debtor Residences LLC entered into the BofA Land Loan with BofA in the amount of $10,000,000 with an original maturity date of October 27, 2009. The BofA Land Loan is secured by certain undeveloped land at Northstar Highlands to be utilized for future development projects related to the Ritz Hotel and is fully guaranteed by EWRD V, EWRD IX and non-debtor Hotel Holding LLC. The BofA Land Loan is currently in default and as of the Petition Date, the principal balance outstanding on the BofA Land Loan was $10,000,000.

## 4.    Trailside Townhomes

On September 20, 2006, Trailside Townhomes and US Bank entered into the US Bank Facility in an amount not to exceed $36,000,000. The US Bank Facility was later amended to, among other things, reduce the maximum loan amount to $4,000,000. The US Bank Facility matures on March 20, 2010 and accrues interest at a variable rate of interest, currently at 4.32%. The US Bank Facility is fully guaranteed by EWRD V. As of the Petition Date, the principal balance outstanding on the US Bank Facility was approximately $450,000. On March 2, 2010, the full balance of the US Bank Facility was paid in full from the sale of proceeds of a closing at Trailside Townhomes.

30

## 5.  Manor Vail Construction Loan

On August 28, 2007, MV Penthouses, LLC and BofA, as agent, entered into the Manor Vail Construction Loan in the amount of $76,500,000 for the development of 17 condominiums in Vail, Colorado.

The Manor Vail Construction Loan is guaranteed by EWRD V and non-debtor EWRD VIII. As of the Petition Date, the principal balance outstanding on the Manor Vail Construction Loan was $17,700,000.

## 6.  The Series A Bonds

On June 1, 2006, NCHC and US Bank, as trustee, entered into that certain Indenture of Trust establishing NCHC's right to issue bonds on behalf of the Town of Truckee to finance the acquisition and construction of real and personal property, buildings and improvements for approximately 96 housing units known as *Sawmill Heights*." In connection therewith, NCHC issued $20,393,000 in aggregate principal amount of its Series A Bonds. EWRD V guaranteed 25% of the Series A Bonds.

## 7.  The Mello-Roos Bonds

In 2003, the Greenwood District issued the Greenwood Mello-Roos Bonds in an aggregate principal amount of approximately $12,400,000 to finance the development and construction of the Greenwood Property. The Greenwood Mello-Roos Bonds are payable solely from special tax revenues earned from the Greenwood Property and from special accounts holding such revenues, proceeds of the Greenwood Mello-Roos Bonds themselves, and earnings on the funds held in the accounts. These special tax revenues and accounts are pledged as security for the Greenwood Mello-Roos Bonds. The Greenwood District is obligated to use the special tax revenues to pay the Greenwood Mello-Roos Bonds and is granted a continuing lien against the Greenwood Property to secure the payment of the special taxes, and it has the ability and obligation to foreclose upon the Greenwood Property or portions thereof if there is a default in payment of the special taxes. Greenwood incurs approximately $225,000 per year in special tax obligations.

In 2004 and 2005, the Gray's District issued the Gray's Mello-Roos Bonds in an aggregate principal amount of approximately $34,500,000 to finance the development and construction of the Gray's Property. The Gray's Mello-Roos Bonds are payable solely from special tax revenues earned from the Gray's Property and from special accounts holding such revenues, proceeds of the Gray's Mello-Roos Bonds themselves, and earning on the funds held in the accounts. These special tax revenues and accounts are pledged as security for the Gray's Mello-Roos Bonds. The Gray's District is obligated to use the special tax revenues to pay the Gray's Mello-Roos Bonds and is granted a continuing lien against the Gray's Property to secure the payment of the special taxes, and it has the ability and obligation to foreclose upon the Gray's Property or portions thereof if there is a default in payment of the special taxes. Gray's and Club combined incur approximately $1,000,000 per year in special tax obligations.

In 2005 and 2006, the Northstar District issued the Northstar Mello-Roos Bonds in an aggregate principal amount of approximately $114,000,000 to finance the development and

31

construction of the Northstar Property. The Northstar Mello-Roos Bonds are payable solely from special tax revenues earned from the Northstar Property and from special accounts holding such revenues, proceeds of the Northstar Mello-Roos Bonds themselves, and earning on the funds held in the accounts. These special tax revenues and accounts are pledged as security for the Northstar Mello-Roos Bonds. The Northstar District is obligated to use the special tax revenues to pay the Northstar Mello-Roos Bonds and is granted a continuing lien against the Northstar Property to secure the payment of the special taxes, and it has the ability and obligation to foreclose upon the Northstar Property or portions thereof if there is a default in payment of the special taxes.

The Districts assert that the special taxes assessed on property of the Debtors pursuant to the Mello-Roos Act are Secured Tax Claims pursuant to section 506 of the Bankruptcy Code rather than Priority Tax Claims pursuant to section 507(a)(8) of the Bankruptcy Code. The Debtors reserve all rights to challenge such assertion.

## 8.    Surety Bonds

In the ordinary course of their businesses, certain of the Debtors are required to post bonds as collateral to secure  their performance, homeowners association and escrow obligations (the "Surety Bonds"). These Surety Bonds are provided by various companies who specialize in such issuance (the "Sureties"). The Debtors do not have a Surety Bond premium financing program in effect. Rather, premiums under each of the Surety Bonds are paid annually. Because the Debtors have a substantial number of Surety Bonds outstanding with various due dates for the annual premium, the Debtors make payments each month when required which constitute various Surety Bonds' annual premium payments. The Debtors have outstanding Surety Bonds of approximately $5,400,000. The aggregate annual premiums for the Debtors' Surety Bonds is approximately $67,500 and as of the Petition Date, no premiums are owed on account of these bonds.

### a.    Performance Bonds

Several of the Debtors' Surety Bonds are issued by Sureties to ensure the Debtors' performance obligations under various contracts, principally in connection with infrastructure improvements that the Debtors are obligated to complete for various local governmental agencies as conditions of obtaining permits and other approvals necessary for the development of their projects (collectively, the "Performance Bonds"). Generally, the Performance Bonds are released when the required infrastructure improvements are completed. The Debtors do not believe that these bonds give the Sureties the right to cancel at will. As of the Petition Date, the Debtors have outstanding Performance Bonds of approximately $2,600,000. As of the Petition Date, no premiums are owed on account of these bonds.

### b.    HOA Bonds

Surety Bonds are also issued by Sureties to ensure the Debtors' compliance with state regulations to properly fund and subsidize various homeowner and condominium associations as required for the sale of real estate necessary for the development of their projects (collectively, the "HOA Bonds"). Generally, the HOA Bonds are released when sales in the communities

32

reach state regulated sales milestones. The Debtors do not believe that these bonds give the Sureties the right to cancel at will. As of the Petition Date, the Debtors have outstanding HOA Bonds of approximately $2,800,000. As of the Petition Date, no premiums are owed on account of these bonds.

On March 11, 2010, the Bankruptcy Court entered an order (the "DIP Order") authorizing the DIP Facility on a final basis. Pursuant to the DIP Order, the Debtors, among other things, are authorized and directed to fund from the Postpetition Debt (as that term is defined in the DIP Order) a cash collateral account for the benefit of IFIC in the amount of $700,000 to secure the Debtors' postpetition obligations under HOA Bonds issued by IFIC, as set forth on Exhibit F of the DIP Order. As set forth in the DIP Order, in the event the Debtors default on their postpetition obligations on the HOA Bonds issued by IFIC and fail to cure the default within five days, IFIC shall be entitled to the cash collateral account and to terminate all HOA Bonds without further order. Through the Effective Date of confirmation, all Debtors responsible for HOA Bond obligations intend to continue to meet their obligations under the HOA Bonds as they mature, will provide IFIC with proof of compliance with those obligations and shall fund the cash collateral account in the amount of $700,000 to secure those obligations until the Effective Date.

### c. Escrow Bonds

The Debtors obtain a third type of Surety Bonds as security for their obligation to credit at closing or return escrow deposits of home purchasers that the Debtors had used to fund construction costs as allowable by applicable law (the "Escrow Bonds"). As of the Petition Date, no premiums are owed on account of these bonds.

### d. Debtor Guarantees to Affiliated Non-Debtor Entities

EWRD V has also entered into various general indemnity agreements with Sureties to guarantee certain obligations of affiliated non-debtor entities. These guarantees total approximately $4,900,000 for Performance Bonds, $600,000 for HOA Bonds and approximately $8,000,000 for Escrow Bonds.

### e. IFIC Claims

International Fidelity Insurance Company ("IFIC") is a Surety that has issued (i) bonds (the "Gray's Performance Bonds") on behalf of Gray's to secure Gray's obligation to the Town of Truckee ("Truckee") to complete certain subdivision public improvements and (ii) HOA Bonds on behalf of certain of the Debtors. IFIC has asserted that it believes that to the extent it incurs a loss under the Gray's Performance Bonds, it will be equitably subrogated to Truckee's statutory trust and equitable lien rights to Gray's assets. Likewise, IFIC contends that to the extent it satisfies an obligee's claim under an HOA Bond, it would be equitably subrogated to the proceeds tendered to the Debtors by purchasers of real estate lots at the closing of the subject property. IFIC claims that its equitable and statutory rights are senior to any Secured Claims. The Debtors and the respective lenders reserve all rights to dispute the existence, extent, perfected status, validity and priority of IFIC's alleged lien, subrogation rights or equitable rights.

LEGAL_US_E # 86966965.18

### 9. Community Benefit Fee Agreements

Real property presently held by several of the Debtors is subject to covenants contained in agreements creating transfer fees pursuant to California Civil Code sections 1098 and 1098.5. Debtors Greenwood and Gray's entered into and are party to agreements entitled, respectively, "Community Benefit Fee Agreement (Old Greenwood)" and "Community Benefit Fee Agreement (Gray's Crossing)" (collectively, the "Fee Agreements"). Pursuant to the Fee Agreements (and subsequent assignments), a fee is to be paid to Truckee Donner Land Trust ("TDLT") upon each transfer of subject real property, with certain types of transfers excepted from the requirement. The fees are to be used by the recipient for projects that benefit the value of the subject real property. The obligation to pay such fees is a joint and several obligation of the transferor and transferee involved in each covered transaction. TDLT believes that the obligations created by each Fee Agreement run with the land and are binding upon all persons or entities holding or acquiring interests in the subject real property. TDLT further takes the position that notwithstanding anything to the contrary in the Plan or any other pleading or other document filed by the Debtors, the Fee Agreements and the covenants and obligations existing thereunder shall not be terminated, discharged, nullified, modified, altered or affected in any way by the confirmation of the Plan. Additionally, TDLT believes that any transferee under the Debtors' Plan of Reorganization or through any sale under Section 363 of the Bankruptcy Code who holds or acquires any real property subject to the Fee Agreements will be subject to the covenants and obligations existing thereunder. The Debtors, however, have not yet evaluated the bases of TDLT's position in regard to the Fee Agreements. Notwithstanding the foregoing, TDLT and the Debtors agree that nothing contained in the Plan or this Disclosure Statement shall affect TDLT's rights and interests that otherwise exist under applicable law.

### D. Recent Financial Information

For the twelve months ending December 31, 2009, the Debtors had total revenues on an unaudited consolidated basis of approximately $38,700,000 and total net losses on an unaudited consolidated basis of approximately $31,800,000. As of December 31, 2009, the Debtors had total assets with book value of approximately $256,000,000 and $61,000,000 in total liabilities, excluding approximately $189,400,000 in contingent guarantee liabilities and the Debtors' obligations arising from the Bonds and Surety Bonds.

## ARTICLE IV.

## KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

Given that the Debtors focused their business on the construction, development, management and sale of resort real property and the management of high-end resort amenities, the unprecedented collapse of the real estate finance market and drop in real property values have dramatically affected the Debtors. At the same time, the collapse of the financial markets has made it impossible for the Debtors to continue with their normal operations, despite extensive out-of-court restructuring efforts.

34

## A. The Collapse of Real Estate Finance Markets Left the Debtors Unable to Refinance Existing Obligations

In August 2007, Morgan Stanley Real Estate acquired CRE. The transaction was financed with a loan from BCRE. On November 20, 2009, following an unprecedented collapse of the real estate market, ownership in CRE was transferred to a joint venture between an affiliate of BCRE and Goff Capital Units, LP, called Crescent Real Estate Holdings LLC.

Subsequently, EWRD V was unable to secure additional capital or financing, other than with the protection provided under the Bankruptcy Code, from its current lenders or investors to fund, among other things, (i) land holding costs, (ii) further development, and (iii) operating costs at the Tahoe Club.

Making matters worse, the general decline in the economy took its toll on demand for luxury real estate causing property values to fall markedly, particularly in Lake Tahoe, where all of the Debtors' properties are located. Over the course of the past year, the Debtors' properties have lost significant value, in some cases resulting in assets being valued below their loan balances.

In addition, costs stemming from the Tahoe Club, which loses money on an operating basis, and continued contractual infrastructure obligations and tax obligations, have put a severe drain on the Debtors' cash resources. For the twelve months ending December 31, 2009, the Debtors had total net losses on an unaudited consolidated basis of approximately $31.8 million. Such losses were due to, among other things, the following:

- Declining real estate sales during the last six months of 2009 ($20.5 million vs. $48.7 million during the last six months of 2008).

- Ongoing operating losses at the Tahoe Club.

- Significant ongoing land holding costs, which include approximately $3.1 million of annual property taxes and significant annual special taxes incurred by the Debtors pursuant to the Mello-Roos Act.

Moreover, the Debtors had limited internal options to fund ongoing cash burn at the Debtors, including, but not limited to: (i) significant land holding costs, (ii) operating losses at the Tahoe Club, (iii) ongoing development, marketing and administrative expenditures and (iv) constructions loans which swept 100% of asset sale proceeds.

This lack of liquidity made it impossible for the Debtors to continue their development efforts, operate the Tahoe Club, fulfill contractual infrastructure obligations or continue to pay their debt service. Indeed, due to inadequate liquidity, immediately prior to commencing the Chapter 11 Cases, the Debtors faced an imminent shut down of operations and liquidation of all their assets.

LEGAL_US_E # 86966965.18

## B.    Cost Reductions and Discounted Property Sales

In an effort to stabilize their cash flow, the Debtors implemented cost reductions and increased their efforts with respect to property sales over the last two years. The Debtors responded quickly to limit their exposure to worsening economic conditions. The staff in the Truckee offices of East West was reduced to 25 from 65. Further reductions in cash flow requirements were achieved by postponing or foregoing new development projects in the Debtors' pipeline.

Additionally, to boost property sales, the Debtors offered steep discounts on certain of their properties. Since April 2009, the Debtors sold 27 residences for a total price of $20,000,000 and 69 fractions for a total price of $3,700,000 and have contracts with buyers for 4 additional residences at Trailside Townhomes for a total price of $14,600,000 and 6 fractions at Old Greenwood for a total price of $245,000. The cash proceeds from the sale of the four residences at Trailside Townhomes are expected to be approximately $8 million.

## C.    The Debtors' Restructuring Efforts

During the weeks preceding the commencement of the Chapter 11 Cases, the Debtors engaged in a comprehensive process to identify potential financial and strategic sources that could not only provide the requisite debtor-in-possession financing, but be in a position to provide the additional financing that would be needed to restructure the Debtors. Indeed, the Debtors' financial advisors contacted 19 parties regarding potential in- and/or out-of-court financing, and ultimately received term sheets for debtor-in-possession financing from two parties. Based on a number of factors, including, facility size, maturity, pricing and perceived ability to close in the timeframe that the circumstances required, the Debtors elected to move forward with Barclays' proposed debtor-in-possession financing.

During the weeks leading up to the Chapter 11 Cases, the Debtors and their advisors also engaged in extensive and at times contentious negotiations with their key stakeholders in an effort to work toward a consensual restructuring. The urgency of these negotiations was fueled by a critical liquidity shortfall within the Debtors which threatened an immediate shut-down of operations and liquidation of assets unless a solution could be achieved within the timeframe required. With these immediate pressures, the Debtors and their advisors were able to reach an agreement with their key stakeholders on the terms of a restructuring transaction that provides committed long-term financing and would enable the Debtors to successfully emerge from chapter 11.

The terms of the agreement between the Debtors and their key stakeholders are embodied in the PSA. Pursuant to the PSA, the Debtors successfully obtained: (i) the $10,000,000 DIP Facility, (ii) up to $32,500,000 of long term post-emergence financing from the New Money Investors and (iii) the necessary consents to file the Chapter 11 Cases.

Pursuant to the PSA, the Debtors agreed to, among other things: (i) commence the Chapter 11 Cases by no later than February 17, 2010, (ii) file a qualified plan and accompanying disclosure statement by March 8, 2010, (iii) implement all steps necessary or appropriate to obtain an order from the Bankruptcy Court confirming a qualified plan by May 30, 2010 or as

36

soon thereafter as the Bankruptcy Court's calendar permits and (iv) use commercially reasonable efforts to effectuate and consummate a qualified plan by June 30, 2010.

The Debtors strongly believe that the process embodied in the PSA and now the Plan will enable them to, among other things, (i) avoid immediate liquidation of their assets which will result in a greater distribution to their creditors, (ii) resolve their pressing liquidity problems and guarantee and contingent liabilities, (ii) eliminate non-essential operations, (iii) provide the opportunity to stabilize the Debtors' business and preserve their substantial Northstar investments for their thousands of owners and members, and (iv) with the New Money Investment, fund ongoing operating costs at the Tahoe Club, ongoing land holding costs and most importantly, continued development of existing and future projects.

## ARTICLE V.

## SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES

### A.    Retention of Professionals by the Debtors

On March 11, 2010, the Bankruptcy Court entered orders authorizing the retention of Paul, Hastings, Janofsky & Walker LLP as the Debtors' lead counsel and Richards Layton & Finger, P.A., as their co-counsel pursuant to section 327(a) of the Bankruptcy Code in connection with these Chapter 11 Cases. On that same date, the Bankruptcy Court entered an order authorizing the retention of Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey") as the Debtors' financial advisors and investment bankers pursuant to sections 327(a) and 328(a) of the Bankruptcy Code.

### B.    Formation of the Official Committee of Unsecured Creditors

The U.S. Trustee held a meeting to form an official committee of unsecured creditors on March 1, 2010. Due to insufficient response by the Debtors' creditors, however, a committee was not appointed by the U.S. Trustee.

### C.    "First Day" Relief

As in many large chapter 11 cases, the Debtors filed a variety of customary motions on the Petition Date which were designed to facilitate their smooth transition into bankruptcy.

#### 1.    Joint Administration

On February 18, 2010, the Bankruptcy Court entered a final order allowing the joint administration of these Chapter 11 Cases solely for procedural purposes to reduce the financial and other resources spent on administering the Chapter 11 Cases.

#### 2.    Cash Management

On February 18, 2010, the Bankruptcy Court entered an interim order granting the Debtors' motion to continue using their established cash management system, bank accounts, and documents related to the bank accounts, in lieu of closing existing accounts and establishing

37

an entirely new post-petition cash management system, to avoid disruption. The Bankruptcy Court order granted the Debtors an additional 45 days to invest and deposit funds in accordance with the requirements of section 345 of the Bankruptcy Code. A final order approving such motion was entered on March 11, 2010.

### 3.    Utilities

On February 18, 2010, the Bankruptcy Court entered an interim order prohibiting the Debtors' utility providers from discontinuing, altering or refusing service and authorizing the Debtors to provide each utility provider with adequate assurance of future performance in the form of a cash deposit. The proposed aggregate amount of such deposits was to be $47,195, an amount equal to the Debtors' calculation of two weeks worth of utility services, based on the historical average over the past 12 months and adjusted to reflect anticipated usage post-petition. A final order approving such motion was entered on March 11, 2010. Subsequent to the entry of this final order, the Debtors have received additional assurance requests from three of their utility providers and have entered into, and currently are negotiating agreements to resolve such additional assurance requests.

### 4.    Retention of Epiq as Claims and Noticing Agent

On February 18, 2010, the Bankruptcy Court entered an order authorizing the Debtors to retain Epiq to perform certain claims, noticing and balloting functions in the Chapter 11 Cases. The order retaining Epiq further provided that the fees and expenses incurred pursuant to Epiq's provision of services would be treated as administrative expenses of the Debtors' estates.

### 5.    Prepetition Trust Fund Taxes

On February 18, 2010, the Bankruptcy Court entered a final order authorizing the Debtors to pay prepetition trust fund taxes in the ordinary course of business. The authorization permits, but does not require, the Debtors to pay all such taxes, including prepetition sales, use and other trust fund type taxes due and owing to all federal, state and local taxing authorities. Such payments are authorized only to the extent that adequate funds are available and, in any event, the Debtors are only permitted to pay up to $15,000 in prepetition trust fund taxes.

### 6.    Insurance

On February 18, 2010, the Bankruptcy Court entered a final order: (i) authorizing the Debtors to (a) maintain insurance and surety bond programs, (b) pay insurance and surety bond premiums in the ordinary course, and (c) pay all obligations associated therewith; and (ii) preventing insurance and surety companies from giving notice of termination or otherwise modifying any insurance policy or surety bonds.

### 7.    DIP Financing

On March 11, 2010, the Bankruptcy Court entered an order authorizing the DIP Facility on a final basis. The amount drawn down under the DIP Facility as of April 5, 2010 was $2,000,000, but owing to sales proceeds from Trailside Townhomes closings, approximately $1,940,000 of the outstanding principal balance under the DIP Facility was paid down.

LEGAL_US_E # 86966965.18

## D.    Other Significant Motions

### 1.    Gray's, Greenwood, the Gray's Crossing Golf Course and the Old Greenwood Golf Course

On March 31, 2010, the Bankruptcy Court entered the Order (A) Approving Procedures in Connection with the Sale of the Sale Debtors' Assets; (B) Scheduling Related Auction and Hearing to Consider Approval of Sale; (C) Approving Procedures Related to the Assumption of Certain of Sale Debtors' Executory Contracts and Unexpired Leases; (D) Approving the Form and Manner of Notice Thereof; and (E) Granting Related Relief. (the "Amended Order") approving the Debtors' motion seeking to establish bid procedures and to sell pursuant to section 363 of the Bankruptcy Code: (i) all of the assets of Gray's, (ii) all of the assets of Old Greenwood, (iii) the Gray's Crossing Golf Course and (iv) the Old Greenwood Golf Course (collectively, the "Assets"). An auction to sell the Assets was scheduled to be conducted on April 9, 2010 if Qualified Bids (as defined in the Amended Order) for any of the Assets were received by the bid deadline of April 7, 2010. With respect to the assets of Gray's, the only Qualified Bid received by the Debtors was a credit bid pursuant to section 363(k) of the Bankruptcy Code by SocGen with respect to the portion of Gray's assets that constitute the SocGen Collateral. The Debtors will not pursue a sale to SocGen based on its credit bid, but, instead, the Debtors anticipate that they will work with SocGen to attempt to consensually effectuate the transfer of the SocGen Collateral to SocGen. The Debtors also intend to continue to pursue the sale of the assets of Gray's pursuant to the existing sale process commenced by the March 4, 2010 sale motion and subject to the protections and rights provided in the Amended Order including, without limitation, those rights and protections provided to SocGen. Any proposed sale shall be and remain subject to the protections and rights provided in the Amended Order. In the event the Debtors have not consummated such a consensual transfer or permitted sale on or before the Effective Date and the stay has not otherwise been lifted with respect to the SocGen Collateral on or before the Effective Date, (i) the SocGen Collateral shall be deemed abandoned, (ii) any and all stays and injunctions under the Bankruptcy Code, the Plan or otherwise with respect to the SocGen Collateral shall be immediately lifted, and (iii) there shall be no impairment, injunction against or discharge of SocGen's liens, security interests, rights, loan documents or claims, and SocGen shall be permitted to exercise any and all of its rights and remedies under applicable bankruptcy and non-bankruptcy law against the SocGen Collateral and Gray's Crossing, to the extent incidental thereto. The consensual transfer, conveyance or sale of the SocGen Collateral by the Debtors by any method (a consensual sale shall not include foreclosure), shall be subject to any valid, enforceable and perfected lien, right of subrogation, or right under statute held by International Fidelity Insurance Company, if any, or the Town of Truckee, if any, or Truckee Donner Public Utility District Community Facilities District No. 04-1 or the Truckee Donner Public Utility District Community Facilities District No. 03-1, if any, against such SocGen Collateral that is determined to be senior in priority in such SocGen Collateral under otherwise applicable non-bankruptcy law to the liens and security interests under the SocGen Loan Documents in or against such SocGen Collateral, if any. It is expressly understood that SocGen does not admit the existence, extent, amount or validity of any such alleged liens or rights, and affirmatively disputes the same. The Debtors do not believe SocGen will accept a consensual transfer of the SocGen Collateral in the absence of prior resolution of such disputed liens and rights.

LEGAL_US_E # 86966965.18

The Debtors also received one bid for certain assets of Old Greenwood and one bid for certain assets of Gray's. Based upon the Debtors' business judgment, however, in conjunction with their financial advisors, the Debtors determined that these bids were inadequate or did not conform with the Court-approved bid procedures, or both, and accordingly, no sale of the Old Greenwood or Gray's assets will occur. The Debtors received no bids on either the Gray's Crossing Golf Course or the Old Greenwood Golf Course and accordingly will continue to operate these golf courses pursuant to the Plan.

2.  **Title Motion**

On March 11, 2010, the Bankruptcy Court entered an order approving the Debtors' motion for entry of an order (i) authorizing them to deliver full or fractional title to residences and certain other real property free and clear of liens, claims, encumbrances and other interests; (ii) authorizing them to satisfy certain prepetition obligations in connection with the sale of such property and (iii) granting certain related relief.

3.  **Payment of Independent Contractor Prepetition Commissions, Prepetition Employee Severance & Prepetition Business Expenses**

On March 11, 2010, the Bankruptcy Court entered an order approving the Debtors' motion for entry of an order: (i) authorizing them to pay outstanding prepetition commissions to their Independent Contractors; (ii) authorizing them to pay outstanding prepetition business expense reimbursements; and (iii) granting certain related relief.

4.  **Design Review Board Deposits**

The Debtors often permit purchasers of real property to customize their properties. To ensure compliance with the Debtors' regulations, a design review board, an entity created by the Debtors and overseen by Old Greenwood, collects refundable $5,000 deposits from all purchasers who wish to customize their properties. On March 11, 2010, the Bankruptcy Court entered an order approving the Debtors' motion requesting authorization to refund any outstanding prepetition deposits within 30 days of the completion of any project deemed compliant with deposit review board's guidelines.

5.  **Schedules and Bar Date Motion**

On March 8, 2010, the Debtors filed their Schedules with the Bankruptcy Court. On April 5, 2010, the Debtors filed an amendment to certain of its Schedules. As set forth on the global notes to the Schedules, the assets listed on the Schedules are listed at book value rather than market value.

On March 11, 2010, the Debtors entered an order establishing April 14, 2010 as the Bar Date and September 11, 2010 as the Governmental Bar Date.

LEGAL_US_E # 86966965.18

6.      **Ordinary Course Professionals**

On March 11, 2010, the Bankruptcy Court entered an order approving the Debtors' motion to, among other things, continue to pay their ordinary course professionals up to a cap of $15,000 per month each, without further approval of the Bankruptcy Court.

E.      **Postpetition Negotiations with Key Parties**

1.      **Wild Goose Restaurant Lease**

Club has operated the Wild Goose Restaurant since 2000. The Club leases the space for the restaurant from Walsh Family, LLC (the "Walsh Family") pursuant to a lease agreement between the parties (the "Wild Goose Lease"). Due to the Debtors' liquidity crisis, however, Club was delinquent in approximately $155,000 in lease payments due under the Wild Goose Lease as of the Petition Date. On March 19, 2010, the Walsh Family and Club reached a settlement agreement whereby the Walsh Family agreed to waive its General Unsecured Claim against Club arising from delinquent lease payments and in exchange the Club agreed to operate the Wild Goose Restaurant until November 2010. The Debtors intend to file a motion for entry of an order approving this settlement.

2.      **Office Building Lease**

The Debtors are currently exploring options to restructure its office lease with CNL. In the event that the Debtors are not able to restructure this lease, they intend to reject the lease.

3.      **Coyote Moon Golf Course Lease**

The Debtors will reject the lease with the landlord of the Coyote Moon Golf Course and in settlement of all of the landlord's Claims against Club, the landlord will receive an Allowed Club General Unsecured Claim in Class 7.K(a) of approximately $2.4 million.

4.      **Secured Claims**

The Debtors and their professionals have engaged in discussions and negotiations with Citizens, JPMorgan, Plumas and SocGen in an attempt to reach an agreement regarding the resolution and treatment of each of those parties' Secured Claims. As a result, the treatments of Claims in Classes 2 through 6 reflect the agreements between the Debtors and the applicable Holder of the Secured Claims in those Classes.

5.      **Golf Members**

Tahoe Club has operated the Gray's Crossing Golf Course as a private course since its opening in 2007. Due to challenges in marketing private golf memberships during the economic slowdown, only 43 Full Golf Memberships and only 2 Signature Golf Memberships have been sold to date. To stem the considerable operating losses at the Gray's Crossing Golf Course, the Debtors intend to open the course to public play for the 2010 season. To effectuate this operational change, the Debtors will be required to reject the Full Golf Memberships and Signature Golf Memberships. In order to provide these 45 members with the maximum

41

available benefits, these members will have the option to either: (a) assert an unsecured claim in Class 7.K(a) for the rejection damages associated with the rejection of their membership agreement or (b) accept a modified benefit package that will include a (i) Sports Membership with all the privileges of Sports Membership afforded by the Club for Sports Members, (ii) a credit toward the full initiation deposit for the Sports Membership, and (iii) a waiver of the required monthly dues for the Sports Membership and annual green fees until the earlier of such Holder's resignation from the Club or other termination or a date between two to ten years following the Effective Date of the Plan, with such date calculated based on the amount of initiation deposit previously paid by such Holder to the Club.

## ARTICLE VI.

## THE PLAN

### A.      Introduction

The Debtors believe that (i) through the Plan, holders of Allowed Claims will receive a greater recovery from the Estates than the recovery that they would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the Plan will afford the Debtors the opportunity and ability to continue the businesses as a viable going concern.

The Plan is annexed hereto as Exhibit A and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

Statements as to the rationale underlying the treatment of Claims and Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

### B.      Classification and Treatment of Claims and Interests Under the Plan

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims and contingent claims for contribution and reimbursement. Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed,

42

contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which gives rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a non-monetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

The Plan constitutes a separate chapter 11 plan for each of the Debtors except for EWRD V, which is not subject to the Plan and will be resolved through a separate plan of liquidation or alternative process. Any and all claims against EWRD V shall be completely unaffected by the Plan and any rights and interests of EWRD V claimants are expressly reserved. Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan. Accordingly, their votes are not solicited. Under the Debtors' Plan, the Claims in Classes 1.A, 1.B, 1.C, 1.D, 1.E, 1.F, 1.G. 1.H, 1.J, 1.K, 8.B, 8.G. 8.J and 8.K(a) are unimpaired or impaired by agreement, and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Plan.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan of reorganization. For example, a class is deemed to reject a plan of reorganization under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class do not receive or retain property under the plan on account of their claims or equity interests. Under this provision of the Bankruptcy Code, the Holders of Claims in Class 1.I (Gray's Priority Claims), Class 7.I (Gray's General Unsecured Claims), Classes 9.A through 9.K (Intercompany

43

Claims) and Classes 10.A through 10.K (Interests and Interest Related Claims) are deemed to reject the Plan because they receive no distribution and retain no property interest under the Plan. Because Holders of Claims in Class 1.I (Gray's Priority Claims), Class 7.I (Gray's General Unsecured Claims), Classes 9.A through 9.K (Intercompany Claims) and Classes 10.A through 10.K (Interests and Interest Related Claims) are deemed to reject the Plan, the Debtors are required to demonstrate that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Classes. Among these are the requirements that the plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, the Claims and equity interests in such Classes. For a more detailed description of the requirements for confirmation, see Article XVI.B below.

Consistent with these requirements, the Plan divides the Allowed Claims against, and Interests in, the Debtors into the following Classes:

| CLASS | STATUS | ENTITLED TO VOTE |
|---|---|---|
| Class 1.A: NMPH Priority Claims | Unimpaired | No |
| Class 1.B: NMP Priority Claims | Unimpaired | No |
| Class 1.C: Iron Horse Priority Claims | Unimpaired | No |
| Class 1.D: Big Horn Priority Claims | Unimpaired | No |
| Class 1.E: Village Townhomes Priority Claims | Unimpaired | No |
| Class 1.F: Trailside Townhomes Priority Claims | Unimpaired | No |
| Class 1.G: Greenwood Priority Claims | Unimpaired | No |
| Class 1.H: Realty Priority Claims | Unimpaired | No |
| Class 1.I: Gray's Priority Claims | Impaired | No |
| Class 1.J: Resorts Priority Claims | Unimpaired | No |
| Class 1.K: Club Priority Claims | Unimpaired | No |
| Class 2: Citizens Secured Claim | Impaired | Yes |
| Class 3: Citizens Model Secured Claim | Impaired | Yes |
| Class 4: JPMorgan Secured Claim | Impaired | Yes |
| Class 5: Plumas Secured Claim | Impaired | Yes |
| Class 6: SocGen Secured Claim | Impaired | Yes |
| Class 7.A: NMPH General Unsecured Claims | Impaired | Yes |
| Class 7.B: NMP General Unsecured Claims | Impaired | Yes |
| Class 7.C: Iron Horse General Unsecured Claims | Impaired | Yes |
| Class 7.D: Big Horn General Unsecured Claims | Impaired | Yes |

LEGAL_US_E # 86966965.18

| CLASS | STATUS | ENTITLED TO VOTE |
|---|---|---|
| Class 7.E:  Village Townhomes General Unsecured Claims | Impaired | Yes |
| Class 7.F:  Trailside Townhomes General Unsecured Claims | Impaired | Yes |
| Class 7.G:  Greenwood General Unsecured Claims | Impaired | Yes |
| Class 7.H:  Realty General Unsecured Claims | Impaired | Yes |
| Class 7.I:  Gray's General Unsecured Claims | Impaired | No |
| Class 7.J:  Resorts General Unsecured Claims | Impaired | Yes |
| Class 7.K(a):  Club General Unsecured Claims | Impaired | Yes |
| Class 7.K(b):  Golf Member Club General Unsecured Claims | Impaired | Yes |
| Class 8.B:  NMP Convenience Class Claims | Unimpaired or Impaired by Agreement | No |
| Class 8.G:  Greenwood Convenience Class Claims | Unimpaired or Impaired by Agreement | No |
| Class 8.J:  Resorts Convenience Class Claims | Unimpaired or Impaired by Agreement | No |
| Class 8.K(a):  Club Convenience Class Claims | Unimpaired or Impaired by Agreement | No |
| Class 9.A:  NMPH Intercompany Claims | Impaired | No |
| Class 9.B:  NMP Intercompany Claims | Impaired | No |
| Class 9.C:  Iron Horse Intercompany Claims | Impaired | No |
| Class 9.D:  Big Horn Intercompany Claims | Impaired | No |
| Class 9.E:  Village Townhomes Intercompany Claims | Impaired | No |
| Class 9.F:  Trailside Townhomes Intercompany Claims | Impaired | No |
| Class 9.G:  Greenwood Intercompany Claims | Impaired | No |
| Class 9.H:  Realty Intercompany Claims | Impaired | No |
| Class 9.I:  Gray's Intercompany Claims | Impaired | No |
| Class 9.J:  Resorts Intercompany Claims | Impaired | No |
| Class 9.K:  Club Intercompany Claims | Impaired | No |
| Class 10.A:  NMPH Interests | Impaired | No |

LEGAL_US_E # 86966965.18

| CLASS | STATUS | ENTITLED TO VOTE |
|---|---|---|
| Class 10.B:  NMP Interests | Impaired | No |
| Class 10.C:  Iron Horse Interests | Impaired | No |
| Class 10.D:  Big Horn Interests | Impaired | No |
| Class 10.E:  Village Townhomes Interests | Impaired | No |
| Class 10.F:  Trailside Townhomes Interests | Impaired | No |
| Class 10.G:  Greenwood Interests | Impaired | No |
| Class 10.H:  Realty Interests | Impaired | No |
| Class 10.I:  Gray's Interests | Impaired | No |
| Class 10.J:  Resorts Interests | Impaired | No |
| Class 10.K:  Club Interests | Impaired | No |

**C.  Unclassified Claims: Administrative Claims, Priority Tax Claims, Secured Tax Claims and DIP Lender Secured Claims**

As provided in Bankruptcy Code section 1123(a)(1), Administrative Claims, Priority Tax Claims, Secured Tax Claims and DIP Lender Secured Claims shall not be classified for the purposes of voting or receiving distributions under the Plan.  Rather, all such Claims shall be treated separately as unclassified Claims in accordance with the terms set forth in the Plan.

**1.  Administrative Claims**

**a.  (i)  Non-Professional Fee Claims**

The Disbursing Agent shall pay each Holder of an Allowed Administrative Claim against any Debtor (excluding Professional Fee Claims) the full amount of such Allowed Administrative Claim, without interest, in Cash, as soon as practicable after the later of (a) the Effective Date but no later than twenty (20) days after the Effective Date, (b) within thirty (30) days after such Administrative Claim becomes an Allowed Claim and (c) when due in the ordinary course. Notwithstanding anything herein to the contrary, a Holder of an Allowed Administrative Claim against any Debtor may be paid on such other date or dates and upon such other terms as may be agreed to by such Holder and the Debtors.  Without limiting the foregoing, all outstanding fees payable to the Office of the U.S. Trustee under 28 U.S.C. §1930 that have not been paid as of the Effective Date shall be paid by the Disbursing Agent no later than thirty (30) days after the Effective Date or when due in the ordinary course.

**(ii)  Administrative Claims and Administrative Expense Request Deadline**

Each Holder of an Administrative Claim other than the DIP Lenders or governmental units must file an Administrative Expense Request requesting payment of such Administrative Claim with the Bankruptcy Court by no later than the Administrative Expense Request Deadline

LEGAL_US_E # 86966965.18

for all other Administrative Claims that are not subject to the Bar Date Order. Nothing herein extends a Bar Date established in the Bar Date Order.

### b. Professional Fee Claims

The Disbursing Agent shall pay Professionals who are entitled to reimbursement or allowance of fees and expenses from each of the Debtors' Estates pursuant to Bankruptcy Code sections 327-330 and 503(b)(2) - (b)(6) of the Bankruptcy Code in Cash, in the amount awarded to such Professionals by the interim fee application order or by Final Order of the Bankruptcy Court, as soon as practicable after the later of the Effective Date and the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Cases, and after application of any retainer received by the Professionals.

Any final application for allowance of a Professional Fee Claim for services rendered and costs incurred through the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Debtors at the addresses listed in Article XIV.P of the Plan and on the U.S. Trustee so that it is received no later than forty-five (45) days after the Effective Date, unless otherwise extended by agreement of the claimant and the Debtors, or such Professional Fee Claim shall be forever barred and shall not be enforceable against the Debtors, their Estates, the Disbursing Agent and their successors, their assigns, the New EWRD V Assets. Allowed Professional Fee Claims must be paid in full or reserved in full in Cash pending allowance by the Bankruptcy Court prior to any payment to Holders of Allowed Claims entitled to a Distribution under the Plan.

The Debtors estimate that the total approximate Allowed amount for all Administrative Claims and Professional Fee Claims is $6,625,000.

### 2. Priority Tax Claims and Secured Tax Claims

The Disbursing Agent shall pay, at the Debtors' discretion, each Holder of an Allowed Priority Tax Claim and Allowed Secured Tax Claim against any Debtor in full in Cash at the later of (a) as soon as practicable after the Effective Date but not more than 10 Business Days after the Effective Date, or (b) within thirty (30) days after such Claim becomes an Allowed Claim. Notwithstanding the immediately preceding sentence, the Disbursing Agent, may at the direction of the Debtors, make payment on such Claims over a term of 5 years from the Petition Date, provided, however, that if the Debtors elect to make payments in this manner, such claimants shall receive interest from the Effective Date through and including the date of the last payment at the interest rate required by section 511 of the Bankruptcy Code. All Allowed Priority Tax Claims and Allowed Secured Tax Claims against the Debtors which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof, including all other costs, fees, interest and penalties as required under sections 506 and 511of the Bankruptcy Code, to the extent applicable. The Debtors may direct the Disbursing Agent to prepay any Allowed Priority Tax Claim or Allowed Secured Tax Claim at any time after the Effective Date without any penalty or charge. The Debtors shall be authorized, without the need for further notice or approval, to enter into

47

agreements with Holders of Allowed Priority Tax Claims and Allowed Secured Tax Claims with respect to the Debtors' election of payment under this subsection, and shall be bound by any such agreement.

To the extent that any tax is incurred by the Estates after the Petition Date, such tax is entitled to treatment as an administrative expense of the Estates pursuant to section 503(b)(1)(B)(i) of the Bankruptcy Code and the applicable taxing authority shall be entitled to assert, in connection with confirmation of the Plan, that any associated tax penalties are entitled to treatment as administrative expenses of the Estates and interest as applicable as required under sections 506(b) and 511 of the Bankruptcy Code. The Debtors reserve all rights to challenge such assertion.

Any penalty arising with respect to or in connection with an Allowed Priority Tax Claim or Allowed Secured Tax Claim may be subject to subordination to the extent permitted by section 726(a)(4) of the Bankruptcy Code as made applicable to these Chapter 11 Cases through section 1129(a)(7)(ii) of the Bankruptcy Code. The taxing authorities shall be entitled to assert, in connection with confirmation of the Plan, that penalties associated with any taxes levied by them on the Debtors are not subject to subordination under section 726(a)(4) of the Bankruptcy Code.

The Allowed Secured Tax Claims which are secured by a lien on property of the Debtors that is sold will be paid (with interest as required and to the extent that sections 506(b) and 511 of the Bankruptcy Code are applicable) at the closing of the sale of such property from the net proceeds from such sale except to the extent that such Claim is otherwise satisfied by the provisions of the Plan.

The Districts shall, as a result of any Claims that they may have against the Debtors arising from specials taxes incurred by the Debtors pursuant to the Mello-Roos Act prior to the Petition Date, receive the same treatment as Holders of Allowed Secured Tax Claims, unless another treatment is agreed to by the Gray's District, Greenwood District and/or the Northstar District, as applicable, with the consent, to the extent required, of the Holders of the Mello Roos Bonds.

### 3. DIP Lenders Secured Claims

On the Effective Date, all Allowed DIP Lenders Secured Claims, if any, shall be paid in full in Cash. Upon final and indefeasible payment and satisfaction in full of all Allowed DIP Lenders Secured Claims, all Liens and security interests granted to secure such obligations shall be terminated and of no further force or effect. All DIP Lenders Secured Claims are deemed Allowed under the Plan consistent with all terms of the DIP Facility and related documents.

### D. Classes of Claims and Interests: Classification, Treatment and Voting Rights

Holders of Claims and Interests are divided into Classes and treated as follows:

LEGAL_US_E # 86966965.18

1. **Classes 1.A through 1.K – Priority Claims – Unimpaired, Impaired by Agreement or Impaired**

   a. **Classification**

   Classes 1.A, 1.B, 1.C, 1.D, 1.E, 1.F, 1.G. 1.H, 1.I, 1.J and 1.K consist of all Allowed Priority Claims for such respective classes.

   b. **Treatment**

   The Disbursing Agent shall pay each Holder of an Allowed Class 1.A Claim, Allowed Class 1.B Claim, Allowed Class 1.C Claim, Allowed Class 1.D Claim, Allowed Class 1.E Claim, Allowed Class 1.F Claim, Allowed Class 1.G Claim, Allowed Class 1.H Claim, Allowed Class 1.J Claim and Allowed Class 1.K Claim in relative order of priority pursuant to Bankruptcy Code section 507, in full, in Cash, without interest, as soon as practicable but not later than thirty (30) days after the Effective Date.

   Holders of Allowed Claims in 1.I shall receive no Distributions under the Plan.

   c. **Voting**

   Classes 1.A, 1.B, 1.C, 1.D, 1.E, 1.F, 1.G. 1.H, 1.J and 1.K are not Impaired. Holders of Allowed Claims in Classes 1.A, 1.B, 1.C, 1.D, 1.E, 1.F, 1.G. 1.H, 1.J and 1.K are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Priority Claims in Classes 1.A, 1.B, 1.C, 1.D, 1.E, 1.F, 1.G. 1.H, 1.J and 1.K are not entitled to vote to accept or reject the Plan.

   Holders of Allowed Class 1.I (Gray's Priority Claims) will receive no Distribution under the Plan and, therefore, are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Allowed Class 1.I (Gray's Priority Claims) are not entitled to vote to accept or reject the Gray's Plan.

2. **Class 2 – Citizens Secured Claim – Impaired**

   a. **Classification**

   Class 2 consists of the Citizens Secured Claim

   b. **Treatment**

   In full and final satisfaction of the Allowed Citizens Secured Claim, Holders of Allowed Class 2 Claims shall be entitled to a recovery of their Allowed Claim through, at Citizen's option, either (i) the sale of the Citizens Collateral by the Debtors to a third party with the proceeds from such sale (less broker fees not to exceed 4%) in an amount sufficient to satisfy the Allowed Citizens Secured Claim returned to Citizens, and the repair of the Citizens Collateral to be completed using insurance proceeds previously received and without cost to Citizens or (ii) the transfer of the Citizens Collateral to Citizens.

LEGAL_US_E # 86966965.18

### c.    Voting

Class 2 is Impaired.  Therefore, Holders of Allowed Class 2 Claims are entitled to vote to accept or reject the Gray's Plan.

### 3.    Class 3 – Citizens Model Secured Claim – Impaired

#### a.    Classification

Class 3 consists of the Citizens Model Secured Claim

#### b.    Treatment

On the Effective Date, the legal, equitable and contractual rights of Holders of Allowed Class 3 Claims shall be unaffected by the Plan; however, the Citizens Model Facility shall be modified as follows: (i) the interest rate on the Citizens Model Facility shall be reduced from 7.95% to 5.0%, (ii) following the repayment of the JPMorgan Facility, the Debtors will contribute $5,000 from the sale of each future fraction at Greenwood to pay down the Citizens Model Facility; (iii) on or before December 31, 2011, Greenwood will begin to market fractions at Greenwood that comprise the Citizens Model Collateral with 100% of the proceeds from any sales of such fractions to be used pay down the Citizens Model Facility and (iv) certain other terms of the Citizens Model Facility shall be modified as agreed to by the Debtors and Citizens.

The Debtors' failure to object to any such Class 3 Claims in the Chapter 11 Cases shall be without prejudice to the Debtors' or the New EWRD V Entities' right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the holder of such Claim.  Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition liens on property of any Debtors held by or on behalf of the Class 3 Claim holders with respect to such Claims shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such Claim holders until, as to each such Claim holder, the Allowed Claims of such Class 3 Claim holder are paid in full.  Nothing in this section or elsewhere in the Plan shall preclude the Debtors or New EWRD V Entities from challenging the validity of any alleged lien on any asset of a Debtor or the value of the Citizens Model Collateral.

#### c.    Voting

Class 3 is Impaired.  Therefore, Holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Greenwood Plan.

### 4.    Class 4 – JPMorgan Secured Claim – Impaired

#### a.    Classification

Class 4 consists of the JPMorgan Secured Claim

50

### b. Treatment

On the Effective Date, the legal, equitable and contractual rights of Holders of Allowed Class 4 Claims shall be unaffected by the Plan; however, the JPMorgan Facility shall be modified as follows: (i) the maturity date on the JPMorgan Facility shall be extended to March 31, 2011 and (ii) certain other terms of the JPMorgan Facility shall be modified as agreed to by the Debtors and JPMorgan.

The Debtors' failure to object to any such Class 4 Claims in the Chapter 11 Cases shall be without prejudice to the Debtors' or New EWRD V Entities' right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the holder of such Claim. Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition liens on property of any Debtors held by or on behalf of the Class 4 Claim holders with respect to such Claims shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such Claim holders until, as to each such Claim holder, the Allowed Claims of such Class 4 Claim holder are paid in full. Nothing in this section or elsewhere in the Plan shall preclude the Debtors or New EWRD V Entities from challenging the validity of any alleged lien on any asset of a Debtor or the value of the JPMorgan Collateral.

### c. Voting

Class 4 is Impaired. Therefore, Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Greenwood Plan.

### 5. Class 5 – Plumas Secured Claim – Impaired

#### a. Classification

Class 5 consists of the Plumas Secured Claim

#### b. Treatment

In full and final satisfaction of the Allowed Plumas Secured Claim, Holders of Allowed Class 5 Claims shall be entitled to (A) a recovery of their Allowed Claim through the transfer of the Plumas Collateral to Plumas (as further described below); and (B) an Allowed General Unsecured Claim in Class 7.G in the amount of $1,500,000. In the event the Debtors have not consummated a consensual transfer of the Plumas Collateral on or before the Effective Date and the stay has not otherwise been lifted with respect to the Plumas Collateral on or before the Effective Date, (i) the Plumas Collateral shall be deemed abandoned, (ii) any and all stays and injunctions under the Bankruptcy Code, the Plan or otherwise with respect to the Plumas Collateral shall be immediately lifted, and (iii) there shall be no impairment, injunction against or discharge of Plumas's liens, security interests, rights, loan documents or claims, and Plumas shall be permitted to exercise any and all of its rights and remedies under applicable bankruptcy and non-bankruptcy law against the Plumas Collateral and Greenwood, to the extent incidental thereto. The consensual transfer or conveyance of the Plumas Collateral by the Debtors by any method (a consensual sale shall not include foreclosure), shall be subject to any valid, enforceable and perfected lien, right of subrogation, or right under statute held by International

LEGAL_US_E # 86966965.18

Fidelity Insurance Company, if any, or the Town of Truckee, if any, or Truckee Donner Public Utility District Community Facilities District No. 04-1 or the Truckee Donner Public Utility District Community Facilities District No. 03-1, if any, against such Plumas Collateral that is determined to be senior in priority in such Plumas Collateral under otherwise applicable non-bankruptcy law to the liens and security interests under the Plumas Facility in or against such Plumas Collateral, if any. It is expressly understood that Plumas does not admit the existence, extent, amount or validity of any such alleged liens or rights, and affirmatively disputes the same.

### c. Voting

Class 5 is Impaired. Therefore, Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Greenwood Plan.

### 6. Class 6 – SocGen Secured Claim – Impaired

### a. Classification

Class 6 consists of the SocGen Secured Claim

### b. Treatment

In full and final satisfaction of the Allowed SocGen Secured Claim, Holders of Allowed Class 6 Claims shall be entitled to a recovery of their Allowed Claim through, at the Debtors' option, either (i) proceeds from the sale of the SocGen Collateral to a third party, provided, however, that the Debtors shall not proceed with any sale of the SocGen Collateral unless the entire indebtedness and sums owed to SocGen under the SocGen Loan Documents are paid in cash in full upon closing of such a sale or SocGen provides further written consent to such a sale or (ii) the consensual transfer of the SocGen Collateral to SocGen. In the event the Debtors have not consummated such a consensual transfer or permitted sale on or before the Effective Date and the stay has not otherwise been lifted with respect to the SocGen Collateral on or before the Effective Date, (i) the SocGen Collateral shall be deemed abandoned, (ii) any and all stays and injunctions under the Bankruptcy Code, the Plan or otherwise with respect to the SocGen Collateral shall be immediately lifted, and (iii) there shall be no impairment, injunction against or discharge of SocGen's liens, security interests, rights, loan documents or claims, and SocGen shall be permitted to exercise any and all of its rights and remedies under applicable bankruptcy and non-bankruptcy law against the SocGen Collateral and Gray's Crossing, to the extent incidental thereto. The consensual transfer, conveyance or sale of the SocGen Collateral by the Debtors by any method (a consensual sale shall not include foreclosure), shall be subject to any valid, enforceable and perfected lien, right of subrogation, or right under statute held by International Fidelity Insurance Company, if any, or the Town of Truckee, if any, or Truckee Donner Public Utility District Community Facilities District No. 04-1 or the Truckee Donner Public Utility District Community Facilities District No. 03-1, if any, against such SocGen Collateral that is determined to be senior in priority in such SocGen Collateral under otherwise applicable non-bankruptcy law to the liens and security interests under the SocGen Loan Documents in or against such SocGen Collateral, if any. It is expressly understood that SocGen does not admit the existence, extent, amount or validity of any such alleged liens or rights, and

affirmatively disputes the same. The Debtors do not believe SocGen will accept a consensual transfer of the SocGen Collateral in the absence of prior resolution of such disputed liens and rights.

### c. Voting

Class 6 is Impaired. Therefore, Holders of Allowed Class 6 Claims are entitled to vote to accept or reject the Gray's Plan.

### 7. Classes 7.A through 7.K – General Unsecured Claims – Impaired

### a. Classification

Classes 7.A, 7.B, 7.C, 7.D, 7.E, 7.F, 7.G, 7.H, 7.I, 7.J, 7.K(a) and 7.K(b) consist of all General Unsecured Claims for such respective classes.

### b. Treatment

- Class 7.A (NMPH General Unsecured Claims): In full and final satisfaction of Allowed NMPH General Unsecured Claims in Class 7.A, Holders of Allowed Class 7.A Claims shall receive the lesser of (i) Cash in an amount equal to their Claim without interest or (ii) a Pro Rata Distribution in Cash of $1,000.

- Class 7.B (NMP General Unsecured Claims): In full and final satisfaction of Allowed NMP General Unsecured Claims in Class 7.B, Holders of Allowed Class 7.B Claims (except for those who receive or elect to receive treatment and payment under a Convenience Class) shall receive a Pro Rata Distribution in Cash of $1,000,000.

- Class 7.C (Iron Horse General Unsecured Claims): In full and final satisfaction of Allowed Iron Horse General Unsecured Claims in Class 7.C, Holders of Allowed Class 7.C Claims shall receive the lesser of (i) Cash in an amount equal to their Claim without interest or (ii) a Pro Rata Distribution in Cash of $1,000.

- Class 7.D (Big Horn General Unsecured Claims): In full and final satisfaction of Allowed Big Horn General Unsecured Claims in Class 7.D, Holders of Allowed Class 7.D Claims shall receive the lesser of (i) Cash in an amount equal to their Claim without interest or (ii) a Pro Rata Distribution in Cash of $20,000.

- Class 7.E (Village Townhomes General Unsecured Claims): In full and final satisfaction of Allowed Village Townhomes General Unsecured Claims in Class 7.E, Holders of Allowed Class 7.E Claims shall receive the lesser of (i) Cash in an amount equal to their Claim without interest or (ii) a Pro Rata Distribution in Cash of $15,000.

LEGAL_US_E # 86966965.18

- Class 7.F (Trailside Townhomes General Unsecured Claims): In full and final satisfaction of Allowed Trailside Townhomes General Unsecured Claims in Class 7.F, Holders of Allowed Class 7.F Claims shall receive the lesser of (i) Cash in an amount equal to their Claim without interest or (ii) a Pro Rata Distribution in Cash of $2,000.

- Class 7.G (Greenwood General Unsecured Claims): In full and final satisfaction of Allowed Greenwood General Unsecured Claims in Class 7.G, Holders of Allowed Class 7.G Claims (except for those who receive or elect to receive treatment and payment under a Convenience Class) shall receive a Pro Rata Distribution in Cash of $500,000.

- Class 7.H (Realty General Unsecured Claims): In full and final satisfaction of Allowed Realty General Unsecured Claims in Class 7.H, Holders of Allowed Class 7.H Claims shall receive a Pro Rata Distribution in Cash of $10,000.

- Class 7.I (Gray's General Unsecured Claims): Holders of Allowed Class 7.I Claims shall receive no Distributions with respect to Gray's General Unsecured Claims.

- Class 7.J (Resorts General Unsecured Claims): In full and final satisfaction of Allowed Resorts General Unsecured Claims in Class 7.J, Holders of Allowed Class 7.J Claims (except for those who receive or elect to receive treatment and payment under a Convenience Class) shall receive a Pro Rata Distribution in Cash of $20,000.

- Class 7.K(a) (Club General Unsecured Claims): In full and final satisfaction of Allowed Club General Unsecured Claims in Class 7.K(a), Holders of Allowed Class 7.K(a) Claims (except for those who receive or elect to receive treatment and payment under a Convenience Class), shall receive a Pro Rata Distribution in Cash of $1,000,000.

- Class 7.K(b) (Golf Member Club General Unsecured Claims): In full and final satisfaction of Allowed Golf Member Club General Unsecured Claims in Class 7.K(b), each Holder of an Allowed Golf Member Club General Unsecured Claim shall be entitled to receive, at their sole election, either (1) non-monetary compensation in the form of a (i) Sports Membership with all the privileges of Sports Membership afforded by the Club for Sports Members, (ii) a credit toward the full initiation deposit for the Sports Membership, and (iii) a waiver of the required monthly dues for the Sports Membership and annual green fees until the earlier of such Holder's resignation from the Club or other termination or a date between two to ten years

following the Effective Date of the Plan, with such date calculated based on the amount of initiation deposit previously paid by such Holder to the Club or (2) a Club General Unsecured Claim in Class 7.K(a). In the event that the Holder of a Golf Member Claim does not elect treatment under either Class 7.K(b)(1) or 7.K(b)(2), upon confirmation of the Plan of Club, the Golf Member shall be deemed to have elected to receive the treatment provided for in Class 7.K(b)(1).

### c. Voting

Classes 7.A, 7.B, 7.C, 7.D, 7.E, 7.F, 7.G, 7.H, 7.J, 7.K(a) and 7.K(b) are Impaired. Therefore, Holders of Allowed General Unsecured Claims in Classes 7.A, 7.B, 7.C, 7.D, 7.E, 7.F, 7.G, 7.H, 7.J, 7.K(a) and 7.K(b) are entitled to vote to accept or reject the Plan, however, those Holders with Claims in Classes 7.B, 7.G., 7.J and 7.K(a) may choose the Convenience Class Election.

Holders of Class 7.I (Gray's General Unsecured Claims) shall receive no Distribution under the Plan and are therefore conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Class 7.I (Gray's General Unsecured Claims) are not entitled to vote to accept or reject the Plan.

### 8. Classes 8.B, 8.G., 8.J and 8.K(a) – Convenience Class Claims (Includes Those Electing the Convenience Class Election) – Not Impaired or Impaired by Agreement

#### a. Classification

Classes 8.B, 8.G., 8.J and 8.K(a) consist of all Convenience Class Claims for such respective classes, including Claims of a single Holder of a type that would otherwise be included in 7.B, 7.G, 7.J or 7.K(a) that are either (i) $1,000 or less in the aggregate or (ii) greater than $1,000 in the aggregate, but as to which the holder thereof has made a Convenience Class Election.

#### b. Treatment

The Disbursing Agent shall distribute to each Holder of an Allowed Class 8.B Claim, Allowed Class 8.G Claim, Allowed Class 8.J Claim and Allowed Class 8.K(a) Claim, Cash equal to 100% of the Face Amount thereof up to a maximum of $1,000 total payout in full and final satisfaction of such Claim for Allowed Class 8.B Claim, Allowed Class 8.G Claim, Allowed Class 8.J Claim or Allowed Class 8.K(a) Claim.

#### c. Voting

Holders of Class 8.B Claims, Class 8.G Claims, Class 8.J Claims and Class 8.K(a) Claims are conclusively deemed to have accepted the Plan. Therefore, Holders of Class 8.B Claims, Class 8.G Claims, Class 8.J Claims and Class 8.K(a) Claims are not entitled to vote to accept or reject the Plan.

LEGAL_US_E # 86966965.18

### 9. Classes 9.A through 9.K – Intercompany Claims – Impaired

#### a. Classification

Classes 9.A, 9.B, 9.C, 9.D, 9.E, 9.F, 9.G. 9.H, 9.I, 9.J and 9.K consist of all Intercompany Claims for such respective class.

#### b. Treatment

Intercompany Claims in Classes 9.A, 9.B, 9.C, 9.D, 9.E, 9.F, 9.G. 9.H, 9.I, 9.J and 9.K shall be cancelled and forever discharged.

#### c. Voting

Holders of Intercompany Claims in Classes 9.A, 9.B, 9.C, 9.D, 9.E, 9.F, 9.G. 9.H, 9.I, 9.J and 9.K shall receive no Distribution under the Plan and are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders in Intercompany Claims in Classes 9.A, 9.B, 9.C, 9.D, 9.E, 9.F, 9.G. 9.H, 9.I, 9.J and 9.K are not entitled to vote to accept or reject the Plan.

### 10. Class 10.A through 10.K – Interests and Interest Related Claims –Impaired

#### a. Classification

Classes 10.A, 10.A, 10.B, 10.C, 10.D, 10.E, 10.F, 10.G. 10.H, 10.I, 10.J and 10.K consist of all Interests and Interest Related Claims for such respective class.

#### b. Treatment

On the Effective Date, all Interests in any of the Debtors shall be deemed canceled, null and void, and of no force and effect, and Holders of Interest Related Claims in Classes 10.A, 10.A, 10.B, 10.C, 10.D, 10.E, 10.F, 10.G. 10.H, 10.I, 10.J and 10.K shall receive no Distributions on account of such Claims.

#### c. Voting

Classes 10.A, 10.A, 10.B, 10.C, 10.D, 10.E, 10.F, 10.G. 10.H, 10.I, 10.J and 10.K will receive no Distribution under the Plan. Holders of Interests and Interest Related Claims in Classes 10.A, 10.A, 10.B, 10.C, 10.D, 10.E, 10.F, 10.G. 10.H, 10.I, 10.J and 10.K are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Interests and Allowed Interest Related Claims in Classes 10.A, 10.A, 10.B, 10.C, 10.D, 10.E, 10.F, 10.G. 10.H, 10.I, 10.J and 10.K are not entitled to vote to accept or reject the Plan.

LEGAL_US_E # 86966965.18