# ARTICLE VII.

## ACCEPTANCE AND REJECTION OF THE PLAN

### A. Impaired Classes of Claims Entitled to Vote

Except as otherwise provided in order(s) of the Bankruptcy Court pertaining to solicitation of votes on the Plan, Classes, 2, 3, 4, 5, 6, 7.A, 7.B, 7.C, 7.D, 7.E, 7.F, 7.G, 7.H, 7.J, 7.K(a) and 7.K(b) shall be entitled to vote to accept or reject the Plan. If and to the extent any other Class identified as being unimpaired is impaired (whether as a result of the terms of the Plan or any modification or amendment thereto), upon such determination, such Class shall then be entitled to vote to accept or reject the Plan.

### B. Classes Deemed to Accept the Plan

Classes 1.A, 1.B, 1.C, 1.D, 1.E, 1.F, 1.G. 1.H, 1.J and 1.K (Priority Claims) and Classes 8.B, 8.G., 8.J and 8.K(a) (Convenience Class Claims) are unimpaired by the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, Holders of such Classes are therefore conclusively presumed to have accepted the Plan, and the votes of Holders of such Classes will therefore not be solicited.

### C. Classes Deemed to Reject the Plan

Holders of Claims in Class 1.I (Gray's Priority Claims), Class 7.I (Gray's General Unsecured Claims), Classes 9.A through 9.K (Intercompany Claims) and Classes 10.A through 10.K (Interests and Interest Related Claims) are not entitled to receive any distribution under the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, Class 1.I (Gray's Priority Claims), Class 7.I (Gray's General Unsecured Claims), Classes 9.A through 9.K (Intercompany Claims) and Classes 10.A through 10.K (Interests and Interest Related Claims) are conclusively presumed to have rejected the Plan, and the votes of Holders of Claims in Class 1.I (Gray's Priority Claims), Class 7.I (Gray's General Unsecured Claims), Classes 9.A through 9.K (Intercompany Claims) and Classes 10.A through 10.K (Interests and Interest Related Claims) therefore will not be solicited.

### D. Nonconsensual Confirmation

The Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Class that is deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code. The Debtors reserve the right to (i) request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code and (ii) modify the Plan to the extent, if any, that confirmation of the Plan under section 1129(b) of the Bankruptcy Code requires modification.

LEGAL_US_E # 86966965.18

# ARTICLE VIII.

## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Continued Corporate Existence

Each of NMP, Club, Village Townhomes, Resorts, Realty, Greenwood and Trailside Townhomes, as the Reorganized Subsidiaries, shall continue to exist after the Effective Date as a limited liability company, with all the powers of a limited liability company in the jurisdiction in which each particular Debtor is organized or otherwise formed and pursuant to its certificate of formation or articles of organization, and other organizational documents, as such documents are amended pursuant to the Plan.  To the extent that any of the organizational documents of any of the Reorganized Subsidiaries are amended pursuant to the Plan, such documents are deemed to be pursuant to the Plan and require no further action or approval.

### B.    New EWRD V

On the Effective Date or as soon thereafter as practicable, a new Delaware limited liability company will be established to replace EWRD V as the holding company and 100% owner of the Reorganized Subsidiaries except as otherwise provided in this Article.

### C.    Dissolution of Gray's

Subsequent to the transfer of the SocGen Collateral by consensual transfer or sale or the completion of exercise by SocGen of its rights and remedies with respect to the SocGen Collateral, and to the extent necessary, Gray's will be fully and finally dissolved for all purposes under Delaware law without the necessity for any further filing or actions to be taken by or on behalf of Gray's, _provided, however,_ that Gray's shall file with the Office of the Secretary of State of Delaware a certificate of dissolution, which may be executed by an officer of East West without need for approval by the holders of Interests in Gray's.  From and after the Effective Date, Gray's shall not be required to file any document, or take any other action, or obtain any approval from the holders of Interests, to withdraw their business operations from any states in which the Debtors previously conducted their business operations.

To the extent that anything in this section is inconsistent or conflicts with any bylaws, organizational documents, and related corporate documents of Gray's, such organizational documents are deemed amended by the Plan to permit and authorize the Debtors to take the actions contemplated by this section.

### D.    EWRD V

As described in the Plan, the Debtors are not at this time attempting to confirm a plan for, or affect the rights of creditors of, EWRD V.  In conjunction with the Debtors' financial and legal advisors, EWRD V determined that a plan of reorganization could not be confirmed for EWRD V based upon the amount of claims likely to be asserted by creditors of EWRD V and the confirmation requirements of section 1129(a) of the Bankruptcy Code.  In addition, EWRD V and its advisors determined that there was no ability to realize any material assets for the satisfaction of such claims.  EWRD V and the other Debtors will attempt to work with the

58

creditors of EWRD V to determine those assets that are available for the creditors of EWRD V, facilitate the monetization of those assets and work toward a distribution of those assets either through a plan of liquidation or other process agreed to by the creditors of EWRD V. In furtherance of this process, EWRD V will file proofs of claim against each of the Debtors to preserve any claims that may exist. Information relating to the Claims of EWRD V will be made available to the creditors of EWRD V upon request.

### E.    The Dissolving Subsidiaries

On the Effective Date, the Dissolving Subsidiaries shall be deemed to have been fully and finally dissolved for all purposes under Delaware law without the necessity for any further filing or actions to be taken by or on behalf of the Dissolving Subsidiaries or payments to be made in connection therewith; provided, however, that each Dissolving Subsidiary shall file with the Office of the Secretary of State of Delaware a certificate of dissolution, which may be executed by an officer of East West without need for approval by the holders of Interests in the applicable Dissolving Subsidiary. From and after the Effective Date, each Dissolving Subsidiary shall not be required to file any document, or take any other action, or obtain any approval from the holders of Interests, to withdraw their business operations from any states in which the Debtors previously conducted their business operations.

To the extent that anything in this section is inconsistent or conflicts with any bylaws, organizational documents, and related corporate documents of any Dissolving Subsidiary, such organizational documents are deemed amended by the Plan to permit and authorize the Debtors to take the actions contemplated by this section.

### F.    Transfer of Assets

All property of the Estates of Debtors that are being dissolved under the Plan that is not distributed to the Holders of Claims on the Effective Date including, without limitation, any moneys held in escrow or separate segregated accounts during the pendency of the Chapter 11 Cases, shall be managed by New EWRD V and shall be held in the name of New EWRD V free and clear of all Claims against and Interests in New EWRD V, except for the rights to Distribution afforded to Holders of Claims under the Plan. After the Effective Date, New EWRD V shall have no liability to Holders of Claims or Interests other than as provided for in the Plan.

### G.    Asset Sales

All non-Cash assets of the Estates of Debtors that are not being reorganized under the Plan that are existing as of the Effective Date and that have not been previously disposed of shall be sold or otherwise liquidated or, if appropriate in the judgment of New EWRD V, abandoned in any commercially reasonable manner, including to a charitable organization or organizations designated by New EWRD V in respect of assets of inconsequential value.

### H.    Tahoe Club Member Rights

The New EWRD V Entities, shall, at their discretion, be permitted to convert the Gray's Crossing Golf Course from a private-members only golf course to a public golf course at any

time before or after the Effective Date. The Debtors do not anticipate that the rights of any Tahoe Club members other than the Golf Members will be adversely impacted by the Chapter 11 Cases, and accordingly, the Debtors do not believe that any Tahoe Club member, except possibly those members who hold Full Golf Memberships or Signature Golf Memberships, will have a General Unsecured Claim in these Chapter 11 Cases.

All other terms and conditions that apply to the various membership categories shall remain in place on and after the Effective Date. Other than Golf Members participating in Class 7.K(a) whose membership agreements will be rejected, all membership agreements will be assumed by the Debtors.

**I.      Consummation of the Transactions Contemplated by the PSA**

The Debtors shall consummate the Plan pursuant to the terms of the PSA and this Plan. To the extent that there may be any inconsistencies between the terms of the PSA, on the one hand, and this Plan and the Confirmation Order, on the other hand, the terms of this Plan and Confirmation Order shall govern.

**J.      Terms of New Money Investment**

On and after the Effective Date, CRDI or a designated affiliate (the "CRDI Investor") shall provide 95% and EW Investor shall provide 5% of the New Money Investment in an aggregate amount not to exceed $32,500,000 which amount shall be sufficient to satisfy and fund the payment of the DIP Lender Secured Claims, Allowed Administrative Claims, Priority Claims, Priority Tax Claims, Secured Tax Claims, Professional Fee Claims and distributions to Allowed General Unsecured Claims and future capital requirements of the New EWRD V Entities (collectively, the "Expenses"). Following the Effective Date, the CRDI Investor and EW Investor shall unanimously determine the amount of New Money Investment required to be funded to pay for Expenses and the timing for delivery of each party's pro rata share of such cash to New EWRD V.

**K.      Execution of Documents and Limited Liability Action**

**1.      Execution of Documents and Corporate Action**

The Debtors shall deliver all documents and perform all actions reasonably contemplated with respect to implementation of the Plan. On the Effective Date or as soon thereafter as practicable, the New EWRD V Members shall enter into the New EWRD V Operating Agreement. The organizational documents of the Reorganized Subsidiaries shall be amended to the extent practicable to conform to the rights of the parties to the New EWRD V Operating Agreement.

**2.      Manager of New EWRD V**

New EWRD V Manager shall be the initial managing member of New EWRD V.

### 3. Authorization and Issuance of the New EWRD V Membership Interests

On the Effective Date and in accordance with this Plan and the PSA, New EWRD V shall, without further act or action under applicable law, regulation, order, or rule, authorize and issue (a) a 95% profits interest to the CRDI Investor (in return for an obligation to contribute 95% of the capital of New EWRD V), (b) a 5% profits interest to the EW Investor (in return for an obligation to contribute 5% of the capital of New EWRD V); (c) a 1% promoted profits interest (meaning that the holder generally has no obligation to contribute capital) to the New EWRD V Manager; and (d) a 19% promoted profits interest to the EW Promoted Investor.

### 4. Distributions

Distributions of available cash flow of New EWRD V after payment of operating expenses, including without limitation, debt service will be made in the following order: (a) first, to the CRDI Investor and the EW Investor *pari passu* in the following proportions: 95% to CRDI Investor until the CRDI Investor has received a preferred return of 12% on all its contributions and a return of all contributions and 5% to EW Investor until it has received a preferred return of 12% on all contributions and a return of all its contributions and (b) second, to the EW Promoted Investor, the New EWRD V Manager, the CRDI Investor and EW Investor *pari passu* in the following proportions: 19% to EW Promoted Investor, 1% to the New EWRD V Manager, 76% to the CRDI Investor and 4% to the EW Investor.

### 5. The Reorganized Subsidiaries

On the Effective Date, New EWRD V shall hold 100% of the Interests in the Reorganized Subsidiaries except as otherwise provided in this Article. Such Interests shall be free and clear of all liens, claims, encumbrances or other interests and New EWRD V shall own all of the assets of the Reorganized Subsidiaries free and clear of all liens, claims, encumbrances or other interests. New EWRD V may elect that one or more of the Reorganized Subsidiaries be merged into New EWRD V, such that all assets of such merged Reorganized Subsidiaries shall be owned by New EWRD V, free and clear of all liens, claims, encumbrances and other interests. New EWRD V may also elect to create a new subsidiary(ies) of New EWRD V, and to transfer assets from New EWRD V to such new subsidiary(ies), free and clear of all liens, claims, encumbrances and other interests.

### 6. Reorganized Management Agreement

The New EWRD V Manager shall manage all of the affairs of the New EWRD V Entities pursuant to the Reorganized Management Agreement between New EWRD V and the New EWRD V Manager. The Debtors contemplate that the Reorganized Management Agreement will include the terms as described in this section.

In exchange for its management services, New EWRD V Manager shall be entitled to an annual management fee of $1,000,000, as more fully described in the Reorganized Management Agreement, the form of which will be included in the Plan Supplement.

The New EWRD V Sub-Manager shall provide submanagement services to each Reorganized Subsidiary and the New EWRD V Sub-Manager shall be reimbursed by each

Reorganized Subsidiary for almost all direct and indirect general and administrative costs incurred by the New EWRD V Sub-Manager in connection with operating such Reorganized Subsidiary, as more fully described in the New Submanagement Agreements, the forms of which will be included in the Plan Supplement.

CRDI may remove the New EWRD V Manager and may terminate the Reorganized Management Agreement at any time for cause, or at any time after two years without cause. Upon any termination and removal that occurs without cause and without a change in control having occurred, the New EWRD V Manager will be entitled to a termination fee of $1,000,000.

Employees of the New EWRD V Manager will be eligible to earn bonuses subject to the approval of CRDI. The salaries of the employees of the New EWRD V Manager will be part of the annual budget process and all bonuses will be subject to CRDI's specific approval.

CRDI has agreed to make certain payments and loans to key employees of an affiliate of the New EWRD V Manager based upon the services they provided both prior to, and during the course of the Chapter 11 Cases.

### 7. **Board of New EWRD V**

New EWRD V will have a board which will be comprised of (i) 2 representatives of CRDI and (ii) 3 representatives of the New EWRD V Manager. The identities of such board members will be disclosed in the New EWRD V Operating Agreement.

### 8. **Certificate of Formation and New EWRD V Operating Agreement**

The New EWRD V Certificate of Formation and the New EWRD V Operating Agreement shall contain provisions necessary to provide for the provisions, terms, and conditions necessary to comply, conform with, and implement the terms, conditions, and requirements of this Plan.

### L. **NMP Consents**

The following consents and other actions with respect to the NMP Operating Agreement shall be effective on the Effective Date (with any capitalized terms used in this Article but not defined in this Plan having the meanings given to such terms in the NMP Operating Agreement):

### 1. **Consent to Construction of Single Family Residences and Reduction in Construction Requirements.**

TLH consents to the development by NMP in the Highlands Area of up to an aggregate of 100 (and not more) single family residences or lots for single family residences.

TLH consents to the reduction by (but not more than) up to 368 Units (so that the overall density requirement may be as low as 1,432 Units) of the requirement that the Manager will cause NMP to construct 1,450 Units pursuant to the Amended and Restated Master Development Plan on Parcel P and the Non-Village Core Property (so that the overall construction requirement for Parcel P and the Non-Village Core Property may be as low as 1,082 Units and the overall

construction requirement for the Property may be as low as 1,432 units when taking account the 350 Units constructed in the Village Core other than Parcel P), so that, in effect, the references to "1,450 Units" in Sections A(1)[b] and A(1)[d] of the Amended and Restated Master Development Plan are changed to "not less than 1,082 Units," and the references to "1,800 Units" in Section A(1)[d] of the Amended and Restated Master Development Plan are changed to "not less than 1,432 Units", respectively, provided, however, that (i) the Property may not be downzoned, (ii) the total density allocated to the Property shall remain at a total of 1,800 Units (exclusive of 255 Hotel rooms and any employee housing required to be built), and (iii) all other permits and other legal entitlements to construct such 368 Units shall remain with NMP (both prior to and after the Effective Date) and shall not be transferred, assigned, waived or conveyed, in each case, without either the approval of TLH in its sole and absolute discretion, subject to a duty to act in good faith or compliance with the terms of the NMP Operating Agreement.

Except as otherwise set forth above, the NMP Operating Agreement shall remain in full force and effect after the Effective Date.

**2.**     **Concession on Preferred Return.**

For a period of three years following the Effective Date, the Adjusted Capital Contribution Account for Land and the Return Account will not accrue any Preferred Return (which in effect means that the Preferred Return for Land for such period will be zero percent). NMPH and TLH acknowledge and agree that the Adjusted Capital Contribution Account for Land and the Return Account shall continue to accrue Preferred Return until the Effective Date.

**3.**     **Protection of Booth Creek Return.**

Except for the DIP Facility, any loan or equity investment (including any preferred equity investment) made by NMPH, East West, EWRD V, the New Money Investors, any Partner, Barclays or any Affiliate of any of the foregoing Persons to or in NMP will be subordinated in right of payment to the payment and/or accrual of the Booth Creek Return.

**4.**     **Interests in Reorganized NMP.**

In consideration for TLH's consent to the actions taken hereunder, TLH shall be granted a 0.1% membership interest in Reorganized NMP.

**M.**     **Effectuating Documents; Further Transactions**

The Debtors and the New EWRD V Entities, subject to the terms and conditions of this Plan, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Support Parties shall execute and deliver such documents as the New EWRD V Entities shall reasonably request to effectuate or further evidence the terms and conditions of this Plan.

LEGAL_US_E # 86966965.18

# ARTICLE IX.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Rejection of Remaining Executory Contracts and Unexpired Leases

On the Confirmation Date, except for (i) any Executory Contract that previously expired by its own terms, (ii) that was previously assumed or rejected by an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, (iii) is assumed pursuant to the Plan or (iv) is the subject of a pending motion to assume or assume and assign as of the Confirmation Date, any Executory Contract that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection pursuant to Bankruptcy Code sections 365 and 1123 as of the Confirmation Date.

### B.    Assumption and Cure of Executory Contracts

The Debtors will file the Assumed Contracts Schedule identifying Executory Contracts to be assumed by the New EWRD V Entities pursuant to the Plan in addition to those previously assumed by the Debtors by order of the Bankruptcy Court, provided, that the Debtors reserve the right to amend both the Assumed Contracts Schedule at any time up to three (3) Business Days before the Confirmation Hearing to delete any Executory Contract contained therein, or to add any Executory Contract to the Assumed Contracts Schedule.  The Debtors will provide notice of any amendments to the Assumed Contracts Schedule to the parties to the Executory Contracts added or removed.  The Assumed Contracts Schedule shall include a designation of the monetary cure amount the Debtors believe is owed with respect to each Executory Contract set forth in the Assumed Contracts Schedule.  Except as provided elsewhere in the Plan, any non-Debtor party to an Executory Contract shall file and serve its objection thereto in writing no later than 4:00 p.m. (prevailing Eastern Time) on the day that is seven (7) days after the Debtors file and serve the Assumed Contracts Schedule.  The failure of any non-Debtor party to an Executory Contract to file and serve an objection to the assumption of the contract or lease by the deadline therefore shall be deemed to consent to the assumption or assumption and assignment of the contract or lease and to such cure amount.  On the Effective Date, in addition to all Executory Contracts that have been previously assumed by the Debtors by order of the Bankruptcy Court, each of the Executory Contracts of the Debtors that are identified in the Assumed Contracts Schedule, shall be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, and the Confirmation Order shall constitute adequate assurance of the performance of such assumed contract.

### C.    Cure of Defaults of Assumed Executory Contracts

The monetary cure amounts owed under each Executory Contract to be assumed or assumed and assigned pursuant to the Plan, as set forth in the Assumed Contracts Schedule, or as otherwise established by the Bankruptcy Court at the Confirmation Hearing, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash solely by the applicable New EWRD V Entity on the later of (i) the Effective Date (or as soon as

64

practicable thereafter), (ii) as due in the ordinary course of business or (iii) on such other terms as the parties to such Executory Contracts may otherwise agree. In the event of a dispute regarding: (1) the amount of any cure payments, (2) ability of the applicable New EWRD V Entity or any other assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assigned, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made on later of: (A) the applicable date set forth in clause (i), (ii), or (iii) above, and (B) fifteen (15) days following the entry of a Final Order authorizing the assumption of Executory Contracts.

## D.    Effect of Assumption Assignment

Each Executory Contract assumed or assumed and assigned pursuant to this Article (or pursuant to Bankruptcy Court order) shall remain in full force and effect and be fully enforceable by the New EWRD V Entities in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment. To the extent applicable, all Executory Contracts assumed during the Chapter 11 Cases, (i) shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant Executory Contract (ii) shall not constitute a breach of any anti-alienation provision thereof, and (iii) any required consent under any such contract or lease shall be deemed satisfied by the confirmation of the Plan.

## E.    Rejection Damages Bar Date

Except to the extent another Bar Date applies pursuant to an order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts under the Plan must be filed with the Voting and Claims Agent at the following applicable address:

> Epiq Bankruptcy Solutions, LLC
> 757 Third Avenue, 3rd Floor
> New York, NY 10017
> Attn: East West Resort Development V, L.P., L.L.L.P.
> Claims Processing Center

and a copy served on counsel for the Debtors within thirty (30) days from the entry of the Confirmation Order, or such Claim shall be forever barred and shall not be entitled to a Distribution or be enforceable against the Debtors, their Estates, their successors or their assigns. Any Claim arising from the rejection of an Executory Contract shall be treated as a Claim in the applicable Classes 7.A, 7.B, 7.C, 7.D, 7.E, 7.F, 7.G, 7.H, 7.J and 7.K(a). Nothing in the Plan extends or modifies any previously applicable Bar Date.

## F.    Insurance Policies

To the extent any or all of the insurance policies set forth on <u>Exhibit A</u> to the Plan are considered to be Executory Contracts, then notwithstanding anything contained in the Plan to the

contrary, the Plan shall constitute a motion to assume the insurance policies set forth on Exhibit A to the Plan by the New EWRD V Entities. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to Bankruptcy Code section 365(a) and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, the Estates and all parties in interest in these Chapter 11 Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy set forth on Exhibit A to the Plan. To the extent the Bankruptcy Court determines otherwise with respect to any insurance policy, the Debtors reserve the right to seek rejection of such insurance policy or other available relief. The Plan shall not affect contracts that have been assumed and/or assigned by order of the Bankruptcy Court prior to the Confirmation Date. For the avoidance of doubt, the certain insurance policies (including any insurance policies that are not executory contracts, insurance policies that may have expired prior to the Petition Date, insurance policies in existence on the Petition Date and insurance policies entered into by the Debtors after the Petition Date) of the Debtors set forth on Exhibit A to the Plan and all rights thereunder and rights under any other insurance policies under which the Debtors may be beneficiaries (including the rights to make, amend, prosecute and benefit from claims) are retained by the Debtors and will be included in the New EWRD V Assets and handled accordingly pursuant to the Plan.

**G.      Trailside Closings**

In the event that Trailside Townhomes does not close on all of the remaining townhomes currently under contract with Exclusive Resorts Real Estate Holdings II, LLC ("Exclusive Resorts") prior to the Effective Date, Trailside Townhomes will assume its sales contract with Exclusive Resorts.

## ARTICLE X.

## DISTRIBUTIONS

**A.      Distributions on Allowed Unsecured Claims**

Distributions with respect to Holders of Allowed Unsecured Claims shall only be made on the Distribution Date or as soon thereafter as practicable. All Allowed Unsecured Claims held by a single creditor against the Debtor shall be aggregated and treated as a single Unsecured Claim against the Debtor. At the written request of the New EWRD V Entities, any creditor holding multiple Allowed Unsecured Claims shall provide the New EWRD V Entities a single address to which any Distributions shall be sent.

**B.      Date of Distributions**

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

LEGAL_US_E # 86966965.18

## C. Disbursing Agent

All Distributions under the Plan shall be made by the Disbursing Agent.

## D. Delivery of Distributions

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such holder as set forth on the Schedules or on the books and records of the Debtors or its agents, as applicable, unless the Debtors or the New EWRD V Entities have been notified in writing of a change of address by the filing of a Proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules. Nothing in the Plan shall require the Debtors or the New EWRD V Entities to attempt to locate any holder of an Allowed Claim or Allowed Administrative Claim.

## E. Unclaimed Distributions

All Distributions under the Plan that are unclaimed for a period of ninety (90) days after Distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the New EWRD V Entities notwithstanding state escheat or other similar laws to the contrary and any entitlement of any holder of any Claims to such Distributions shall be extinguished and forever barred.

## F. Manner of Payment

At the option of the New EWRD V Entities, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise provided in applicable agreements.

## G. Limitation on Cash Distributions

No payment of Cash less than twenty-five dollars ($25) will be made to any holder of an Allowed Claim unless a request for such payment is made in writing to the New EWRD V Entities within thirty (30) days after the Effective Date.

## H. Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

LEGAL_US_E # 86966965.18

# ARTICLE XI.

## PROCEDURES FOR TREATING DISPUTED CLAIMS

### A. Claims Administration Responsibility

#### 1. Reservation of Rights to Object to Claims

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Plan, or otherwise becomes an Allowed Claim prior to or after the Effective Date, the Debtors and New EWRD V Entities (on behalf of the Estates) reserve any and all objections to any and all Claims and motions or requests for the payment of Claims, whether Administrative, Priority Tax, Priority, Secured or Unsecured, including, without limitation, any and all objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Secured Tax Claims, Priority Claims, General Unsecured Claims, Intercompany Claims, Interest Related Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.

#### 2. Objections to Claims

Prior to the Effective Date, the Debtors or any other party that filed a Claim objection shall be responsible for pursuing any objection to the allowance of any Claim. From and after the Effective Date, the New EWRD V Entities will retain responsibility for administering, disputing, objecting to, compromising or otherwise resolving and making Distributions, if any, with respect to all Claims subject to the other provisions of the Plan. Unless otherwise provided in the Plan or by order of the Bankruptcy Court, any objections to Claims by the New EWRD V Entities will be filed and served not later than 90 days after the Effective Date, provided that the New EWRD V Entities may request (and the Bankruptcy Court may grant) an extension of such deadline by filing a motion with the Bankruptcy Court, based upon a reasonable exercise of business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan. The New EWRD V Entities shall be substituted for the Debtors with respect to any objections pending as of the Effective Date.

#### 3. Filing of Objections

An objection to a Claim or Interest shall be deemed properly served on the Holder of such Claim or Interest if the Debtors or the New EWRD V Entities effect service in accordance with Bankruptcy Rule 3007.

#### 4. Determination of Claims

Except as otherwise agreed by the Debtors, any Claim as to which a Proof of Claim or request for payment was timely filed in the Chapter 11 Cases may be determined and (so long as such determination has not been stayed, reversed or amended and as to which determination, or any revision, modification or amendment thereof, the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) liquidated pursuant to (i) an order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the applicable New EWRD V Entity and the claimant without

68

the necessity of Bankruptcy Court approval, (iv) applicable non-bankruptcy law, or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim, and (c) an application to otherwise limit recovery with respect to such Claim, filed by the Debtors on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with the Plan. Nothing contained in this Article shall constitute or be deemed a waiver of any claim, right or Cause of Action that the Debtors or the New EWRD V Entities may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under 28 U.S.C. §157.

**B.      Procedures for Treating and Resolving Disputed and Contingent Claims**

**1.      <u>No Distributions Pending Allowance</u>**

No payments or Distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled, withdrawn, determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

**2.      <u>Claim Estimation</u>**

The Debtors or the New EWRD V Entities may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated pursuant to Bankruptcy Code section 502(c); provided, however, that the Bankruptcy Court shall determine (i) whether such Disputed Claim is subject to estimation pursuant to Bankruptcy Code section 502(c) and (ii) the timing and procedures for such estimation proceedings, if any.

**C.      Setoffs and Recoupment**

The Debtors and the New EWRD V Entities may, pursuant to Sections 502(d), 553 and 558 of the Bankruptcy Code or applicable non-bankruptcy law, but shall not be required to, setoff against or recoup from any Claim on which payments are to be made pursuant to the Plan, any claims or Causes of Action of any nature whatsoever the Debtors or their Estates may have against the Holder of such Claim; provided, however, that neither the failure to effect such offset or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Debtors or the New EWRD V Entities of any setoff or recoupment the Debtors or the New EWRD V Entities may have against the Holder of such Claim, nor of any other claim or Cause of Action.

**D.      Allowance and Disallowance of Claims Subject to Section 502 of the Bankruptcy Code**

Allowance and disallowance of Claims shall be in all respects subject to the provisions of section 502 of the Bankruptcy Code, including, without limitation, subsections (b), (d), (e), (g), (h) and (i) thereof.

LEGAL_US_E # 86966965.18

### E. Adjustment to Certain Claims Without a Filed Objection

Any Claim that has been settled, paid and satisfied, or amended and superseded, may be adjusted or expunged on the Claims register by the New EWRD V Entities without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, all Claims filed by a current or former employee of the Debtors on account of a benefit arising out of a benefit plan shall be deemed satisfied and expunged from the Claims register as of the Effective Date to the extent the New EWRD V Entities elect to honor such employee benefit, without any further notice to or action, order or approval of the Bankruptcy Court.

### F. Resolution of Administrative Claims and Claims

On and after the Effective Date, the New EWRD V Entities shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Claims and Claims against the Debtor and to compromise, settle or otherwise resolve any Disputed Administrative Claims and Disputed Claims against the Debtor without approval of the Bankruptcy Court.

### G. Offer of Judgment

The New EWRD V Entities are authorized to serve upon a holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment. To the extent the holder of a Claim must pay the costs incurred by the New EWRD V Entities after the making of such offer, the New EWRD V Entities are entitled to setoff such amounts against the amount of any Distribution to be paid to such holder and/or withhold payment of any Distribution under Section 502(d) of the Bankruptcy Code, each without any further notice to or action, order, or approval of the Bankruptcy Court.

### H. Amendments to Claims

On or after the Effective Date, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the New EWRD V Entities, and any such new or amended Claim filed without prior authorization shall be deemed disallowed in full and expunged without any further action.

### I. Cancellation of Instruments and Agreements

Upon the occurrence of the Effective Date, except as otherwise provided herein, all promissory notes, shares, certificates, instruments, indentures, stock or agreements evidencing, giving rise to or governing any Claim or Interest shall be deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order or rule; the obligations of the Debtors under such promissory notes, share certificates, instruments, indentures or agreements shall be discharged and the Holders thereof shall have no rights against the Debtors, the New EWRD V Entities or the Estates; and such promissory notes, share certificates, instruments, indentures or agreements shall evidence no such rights, except the right to receive the distributions provided for in the Plan.

70

**J. No Interest on Claims**

Unless otherwise specifically provided for in the Plan, the Confirmation Order, a post-petition agreement in writing between the Debtors and a Holder of a Claim that has been approved by an order of the Bankruptcy Court, or required under section 506(b) of the Bankruptcy Code, post-petition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

**K. Withholding Taxes**

The New EWRD V Entities shall be entitled to deduct any federal, state or local withholding taxes from any payments under the Plan. As a condition to making any distribution under the Plan, the New EWRD V Entities may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as the New EWRD V Entities may deem necessary to comply with applicable tax reporting and withholding laws.

**ARTICLE XII.**

**EFFECT OF CONFIRMATION**

**A. Vesting of Assets**

Subject to Article VIII.D of the Plan, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the New EWRD V Assets shall be released from the custody and jurisdiction of the Bankruptcy Court, and all of New EWRD V Assets shall vest in the New EWRD V Entities free and clear of all Claims, Liens, encumbrances, charges and other interests, including any right of any governmental agency to impair, modify, rescind, abate or otherwise affect the Assets and properties of the Debtors, except as provided in the Plan. From and after the Effective Date, the New EWRD V Entities may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

**B. Binding Effect**

On and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, a Debtor and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan, whether or not such Holder has accepted the Plan and whether or not such holder is entitled to a Distribution under the Plan.

**C. Discharge of Claims and Termination of Interests**

Except for Gray's Priority Claims in Class 1.I and Gray's General Unsecured Claims in Class 7.I or otherwise provided in the Plan, the rights afforded in and the payments and

Distributions to be made under the Plan shall terminate all Interests and discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtors, or their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except for Gray's Priority Claims in Class 1.I and Gray's General Unsecured Claims in Class 7.I or otherwise provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Interests shall be precluded and enjoined from asserting against the Debtors, the New EWRD V Entities, their successors or assignees or any of their assets or properties, any other or further Claim or Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such Holder has filed a Proof of Claim or proof of interest and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.

**D.      Injunction**

Except as otherwise expressly provided in the Plan or in the Confirmation Order, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against any Protected Party or any property of any Protected Party with respect to any such Claim or Interest; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree or order against any Protected Party or any property of any Protected Party with respect to any such Claim or Interest; (c) creating, perfecting or enforcing, directly or indirectly, any lien or encumbrance of any kind against any Protected Party or any property of any Protected Party with respect to any such Claim or Interest; (d) effecting, directly or indirectly, any setoff or recoupment of any kind against any obligation due to any Protected Party or any property of any Protected Party with respect to any such Claim or Interest, unless approved by the Bankruptcy Court; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest.  Nothing contained in this Article shall prohibit the Holder of a Claim or Interest with respect to which a Proof of Claim was timely filed from litigating its right to seek to have such Claim or Interest declared an Allowed Claim or Interest and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of such Claim or Interest of any of the obligations of the Debtors or the New EWRD V Entities under the Plan. Notwithstanding anything to the contrary in this paragraph, any right of a taxing authority to retain and enforce their liens until the claims of such taxing authority are paid in full, consistent with the Plan, to the extent that any exist, and collect taxes consistent with the Plan, shall not be affected by this paragraph.

**E.      Term of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, the Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the entry of the Final Decree.

LEGAL_US_E # 86966965.18

## F.    Exculpation and Releases

None of the Protected Parties shall have or incur any liability for any act or omission taken in connection with, arising from or relating to the Chapter 11 Cases, the formulation, negotiation and/or pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan and/or the property to be distributed under the Plan, except for claims, Causes of Action or liabilities arising from the gross negligence, willful misconduct or fraud of any Protected Party, in each case subject to determination of such by final order of a court of competent jurisdiction and provided that any Protected Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan and such reasonable reliance shall form an absolute defense to any such claim, cause of action or liability. Without limiting the generality of the foregoing, each Protected Party shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.

## G.    Reservation of Causes of Action/Reservation of Rights

Subject to Article XII.F above and Article VIII.F of the Plan, nothing contained in the Plan shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors, their Estates or the New EWRD V Entities may have or may choose to assert against any Person.

## H.    Avoidance Actions/Objections

Other than any releases granted herein, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the New EWRD V Entities shall have the right to prosecute any and all avoidance or equitable subordination actions, recovery causes of action and objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or their Estates.

## I.    Discharge of the Debtors' Professionals

Upon the Effective Date, the Debtors' Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to: (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases which shall remain in full force and effect according to their terms; (ii) applications for Professional Fee Claims; (iii) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases; and (iv) any pending motions, or any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order. The Professionals retained by the Debtors and the respective members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered to or on behalf of the Debtors after the Effective Date (including, but not limited to, any agreements for compensation during a "tail period"), except for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date.

LEGAL_US_E # 86966965.18

# ARTICLE XIII.

## CONDITIONS PRECEDENT

### A.     Conditions Precedent to Effectiveness

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with Article XIV.B hereof:

a.      The Confirmation Order, in form and substance acceptable to the Debtors and the New Money Investors and the other Protected Parties, shall have been entered and is a Final Order or, if not a Final Order, is not subject to any stay;

b.      All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors; and

c.      All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked.

d.      All necessary documents relating to the New Money Investment shall be executed.

### B.     Waiver of Conditions

Each of the conditions precedent in Article XIII.A hereof may be waived, in whole or in part, by the Debtors upon the written consent of the New Money Investors. Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

### C.     Satisfaction of Conditions

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. In the event that one or more of the conditions specified in Article XIII.A of the Plan have not occurred or otherwise been waived pursuant to Article XIII.B of the Plan, (a) the Confirmation Order shall be vacated, (b) the Debtors and all holders of Claims and Interests, shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) the Debtors' obligations with respect to Claims and Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

LEGAL_US_E # 86966965.18

# ARTICLE XIV.

## ADMINISTRATIVE PROVISIONS

### A.   Retention of Jurisdiction by the Bankruptcy Court

The Plan shall not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided under the Bankruptcy Code. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and have exclusive jurisdiction (to the extent granted by applicable law, including any provisions permitting mandatory or discretionary withdrawal of such jurisdiction) over any matter arising out of or related to the Chapter 11 Cases and the Plan, including, without limitation, the following:

    a.    all matters relating to the assumption or rejection or the assumption and assignment of Executory Contracts, or Claims or disputes relating thereto;

    b.    all matters relating to the ownership of a Claim or Interest;

    c.    all matters relating to the distribution to holders of Allowed Claims and to the determination of Claims;

    d.    all matters relating to or arising in connection with the allowance or estimation of Claims filed, both before and after the Confirmation Date, including any objections to the classification of any Claim;

    e.    to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified and/or vacated;

    f.    all matters relating to the construction and implementation of the Plan and the provisions thereof, and to hear and determine all requests for orders in aid of execution, implementation or consummation of the Plan;

    g.    all matters relating to disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

    h.    to consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

    i.    all applications for allowance of compensation and reimbursement of Professional Fee Claims under Bankruptcy Code sections 328, 330, 331, 503(b), 1103 and 1129(a)(4);

    j.    to hear and determine all motions requesting allowance of an Administrative Claim;

LEGAL_US_E # 86966965.18

k.      to determine requests for the payment of Claims entitled to priority under section 507(a)(2) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

l.      all Causes of Action, Avoidance Actions and other suits and adversary proceedings to recover assets for the Debtors and property of the Estates, wherever located, and to adjudicate any and all other Causes of Action, Avoidance Actions, suits, adversary proceedings, motions, applications and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or the Plan, proceedings to adjudicate the allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

m.      all matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

n.      all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

o.      to enter the Final Decree closing the Chapter 11 Cases; and

p.      to enforce all orders previously entered by the Bankruptcy Court.

## B.      Payment of Statutory Fees

All fees through the Effective Date pursuant to 28 U.S.C. §1930 shall be paid on or before the Effective Date to the extent that an invoice for such fees has been provided to the Debtors prior to the Effective Date. All fees invoiced after the Effective Date pursuant to 28 U.S.C. §1930 shall be paid by the New EWRD V Entities out of the New EWRD V Assets.

## C.      Headings

The headings of the articles, paragraphs and sections of the Plan are inserted for convenience only and shall not affect the interpretation hereof.

## D.      Binding Effect of Plan

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code on and after the Effective Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, the Estates, New EWRD V Entities and their respective successors or assigns, whether or not the Claim or Interest of such Holders is impaired under the Plan and whether or not such Holder has accepted the Plan. The rights, benefits and obligations of any entity named or referred to in the Plan, whose actions may be required to effectuate the terms of the Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such entity (including, without limitation, the New EWRD V Entities and any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

LEGAL_US_E # 86966965.18

## E. Final Order

Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by the Debtors upon written notice to the Bankruptcy Court. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

## F. Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection herewith and distributions hereunder, the New EWRD V Entities shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution. Any party issuing any instrument or making any Distribution under the Plan has the right, but not the obligation, to not make a Distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

## G. Tax Exemption and Expedited Tax Determination

Pursuant to section 1146 of the Bankruptcy Code, any transfers from a Debtor, New EWRD V Entity or any subsidiary thereof to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' or the New EWRD V Entities' real or personal property, or the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, including, without limitation, any transfers of the Debtors' property in implementation of or as contemplated by the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

The Debtors and New EWRD V Entities are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, on or behalf of, the Debtors for any or all taxable periods (or portions thereof) ending after the Petition Date through and including the Effective Date.

## H. Governing Law

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless specifically stated, the rights, duties and

LEGAL_US_E # 86966965.18

obligations arising under the Plan, any agreements, documents and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control), and, with respect to the Debtors incorporated or organized in Delaware, corporate and limited liability company governance matters shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to conflicts of law principles.

## I.     Plan Supplement

The Plan Supplement and the documents contained therein shall be in form, scope and substance satisfactory to the Debtors, TLH and the New Money Investors and shall be filed with the Bankruptcy Court no later than five (5) Business Days before the deadline for voting to accept or reject the Plan, provided that the documents included therein may thereafter be amended and supplemented prior to execution, so long as no such amendment or supplement materially affects the rights of holders of Claims or Interests. The Plan Supplement and the documents contained therein are incorporated into and made a part of the Plan as if set forth in full therein.

## J.     Severability

After the Effective Date, should the Bankruptcy Court or any other court of competent jurisdiction determine that any provision in the Plan is either illegal on its face or illegal as applied to any Claim, such provisions shall be unenforceable either as to all Holders of Claims or as to the Holder of such Claim as to which the provision is illegal, respectively. Such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

## K.     Revocation

The Debtors reserve the right to revoke and withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, then the Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or be deemed an admission by the Debtors.

## L.     Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## M.     Construction

The rules of construction as set forth in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

LEGAL_US_E # 86966965.18

## N.    Conflict

In the event and to the extent any provision of the Plan is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan shall control and take precedence. The terms of the Confirmation Order shall govern in the event of any inconsistency with the Plan or the summary of the Plan set forth in the Disclosure Statement.

## O.    Amendments and Modifications

The Debtors, TLH, the New Money Investors and the DIP Lenders (solely to the extent that any modification changes the treatment of the DIP Lenders Secured Claim) jointly may agree to alter, amend or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing. After the Confirmation Date and prior to "substantial consummation" (as such term is defined in section 1101(2)) of the Bankruptcy Code of the Plan, any Debtor or any New EWRD V Entity may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, by the filing of a motion on notice to those parties set forth in Bankruptcy Rule 2002, and the solicitation of all Creditors and other parties-in-interest shall not be required. Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Claims or Interests.

Effectuation of waivers otherwise authorized by the Plan shall not be deemed amendments or modifications of the Plan.

## P.    Notices

Any notices required under the Plan or any notices or requests of the Debtors or the New EWRD V Entities by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

To the Debtors:

East West Resort Development V, L.P., L.L.L.P.
c/o Craig Ferraro
126 Riverfront Lane, 5th Floor
PO Drawer 2770, Avon, Colorado 81620

LEGAL_US_E # 86966965.18

with a copy to:

Paul, Hastings, Janofsky & Walker, LLP
Attn: Richard A. Chesley, Esq.
191 N. Wacker Dr., Suite 3000
Chicago, IL 60606

Richards, Layton & Finger, P.A.
Attn: Daniel J. DeFranceschi, Esq.
One Rodney Square
920 North King Street
Wilmington, DE 19801

**Q.**     **Filing of Additional Documents**

On or before substantial consummation of the Plan, and without the need for any further order or authority, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**R.**     **Direction to a Party**

From and after the Effective Date, the Debtors or the New EWRD V Entities may apply to the Bankruptcy Court for the entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including the satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

**S.**     **Successors and Assigns**

The rights, duties and obligations of any Person named or referred to in the Plan, including all Creditors, shall be binding on, and shall inure to the benefit of, the successors and assigns of such Person.

**ARTICLE XV.**

**CERTAIN FACTORS AFFECTING THE DEBTORS**

**A.**     **Certain Bankruptcy Law Considerations**

**1.**     **Risk of Non-Confirmation of the Plan**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

LEGAL_US_E # 86966965.18

2.     **Non-Consensual Confirmation**

In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes. Because Classes 9.A through 9.K (Intercompany Claims) and Classes 10.A through 10.K (Interests and Interest Related Claims) are deemed to reject the Plan, these requirements must be satisfied with respect to such Classes. The Debtors believe that the Plan satisfies these requirements.

3.     **Risk of Delay in Confirmation of the Plan**

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. In addition, as with any judicial proceeding, there are risks of unavoidable delay with a chapter 11 proceeding and there are risks of objections from certain stakeholders. Any material delay in the confirmation of the Plan, or the threat of rejection of the Plan by the Bankruptcy Court, would not only add substantial expense and uncertainty to the process, but also would adversely affect the Debtors' operations during this period. Moreover, the mere filing of a "bankruptcy case," even, as is the case here, one pursuant to a pre-arranged plan has adverse effects on the business and operations of the Debtors.

B.     **Additional Factors to be Considered**

1.     **The Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.     **No Representations Outside This Disclosure Statement Are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.     **Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward looking and contains estimates and assumptions which might ultimately prove to be incorrect

and projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and the projections and estimates herein should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

4.     **The Amount of Claims Could Be More Than Projected**

The Bar Date for filing proofs of Claim has not occurred. The Allowed amount of Claims in each class could be significantly more than projected, which in turn, could cause the value of distributions to be diluted substantially. If the Claims asserted against the Debtors exceed projections, it may reduce the value of distributions to the holders of Claims, if applicable.

5.     **Debtors Could Withdraw the Plan**

Under the Plan, the Debtors could withdraw the Plan with respect to any Debtors and proceed with confirmation of the Plan with respect to any other Debtors.

6.     **No Legal or Tax Advice Is Provided to You by This Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each creditor or equity interest holder should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her or its Claim or equity interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

7.     **No Admission Made**

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

8.     **Even if the Plan is confirmed, the Debtors will continue to face risks**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in its industry and other expenses. Some of these concerns and effects typically become more acute when a chapter 11 case continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guaranty that the Plan will achieve its stated goals.

LEGAL_US_E # 86966965.18

9. **Business Factors and Competitive Conditions**

    a. **General Economic Conditions**

In their Financial Projections, the Debtors have assumed that the general economic conditions of the United States economy will improve over the next several years. The improvement of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, consumer spending, war, terrorism and other such factors. Any one of these or other economic factors could have a significant impact on the operating performance of the New EWRD V Entities. There is no guaranty that economic conditions will improve, or remain stable, in the near term.

    b. **Business Factors**

The Debtors believe that they will succeed in implementing and executing their business plan for the benefit of all constituencies. However, there are risks that the goals of the Debtors' going-forward business plan and operational strategies will not be achieved. In such event, the Debtors may be unable to refinance maturing term debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein or become subject to further insolvency proceedings.

    c. **Other Factors**

Other factors that holders of Claims should consider are potential regulatory and legal developments that may impact the New EWRD V Entities. Although these and other such factors are beyond the Debtors' control and cannot be determined in advance, they could have a significant impact on the New EWRD V Entities' operating performance.

10. **Variances from Projections**

The fundamental premise of the Plan is the reduction of the Debtors' debt levels and the implementation and realization of the Debtors' business plan, as reflected in the projections for the New EWRD V Entities contained in this Disclosure Statement. The projections reflect numerous assumptions concerning the anticipated future performance of the New EWRD V Entities, some of which may not materialize. Such assumptions include, among other items, assumptions concerning the general economy and the real estate finance market, the ability to make necessary capital expenditures, the ability to establish market strength and the ability to control future operating expenses. The Debtors believe that the assumptions underlying the projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the New EWRD V Entities. Therefore, the actual results achieved throughout the periods covered by the projections necessarily will vary from the projected results, and such variations may be material and adverse.

# ARTICLE XVI.

## CONFIRMATION OF THE PLAN

### A.   Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the confirmation hearing for May 27, 2010 at 1:30 p.m. (prevailing Eastern Time).  The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or interests held or asserted by the objector against the Debtors' estate(s) or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon counsel for the Debtors: Paul, Hastings, Janofsky & Walker LLP, 191 N. Wacker Drive, Chicago, Illinois 60606 (Attn: Hilla Uribe Jimenez, Esq. – Tel: 312-499-6000) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Daniel J. DeFranceschi, Esq. – Tel: 302-651-7700) so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on May 21, 2010.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### B.   Requirements for Confirmation of the Plan

#### 1.   Requirements of Section 1129(a) of the Bankruptcy Code

##### a.   General Requirements

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1.   The Plan complies with the applicable provisions of the Bankruptcy Code.

2.   The Debtors have complied with the applicable provisions of the Bankruptcy Code.

3.   The Plan has been proposed in good faith and not by any means proscribed by law.

4.   Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in

84

connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.    The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

6.    With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

7.    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

8.    Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims other than priority tax claims will be paid in full on the Effective Date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding six years after the date of assessment of such claims, of a value, as of the Effective Date, equal to the allowed amount of such claims.

9.    At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

10.    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See discussion of "Feasibility" below.

11.    The Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits, if any.

### b.    Best Interests Test

Each Holder of a Claim or Interest in an Impaired Class must either (i) accept the Plan or (ii) receive or retain under the Plan Cash or property of a value, as of the Effective Date of the Plan, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

To determine what holders of Claims and Interests of each impaired class would receive if the Debtors were liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of the Debtors in a chapter 7 liquidation case. The proceeds that would be available for satisfaction of Claims and Interests would consist of the proceeds generated by disposition of the unencumbered equity in the properties and interests in property of the Debtors and the cash held by the Debtors at the time of the commencement of the liquidation case.  Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional administration and priority claims that may result from the termination of the business of the Debtors and the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases, such as compensation for attorneys, financial advisors, accountants and costs that are allowed in the chapter 7 case. In addition, Claims would arise by reason of the breach or rejection of obligations incurred and executory contracts entered into or assumed by the Debtors during the pendency of the Chapter 11 Cases.

The foregoing types of Claims and such other Claims which may arise in the liquidation cases or result from the pending Chapter 11 Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay unsecured Claims arising on or before the Petition Date.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the liquidation of the properties and interests in property of the Debtors (net of the amounts attributable to the aforesaid claims) is then compared with the present value offered to such classes of Claims and Interests under the Plan (the "Best Interests Test").

In applying the Best Interests Test, it is possible that Claims and Interests in the chapter 7 cases may not be classified according to the seniority of such Claims and Interests as provided in the Plan.  In the absence of a contrary determination by the Bankruptcy Court, all unsecured Claims arising on or before the Petition Date which have the same rights upon liquidation would be treated as one class for the purposes of determining the potential distribution of the liquidation proceeds resulting from the chapter 7 cases of the Debtors.  The distributions from the liquidation proceeds would be calculated ratably according to the amount of the Claim held by each creditor. Therefore, creditors who claim to be third-party beneficiaries of any contractual subordination provisions might have to seek to enforce such contractual subordination provisions in the Bankruptcy Court or otherwise. The Debtors believe that the most likely outcome of

LEGAL_US_E # 86966965.18

liquidation proceedings under chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full with interest, and no stockholder receives any distribution until all creditors are paid in full with interest.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the chapter 11 cases, including: (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; and (iii) the substantial increases in claims which would be satisfied on a priority basis or on parity with creditors in the chapter 11 cases, the Debtors have determined that confirmation of the Plan will provide each holder of a Claim or Interest with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code

The Debtors' liquidation analysis is attached hereto as Exhibit D.

### c. Feasibility

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization.

For purposes of determining whether the Plan meets this requirement, the Debtors, with the assistance of their advisors, developed a set of financial projections (as summarized below and attached hereto as Exhibit E, the "Financial Projections") to generally assess the cash requirements of the New EWRD V Entities. The Financial Projections set forth below and in Exhibit E are based on a number of significant assumptions, including, among other things, the successful reorganization of the Debtors. Actual operating results may vary.

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management have, through the development of the Financial Projections, analyzed the Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their business subsequent to their emergence from these Chapter 11 Cases. The Financial Projections were also prepared to assist those holders of Allowed Claims entitled to vote on the Plan in determining whether to accept or reject the Plan.

The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein and in Exhibit E, and certain relevant information set forth in the Plan. The Financial Projections were prepared in good faith based upon assumptions believed to be reasonable. The Financial Projections, which were prepared during April 2010, were based, in part, on economic, competitive, and general business conditions prevailing at the time. Any

future changes in these conditions may materially impact the Debtors' ability to achieve the Financial Projections.

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTORS' INDEPENDENT ACCOUNTANT HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTORS DO NOT, AS A MATTER OF NORMAL COURSE, PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, THE DEBTORS DO NOT INTEND TO, AND DISCLAIM ANY OBLIGATION TO FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS INTERESTS PRIOR TO THE EFFECTIVE DATE OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE OR OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.

The Financial Projections are based on the assumption that the Effective Date will occur on or about June 30, 2010 with 2010 representing projected cash flows and Chapter 11 emergence costs for the 12 months ending December 31, 2010. If the Effective Date is significantly delayed, additional expenses, including professional fees, may be incurred and operating results may be negatively impacted. It is also assumed that the New EWRD V Entities will conduct operations and pursue developments substantially similar to those businesses currently in operation and assets currently deployed.

The Financial Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Factors that could cause actual results to differ materially include, but are not limited to, New EWRD V's ability to operate the New EWRD V

LEGAL_US_E # 86966965.18

Entities' business and develop future assets consistent with their projections, New EWRD V's ability to attract and retain key executives, failure of demand for luxury real estate or second homes to rebound to anticipated levels, New EWRD V's ability to control operational and development costs as projected, and New EWRD V's ability to obtain sufficient project level financing.

The Financial Projections estimate future cash flows of each of the Debtors' existing and currently planned real estate development projects from the assumed Effective Date through the year ending December 31, 2027. The Financial Projections assume neither a change to the Debtors' current entitlement rights nor a change to the Debtors' current method of developing and selling luxury real estate assets. The Financial Projections also assume general economic conditions will improve over the term of the projections.

The Financial Projections also assume the benefits from the proposed capital injection to be provided by the New Money Investors in an amount up to $32,500,000. A change in any of these assumptions would have a material impact on the Financial Projections.

Cash Generated. The Debtors generate cash through the sale of (i) single family lots, (ii) townhomes, (iii) condominiums, and (iv) fractional ownership shares in residential real estate properties developed by the Debtors and located on and around the Northstar-at-Tahoe Resort in Lake Tahoe, CA. In addition, the Debtors operate the Tahoe Club which collects dues from paying members and generates revenue through sale of food and other products and services at restaurants, golf courses and swim and tennis fitness centers.

In operating its business, the Debtors incur certain costs to develop and then subsequently sell its inventory of real estate properties. These costs include the following:

- Development Costs: Development costs include construction costs and land costs. Construction costs include expenses associated with developing and building new real estate projects, which may include: architects, planning and permits, contractors, labor, material, and equipment costs related to property construction and/or development.

- Soft Costs: Soft costs include general and administrative costs, marketing expenses and taxes at the project entities as well as master costs, which include costs associated with home owners associations, management fees, overhead and salaries, property taxes, special tax obligations arising from the Mello-Roos Act and costs associated with the Debtor's financial restructuring.

- Other: Other costs include minority interest and closing costs. Closing costs consist of commissions associated with the sale of real estate inventory.

- Debt Service: Debt service includes interest from project level borrowings.

- Bank Borrowing / Repayments: Bank borrowings and repayments include amounts borrowed to develop and build existing and future real estate developments as well as the repayment of project level financing.

89

### d. Reorganized Value

The Debtors have been advised by their investment banker, Houlihan Lokey, with respect to the estimated range of hypothetical reorganization values of the New EWRD V Entities. Houlihan Lokey estimates the range of concluded asset values of the New EWRD V Entities (the "Reorganized Value") to be from approximately $5.7 million to approximately $12.1 million. After repayment of estimated secured, administrative and priority claims by estate, the distributable value available for unsecured creditors is estimated to be from $0 to approximately $2 million. Table A below outlines concluded asset values and value available for unsecured creditors for the various New EWRD V Entities. Priority and Administrative Claims do not reflect special tax obligations of several of the Debtors arising from the Mello-Roos Act. However, the special tax obligations arising from the Mello-Roos Act were factored into the Debtors' projected cash flows and therefore impact estimated asset values.

| ($ rounded, in thousands) | Concluded Value of Assets | | | Less: Secured, Admin, & Priority Claims | Value Available for Unsecured Creditors | | |
|---|---|---|---|---|---|---|---|
| | Low | | High | | Low | | High |
| Old Greenwood, LLC | $4,670 | -- | $5,660 | ($5,250) | $0 | -- | $410 |
| Northstar Mountain Properties, LLC | 0 | -- | 3,400 | (2,430) | 0 | -- | 960 |
| Tahoe Club Company, LLC - Cash | 1,000 | -- | 3,000 | (2,350) | 0 | -- | 650 |
| Total | $5,670 | -- | $12,060 | ($10,030) | $0 | -- | $2,020 |

The Reorganized Value consists of the theoretical value of the New EWRD V Entities through the application of intrinsic valuation methodologies. Houlihan Lokey has estimated the Reorganized Value as of the Debtors' estimated emergence in June 2010.

The foregoing estimates of the Reorganized Value of the New EWRD V Entities is based on a number of assumptions, including a successful reorganization of the Debtors' business, the implementation and realization of the New EWRD V Entities' business plans, the achievement of the forecasts reflected in management's projections, the timing of future development, the absorption of such developments, residential luxury resort real estate prices in the areas in which the New EWRD V Entities will continue to conduct business, overall economic conditions, and the Plan becoming effective on the assumed Effective Date.

In preparing the estimate of the Reorganized Value of the New EWRD V Entities, Houlihan Lokey undertook, among other things, the following steps: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors and financial projections relating to their business and prospects; (c) met with certain members of senior management of the Debtors to discuss the Debtors' operations and future prospects; (d) considered certain economic and real estate market information and surveys relevant to the Debtors' assets; and (e) reviewed such other information and conducted such other analyses as Houlihan Lokey deemed appropriate.

Although Houlihan Lokey conducted a review and analysis of the Debtors' business, assets, liabilities and projected business plan, Houlihan Lokey assumed and relied on the accuracy and completeness of all (a) financial and other information furnished to it by the Debtors and (b) publicly available information. Houlihan Lokey did not independently verify

any financial projections prepared by management of the Debtors in connection with its estimates of the Reorganized Value. Houlihan Lokey has assumed that such projections have been prepared reasonably, in good faith and on a basis reflecting the currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Debtors. Such projections assume that the New EWRD V Entities will operate the business reflected in the financial forecast and that the business will perform, and the state of the real estate markets will be, as expected in the financial forecast. To the extent that (i) real estate pricing and demand in the markets in which the Debtors operate recover more slowly or more quickly during the period contemplated in the projections or (ii) the costs of the New EWRD V Entities' developments are inconsistent with those expected by management in the financial forecast, such differences may have a material impact on the projections and the valuations as presented herein.

The hypothetical valuation was based on the estimated value of the projected operating and development cash flows of the New EWRD V Entities through the application of, among other analyses, a discounted cash flow analysis using a range of discount rates. In addition, given projected ongoing negative cash flows at the Club, Houlihan Lokey evaluated certain alternative uses of such club assets and potential cash flows from such alternative uses.

Selected discount rates were informed by (i) Houlihan Lokey's knowledge of required industry rate of returns; (ii) the pre-petition capital raising process that resulted in only one bid for the development with specific return parameters consistent with the selected range of discount rates; and (iii) the post-petition 363 asset sale process and limited, if any, bids received through such process. In addition, such discount rates were considered in light of significant projected near-term cash needs and funding requirements, including substantial holding costs and development expenditures required to achieve the Debtors' business plan. Moreover, Houlihan Lokey analyzed alternative uses for certain Tahoe Club assets based on market cap rates.

An estimate of the Reorganized Value is not entirely mathematical but, rather, involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Houlihan Lokey made judgments as to the relative significance of each analysis in determining the New EWRD V Entities' Reorganized Value range. Houlihan Lokey did not consider any one analysis or factor to the exclusion of any other analysis or factor. Houlihan Lokey's hypothetical valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the New EWRD V Entities' Reorganized Value.

THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR THE NEW EWRD V ENTITIES. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

LEGAL_US_E # 86966965.18

THE ESTIMATED CALCULATION OF REORGANIZED VALUE IS HIGHLY DEPENDENT UPON ACHIEVING THE FUTURE FINANCIAL RESULTS AS SET FORTH IN THE DEBTORS' BUSINESS PROJECTIONS, AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS, NONE OF WHICH ARE GUARANTEED AND MANY OF WHICH ARE OUTSIDE OF THE DEBTORS' CONTROL.

### e. Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

*No Unfair Discrimination.* This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

*Fair and Equitable Test.* This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

- *Unsecured Claims.* Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

- *Interests.* Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement, notwithstanding that Holders of Claims in Class 1.I (Gray's Priority Claims), Class 7.I (Gray's General Unsecured Claims), Classes 9.A through 9.K (Intercompany Claims) and Classes 10.A through 10.K (Interests and Interest Related Claims) are deemed to reject the Plan, because as to such Classes, there is no class of equal priority receiving more favorable treatment and no class that is junior to such a dissenting class will receive or retain any property on account of the claims or equity interests in such class.

LEGAL_US_E # 86966965.18

# ARTICLE XVII.

## EXEMPTION FROM SECURITIES LAWS

### A.    Exemption From Securities Laws

The Plan contemplates the issuance of New EWRD V Membership Interests (collectively, the "1145 Securities")[5] to certain holders of Claims.  In reliance upon section 1145 of the Bankruptcy Code, the offer and issuance of 1145 Securities will be exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), and equivalent provisions in state securities laws.  Section 1145(a) of the Bankruptcy Code generally exempts from such registration requirements the issuance of securities if the following conditions are satisfied:  (i) the securities are issued or sold under a chapter 11 plan by (a) a debtor, (b) one of its affiliates participating in a joint plan with the debtor or (c) a successor to a debtor under the plan and (ii) the securities are issued entirely in exchange for a claim against or interest in the debtor or such affiliate or are issued principally in such exchange and partly for cash or property.  The Debtors believe that the exchange of 1145 Securities for Claims against the Debtors under the circumstances provided in the Plan (other than with respect to entities deemed statutory underwriters, as described below) will satisfy the requirements of section 1145(a) of the Bankruptcy Code.

The 1145 Securities to be issued pursuant to the Plan will be deemed to have been issued in a public offering under the Securities Act and, therefore, may be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code (a "statutory underwriter") or an "affiliate" of the issuer within the meaning of the Securities Act.  In addition, such securities generally may be resold by the holders thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states.  However, holders of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(1) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (i) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (ii) offers to sell securities offered or sold under a plan for the holders of such securities, (iii) offers to buy securities offered or sold under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan or (iv) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include

---

[5]    1145 Securities shall not include securities received by underwriters in connection with the issuance of New EWRD V Membership Interests.

LEGAL_US_E # 86966965.18

as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144 or any other applicable exemption from registration.

Pursuant to no-action and interpretive guidance from the staff of the Securities and Exchange Commission (the "SEC"), an entity that is an "underwriter" pursuant to section 1145(b)(1) of the Bankruptcy Code, other than an "affiliate" of the issuer within the meaning of the Securities Act may nevertheless resell securities received under section 1145(a)(1) that are transferred in "ordinary trading transactions" made on a national securities exchange or in the over-the-counter markets, subject to the volume limitations contained in Rule 144 under the Securities Act. Persons that receive New EWRD V Membership Interests should note, however, that the Debtors and New EWRD V do not currently intend to list the New EWRD V Membership Interests on any exchange. What constitutes "ordinary trading transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the SEC. Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating to the plan, any amendments thereto and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934, as amended (the "Securities Exchange Act") or (iii) payment of special compensation to brokers or dealers in connection with the sale.

Resales by persons that receive 1145 Securities pursuant to the Plan who are "affiliates" of the issuer within the meaning of the Securities Act may be made without registration under the Securities Act by complying with the conditions contained in Rule 144, except for the holding period requirement of Rule 144(d). These conditions include the requirement that there be available current public information with respect to the issuer, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction," in a transaction directly with a "market maker" or in a "riskless principal transaction" and that notice of the resale be filed with the SEC. The Debtors cannot assure, however, that adequate current public information will exist with respect to New EWRD V, and therefore the safe harbor provisions of Rule 144 of the Securities Act may not be available. In addition, the Debtors and New EWRD V do not currently intend to list the New EWRD V Membership Interests on any exchange, and therefore the requirement that the securities be sold in a "brokers transaction," in a transaction directly with a "market maker" or in a "riskless principal transaction" may not be able to be satisfied and the safe harbor provisions of Rule 144 of the Securities may not be available for "affiliates."

Pursuant to the Plan, certificates evidencing New EWRD V Membership Interests received by Restricted Holders or by a holder that the Debtors determine is an underwriter within the meaning of section 1145 of the Bankruptcy Code will bear a legend substantially in the form below:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

Any Person entitled to receive New EWRD V Membership Interests who the Debtors or Reorganized EWRD V Entities determine to be a statutory underwriter that would otherwise receive legended securities as provided above, may instead receive certificates evidencing New EWRD V Membership Interests without such legend if, prior to the distribution of such securities, such person or entity delivers to the Debtors or New EWRD V Entities, as the case may be, (i) an opinion of counsel reasonably satisfactory to the Debtors or New EWRD V Entities, as the case may be, to the effect that the New EWRD V Membership Interests to be received by such person or entity are not subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code and may be sold without registration under the Securities Act and (ii) a certification that such person or entity is not an "underwriter" within the meaning of section 1145 of the Bankruptcy Code.

Any holder of a certificate evidencing 1145 Securities bearing such legend may present such certificate to the transfer agent for the 1145 Securities in exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such time as (i) such securities are sold pursuant to an effective registration statement under the Securities Act, (ii) such holder delivers to the Debtors or New EWRD V Entities, as the case may be, an opinion of counsel reasonably satisfactory to the Debtors or New EWRD V Entities to the effect that such securities are no longer subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code or (iii) such holder delivers to the Debtors or New EWRD V Entities, as the case may be, an opinion of counsel reasonably satisfactory to the Debtors or New EWRD V Entities to the effect that (x) such securities are no longer subject to the restrictions under the Securities Act and such securities may be sold without registration under the Securities Act or (y) such transfer is exempt from registration under the Securities Act and such securities may be sold without registration under the Securities Act, in which event the certificate issued to the transferee shall not bear such legend.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF NEW EWRD V ENTITIES, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND COMPLIANCE WITH THE FEDERAL AND STATE SECURITIES LAWS.

## B. New Money Investment and Management Investment

The Plan also contemplates that (i) the Debtors will acquire a New Money Investment on terms mutually agreed to by the Debtors and the new Money Investors and consistent with the New Money Definitive Documents and (ii) EW Investor will make the EW Investment. The Debtors believe that any New EWRD V Membership Interests issued pursuant to the New Money Investment as provided under the Plan will be exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act and Regulation D promulgated thereunder, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws. Thus, the New EWRD V Membership Interests being issued in the New Money Investment are "restricted securities" within the meaning of Rule 144 under the Securities Act and accordingly may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except in transactions that are exempt from, or in transactions not subject to, the registration requirements of the Securities Act and in compliance with any applicable state securities laws. The New EWRD V Membership Interests issued in the new Investment shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

The Holders of New EWRD V Membership Interests issued under the Plan shall also be restricted from trading such New EWRD V Membership Interests as provided in the Operating Agreement.

## ARTICLE XVIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan of reorganization.

## A. Liquidation Under Chapter 7

If no plan can be confirmed, or if certain Debtors do not receive the requisite consents to support the Plan, the Debtors' chapter 11 cases may, in whole or in part, be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a trustee and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

## B. Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different chapter 11 plan of reorganization. Such a plan of reorganization might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets under chapter 11. With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in chapter 7. Further, if a trustee were not appointed, because such appointment is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case. Although preferable to a chapter 7 liquidation, the Debtors believe that any alternative liquidation under chapter 11 is a much less attractive alternative to creditors and equity holders than the Plan because of the greater return provided by the Plan.

## ARTICLE XIX.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims and Interests. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. In addition, this summary does not address foreign, state or local tax consequences of the Plan or federal taxes other than income taxes. Furthermore, the U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt.

Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances of a holder of a Claim or an Interest.

## A. Federal Income Tax Consequences to Holders of Claims

The following discussion is a summary and does not address all of the tax consequences that may be relevant to Holders of Claims. Among other things, this summary does not address the U.S. federal income tax consequences of the Plan to Holders whose Claims are Unimpaired, Impaired by Agreement or who are otherwise entitled to payment in full in Cash under the Plan. In addition, this summary does not address foreign, state or local tax consequences of the Plan or federal taxes other than income taxes, nor does this discussion address the income tax

97

consequences of the Plan to special classes of Holders (such as broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, persons holding an interest as part of an integrated constructive sale or straddle, persons whose Claims are not held as a capital asset and investors in pass-through entities that hold Claims or interests). This summary does not discuss the tax consequences of the Plan to Holders that are not U.S. persons. A "Non-U.S. person" is any person or entity (other than a partnership) that is not a U.S. person. For purposes of this discussion, a "U.S. person" is:

- an individual who is a U.S. citizen or U.S. resident alien;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate whose income is subject to U.S. federal income taxation regardless of its source; or

  - a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or that has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a U.S. person.

The tax treatment of a partner (or other owner) of a partnership (or other pass-through entity) generally will depend upon the status of the partner or owner and the activities of the partnership or other entity. U.S. persons who are owners of a partnership or other pass-through entity that hold Claims or Interests should consult their tax advisors regarding the tax consequences of the Plan.

Unless otherwise noted below, the term "Holder" means a holder of a Claim that is a U.S. person. The U.S. federal income tax consequences of the Plan to Holders of Claims will depend upon, among other things, (1) the manner in which a Holder acquired its Claim; (2) the length of time the Claim was held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has claimed a bad debt deduction with respect to the Claim (or any portion thereof); (5) whether the Holder has previously included in income accrued but unpaid interest on the Claim; (6) the method of tax accounting used by the Holder; (7) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (8) whether the Claim is a "security" for federal income tax purposes.

The term "security" is not defined in the Tax Code or applicable Treasury Regulations. The determination of whether a particular debt constitutes a "security" generally depends on an overall evaluation of the nature of the original debt. One of the most significant factors is the original term of the debt. In general, debt obligations issued with a weighted average maturity at issuance of five years or less (*e.g.*, trade debt and revolving credit obligations) do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute securities.

LEGAL_US_E # 86966965.18

Holders of Claims may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year, with respect to their Claims, to the extent permitted under the Holder's method of accounting. Holders should consult their tax advisors with respect to the availability of a bad debt deduction.

### 1. Federal Income Tax Consequences to Holders of Class 2, Class 3, Class 4, Class 5 and Class 6 Claims

Pursuant to the Plan, each Holder of an Allowed Class 2, Class 3, Class 4, Class 5 or Class 6 Claim may, at the option of the Debtors, receive certain collateral and possibly Cash in satisfaction of their Claims. In this case, the Holder of such Claim will recognize gain or loss equal to the difference between the "amount realized" by such Creditor and such Creditor's adjusted tax basis in such Creditors' Claim. The "amount realized" by such Creditor would be equal to the sum of (i) the fair market value of the collateral received, and (ii) the total Cash received in satisfaction of the Claim. Any gain or loss realized by such Creditor should constitute ordinary income or loss to such Creditor unless such Claim is a capital asset in the hands of such Creditor. If a Claim is a capital asset and it has been held for more than one year, such Creditor will realize long-term capital gain or loss. The Creditor's would receive an adjusted tax basis in the collateral equal to such collateral's fair market value at the time of the transfer.

### 2. Federal Income Tax Consequences to Holders of Allowed General Unsecured Claims

Pursuant to the Plan, each Holder of an Allowed General Unsecured Claim will receive Cash in satisfaction of their Claims. Each Holder of an Allowed General Unsecured Claim will recognize gain or loss upon receipt of Cash equal to the difference between the Cash received by such Creditor and such Creditor's adjusted tax basis in such Creditor's Claim. Any gain or loss realized by such Creditor should constitute ordinary income or loss to such Creditor unless such Claim is a capital asset in the hands of such Creditor. If a Claim is a capital asset and it has been held for more than one year, such Creditor will realize long-term capital gain or loss.

### 3. Federal Income Tax Consequences to Holders of Intercompany Claims and Interest Related Claims

Pursuant to the Plan, Holders of Intercompany Claims or Interest Related Claims will not receive anything on account of such Claim and will recognize loss in an amount equal to such Holder's adjusted tax basis in the Claim. The character of any recognized loss will depend upon several factors, including, but not limited to, the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim.

### 4. Distributions in Respect of Accrued but Unpaid Interest

The receipt of consideration attributable to a Claim for accrued but unpaid interest or original issue discount ("OID") will be taxed as interest income if the Holder did not previously include the accrued interest in income for U.S. federal income tax purposes. Conversely, a

Holder recognizes a deductible loss to the extent accrued interest that was previously included in income for U.S. federal income tax purposes is not paid in full. It is uncertain whether an ordinary loss deduction is allowable for OID that was previously included in income for U.S. federal income tax purposes and is not paid in full. The IRS has taken the position that a holder of a security, in an otherwise tax-free exchange, cannot claim a current deduction for unpaid OID. The IRS may also take the position that the security holder would recognize a capital loss, rather than an ordinary loss, in a taxable exchange in which OID that was previously included in income is not paid in full.

Consistent with the Plan, for U.S. federal income tax purposes, the Debtors intends to allocate Plan consideration first to the principal amount of a Holder's Claim, as determined for U.S. federal income tax purposes and, only when such principal amount has been paid in full, to accrued interest or OID, if any, on the Claim. However, there is no assurance such allocation will be respected by the IRS. Holders are urged to consult their tax advisors regarding the allocation of consideration received under the Plan between principal and interest.

## B.      Federal Income Tax Consequences to Holders of Interests

Pursuant to the Plan, Holders of Interests will not receive anything on account of such Interest and will recognize loss in an amount equal to such Holder's adjusted tax basis in the Interest. The character of any recognized loss will depend upon several factors, including, but not limited to, the status of the Holder, the nature of the Interest in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Interest.

## C.      Information Reporting and Withholding

Distributions under the Plan are subject to applicable tax reporting and withholding. Under U.S. federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at then applicable rates (currently 28%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN it provided is correct and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax, provided the required information is timely provided to the IRS. Certain persons are exempt from backup withholding, including, in most circumstances, corporations and financial institutions.

Treasury Regulations generally require a taxpayer to disclose certain transactions on its U.S. federal income tax return, including, among others, certain transactions that result in a taxpayer claiming a loss in excess of a specified threshold. Holders are urged to consult their tax advisors as to whether the transactions contemplated by the Plan would be subject to these or other disclosure or information reporting requirements.

LEGAL_US_E # 86966965.18

THE FOREGOING SUMMARY IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY. HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

## ARTICLE XX.

## DEFINITIONS AND INTERPRETATION

### A.    Defined Terms

Unless otherwise provided in this Disclosure Statement, all terms used herein shall have the meanings assigned to such terms in the Bankruptcy Code or the Bankruptcy Rules.  For the purposes of this Disclosure Statement, the following terms (which appear in the Plan and Disclosure Statement in capitalized form) shall have the meanings set forth below, and such meanings shall be equally applicable to the singular and to the plural form of the terms defined, unless the context otherwise requires.

1.    **"Administrative Claim"** shall mean any Claim for costs and expenses of administration of these Chapter 11 Cases with priority under Bankruptcy Code section 507(a)(2), including, without limitation, costs and expenses allowed under Bankruptcy Code section 503(b), the actual and necessary costs and expenses of preserving the Estates of the Debtors, any Claim arising under Bankruptcy Code section 503(b)(9) with respect to which an Administrative Expense Request was filed on or prior to the Bar Date established for Claims, any claim relating to the right of reclamation to the extent afforded such priority under the Bankruptcy Code, any Professional Fee Claims, and any fees or charges assessed against the Estates of the Debtors under 28 U.S.C. §1930.

2.    **"Administrative Expense Request"** shall mean a request for allowance and/or payment of an Administrative Claim in the form to be attached to the Confirmation Order.

3.    **"Administrative Expense Request Deadline"** shall mean the date set by the Confirmation Order as the deadline for filing Administrative Expense Requests for Administrative Claims (excluding Professional Fee Claims) that are not subject to the Bar Date Order, which deadline shall be thirty (30) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

4.    **"Affiliate"** has the meaning set forth at section 101(2) of the Bankruptcy Code.

5.    **"Allowed"** shall mean with respect to any Claim or Interest, respectively, a Claim or Interest that: (a) has been allowed by a Final Order of the Bankruptcy Court; (b) has been Scheduled, other than a Claim that is Scheduled as disputed, contingent or unliquidated, which Scheduled claim has not been superseded by filed Proof of Claim; (c) is the subject of a timely Proof of Claim that has been filed as of the relevant Bar Date and no objection thereto, or motion to subordinate, disallow or otherwise limit recovery, has been made prior to the claim objection deadline provided in Article VII of the Plan; or (d) has been specifically "Allowed" pursuant to the Plan. An "Allowed Claim" shall not include interest on the amount of any Claim

101

except (i) with respect to an Allowed Claim filed pursuant to Bankruptcy Code section 506(b), (ii) as specifically provided in the Plan, or (iii) as provided by Final Order of the Bankruptcy Court. If the Debtors shall object to any Claim in accordance with section 502(d) of the Bankruptcy Code, such Claim shall not be an Allowed Claim until the avoidable transfer is returned, a Final Order has been entered that no avoidable transfer exists, or an agreement or settlement is reached that is approved by the Bankruptcy Court or pursuant to provisions in the Plan.

6. **"Allowed [_____] Claim" or "Allowed [_____] Interest"** shall mean an Allowed Claim or Allowed Interest, as the case may be, of a specified Class or an Allowed Claim that is an Administrative Claim, Priority Tax Claim, Priority Claim, General Unsecured Claim, Convenience Class Claim or Interest Related Claim, as the case may be.

7. **"Assumed Contracts Schedule"** shall mean the list of Executory Contracts assumed by the New EWRD V Entities, which list will be included in the Plan Supplement.

8. **"Avoidance Action(s)"** shall mean all claims and Causes of Action arising under chapter 5 of the Bankruptcy Code.

9. **"Bankruptcy Code"** shall mean the Bankruptcy Reform Act of 1978, as amended and codified in Title 11 of the United States Code, as in effect on the Petition Date or thereafter amended and applicable to the Chapter 11 Cases, as the case may be.

10. **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of Delaware or any court having competent jurisdiction over the Chapter 11 Cases.

11. **"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure effective in accordance with the provisions of 28 U.S.C. §2075, as in effect on the Petition Date or thereafter amended and applicable to the Chapter 11 Cases, as the case may be.

12. **"Barclays"** shall mean Barclays Bank PLC.

13. **"Bar Date"** shall mean April 14, 2010 at 5:00 p.m. (prevailing Eastern Time), and such other date(s) fixed by order(s) of the Bankruptcy Court, by which all Persons, excluding governmental units, asserting a pre-petition Claim must have filed a Proof of Claim or be forever barred from asserting such Claim.

14. **"Bar Date Order"** shall mean that certain order of the Bankruptcy Court establishing April 14, 2010 at 5:00 p.m. (prevailing Eastern Time), as the Bar Date for filing Proofs of Claim, with only those exceptions permitted thereby.

15. **"BCRE"** shall mean Barclays Capital Real Estate, Inc.

16. **"Big Horn"** shall mean Northstar Big Horn, LLC.

17. **"BofA"** shall mean Bank of America, National Association.

LEGAL_US_E # 86966965.18

18. **"BofA Construction Loan"** shall mean that certain construction loan agreement between Hotel LLC and BofA.

19. **"BofA Land Loan"** shall mean that certain land loan agreement between Residences LLC and BofA.

20. **"Booth Creek"** shall mean Booth Creek Ski Holdings Inc.

21. **"Bonds"** shall mean, collectively, the Mello-Roos Bonds and Series A Bonds.

22. **"Business Day"** shall mean a day other than Saturday, Sunday, a legal holiday as defined in Bankruptcy Rule 9006(a) or other day on which the Bankruptcy Court is authorized or required by law to close.

23. **"Cash"** shall mean cash and cash equivalents (including, but not limited to, bank deposits, checks and similar items) in certified or immediately available funds.

24. **"Causes of Action"** shall mean all claims, causes of action, third-party claims, counterclaims and crossclaims (including but not limited to any Causes of Action described in the Disclosure Statement) of the Debtors and/or their Estates that are pending on the Effective Date or may be instituted after the Effective Date against any Person.

25. **"Chapter 11 Cases"** shall mean the above-captioned chapter 11 cases of the Debtors pending in the Bankruptcy Court and jointly administered under Case No. 10-10452 (BLS).

26. **"Citizens"** shall mean Citizens Bank of Northern California.

27. **"Citizens Collateral"** shall mean the collateral securing the Citizens Facility.

28. **"Citizens Facility"** shall mean that certain credit agreement dated as of July 16, 2007 by and among Gray's and Citizens.

29. **"Citizens Model Collateral"** shall mean the collateral securing the Citizens Model Facility.

30. **"Citizens Model Facility"** shall mean that certain credit agreement dated as of December 26, 2006 by and among Greenwood and Citizens.

31. **"Citizens Model Secured Claim"** shall mean all claims of Citizens against any of the Debtors and/or their Estates that arise from or relate to the Citizens Model Facility.

32. **"Citizens Secured Claim"** shall mean all claims of Citizens against any of the Debtors and/or their Estates that arise from or relate to the Citizens Facility.

LEGAL_US_E # 86966965.18

33. **"Claims"** shall mean any claim(s) against the Debtors or any of them as such term is defined in section 101(5) of the Bankruptcy Code.

34. **"Class"** shall mean any category of Holders of Claims or Interests specified in Article II.B of the Plan.

35. **"Club"** shall mean Tahoe Club Company, LLC.

36. **"Confirmation Date"** shall mean the date on which the Confirmation Order is entered on the docket in the Chapter 11 Cases by the Bankruptcy Court.

37. **"Confirmation Hearing"** shall mean the hearing at which the Bankruptcy Court considers confirmation of the Plan.

38. **"Confirmation Order"** shall mean the order of the Bankruptcy Court confirming the Plan and approving the transactions contemplated herein, pursuant to section 1129 of the Bankruptcy Code.

39. **"Contingent Claim"** shall any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the Debtor now or hereafter exists or previously existed.

40. **"Convenience Class Claims"** are General Unsecured Claims of a single holder of a type that (A) would otherwise be included in Classes 7.B, 7.G, 7.J and 7.K(a) that are either (i) $1,000 or less in the aggregate or (ii) greater than $1,000 in the aggregate, but as to which the holder thereof has made a Convenience Class Election.

41. **"Convenience Class Election"** shall mean the election on the ballot for voting to accept the Plan by a single holder of General Unsecured Claims that are greater than $1,000 in the aggregate to have such General Unsecured Claims treated as a single Convenience Class Claim. Holders of Claims making the Convenience Class Election are deemed to have accepted the Plan and are not entitled to vote on the Plan.

42. **"CRDI"** shall mean Crescent Resort Development, Inc., including, without limitation, any affiliates or subsidiaries that are created to effectuate the transactions contemplated in the Plan.

43. **"Creditor"** shall have the meaning set forth in section 101(10) of the Bankruptcy Code.

44. **"Debtors"** shall mean, collectively, EWRD V, NMPH, NMP, Iron Horse, Big Horn, Village Townhomes, Trailside Townhomes, Greenwood, Realty, Gray's, Resorts and Club.

LEGAL_US_E # 86966965.18

45. **"DIP Borrowers"** shall mean, collectively, EWRD V, NMPH, Trailside Townhomes, Greenwood, Club and NMP.

46. **"DIP Facility"** shall mean that certain debtor-in-possession financing and security agreement dated as of February 18, 2010, by and among the DIP Borrowers and the DIP Lenders.

47. **"DIP Lenders"** shall mean Barclays, in its capacity as a DIP Lender and agent for the DIP Lenders, and any other lenders identified in the DIP Facility.

48. **"DIP Lenders Collateral"** shall mean the collateral securing the DIP Facility.

49. **"DIP Lenders Secured Claim"** shall mean all claims of the DIP Lenders against any of the Debtors and/or their Estates that may arise from or relate to the DIP Facility.

50. **"Disallowed Claim"** shall mean a Claim or any portion thereof that (a) has been disallowed by a Final Order, (b) is Scheduled as zero or as contingent, disputed or unliquidated and as to which no Proof of Claim or Administrative Expense Request has been timely filed or deemed timely filed, (c) is not Scheduled and as to which no Proof of Claim or Administrative Expense Request has been timely filed or deemed timely filed with the Voting and Claims Agent, (d) has been withdrawn by agreement of the Holder thereof and the Debtors, or (e) has been withdrawn by the Holder thereof.

51. **"Disbursing Agent"** shall mean any entity retained as disbursing agent in the Confirmation Order.

52. **"Disclosure Statement"** shall mean that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

53. **"Disputed Claim"** shall mean a Claim or any portion thereof that is neither an Allowed Claim nor a Disallowed Claim, including, without limitation, all Claims that (i) have not been Scheduled by the Debtors or have been Scheduled as unknown, contingent, unliquidated, disputed or at zero, and no Proof of Claim has been filed with respect to such Claim, or (ii) are the subject of an objection or other challenge or Cause of Action filed with the Bankruptcy Court, which has not been withdrawn or overruled by a Final Order of the Bankruptcy Court; provided, however, that a Claim shall not be a Disputed Claim to the extent it becomes an Allowed Claim or a Disallowed Claim.

54. **"Dissolving Subsidiaries"** shall mean, collectively, each of NMPH, Iron Horse and Big Horn.

55. **"Distribution"** shall mean the distribution, in accordance with the Plan, of Cash or other property, as the case may be, or the Cash or other property as distributed.

56.    **"Distribution Date"** shall mean the date after all Claims or Interests have either been Allowed or Disallowed in a particular Class.

57.    **"Districts"** shall mean, collectively, Gray's District, Greenwood District and Northstar District.

58.    **"East West"** shall mean East West Partners, Inc., or an affiliate thereof.

59.    **"Effective Date"** shall mean the first Business Day after the Confirmation Order has become a Final Order, or such earlier or later date agreed to by the Debtors and the New Money Investors.

60.    **"Estates"** shall mean the estates of the Debtors created by section 541 of the Bankruptcy Code.

61.    **"EW Investor"** shall mean East West or an affiliate thereof.

62.    **"EW Promoted Investor"** shall mean East West or an affiliate thereof, other than the EW Investor.

63.    **"EWRD IX"** shall mean East West Resort Development IX, L.P., L.L.L.P.

64.    **"EWRD V Partnership Agreement"** shall mean that certain amended and restated limited partnership agreement of EWRD V dated as of July 1, 2004, as amended, supplemented and restated.

65.    **"EWRD V Sub-Manager"** shall mean East West in its role as sub-manager of the Reorganized Subsidiaries pursuant to the Submanagement Agreements.

66.    **"EWRD V"** shall mean East West Resort Development V., L.P., L.L.L.P.

67.    **"EWRD VIII"** shall mean East West Resort Development VIII, L.P., L.L.L.P.

68.    **"Executory Contract"** shall mean any executory contract or unexpired lease subject to section 365 of the Bankruptcy Code, between any Debtor and any other Person.

69.    **"Face Amount"** shall mean (i) when used in reference to a Disputed or Disallowed Claim, the full stated liquidated amount, not including interest, claimed by the Holder of such Claim in any Proof of Claim timely filed or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and (ii) when used in reference to an Allowed Claim, the allowed amount of such Claim.

70.    **"Final Decree"** shall mean the decree contemplated under Bankruptcy Rule 3022.

71. **"Final Order"** shall mean an order or judgment of the Bankruptcy Court as entered on the docket of the Chapter 11 Cases that has not been reversed, stayed, modified or amended and as to which the time to appeal, petition for certiorari, or to seek reargument, reconsideration, amended findings or conclusions, or rehearing has run or as to which any right to appeal, reargue, petition for certiorari or to seek rehearing, reconsideration, amended findings or conclusions, has been waived in writing or, if an appeal, petition for certiorari, request for reargument, reconsideration, amended findings or conclusions, or rehearing thereof has been pursued or granted then such an appeal, reargument, reconsideration, request for amended findings or conclusions, petition for certiorari or rehearing has been denied, and the time to take any further appeal or to seek certiorari or further reargument, reconsideration, amended findings or conclusions, or rehearing has expired. Notwithstanding, and in lieu of the foregoing, insofar as the Confirmation Order confirming the Plan is concerned, Final Order means such order or judgment with respect to which no stay is in effect.

72. **"Full Golf Membership"** shall mean that certain type of membership in the Tahoe Club commonly referred to as *"Full Golf Membership."*

73. **"General Unsecured Claim"** shall mean any Claim that is not an Administrative Claim, Priority Claim, Priority Tax Claim, Convenience Class Claim, Intercompany Claim or Interest Related Claim.

74. **"Golf Member"** shall mean any member of the Tahoe Club who has a Full Golf Membership or a Signature Golf Membership.

75. **"Golf Member Club General Unsecured Claim"** shall mean any General Unsecured Claim arising from a Golf Club Member's membership in the Club.

76. **"Governmental Bar Date"** shall mean September 11, 2010 at 5:00 p.m. prevailing Eastern time.

77. **"Gray's"** shall mean Gray's Station, LLC.

78. **"Gray's District"** shall mean the Truckee Donner Public Utility District Gray's Crossing Community Facilities District No. 04-1.

79. **"Gray's Mello-Roos Bonds"** shall mean those certain bonds issued pursuant to the terms and provisions of the Mello-Roos Act to finance the development and construction of land improvements and public utilities at the Gray's Property.

80. **"Gray's Property"** shall mean the land improvements and public utilities at Gray's District.

81. **"Greenwood"** shall mean Old Greenwood, LLC.

82. **"Greenwood District"** shall mean the Truckee Donner Public Utility District Old Greenwood Community Facilities District No. 03-1.

83. **"Greenwood Mello-Roos Bonds"** shall mean those certain bonds issued pursuant to the terms and provisions of the Mello-Roos Act to finance the development and construction of land improvements and public utilities at the Greenwood Property.

84. **"Greenwood Property"** shall mean the land improvements and public utilities at Greenwood District.

85. **"HF Holding"** shall mean HF Holding Corp.

86. **"Holder"** shall mean the owner or holder of any Claim or Interest.

87. **"Hotel LLC"** shall mean Highlands Hotel Company, LLC, a wholly-owned indirect subsidiary of EWRD IX.

88. **"Hotel Holding LLC"** shall mean Highlands Hotel Holding Company, LLC, a wholly-owned subsidiary of EWRD IX.

89. **"Impaired"** shall have the meaning set forth in section 1124 of the Bankruptcy Code.

90. **"Intercompany Claim"** shall mean a Claim of any Debtor against any other Debtor, regardless of whether such Claim arose before, on or after the Petition Date.

91. **"Interest Related Claim"** shall mean any Claim, including pursuant to section 510(b) of the Bankruptcy Code, against the Debtors arising from the purchase or sale of an Interest in the Debtors, or any Claim against the Debtors by a Person that asserts equitable or contractual rights of reimbursement, contribution or indemnification arising from such Claim.

92. **"Interest"** shall mean, with respect to any Debtor, any "equity security" as such term is defined in section 101(16) of the Bankruptcy Code. Interest shall also include, without limitation, all stock, partnership, membership interest, warrants, options or other rights to purchase or acquire any equity interests in the Debtors.

93. **"Iron Horse"** shall mean Northstar Iron Horse, LLC.

94. **"IRS"** shall mean the Internal Revenue Service.

95. **"JPMorgan"** shall mean JPMorgan Chase Bank, N.A.

96. **"JPMorgan Collateral"** shall mean the collateral securing the JPMorgan Facility.

97. **"JPMorgan Facility"** shall mean that certain credit agreement dated as of March 31, 2004 by and among Greenwood and JPMorgan.

98. **"JPMorgan Secured Claim"** shall mean all claims of JPMorgan against any of the Debtors and/or their Estates that arise from or relate to the JPMorgan Facility.

LEGAL_US_E # 86966965.18

99.   **"Lien"** shall mean any lien, mortgage, charge, security interest, right of first refusal, option, nonexecutory purchase agreement, pledge or other encumbrance against or interest in property to secure payment or performance of a claim, debt or litigation.

100.   **"Local Rules"** shall mean Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

101.   **"Manor Vail Construction Loan"** shall mean that certain loan agreement between MV Penthouses, LLC and BofA.

102.   **"Mello-Roos Act"** shall mean that certain Mello-Roos Community Facilities Act of 1982, California Government Code Sections 53311 *et seq.*

103.   **"Mello-Roos Bonds"** shall mean, collectively, the Gray's Mello-Roos Bonds, Greenwood Mello-Roos Bonds and Northstar Mello-Roos Bonds.

104.   **"NCHC"** shall mean Northstar Community Housing Corporation.

105.   **"New EWRD V"** the new Delaware limited liability company that will replace EWRD V as the holding company and be the 100% owner of the Reorganized Subsidiaries except as otherwise set forth in the Plan.

106.   **"New EWRD V Assets"** shall mean (i) any assets held by the Debtors prior to and after the Petition Date, (ii) those Executory Contracts listed on the Assumed Contracts Schedule.

107.   **"New EWRD V Certificate of Formation"** shall mean the certificate of formation of New EWRD V.

108.   **"New EWRD V Entities"** shall mean, collectively, New EWRD V and the Reorganized Subsidiaries.

109.   **"New EWRD V Manager"** shall mean a new entity created, owned and controlled by East West, in its role as manager of the Projects pursuant to the New EWRD V Operating Agreement, or the Reorganized Management Agreement, as agreed by the parties.

110.   **"New EWRD V Operating Agreement"** shall mean the limited liability operating agreement of New EWRD V, which will be included in the Plan Supplement.

111.   **"New EWRD V Membership Interests"** shall mean the membership interests of New EWRD V to be issued pursuant to the Plan.

112.   **"New EWRD V Sub-Manager"** shall mean East West in its role as sub-manager of the Projects pursuant to the New Submanagement Agreements.

113.   **"New Money Investment"** shall mean the New Money Investors' investment in the New EWRD V Entities pursuant to the Plan.

LEGAL_US_E # 86966965.18

114. **"New Money Investors"** shall mean CRDI, or an affiliate thereof, and EW Investor, or an affiliate thereof.

115. **"New Submanagement Agreements"** shall mean the submanagement agreements between New Sub-Manager and certain of the Reorganized Subsidiaries, the forms of which will be included in the Plan Supplement.

116. **"NMP"** shall mean Northstar Mountain Properties, LLC.

117. **"NMP Operating Agreement"** shall mean that certain operating agreement of NMP dated as of September 22, 2000 and in effect on the Petition Date between TLH and NMPH, as amended and supplemented.

118. **"NMPH"** shall mean NMP Holdings, LLC.

119. **"Northstar District"** shall mean the Northstar Community Services District Community Facilities District No. 1.

120. **"Northstar Mello-Roos Bonds"** shall mean those certain bonds issued pursuant to the terms and provisions of the Mello-Roos Act to finance the development and construction of land improvements and public utilities at the Northstar Property.

121. **"Northstar Property"** shall mean land improvements and public utilities at Northstar Village and Northstar Highlands.

122. **"Person"** shall mean any individual, corporation, limited liability company, general partnership, limited partnership, limited liability partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government or any political subdivision thereof or other entity.

123. **"Petition Date"** shall mean February 16, 2010, the date the Debtors commenced the Chapter 11 Cases.

124. **"Plan"** shall mean this Joint Chapter 11 Plan of Reorganization (as the same may be modified or amended by the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules) and any exhibits hereto and any documents incorporated herein by reference.

125. **"Plan Supplement"** shall mean the supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan, including without limitation the Assumed Contract Schedule, the New EWRD V Operating Agreement, the New Submanagement Agreements and the Reorganized Management Agreement.

126. **"Plumas"** shall mean Plumas Bank.

127. **"Plumas Collateral"** shall mean the collateral securing the Plumas Facility.

LEGAL_US_E # 86966965.18

128. **"Plumas Facility"** shall mean that certain credit agreement dated as of December 19, 2005 by and among Greenwood and Plumas.

129. **"Plumas Loan Documents"** means all documents, including the Plumas Facility, evidencing, governing and securing the loan from Plumas to Greenwood, as amended from time to time.

130. **"Plumas Secured Claim"** shall mean all claims of Plumas against any of the Debtors and/or their Estates that arise from or relate to the Plumas Facility.

131. **"Post-Confirmation Expense"** shall mean any fees, costs and expenses (including, without limitation, U.S. Trustee's fees, attorneys' fees, the fees of other professionals, and any taxes imposed on the New EWRD V Assets) necessary to complete the reorganization of the Debtors and their Estates after the Effective Date.

132. **"Priority Claim"** shall mean a Claim entitled to priority pursuant to section 507 of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim.

133. **"Priority Tax Claim"** shall mean any tax Claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

134. **"Pro Rata"** shall mean the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes, unless the Plan provides otherwise.

135. **"Professional Fee Claim"** shall mean (i) all fees and expenses claimed by Professionals accrued on or before the Effective Date which remain unpaid as of the Effective Date and (ii) any fees and expenses accrued by counsel to the Debtors subsequent to the Effective Date in connection with the prosecution, including prosecution or resolution of any dispute or objection, of any final application for fees and expenses.

136. **"Professional"** shall mean a Person (i) employed by the Debtors pursuant to a Final Order in accordance with sections 327, 328 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (ii) for which compensation and reimbursement has been Allowed under section 503(b)(4) of the Bankruptcy Code by the Bankruptcy Court pursuant to a Final Order.

137. **"Project"** shall mean real estate owned in whole or in part by a Debtor or an entity in which a Debtor owns an interest, directly or indirectly.

138. **"Proof of Claim"** shall mean a proof of claim filed in the Chapter 11 Cases pursuant to section 501 of the Bankruptcy Code and/or any order of the Bankruptcy Court, together with supporting documents.

139. **"Protected Party"** shall mean any of the Debtors, the Estates, New EWRD V, the New Money Investors, the DIP Lenders and the Support Parties and their

111

respective officers, directors, current (but not former) employees, members, shareholders, advisors, attorneys, representatives, professionals and other agents.

140.    **"PSA"** shall mean that certain plan support agreement dated as of February 12, 2010 by and among the Debtors, HF Holding, Barclays, CRDI and TLH.

141.    **"Realty"** shall mean Old Greenwood Realty, Inc.

142.    **"Reorganized Management Agreement"** shall mean the management agreement between New EWRD V Manager and New EWRD V, the form of which will be included in the Plan Supplement.

143.    **"Reorganized NMP"** shall mean NMP in the form that it shall have on and after the Effective Date after the implementation of the Plan.

144.    **"Reorganized Subsidiaries"** shall mean, collectively, each of NMP, Greenwood, Club, Village Townhomes, Resorts, Realty and Trailside Townhomes in the form that each shall have on and after the Effective Date after the implementation of the Plan.

145.    **"Residences LLC"** shall mean Highlands Hotel Residences, LLC, a wholly-owned indirect subsidiary of EWRD IX.

146.    **"Resorts"** shall mean Tahoe Mountain Resorts, LLC.

147.    **"Scheduled"** with respect to any Claim, shall mean listed on the Schedules.

148.    **"Schedules"** shall mean the Statements of Financial Affairs and Schedules of Assets and Liabilities filed by the Debtors with the Bankruptcy Court in the Chapter 11 Cases under Bankruptcy Rule 1007, as such Statements of Financial Affairs and Schedules of Assets and Liabilities have been or may be amended or supplemented from time to time.

149.    **"Secretary of State"** shall mean the Secretary of State of the State of Delaware.

150.    **"Secured Claims"** shall mean, collectively, the DIP Lenders Secured Claim, the Citizens Secured Claim, the Citizens Model Secured Claim, the JPMorgan Secured Claim, the Plumas Secured Claim and the SocGen Secured Claim.

151.    **"Secured Tax Claims"** means any secured claim against a Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

152.    **"Series A Bonds"** shall mean those certain Variable Rate MultiFamily Housing Project Revenue Bonds, Series 2006A bonds issued by the NHCH to finance the acquisition and construction of real and personal property, buildings and improvements for approximately 96 housing units known as *"Sawmill Heights."*

153. **"Signature Golf Membership"** shall mean that certain type of membership in the Tahoe Club commonly referred to as *"Signature Golf Membership."*

154. **"SocGen"** shall mean Societe Generale.

155. **"SocGen Collateral"** shall mean the collateral securing the SocGen Facility.

156. **"SocGen Facility"** shall mean that certain credit agreement dated as of July 29, 2005 by and among Gray's and SocGen.

157. **"SocGen Loan Documents"** shall mean all documents, including the SocGen Facility, evidencing, governing and securing the loan from SocGen to Gray's, as amended from time to time.

158. **"SocGen Secured Claim"** shall mean all claims of SocGen against any of the Debtors and/or their Estates that arise from or relate to the SocGen Facility.

159. **"Sports Member"** shall mean any member of the Tahoe Club who has a Sports Membership.

160. **"Sports Membership"** shall mean that certain type of membership in the Tahoe Club commonly referred to as *"Sports Membership."*

161. **"Submanagement Agreements"** shall mean those certain submanagement agreements between the Projects and East West.

162. **"Support Party"** shall mean any party to the PSA.

163. **"Tahoe Club"** shall mean that certain recreational club operated by the Club.

164. **"TLH"** shall mean Trimont Land Holdings, Inc.

165. **"Trailside Townhomes"** shall mean Northstar Trailside Townhomes, LLC.

166. **"Unliquidated Claim"** shall mean any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

167. **"US Bank"** shall mean U.S. Bank, N.A.

168. **"US Bank Facility"** shall mean that certain credit agreement dated as of September 20, 2006 by and among Trailside Townhomes and US Bank.

169. **"U.S. Trustee"** shall mean the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in Region 3.

LEGAL_US_E # 86966965.18

170. **"Village Townhomes"** shall mean Northstar Village Townhomes LLC.

171. **"Voting and Claims Agent"** shall mean Epiq Bankruptcy Solutions, LLC, the Court appointed claims, noticing and balloting agent in these jointly administered Chapter 11 Cases.

172. **"Voting Deadline"** shall mean the date set by order of the Bankruptcy Court as the deadline for the return of Ballots accepting or rejecting the Plan.

## B.    Other Terms

The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to this Disclosure Statement as a whole and not to any particular article, section or clause contained in this Disclosure Statement. A reference to an "Article" refers to an Article, or referenced portion thereof, of this Disclosure Statement. A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in or by the Bankruptcy Code. The rules of construction set forth in section 102 of the Bankruptcy Code shall apply in constructing this Disclosure Statement.

## C.    Exhibits

All Exhibits to the Plan and the Plan Supplement are incorporated by reference into and are made a part of this Disclosure Statement as if set forth in full herein.

114

# ARTICLE XXI.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge Holders of Impaired Claims in Classes 2, 3, 4, 5, 6, 7.A, 7.B, 7.C, 7.D, 7.E, 7.F, 7.G, 7.H, 7.J, 7.K(a) and 7.K(b) to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than 4:00 (prevailing Eastern Time) on May 21, 2010.

[remainder of page intentionally left blank]

LEGAL_US_E # 86966965.18

Dated: April 15, 2010
　　　　 Wilmington, Delaware

Respectfully submitted,

**NMP HOLDINGS, LLC**,
a Delaware limited liability company, its Manager

By:　 EAST WEST RESORT DEVELOPMENT V, L.P., L.L.L.P.,
　　　 a Delaware limited partnership registered as a limited liability
　　　 limited partnership, its member and Manager

　　　 By:　 HF HOLDING CORP.,
　　　　　　 a Colorado corporation, its sole General Partner

　　　　　　 By:　 /s/ Craig Ferraro
　　　　　　 Its:　 Vice President, Treasurer and Secretary

Dated: April 15, 2010
Wilmington, Delaware


**NORTHSTAR MOUNTAIN PROPERTIES, LLC,**
a Delaware limited liability company, its sole member

> By:  NMP HOLDINGS, LLC,
> a Delaware limited liability company, its Manager
>
>> By:  EAST WEST RESORT DEVELOPMENT V, L.P., L.L.L.P.,
>> a Delaware limited partnership registered as a limited liability limited
>> partnership, its member and Manager
>>
>>> By:  HF HOLDING CORP.,
>>> a Colorado corporation, its sole General Partner
>>>
>>>> By:  /s/ Craig Ferraro
>>>> Its:  Vice President, Treasurer and Secretary


**NORTHSTAR IRON HORSE, LLC,**
a Delaware limited liability company

> By:  NORTHSTAR MOUNTAIN PROPERTIES, LLC,
> a Delaware limited liability company, its sole member
>
>> By:  NMP HOLDINGS, LLC,
>> a Delaware limited liability company, its Manager
>>
>>> By:  EAST WEST RESORT DEVELOPMENT V, L.P., L.L.L.P.,
>>> a Delaware limited partnership registered as a limited liability
>>> limited partnership, its member and Manager
>>>
>>>> By:  HF HOLDING CORP.,
>>>> a Colorado corporation, its sole General Partner
>>>>
>>>>> By:  /s/ Craig Ferraro
>>>>> Vice President, Treasurer and Secretary

Dated: April 15, 2010
      Wilmington, Delaware


**NORTHSTAR BIG HORN, LLC**,
a Delaware limited liability company

    By:    NORTHSTAR MOUNTAIN PROPERTIES, LLC,
           a Delaware limited liability company, its sole member

        By:    NMP HOLDINGS, LLC,
             a Delaware limited liability company, its Manager

            By:    EAST WEST RESORT DEVELOPMENT V, L.P., L.L.L.P.,
                a Delaware limited partnership registered as a limited liability
                limited partnership, its member and Manager

                By:    HF HOLDING CORP.,
                    a Colorado corporation, its sole General Partner

                    By:    /s/ Craig Ferraro
                        Vice President, Treasurer and Secretary


**NORTHSTAR VILLAGE TOWNHOMES, LLC**,
a Delaware limited liability company

    By:    NORTHSTAR MOUNTAIN PROPERTIES, LLC,
           a Delaware limited liability company, its sole member

        By:    NMP HOLDINGS, LLC,
              a Delaware limited liability company, its Manager

            By:    EAST WEST RESORT DEVELOPMENT V, L.P., L.L.L.P.,
                a Delaware limited partnership registered as a limited liability
                limited partnership, its member and Manager

                By:    HF HOLDING CORP.,
                    a Colorado corporation, its sole General Partner

                    By:    /s/ Craig Ferraro
                        Vice President, Treasurer and Secretary

Dated: April 15, 2010
      Wilmington, Delaware


**NORTHSTAR TRAILSIDE TOWNHOMES, LLC,**
a Delaware limited liability company

By:    NORTHSTAR MOUNTAIN PROPERTIES, LLC,
        a Delaware limited liability company, its sole member

      By:    NMP HOLDINGS, LLC,
           a Delaware limited liability company, its Manager

            By:    EAST WEST RESORT DEVELOPMENT V, L.P., L.L.L.P.,
                 a Delaware limited partnership registered as a limited liability
                 limited partnership, its member and Manager

                By:    HF HOLDING CORP.,
                    a Colorado corporation, its sole General Partner

                    By:    /s/ Craig Ferraro
                         Vice President, Treasurer and Secretary


**OLD GREENWOOD, LLC**

By:    EAST WEST RESORT DEVELOPMENT V, L.P., L.L.L.P.,
      its Manager

      By:    HF Holding Corp.,
           its General Partner

            By:    /s/ Craig Ferraro
            Its:    Vice President, Treasurer and Secretary

Dated: April 15, 2010
Wilmington, Delaware


**OLD GREENWOOD REALTY, INC.**

By:    OLD GREENWOOD, LLC,
its Owner

       By:    EAST WEST RESORT DEVELOPMENT V, L.P., L.L.L.P.,
its Manager

            By:    HF HOLDING CORP.,
its General Partner

                 By:    /s/ Craig Ferraro
                 Its:    Vice President, Treasurer and Secretary


**GRAY'S STATION, LLC**

By:    EAST WEST RESORT DEVELOPMENT V, L.P., L.L.L.P.,
its Manager

       By:    HF Holding Corp., its General Partner

            By:    /s/ Craig Ferraro
            Its:    Vice President, Treasurer and Secretary


**TAHOE MOUNTAIN RESORTS, LLC**

By:    EAST WEST RESORT DEVELOPMENT V, L.P., L.L.L.P.,
its Manager

       By:    HF Holding Corp.,
its General Partner

            By:    /s/ Craig Ferraro
            Its:    Vice President, Treasurer and Secretary

Dated: April 15, 2010
      Wilmington, Delaware


**TAHOE CLUB COMPANY, LLC**

    By:    EAST WEST RESORT DEVELOPMENT V, L.P., L.L.L.P.,
            its Manager

            By:    HF Holding Corp.,
                   its General Partner

                   By:    /s/ Craig Ferraro
                   Its:    Vice President, Treasurer and Secretary

Prepared by:

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No.3704)
L. Katherine Good (No. 5101)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
Richard A. Chesley (IL 6240877)
Gregory S. Otsuka (IL 6270388)
Hilla Uribe Jimenez (IL 6293064)
191 North Wacker Drive, 30th Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
**Counsel for the Debtors and Debtors in Possession**