# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| **East West Resort Development V, L.P., L.L.L.P.,** *et al.,* | Case No. 10-10452 (BLS) |
| Debtors. | (Jointly Administered) |
| | Related to Docket Nos. 888, 889, 890, 894, 899, 929, 936, 937, 944, 949, 950, 951, 955, 956, 961, 964 & 966 |

WHITEFORD TAYLOR
PRESTON LLC
Thomas J. Francella, Jr., Esq.
Stephen B. Gerald, Esq.
405 N. King Street, Suite 500
Wilmington, DE 19801

*Counsel for Iron Horse
Condominium Association and
Northstar Village Association*

McCARTER & ENGLISH, LLP
Charles A. Stanziale, Jr., Esq.
Katharine L. Mayer, Esq.
Scott H. Bernstein, Esq.
405 N. King Street, 8th Floor
Wilmington, DE 19801

*Counsel for the Chapter 7 Trustee*

RICHARDS, LAYTON &
FINGER, P.A.
Paul N. Heath, Esq.
One Rodney Square
920 N. King Street
Wilmington, DE 19801

-and-

DLA PIPER LLP
Richard A. Chesley, Esq.
Gregory S. Otsuka, Esq.
203 N. LaSalle Street
Suite 1900
Chicago, IL 60601

*Counsel for the Reorganized
Debtors; Crew Tahoe, LLC; and
Crew Tahoe Holdings, LLC*

# OPINION[1]

Before the Court are five related motions in these jointly administered cases. The first three are motions for Rule 2004 examinations (the "2004 Motions") [Docket Nos. 888, 889, & 890] filed by Iron Horse Condominium Association ("IHCA"). IHCA seeks authority to examine debtor Northstar Iron Horse, LLC ("Iron Horse"), Crew Tahoe, LLC ("Crew Tahoe"),[2] and Crew Tahoe Holdings, LLC ("Crew Tahoe Holdings"), pursuant to Bankruptcy Rule 2004. Through the Rule 2004 examinations, IHCA seeks to uncover the details of a litigation settlement between Iron Horse and ACE American Insurance Company ("ACE") entered into May 30, 2012 (the "ACE Settlement"). IHCA argues that the Rule 2004 examinations are necessary because it seeks to recover the proceeds of the ACE Settlement for the benefit of Iron Horse's creditors. Iron Horse's bankruptcy case has been reopened to deal with the 2004 Motions. The Reorganized Debtors, Crew Tahoe, and Crew Tahoe Holdings (the "2004 Objectors") filed an objection to the 2004 Motions [Docket No. 894], contending that the proceeds of the ACE Settlement are not available for distribution. For the reasons that follow, the Court will deny the 2004 Motions.

In separate but related matters, Northstar Mountain Properties, LLC ("NMP") filed a motion to enforce the plan injunction (the "Motion to Enforce the Plan Injunction") [Docket No. 936] against Northstar Village Association ("NVA"). By the Motion to Enforce the Plan Injunction, NMP seeks entry of an order prohibiting NVA from continuing to prosecute its pre-litigation notice and any subsequent litigation against a non-debtor general contractor, G.E. Johnson Construction Company, Inc. ("G.E. Johnson"), which would trigger

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7052, 9014(c).

[2] Crew Tahoe is the "New EWRD V" entity referenced in the Debtors' confirmed plan of reorganization. It is a Delaware limited liability company that was established after plan confirmation to replace EWRD V as the holding company and 100% owner of the subsidiaries that reorganized.

insurance self-insured retentions (SIRs) and administrative costs for which NMP would be liable, unless NVA covers the payment of such obligations. NVA argues that its action against a non-debtor is outside the scope of the Plan Injunction. For the reasons that follow, the Court will grant the Motion to Enforce the Plan Injunction.

The final motion was filed by NMP, Iron Horse, and NMP Holdings, LLC ("NMPH") and Northstar Big Horn, LLC ("Big Horn") (collectively referred to herein, the "Settling Debtors"). It is a motion to enforce a settlement agreement regarding IHCA's claims (the "Motion to Enforce the IHCA Claim Settlement") [Docket No. 937] against IHCA (together with the Motion to Enforce the Plan Injunction, the "Motions to Enforce"). By the Motion to Enforce the IHCA Claim Settlement, the Settling Debtors seek reimbursement from IHCA for amounts NMP paid to ACE on account of a SIR obligation, as well as certain finance charges due to IHCA's delay in reimbursement for the SIR. IHCA argues that the settlement agreement does not provide for reimbursement of SIRs or deductibles by IHCA. For the reasons that follow, the Court will grant the Motion to Enforce the IHCA Claim Settlement.

# I. BACKGROUND

## A. The Debtors

On February 16, 2010 (the "Petition Date"), Iron Horse and eleven of its affiliated entities filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The eleven affiliated entities are: (1) East West Resort Development V, L.P., L.L.L.P. ("EWRD V"), (2) NMPH, (3) NMP, (4) Big Horn, (5) Northstar Village Townhomes, LLC, (6) Northstar Trailside Townhomes, LLC, (7) Old Greenwood, LLC ("Old Greenwood"), (8) Old Greenwood Realty, Inc., (9) Gray's Station, LLC ("Gray's Station"), (10) Tahoe Mountain Resorts, LLC, and (11) Tahoe Club Company, LLC (collectively, and together with Iron

Horse, the "Debtors"). Thereafter, the Court entered an Order directing joint administration of the Debtors' bankruptcy cases.

As of the Petition Date, the Debtors' business was the ownership and development of residential and commercial real estate projects on and around the Northstar-at-Tahoe Resort in Lake Tahoe, California. Until effectuation of the plan of reorganization in these cases, EWRD V directly or indirectly owned each of the other Debtors. Through its subsidiaries, EWRD V had developed four distinct residential communities: Northstar Village, Northstar Highlands, Gray's Crossing, and Old Greenwood.

## B. The ACE Policy

In 2004, ACE issued a commercial general liability policy in connection with the Debtors' construction and real estate development projects (the "ACE Policy"). Debtor EWRD V and certain named affiliate entities were covered as insureds under the ACE Policy. The parties believe that G.E. Johnson is an additional insured under the ACE Policy. Besides the insured Debtors, the policy covered as insureds "any person, firm, partnership, joint venture, company, corporation, organization or other entity including all contractors and subcontractors that perform work at the project site from whom [EWRD V] has agreed by contract to provide an Owner Controlled Insurance Program." The parties proceed with the understanding that G.E. Johnson is covered under this provision.

At the same time that the ACE Policy was issued, ACE and EWRD V entered into a Funded Multi-Line Deductible Program Agreement (the "Multi-Line Agreement"), effective April 14, 2004. The Multi-Line Agreement required EWRD V to fund a collateral account (the "Collateral Account") to cover certain expenses that ACE incurred in defending an insured under the policy.

At some point after the Debtors filed their bankruptcy petitions, ACE filed a motion to compel EWRD V and affiliated Debtors to assume or reject the ACE Policy and related agreements. On March 31,

2011, the Court entered an agreed order [Docket No. 727] resolving ACE's motion to compel. Pursuant to that order, the ACE Policy and the Multi-Line Agreement were assumed and assigned to NMP, and NMP agreed to replenish the Collateral Account in accordance with the Multi-Line Agreement.

### C. The IHCA Claims

On April 14, 2010, IHCA filed proofs of claim against Iron Horse, NMP, and NMPH.[3] Each proof of claim asserted a general unsecured claim in an amount up to $9,405,900 for faulty construction and underfunding of maintenance budget requirements for the properties which IHCA manages.

On June 1, 2010, IHCA entered into a settlement agreement with the Settling Debtors regarding the proofs of claims (the "IHCA Claim Settlement").[4] Among other recitals, the IHCA Claim Settlement stated that as of the date of the agreement, Iron Horse had "approximately $94,000 of unencumbered cash."[5] In full and final satisfaction of IHCA's claims against the Settling Debtors, the parties agreed that three parcels of real property would be conveyed to the Northstar Village Association to be used as common area; the Settling Debtors would cooperate with IHCA in its efforts to recover against the Settling Debtors' insurance carrier(s); and IHCA would have an allowed general unsecured claim in the amount of $250,000 against Iron Horse.

With respect to IHCA's allowed claim against Iron Horse, the IHCA Claim Settlement provided that "notwithstanding anything contained in Section II.D.7.b of the Plan or elsewhere, IHCA and any other Holders of Allowed Iron Horse General Unsecured Claims shall receive the lesser of (i) Cash in an amount equal to their Allowed Claim without interest or (ii) a Pro Rata Distribution in Cash of the Iron Horse

---

[3] The proof of claim against Iron Horse is Claim No. 332, the proof of claim against NMP is Claim No. 315, and the proof of claim against NMPH is Claim No. 333. The claims agent in the Debtors' cases was Epiq Bankruptcy Solutions LLC.

[4] The IHCA Claim Settlement is Ex. A to each of IHCA's 2004 Motions.

[5] IHCA Claim Settlement at p. 1.

Assets."[6] With respect to IHCA's efforts to recover against the Settling Debtors' insurance carriers, the IHCA Claim Settlement provided that,

[¶ 1(c)] [The Settling Debtors] agree to cooperate with IHCA in its efforts to seek to recover against the Settling Debtors' insurance carrier(s) on account of the alleged defects asserted in its Claims, or other claims revealed through further investigation (with respect to which IHCA reserves all rights to recover against the insurance carriers but which is subject to the release in paragraph 2) . . .

[¶ 2] In consideration for paragraph 1(c) above, IHCA agrees not to seek from the Debtors, their Affiliates (as defined in § 101(2) of the Bankruptcy Code), estates, successors or assigns any monies for any judgment entered in favor of IHCA or any settlement made by or on behalf of IHCA on account of its Claims, or for other defects revealed through further investigation, against the insurance carrier(s). Amounts not satisfied by insurance proceeds may not be collected in any manner from the Debtors, their Affiliates (as defined in § 101(2) of the Bankruptcy Code), estates, successors or assigns. However, for the avoidance of doubt, nothing herein shall enjoin or prohibit in any way IHCA from pursuing any action against (i) the Settling Debtors, Debtors, their estates, their successors or assigns, or from any Affiliates (as defined in § 101(2) of the Bankruptcy Code) or their successors or assigns, in name only, or (ii) any other third party, to the extent necessary for IHCA to make a claim against any insurance policy. The Debtors further agree to consent to the modification of the automatic stay provisions of Section 362 of the Bankruptcy Code to the extent necessary for IHCA to proceed against any insurance coverage.

[¶ 5] The Parties agree that the allowance of the Claim and transfer of the Properties as set forth herein [in the IHCA Claim Settlement] shall be in full and final satisfaction of the Debtors' obligations, if any, to pay any deductibles under any insurance policy on account of the

---

[6] IHCA Claim Settlement at p. 4, ¶ 1(b).

alleged defects asserted in the Claims or other claims
revealed through further investigation.

On the same day the IHCA Claim Settlement was signed, the Debtors
filed a motion for approval of the settlement agreement under Rule
9019 [Docket No. 438], and the Court entered an order granting the
motion and approving the settlement on June 2, 2010 [Docket No. 457].

## D. The Plan of Reorganization

Also on June 2, 2010, the Court entered an order (the
"Confirmation Order") [Docket No. 454] confirming the Debtors'
second amended joint plan of reorganization (the "Plan") [Docket No.
468]. The Plan governed ten of the Debtors (the "Reorganized
Debtors"),[7] including Iron Horse. Meanwhile, EWRD V's case was
converted to a case under Chapter 7 [*see* Docket No. 782], and the case
of Gray's Station was dismissed [*see* Docket No. 525].

The Plan provided for the same treatment of IHCA's claim as
that outlined in the IHCA Claim Settlement. In Article II.D.7.b, the Plan
provided: "In full and final satisfaction of Allowed Iron Horse General
Unsecured Claims in Class 7.C, Holders of Allowed Class 7.C Claims
shall receive the lesser of (1) Cash in an amount equal to their Claim
without interest or (ii) [*sic*] a Pro Rata Distribution in Cash of the
unencumbered liquidated assets of Iron Horse." Pursuant to the Plan,
Iron Horse received approximately $85,000 on account of its claim.

Under Article I.A.49 of the Plan, Iron Horse was designated as a
"Dissolving Subsidiary." Section IV.C provided that "[o]n the Effective
Date, the Dissolving Subsidiaries shall be deemed to have been fully
and finally dissolved for all purposes under Delaware law without the
necessity for any further filing or actions to be taken by or on behalf of
the Dissolving Subsidiaries" except the filing of a certificate of
dissolution.

---

[7] The Reorganized Debtors are: NMPH; NMP; Iron Horse; Big Horn; Northstar Village
Townhomes, LLC; Northstar Trailside Townhomes, LLC; Old Greenwood; Old
Greenwood Realty, Inc.; Tahoe Mountain Resorts, LLC; and Tahoe Club Company,
LLC.

The Plan also provided for a discharge and injunction. Article VIII.C of the Plan set forth the discharge:

> [U]pon the Effective Date, all existing Claims against the Debtors . . . shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims . . . shall be precluded and enjoined from asserting against the Debtors, the New EWRD V Entities, their successors or assignees or any of their assets or properties, any other or further Claim . . . based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such Holder has filed a Proof of Claim . . . and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.

The discharge provision was approved in paragraph 29 of the Confirmation Order. Article VIII.D of the Plan set forth the injunction (the "Plan Injunction"):

> . . . [A]ll entities who have held, hold or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against any Protected Party or any property of any Protected Party with respect to any such Claim or Interest . . . and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest.

The injunction provision was approved in paragraph 32 of the Confirmation Order.

### E. Reopening the Bankruptcy Case

The cases of all the Reorganized Debtors except NMP were closed by Final Decree [Docket No. 658] on November 30, 2010. NMP's case was closed by Final Decree [Docket No. 773] on June 27, 2011. The Court entered an Order [Docket No. 929] reopening Iron Horse's bankruptcy case on April 23, 2013, to deal with the matter raised by the 2004 Motions.

### F. Iron Horse's Lawsuit Against ACE

Prior to the Petition Date, on September 11, 2009, EWRD V, Big Horn, Iron Horse, and Old Greenwood filed a complaint against ACE in the Superior Court of the State of California, County of Placer. The claims against ACE were not listed in Iron Horse's schedules [Docket No. 118] nor in its Statement of Financial Affairs [Docket No. 119]. Instead, the claims were listed on EWRD V's Schedule B [Docket No. 98]. Two claims against ACE were listed on EWRD V's Schedule B: one for $6,434,485.25 and the other for $1,000,000. The pending ACE Litigation was not disclosed on EWRD V's Statement of Financial Affairs [Docket No. 99].

On May 17, 2012, the Court entered an order [Docket No. 862] approving the Chapter 7 trustee's abandonment of EWRD V's claims against ACE in the ACE Litigation. IHCA alleges that Iron Horse, Big Horn, and Old Greenwood subsequently reached a consensual resolution of the ACE Litigation with ACE in the amount of $6.8 million. IHCA further alleges that 85% of the settlement recovery, or $5.8 million, is on account of Iron Horse's claims against ACE.

### G. NVA's Claims Against G.E. Johnson

As noted above, Northstar Village is one of the four residential communities developed by the Debtors. NVA is an association that oversees certain elements of the community. G.E. Johnson constructed two phases of Northstar Village as a general contractor.

Then, on May 3, 2013, NVA issued G.E. Johnson and EWRD V each a Notice to Builder Pursuant to CC&R's [Covenants, Conditions, and Restrictions] and California Civil Code §§ 910 and 1375 (the "Notices"). Notices of this type are statutorily mandated in order to provide developers and builders with notice of claims and the ability to address and resolve such claims before litigation is commenced. Through the Notices, NVA notified G.E. Johnson and EWRD V of its "claims for unmet standards in the design and/or construction of the common interest podium deck and related paver system" at Northstar

Village (the "Northstar Village Defects"). NVA attests that it provided the Notices in accordance with the parties' rights and obligations under the applicable notice provisions of California state law and did not intend to commence litigation against EWRD V. To avoid any dispute about the effect of the Notice served upon EWRD V, on July 9, 2013, NVA withdrew the Notice it had previously sent to EWRD V.

NMP alleges that NVA had knowledge of the Northstar Village Defects prior to the Petition Date; that NVA received notice of the claims bar date, which was April 14, 2010; and that NVA failed to file a proof of claim by the claims bar date. NVA does not dispute these allegations. NMP also alleges, and NVA does not dispute, that prosecution of the Notices and any subsequent litigation against G.E. Johnson implicates the Reorganized Debtors' insurance coverage and could require expenditure by NMP for self-insured retention obligations and administrative costs.

## H. IHCA's Lawsuit Against the Settling Debtors

On November 9, 2009, IHCA filed a lawsuit against Iron Horse, NMP, NMPH, and certain other parties for the construction defects underlying their original proofs of claim filed in the Debtors' bankruptcy cases. The lawsuit was tendered to ACE, as the Debtors' commercial general liability insurance provider. Under the applicable policy, the insurance claim is subject to the payment of $250,000 per-occurrence self-insured retentions, as well as administrative costs.

The Settling Debtors submitted a billing statement showing $251,639.96 has been paid to ACE in connection with IHCA's action. The amounts have been paid from the Collateral Account maintained by NMP pursuant to the Multi-Line Agreement.

## II. THE PARTIES' POSITIONS

### A. The 2004 Motions

#### 1. IHCA's Position

IHCA contends that the 2004 exams are necessary to determine whether there are assets from the ACE Settlement that may be recoverable by Iron Horse's creditors. IHCA points out that the ACE Litigation was pending on the Petition Date; that Iron Horse's litigation claims against ACE were not disclosed in Iron Horse's bankruptcy schedules or Statement of Financial Affairs; and that the parties to the ACE Litigation reached a confidential settlement in May 2012. IHCA asserts that there are over $5 million in proceeds from the ACE Settlement that are attributable to Iron Horse's claims in the ACE Litigation, and that the proceeds are assets of Iron Horse's bankruptcy estate available for distribution under the Plan. IHCA argues that it is entitled to further distribution for three reasons. First, it contends that the Settling Debtors made a material misrepresentation during negotiations of the IHCA Claim Settlement by not disclosing the ACE Litigation. Second, relief here is possible because the Plan does not preclude a subsequent distribution. Finally, IHCA contends that Iron Horse's assets were transferred to New EWRD V to be managed for the benefit of Iron Horse's claimholders. IHCA therefore seeks authority to conduct examinations regarding the details of the ACE Settlement, the total amount that was recovered, and the allocation of the settlement proceeds among the respective plaintiffs.

#### 2. Position of the 2004 Objectors

The 2004 Objectors respond that the 2004 Motions should be denied because the ACE Settlement proceeds are not subject to distribution under the Plan. They argue that 1) the claims against ACE were adequately disclosed by being listed on EWRD V's Schedule B, 2) the Plan only allows for a single distribution, and 3) assets that were not distributed before Iron Horse's bankruptcy case was closed are now owned by New EWRD V. Thus, the argument goes, the investigation

contemplated by the 2004 Motions would be futile because the ultimate relief is not available.

## B. The Motion to Enforce the Plan Injunction

### 1. NMP's Position

NMP seeks entry of an order precluding continued prosecution of the Notices and any other actions related to the Northstar Village Defects by NVA unless NVA funds self-insured retention(s) that are triggered and administrative costs that are incurred. NMP argues that the Notice against G.E. Johnson and potential subsequent litigation violate the Plan Injunction as an indirect action against the property of NMP, namely the self-insured retention and administrative cost amounts for which NMP would be liable to ACE. NMP argues that the action is on account of a pre-petition claim because NVA was aware of the Northstar Village Defects prior to the Petition Date.

### 2. NVA's Position

NVA contends that the Notice against G.E. Johnson and any subsequent litigation against G.E. Johnson do not and would not violate the Plan Injunction. NVA argues that it is not seeking to collect a debt from NMP nor even its insurance carrier; NVA is seeking to sue a third non-debtor party, and the Plan Injunction does not extend to NVA's activity with respect to G.E. Johnson. Additionally, NVA argues that the Debtors specifically assumed this obligation post-petition and assigned it NMP without negotiating any modification of the rights and obligations of parties with respect to third party insureds.

## C. The Motion to Enforce the IHCA Claim Settlement

### 1. The Settling Debtors' Position

The Settling Debtors contend that IHCA has the obligation, pursuant to the IHCA Claim Settlement, to reimburse NMP for the amounts paid to ACE for self-insured retention(s) and administrative costs. The Settling Debtors argue that ¶ 5 of the IHCA Claim Settlement creates this obligation. They also argue that IHCA would receive a

windfall if it does not have to reimburse the Settling Debtors for the self-insured retention, and that it is no coincidence that the IHCA Claim Settlement provided that IHCA would have an allowed claim in the amount of $250,000, the same amount as the self-insured retention under the ACE Policy.

### 2. IHCA's Position

IHCA contends that it has no obligation to reimburse NMP. It interprets ¶ 5 of the IHCA Claim Settlement to mean that IHCA agreed not to seek any deductible amounts directly from the Debtors. To the extent that NMP has self-insured retention or deductible obligations to ACE, IHCA did not agree to reimburse NMP. IHCA also contests the Court's jurisdiction to hear the Motion to Enforce the IHCA Claim Settlement.

## III. JURISDICTION & VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.   Venue is proper pursuant to §§ 28 U.S.C. 1408 and 1409.   Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) and (O).

## IV. ANALYSIS

### A. The 2004 Motions

Bankruptcy Rule 2004 states that "[o]n motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a). The purpose of the examination of an entity under Bankruptcy Rule 2004 may relate "to the acts, conduct, or property or to the liabilities and financial condition of the debtor," as well as "to any matter which may affect the administration of the debtor's estate." Fed. R. Bankr. P. 2004(b).

"As the permissive language of the rule suggests, the Court has the discretion to grant a request for a 2004 examination." *In re Enron*

*Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) (citing *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 258 B.R. 580, 587 (Bankr. S.D.N.Y. 2001); *In re French*, 145 B.R. 991, 993 (Bankr. D.S.D. 1992)). Where applicable, "the Court may authorize the examination of third parties that possess knowledge of the debtor's acts, conduct, liabilities or financial condition which relate to the administration of the bankruptcy estate." *Enron*, 281 B.R. at 840 (citing *In re Bennett Funding Group, Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996)).

Rule 2004 examinations are often used to discover assets, and courts have recognized that the scope of a 2004 examination is "unfettered and broad" and the examination is in the nature of a "fishing expedition." *In re GHR Energy Corp.*, 33 B.R. 451, 454 (Bankr. D. Mass. 1983) (citing *In re Foerst*, 93 F. 190, 191 (S.D.N.Y. 1899)); *see also Enron*, 281 B.R. at 840. However, there are limits, such as when a 2004 examination is used to "abuse or harass." *Enron*, 281 B.R. at 840 (citing *In re Mittco, Inc.*, 44 B.R. 35, 36 (Bankr. E.D. Wis. 1984)).

IHCA contends that it has a right to further distribution because Iron Horse did not disclose its claims against ACE during negotiations for the IHCA Claim Settlement. IHCA argues that the Settling Debtors misrepresented Iron Horse's available assets, by asserting that Iron Horse only had $94,000 in unencumbered cash and not disclosing its claims against ACE in the ACE Litigation. IHCA contends that it had a right to such disclosure from Iron Horse's bankruptcy filings, specifically Iron Horse's Schedule B and Statement of Financial Affairs. As a result, IHCA contends that it should not be limited to the $250,000 reduced claim it agreed to under the IHCA Claim Settlement and that it should be able to pursue the $5.8 million in ACE Settlement proceeds that it believes are on account of Iron Horse's claims against ACE.

The 2004 Objectors object on the grounds that the 2004 examinations would be futile. They argue that assets of Iron Horse that were not distributed are now owned by New EWRD V, and therefore Iron Horse's claims against ACE in the ACE Litigation and the resulting proceeds from the ACE Settlement belong to New EWRD V.

In support, the 2004 Objectors point to Articles IV.C, IV.D, and VIII.A of the Plan. Article IV.C of the Plan provides that "[o]n the Effective Date, the Dissolving Subsidiaries [including Iron Horse] shall be deemed to have been fully and finally dissolved for all purposes under Delaware law without the necessity for any further filing or actions to be taken by or on behalf of the Dissolving Subsidiaries," and under Article IV.D,

> [a]ll property of the Estates of the Dissolving Subsidiaries that is not distributed to the Holders of Claims on the Effective Date including, without limitation, any moneys held in escrow or separate segregated accounts during the pendency of the Chapter 11 Cases, shall be managed by New EWRD V and shall be held in the name of New EWRD V free and clear of all Claims against and Interests in New EWRD V, except for (i) the rights to Distribution afforded to Holders of Claims under the Plan and (ii) the Statutory Property Rights, to the extent applicable. After the Effective Date, New EWRD V shall have no liability to Holders of Claims or Interests other than as provided for in the Plan."

In setting forth the effect of confirmation, Article VIII further provides for the vesting of assets in New EWRD V entities:

> [s]ubject to Article VIII.D of the Plan, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the New EWRD V Assets shall be released from the custody and jurisdiction of the Bankruptcy Court, and the New EWRD V Assets shall vest in the New EWRD V Entities free and clear of all Claims, Liens, encumbrances, charges, and other interests, except for Statutory Property Rights or as provided in the Plan.

The 2004 Objectors argue that the effect of these provisions was to transfer the assets of Iron Horse, including any interest in the ACE Litigation, to New EWRD V (Crew Tahoe) on the effective date of the Plan, and therefore the proceeds of the settlement belong to New EWRD V.

IHCA responds that the assets were only transferred to New EWRD V to be managed on behalf of, or for the benefit of, Iron Horse's creditors. Since the dissolving subsidiaries such as Iron Horse were to be fully dissolved on the effective date, to the extent that distribution occurred after the effective date, there needed to be an entity managing the assets. Therefore, Iron Horse's interest in the ACE Litigation, finally liquidated through the ACE Settlement, is still subject to the allowed claims of Iron Horse's creditors under the Plan. In support of its position, IHCA highlights the difference between Article IV.D, regarding the transfer of the assets of dissolving subsidiaries, and Article IV.I.5, regarding the transfer of the assets of reorganized subsidiaries. Whereas under Article IV.D, the dissolving subsidiaries' assets were to be "managed by New EWRD V and . . . held in the name of New EWRD V" subject to "the rights to Distribution afforded to Holders of Claims under the Plan," under Article IV.I.5, "New EWRD V shall own all of the assets of the Reorganized Subsidiaries free and clear of all liens, claims, encumbrances, or other interests, other than the Statutory Property Rights, to the extent applicable." Because Article IV.D refers to "managing" assets and specifically states that the assets are still subject to distribution rights of claimholders, while Article IV.I.5 states that New EWRD V shall "own" the assets of the reorganized subsidiaries and does not state that the assets are still subject to the distribution rights of claimholders, IHCA argues that any transfer of the ACE Claims to Iron Horse is still subject to IHCA's claims under the Plan.

The Court finds that further recovery by Iron Horse's creditors under the Plan is not possible, and therefore the 2004 examinations would be futile. Iron Horse's assets were transferred to New EWRD V subject to the rights of Iron Horse's claimholders, Crew Tahoe (as the New EWRD V) has satisfied its responsibility to Iron Horse's creditors.

There is a "strong need for finality in reorganization plans," and even where a confirmation order is procured by fraud, a court may only revoke such order where a request for revocation is made by a

party in interest within 180 days after the date of entry of the order of confirmation. *Dale C. Eckert Corp. v. Orange Tree Assocs., Ltd. (In re Orange Tree Assocs., Ltd.)*, 961 F.2d 1445, 1447 (9th Cir. 1992) (citing 11 U.S.C. § 1144). "Expiration of the limitations period bars a motion to set aside the confirmation of a reorganization plan even if the fraud is not discovered until the period has passed." *Orange Tree Assocs.*, 961 F.2d at 1447 (citing *In re Medical Analytics*, 532 F.2d 879 (2d Cir. 1976)). The Ninth Circuit Court of Appeals opined,

> There is a compelling reason for finality of reorganization plans. A Chapter 11 proceeding is focused towards rehabilitating a business, which if successful, is to benefit of all persons who had dealings with the debtor. Such plans are not easily devised, and once accomplished a short time for challenging such plan is necessary to keep alive the potential life of that business. Uncertainty of continued operations, injected by a Sword of Damocles in the form of fraud allegations which can be filed at any time in the future, would render meaningless the whole purpose of a Chapter [11] proceeding."

*Orange Tree Assocs.*, 961 F.2d at 1447-48 (citing *In re Newport Harbor Assocs.*, 589 F.2d 20, 23 n.6 (1st Cir. 1978)). In this case, when Iron Horse's assets were transferred to New EWRD V upon the dissolution of Iron Horse, New EWRD V had the responsibility of making a distribution of Iron Horse's assets on the Distribution Date, as defined in the Plan, "or as soon thereafter as practicable." The Plan did not envision the liquidation of the ACE Litigation claim as a distributable asset. It therefore did not provide for a mechanism to handle the representation of such a claim going forward. Crew Tahoe, as the New EWRD V, made the distributions to IHCA that it was responsible for making, and IHCA received the distribution it anticipated under the Plan. To the extent that assets not listed on Iron Horse's bankruptcy filings or de minimis assets of Iron Horse were transferred to Crew Tahoe, they have vested in Crew Tahoe and are not subject to further distribution. IHCA's contentions that Iron Horse misrepresented its

available assets in its bankruptcy filings were brought almost three years after confirmation and must fail in interest of finality.

### B. The Motion to Enforce the Plan Injunction

It is self-evident that a court has the authority to enforce its own orders. *In re Cont'l Airlines, Inc.*, 236 B.R. 328, 325-26 (Bankr. D. Del. 1999) ("It is axiomatic that a court possesses the inherent authority to enforce its own orders") (internal citations omitted). "In the bankruptcy context, courts have specifically, and consistently, held that the bankruptcy court retains jurisdiction, inter alia, to enforce its confirmation order." *Cont'l Airlines*, 236 B.R. at 326 (citing *North American Car Corp. v. Peerless Weighing & Vending Machine Corp.*, 143 F.2d 938, 940 (2d Cir. 1944); *United States Trustee v. Gryphon at the Stone Mansion, Inc.*, 216 B.R. 764, 768 (W.D. Pa. 1997); *Walnut Associates v. Saidel*, 164 B.R. 487, 492 (E.D. Pa. 1994); *In re Almarc Corp.*, 94 B.R. 361, 364 (Bankr. E.D. Pa. 1988)).

A debtor who is "confronted by a creditor seeking to collect on a debt in possible violation of the discharge injunction may either 'assert the discharge as an affirmative defense . . . in state court' or 'bring an Adversary Complaint in bankruptcy court to enforce the statutory injunction under § 524(a)(2) of the Code.'" *In re Conseco, Inc.*, 330 B.R. 673, 680-81 (Bankr. N.D. Ill. 2005) (quoting *In re Kewanee Boiler Corp.*, 270 B.R. 912, 918 (Bankr. N.D. Ill. 2002)). NMP bears the burden of showing that NVA's efforts to seek recovery from ACE are a violation of the permanent injunction. *See In re Pratt*, 462 F.3d 14, 20 (1st Cir. 2006).

NMP relies on a previous Memorandum Order (the "Old Greenwood Order") [Docket No. 832] entered by this Court relating to a different request for modification of the Plan Injunction and the automatic stay in these cases. In the Old Greenwood Order, certain homeowners associations had moved for a modification of the Plan Injunction to institute a state court action against NMP and Old Greenwood as nominal defendants in order to establish liability so that

the associations could recover from applicable insurance coverage. The associations had also entered into a stipulation with EWRD V to modify the automatic stay to commence litigation against EWRD V as a nominal defendant in order to recover from available insurance proceeds. NMP and Old Greenwood objected to both modifications on the basis that they would be responsible for the insurance deductibles and self-insured retentions that were triggered. The Court stated in ¶ 12 of the Old Greenwood Order,

> [T]he Associations may pursue their defective-siding claims so long as any payments made to satisfy those claims come solely from applicable insurance proceeds and either (i) the Associations pay (or otherwise reduce their claims in an amount equal to) the deductible or self-insured retention attributed to the Developer [Old Greenwood and NMP]; or (ii) the insurance companies agree to waive any such deductible or self-insured retention.

NMP argues that the NVA claims are analogous to the associations' claims in the Old Greenwood Order because NMP's deductible or SIR obligations to ACE will be triggered.

The reasoning of the Old Greenwood Order applies here, even though G.E. Johnson is a third party. The discharge of a debt in bankruptcy does not extinguish the debt itself but merely releases the debtor from personal liability. *See* 11 U.S.C. § 524(e) ("[D]ischarge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt"). Thus, the debt continues to exist and may be collected from any other entity that may be liable. However, to the extent NVA's lawsuit against G.E. Johnson would trigger deductible or SIR obligations for the Debtors, specifically NMP due to its responsibility to fund the Collateral Account under the terms of the Multi-Line Agreement, it would be a violation of the Plan Injunction. Therefore, consistent with the Court's prior ruling in the Old Greenwood Order, the Court holds that NVA may pursue its lawsuit against G.E. Johnson so long as either NVA pays the deductible

or self-insured retention and administrative costs attributed to the Debtors or NMP, or ACE agrees to waive any such deductible or self-insured retention.

## C. The Motion to Enforce the IHCA Claim Settlement

### 1. Jurisdiction

Bankruptcy courts have subject matter jurisdiction over civil proceedings arising under title 11 of the United States Code, and arising in or related to cases under title 11, through the operation of 28 U.S.C. §§ 1334 and 157. Where a claim or cause of action is filed prior to confirmation of a plan, "[t]he usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (overruled on other grounds); *see also In re MPC Computers, LLC*, 465 B.R. 384, 392 (Bankr. D. Del. 2012). After the confirmation of a plan,

> [W]here there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate.

*Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 168-69 (3d Cir. 2004).

In this case, there is a close nexus to the bankruptcy plan, as well as the overall bankruptcy proceeding. The Settling Debtors' Motion to Enforce the IHCA Claim Settlement requires interpretation of the terms of the IHCA Claim Settlement as approved and authorized by the Court. The IHCA Claim Settlement in dispute was a negotiated compromise of IHCA's claim against the Debtors that was integral to a successful plan confirmation in this case. Therefore, the interpretation of the approved agreement is related to the bankruptcy and within the Court's jurisdiction.

### 2. The Merits of the Motion to Enforce the IHCA Claim Settlement

The IHCA Claim Settlement provided that the Settling Debtors would cooperate with IHCA in its efforts to recover against the Settling Debtors' insurance carriers on account of the alleged defects asserted in IHCA's bankruptcy claims, and provided the terms under which such recovery efforts could occur in ¶¶ 1(c), 2 & 5. Paragraph 5 specifically is in dispute. As noted above, ¶ 5 stated,

> The Parties agree that the allowance of the Claim and transfer of the Properties as set forth herein [in the IHCA Claim Settlement] shall be in full and final satisfaction of the Debtors' obligations, if any, to pay any deductibles under any insurance policy on account of the alleged defects asserted in the Claims or other claims revealed through further investigation.

The Settling Debtors argue that pursuant to ¶ 5 of the IHCA Claim Agreement, IHCA is obligated to reimburse NMP for the self-insured retention of $250,000 it has paid to ACE on account of IHCA's recovery efforts against ACE. IHCA contends that ¶ 5, read in light of ¶ 2, instead means that IHCA cannot seek any deductible directly from the Debtors if it is not paid by an insurance carrier.

The IHCA Claim Agreement is governed by the laws of the State of California.[8] Under California principles of contract interpretation, "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . ." Cal. Civ. Code § 1639. The "language in a contract must be construed in the context of that instrument as a whole." *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal. App. 4th 516, 526, 132 Cal. Rptr. 2d 151, 159 (2003) (internal quotations omitted).

When considered in light of the settlement agreement as a whole, ¶ 5 requires IHCA to reimburse the Debtors for the self-insured retention. Paragraph 5 indicates an intent that the Settling Debtors not be liable for the deductible. Here, the ACE Policy effectively requires

---

[8] IHCA Claim Settlement ¶ 20.

upfront payment by NMP, the debtor-obligor under the ACE Policy, until the self-insured retention or deductible amount is reached. Since NMP paid the $250,000 self-insured retention at issue, and IHCA agreed that the Settling Debtors would not bear such liability, the liability for the self-insured retention shifts to IHCA. Generally, where a party will trigger deductible obligations owed by a debtor, the Court requires that the party reimburse the debtor for amounts paid or that the insurance carrier waive the deductible. *See, e.g.,* Old Greenwood Order *supra.* Here, the Settling Debtors essentially entered into such an agreement themselves. They agreed to cooperate with IHCA in its efforts to seek recovery from the Settling Debtors' insurance carrier(s), but disavowed responsibility for the deductible amounts. Since ACE was not a party to the IHCA Claim Settlement, it was clear that the insurance company was not waiving the deductible. Therefore, IHCA bears the liability for payment of the self-insured retention and finance charges at issue and must reimburse NMP.

## V. CONCLUSION

For the foregoing reasons, the Court will deny the 2004 Motions and grant each of the Motions to Enforce. An appropriate Order follows.

**BY THE COURT:**

Dated: September 12, 2014
Wilmington, Delaware

Brendan Linehan Shannon
Chief United States Bankruptcy
Judge

~ 22 ~